## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

———————————————————— :
In re:                                          :                    Chapter 11
                                                :
NORTHWESTERN CORPORATION,    :                    Case No. 03-12872 (CGC)
                                                :
                                                :
          Debtor.                               :
———————————————————— :

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125
## OF THE BANKRUPTCY CODE FOR THE
## PLAN OF REORGANIZATION OF THE DEBTOR

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**PAUL, HASTINGS, JANOFSKY
& WALKER , LLP**
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia  30308
Telephone:  (404) 815-2400

Co-Counsel to the Debtor
and Debtor-in-Possession


**GREENBERG TRAURIG, LLP**
Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone:  (302) 661-7000


Dated:      March 11, 2004

              Wilmington, Delaware

TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY ................................................................ 1
      A.    Overview ........................................................................................... 1
      B.    Summary of Classification and Treatment Under the Plan ................... 2
      C.    Voting and Confirmation Procedures ................................................. 10
II.   DESCRIPTION OF DEBTOR AND EVENTS LEADING TO
      COMMENCEMENT OF CHAPTER 11 CASE ............................................... 12
      A.    Overview of the Debtor and its Business Operations .......................... 12
      B.    Pre-Petition Debt Structure of the Debtor .......................................... 15
      C.    Current Compensation and Benefits Programs .................................... 15
      D.    Proceedings Before Montana Public Service Commission ................... 17
      E.    Events Precipitating Chapter 11 Filing ............................................... 18
III.  SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ..................... 21
      A.    Overview of Chapter 11 and Commencement of Chapter 11 Case ...... 21
      B.    First Day Orders ............................................................................... 22
      C.    Professional Retentions ..................................................................... 22
      D.    Appointment of Creditors' Committee and Professionals ................... 23
      E.    Post-Petition Financing ..................................................................... 23
      F.    Sale of Expanets Assets ..................................................................... 24
      G.    Sale of Blue Dot Assets ..................................................................... 25
      H.    Extension of Time to Assume or Reject Leases .................................. 25
      I.    Extension of Exclusive Periods ......................................................... 25
      J.    Claims Process and Bar Date ............................................................. 25
      K.    Performance Bonuses ........................................................................ 28
      L.    Litigation .......................................................................................... 28
IV.   OVERVIEW OF THE PLAN ....................................................................... 30
      A.    General .............................................................................................. 30
      B.    Classification of Claims and Equity Interests ..................................... 31
      C.    Treatment of Claims and Equity Interests Under the Plan ................... 32
      D.    Description of Means of Execution and Transactions to be Implemented in
            Connection with the Plan ................................................................... 40

# TABLE OF CONTENTS
## (continued)

Page

E.  Distributions and Treatment of Disputed, Contingent and Unliquidated Claims and Equity Interests ........................................................... 45

F.  Executory Contracts and Unexpired Leases; Indemnification Claims; and Retiree Benefits .......................................................................... 47

G.  Corporate Governance and Management .......................................... 49

H.  Exculpation; Release; Injunctions; and Discharge ........................... 50

I.  Confirmation and Effectiveness of Plan ........................................... 52

J.  Regulation ...................................................................................... 55

K.  Retention of Jurisdiction ................................................................. 56

V.  SUMMARY OF CERTAIN MATERIAL DOCUMENTS TO BE EXECUTED OR IMPLEMENTED IN CONNECTION WITH THE PLAN ............................ 57

A.  Reorganized Debtor Corporate Charter ........................................... 57

B.  The New Incentive Plan ................................................................... 58

VI.  ACCEPTANCE AND CONFIRMATION OF THE PLAN ............................ 58

A.  Acceptance of the Plan .................................................................... 58

B.  Confirmation .................................................................................. 58

VII.  VALUATION OF REORGANIZED DEBTOR ........................................... 61

VIII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...... 68

A.  Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Class 7, 8 and 10 Claims ................................................................ 69

B.  Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor ...... 71

C.  Backup Withholding and Reporting ................................................. 74

IX.  RISK FACTORS ...................................................................................... 74

A.  Regulated Industry .......................................................................... 74

B.  Commodity Price and Supply Risks ................................................. 75

C.  Seasonal and Quarterly Energy Demand Fluctuations ...................... 76

D.  Dependence on Key Personnel ........................................................ 76

E.  Compliance With Environmental Laws ............................................ 77

F.  Projected Financial Information ....................................................... 77

G.  Lack of Market for Securities Issued Pursuant to the Plan ............... 77

H.  Delay in Distributing Asset Sale Proceeds to Debtor ........................ 78

TABLE OF CONTENTS
(continued)

|   |   |   |   |
|---|---|---|---|
| | I. | Securities Class Action Settlements | 78 |
| | J. | Certain Bankruptcy Related Considerations | 79 |
| | K. | Dividends | 79 |
| X. | | EXEMPTIONS FROM SECURITIES ACT REGISTRATION; REGISTRATION RIGHTS | 79 |
| | A. | Issuance of New Securities Pursuant to the Plan | 80 |
| | B. | Subsequent Transfer of Securities Issued Under the Plan | 80 |
| XI. | | ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION | 81 |
| | A. | Alternative Plans | 81 |
| | B. | Chapter 7 Liquidation | 81 |
| XII. | | RECOMMENDATION AND CONCLUSION | 82 |
| XIII. | | LIST OF EXHIBITS | |

Exhibit A     Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

Exhibit B     Disclosure Statement Approval Order

Exhibit C     Debtor's Pre-Petition Debt Structure

Exhibit D     NorthWestern Corporation Liquidation Analysis

Exhibit E     NorthWestern Corporation 2004-2008 Financial Projections

Exhibit F     NorthWestern Corporation Form 10-K, and Accompanying Audited Financial Statements, for the Fiscal Period Ended December 31, 2003.

Exhibit G     NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended September 30, 2003

Exhibit H     Reorganized NorthWestern Corporation Charter

Exhibit I     Debtor's Projected Balance Sheet as of September 30, 2004

# I.
# INTRODUCTION AND SUMMARY

## A.    Overview

NorthWestern Corporation, the above-captioned debtor and debtor-in-possession (the "Debtor"), transmits this Disclosure Statement pursuant to Section 1125(b) of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rule 3017 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in connection with its proposed Plan of Reorganization dated March 11, 2004 (as same may be amended, the "Plan"), to provide adequate information to enable holders of Claims and Equity Interests that are impaired and entitled to vote under the Plan to make an informed judgment in exercising their right to vote for acceptance or rejection of the Plan.  A copy of the Plan is attached hereto as Exhibit A.  All capitalized terms used but not defined in this Disclosure Statement shall have the respective meanings ascribed to them in the Plan unless otherwise noted.

The Plan provides a means by which the Debtor will be reorganized under Chapter 11 of the Bankruptcy Code, and sets forth the treatment of all Claims against and Equity Interests in the Debtor.

Also attached as Exhibits to this Disclosure Statement are copies of the following:

1.    Order of the Bankruptcy Court dated May ___, 2004 (the "Disclosure Statement Approval Order"), which among other things, approves the Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);

2.    Debtor's Pre-Petition Debt Structure (Exhibit C)

3.    NorthWestern Corporation Liquidation Analysis (Exhibit D)

4.    NorthWestern Corporation 2004-2008 Financial Projections (Exhibit E)

5.    NorthWestern Corporation Form 10-K, and Accompanying Audited Financial Statements, for the Fiscal Period Ended December 31, 2003 ("10-K") (Exhibit F)[1];

6.    NorthWestern Corporation Form 10-Q for the Fiscal Quarter ended September 30, 2003 ("10-Q") (Exhibit G);

7.    Reorganized NorthWestern Corporation Charter (Exhibit H); and

8.    Debtor's Projected Balance Sheet as of September 30, 2004 (Exhibit I)

---

[1] The 10-K is presently being prepared and will be provided when filed with the Securities and Exchange Commission.

The Disclosure Statement Approval Order, sets forth the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. Detailed voting instructions also accompany each Ballot.  Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Approval Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept or reject the Plan may be made except pursuant to Section 1125 of the Bankruptcy Code.

B.      **Summary of Classification and Treatment Under the Plan**

In general, and as more fully described herein, the Plan effectuates a restructuring of the Debtor's pre-petition indebtedness and business operations.  The Plan: (i) divides Claims and Equity Interests into fifteen (15) classes; (ii) sets forth the treatment afforded to each class of Claims; and (iii) provides the means by which the Debtor will be reorganized under Chapter 11 of the Bankruptcy Code (the Debtor, after such reorganization, being the "Reorganized Debtor"). The following table sets forth a summary classification of each type of Claim and Equity Interest under the Plan (a more detailed description of the Plan and proposed treatment of each type of Claim and Equity Interest is set forth in Section IV of this Disclosure Statement entitled "Overview of The Plan").[2]

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|-------|-------------|--------|---------------------|
| Class 1 | Priority Claims | Unimpaired and not entitled to vote | 100% |
| Class 2 | Unsecured Priority Claims | Unimpaired and not entitled to vote | 100% |
| Class 3 | Bank One DIP Financing Claims | Unimpaired and not entitled to vote | 100% |
| Class 4 | CSFB Financing Claims  •Portion of financing secured by Montana utility assets under First Mortgage Bonds, Credit Agreement (2002) Series Due 2006: $278,600,000 | Unimpaired and not entitled to vote | 100% |

---

[2]  This summary contains only a brief and simplified description of the classification and projected recoveries of Claims and Equity Interests under the Plan as of the Petition Date. It does not describe every provision of the Plan. Accordingly, reference should be made to the entire Disclosure Statement (including exhibits) and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

[3]  The CSFB financing facility provides for amortizing payments of $975,000 due each quarter.  The principal amount outstanding on the CSFB facility as of the Petition Date was $388,050,000.

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | (plus accrued interest:  $5,146,361)<br><br>•Portion of financing secured by South Dakota utility assets under New Mortgage Bonds, Credit Agreement (2002) Series Due 2006: $109,450,000 (plus accrued interest: $2,021,785)<br><br>Total face amount: $388,050,000[3]<br><br>Total accrued interest: $7,168,146 | | |
| Class 5 | Secured Bondholder Claims | Unimpaired and not entitled to vote | 100% |
| | South Dakota First Mortgage Bond Claims<br><br>•New Mortgage Bonds, 7.10% Series Due 2005: $60,000,000 (plus accrued interest: $520,667)<br><br>•First Mortgage Bonds, 7% Series Due 2023: $55,000,000 (plus accrued interest $310,138)<br><br>Total face amount: $115,000,000[4]<br><br>Total accrued interest: $830,805[5] | | |
| | Montana First Mortgage Bond Claims<br><br>•First Mortgage Bonds, 7% Series Due 2005: $5,386,000 (plus accrued interest: $14,767) | | |

[4]  This face amount is exclusive of the bonds held as security by CSFB, which are included in the claim amount listed in Class 4.

[5]  This interest amount is exclusive of the bonds held as security by CSFB, which are included in the claim amount listed in Class 4.

[6]  This face amount is exclusive of the bonds held as security by CSFB, which are included in the claim amount listed in Class 4.

[7]  This interest amount is exclusive of the bonds held as security by CSFB, which are included in the claim amount listed in Class 4.

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | •First Mortgage Bonds, 7.30% Series Due 2006: $150,000,000 (plus accrued interest: $3,166,375)<br><br>•First Mortgage Bonds, 8-1/4% Series Due 2007: $365,000 (plus accrued interest: $3,689)<br><br>•7.25% Secured Medium-Term Notes Due 2008: $13,000,000 (plus accrued interest: $351,081)<br><br>•First Mortgage Bonds, 8.95% Series Due 2022: $1,446,000 (plus accrued interest: $15,854)<br><br>Total face amount: $170,197,000[6]<br><br>Total accrued interest: $3,551,766[7] | | |
| | Montana Pollution Control Bond Claims<br><br>•First Mortgage Bonds, 6-1/8% Series due 2023: $90,205,000 (plus accrued interest: $2,058,083)[8]<br><br>•First Mortgage Bonds, 5.90% Series Due 2023: $80,000,000 (plus accrued interest: $1,364,867)[9]<br><br>Total face amount: $170,205,000<br><br>Total accrued interest: $3,422,950 | | |
| | South Dakota Pollution Control Bond Claims<br><br>•5.90% Grant County, South Dakota Series 1993A Revenue Bonds Due 2023: | | |

---

[8]  These bonds secure the Debtor's obligations with respect to City of Forsyth, Montana Series 1993A Revenue Bonds Due 2023.

[9]  These bonds secure the Debtor's obligations with respect to City of Forsyth, Montana Series 1993B Revenue Bonds Due 2023.

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | $6,400,000 (plus accrued interest: $109,084)<br><br>•5.90% Grant County, South Dakota Series 1993B Revenue Bonds Due 2023: $3,400,000 (plus accrued interest: $57,951)<br><br>•5.90% City of Salix, Iowa Series 1993 Revenue Bonds Due 2023: $4,000,000 (plus accrued interest $68,178)<br><br>•5.85% Mercer County, North Dakota Series 1993 Revenue Bonds Due 2023: $7,550,000 (plus accrued interest: $127,594)<br><br>Total face amount: $21,350,000<br><br>Total accrued interest: $362,807 | | |
| | Gas Transition Bond Claims<br><br>•MPC Natural Gas Funding Trust 6.2% Transition Bonds Due 2012: $48,318,000 (plus accrued interest: $1,531,982) | | |
| Class 6 | Other Secured Claims<br><br>Capital lease obligations: $9,689,766<br><br>Letters of credit: $13,750,000 | Unimpaired and not entitled to vote | 100% |
| Class 7 | Unsecured Note Claims | Impaired and entitled to vote | Allowed claims converted to 98% of New Common Stock to be shared Pro rata between and among claimants in Class 7 and Class 9 |
| | November 1, 1998 Indenture Claims<br><br>•7.875% Senior Notes Due 2007: | | |

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | $250,000,000 (plus accrued interest: $9,794,531)<br><br>•8.75% Unsecured Senior Notes Due 2012: $470,000,000 (plus accrued interest: $20,459,687)<br><br>•6.95% Senior Unsecured Debentures Due 2028: $105,000,000 (plus accrued interest: $2,108,167)<br><br>Total face amount: $825,000,000<br><br>Total accrued interest: $32,362,385 | | |
| | December 1, 1989 Indenture Claims<br><br>•7.875% Unsecured Medium-Term Notes due 2026: $20,000,000 (plus accrued interest ($324,188)<br><br>•7.96% Unsecured Medium-Term Notes due 2026: $5,000,000 (plus accrued interest ($81,922)<br><br>•7.07% Unsecured Medium-Term Notes due 2006: $15,000,000 (plus accrued interest ($218,286)<br><br>Total face amount: $40,000,000<br><br>Total accrued interest: $624,396 | | |
| Class 8 | Unsecured Subordinated Note Claims | Impaired and entitled to vote | If Class 8 accepts Plan, allowed claims converted to 2% of New Common Stock shared Pro rata between and among claimants; otherwise, no |

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | | | recovery to Class 8 and 2% of New Common Stock allocated, Pro Rata, to Class 7 and Class 9 |
| | August 1, 1995 Indenture Claims<br><br>•8.125% Junior Subordinated Deferrable Interest Debentures Due 2025: $33,360,154 (plus accrued dividends and interest: $1,213,950)<br><br>•7.20% Junior Subordinated Deferrable Interest Debentures Due 2038: $55,633,530 (plus accrued dividends and interest: $1,818,591)<br><br>•8.25% Junior Subordinated Deferrable Interest Debentures Due 2031: $109,011,575 (plus accrued dividends and interest $3,920,501)<br><br>•8.10% Junior Subordinated Deferrable Interest Debentures Due 2032: $111,985,525 (plus accrued dividends and interest: $4,125,557)<br><br>Total face amount: $309,990,784<br><br>Total accrued dividends and interest: $11,078,599 | | If Class 8 accepts Plan, Allowed claims converted to 98% of New Common Stock to be shared Pro rata between and among claimants in Class 7 and Class 9; otherwise, no recovery to Class 8 and 2% of New Common Stock allocated, Pro Rata, to Class 7 and Class 9 |
| | November 1, 1996 Indenture Claims<br><br>•8.45% Junior Subordinated Debentures Due 2036: $67,010,325 (plus accrued dividends and interest: $2,527,548) | | |
| Class 9 | General Unsecured Claims | Impaired and entitled to vote | Allowed claims converted to 98% of New Common Stock to be shared Pro |

| **CLASS** | **DESCRIPTION** | **STATUS** | **ESTIMATED RECOVERY** |
|---|---|---|---|
| | | | rata between and among claimants in Class 7 and Class 9 |
| Class 10 | Unsecured Convenience Claims each of $100,000 or Less | Unimpaired and not entitled to vote | 100% |
| Class 11 | Environmental Claims | Unimpaired and not entitled to vote | 100% |
| Class 12 | D&O Trust Claims | Impaired | Unknown at this time; to be channeled to D&O Trust |
| Class 13 | Other Equity and Interest Holder Claims | Impaired and deemed to have rejected the Plan | 0% |
| Class 14 | Securities Claims | Unimpaired and not entitled to vote | 100% |
| Class 15 | Opt-Out Securities Claims | Impaired | Unknown at this time; to be channeled to D&O Trust |

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN, THE PLAN DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION.  WHILE THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS.  FURTHERMORE, ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO BE ACCURATE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT, UNLESS OTHERWISE INDICATED, BEEN THE SUBJECT OF AN AUDIT BY

AN OUTSIDE ACCOUNTING FIRM.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS IN THE PLAN, THE PLAN DOCUMENTS, OR THE FINANCIAL INFORMATION INCORPORATED THEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES.  ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS TO THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS, AND OTHER PARTIES-IN-INTEREST REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN UNLESS SO SPECIFIED.  WHILE THE DEBTOR HAS MADE EVERY EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE VOTE ON THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT THAT CERTAIN EVENTS, SUCH AS THOSE MATTERS DISCUSSED IN SECTION IX BELOW ENTITLED "RISK FACTORS," DO OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAWS.  PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR SECURITIES OF, THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IN ACCORDANCE WITH THE BANKRUPTCY CODE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, OR ANY STATE SECURITIES COMMISSION, NOR HAS SUCH APPLICABLE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE INFORMATION CONTAINED HEREIN SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

C.      **Voting and Confirmation Procedures**

    Accompanying this Disclosure Statement in addition to all other Exhibits, are copies of the following documents:

    (i)   the Plan, and;

    (ii)   the Disclosure Statement Approval Order, approving (a) this Disclosure Statement as containing adequate information pursuant to Section 1125 of the Bankruptcy Code, (b) the forms of Ballots to be executed by holders of impaired Claims for voting to accept or reject the Plan and (c) the notice of and fixing the time for (1) submitting acceptances of or rejections to the Plan and making elections required under the Plan, (2) the hearing to consider confirmation of the Plan and (3) filing objections to confirmation of the Plan.

    The forms of Ballots, and the related materials delivered together herewith, are being furnished for purposes of soliciting votes on the Plan, to the following holders of impaired claims: Class 7 Unsecured Note Claims, Class 8 Unsecured Subordinated Note Claims, and Class 9 General Unsecured Claims.  With regard specifically to the Unsecured Notes and the Unsecured Subordinated Notes held by banks and/or brokers (the "Record Holders") for the beneficial ownership of other entities or individuals (the "Beneficial Holders"), the Debtor or its balloting agent, Kurtzman Carson Consultants, LLC (the "Balloting Agent"), will provide a sufficient number of copies of this Disclosure Statement, the Plan and the Ballots to the Record Holders for transmission to each of the Beneficial Holders.  The Debtor shall ask the Record Holders to send copies of the Disclosure Statement, the Plan and the Ballots to the respective Beneficial Holders, and to collect completed Ballots from such Beneficial Holders on the Debtor's behalf.  The Record Holders shall be asked to summarize the results of the votes received from the Beneficial Holders on a summary form, *i.e.*, a master ballot, which will be provided to each Record Holder by the Debtor.  In addition, this Disclosure Statement is also being provided to holders of claims in Classes 1 through 6 and Classes 10, 11 and 14 (who are deemed to accept the Plan), holders of the Class 12 D&O Trust Claims and Class 15 Opt-out Securities Claims and holders of Equity Interests in Class 13 (who are deemed to reject the Plan), and other entities, solely for informational purposes.

  **(1)**  Who May Vote on the Plan

    Pursuant to the provisions of the Bankruptcy Code, only impaired classes of Claims or Equity Interests are entitled to vote to accept or reject a plan of reorganization.  A class which is not "impaired" (also referred to as "unimpaired") under a plan is deemed to have accepted such plan and does not vote.

    A class is "impaired" under the Bankruptcy Code unless the legal, equitable, and contractual rights of the holders of Claims or Equity Interests in such class are not modified or altered.  For purposes of the Plan, holders of Unsecured Note Claims in Class 7, Unsecured Subordinated Note Claims in Class 8, and General Unsecured Claims in Class 9 are impaired and are entitled to vote on the Plan.  Holders of Priority Claims in Class 1, Unsecured Priority Claims in Class 2, Bank One DIP Financing Claims in Class 3, CSFB Financing Claims in Class 4, Secured Bondholder Claims in Class 5, Other Secured Claims in Class 6, Unsecured Convenience Claims of $100,000 or Less in Class 10, Environmental Claims in Class 11 and Securities Claims in Class 14 are unimpaired; therefore such Classes are deemed to accept the

Plan and do not vote.  Other Equity and Interest Holders in Class 13 will not receive or retain any property or interest in property under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Holders of D&O Trust Claims in Class 12 are impaired, but due to their insider status, are not entitled to vote on the Plan.  Holders of Opt-Out Securities Claims will not receive or retain any property or interest in property under the Plan, and therefore are not entitled to vote on the Plan.

    **(2)**    <u>Voting Procedures</u>

       All votes to accept or reject the Plan must be cast by using the form of Ballot (or, in the case of a brokerage firm or bank holding Unsecured Notes or Unsecured Subordinated Notes in its own name as a Record Holder on behalf of a Beneficial Holder, on the form of Ballot entitled "<u>Master Ballot</u>") enclosed with this Disclosure Statement.  No votes other than ones using such Ballots will be counted except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed 5:00 p.m. Pacific Standard Time, on, June ___, 2004 (the "<u>Voting Record Date</u>") as the time and date for the determination of holders of record of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) where applicable, vote to accept or reject the Plan.  After carefully reviewing the Plan and this Disclosure Statement, including the attached exhibits and the Plan Documents, please indicate your acceptance or rejection of the Plan on the appropriate Ballot and return such Ballot in the enclosed envelope to the Balloting Agent at the following address:

       Kurtzman Carson Consultants, LLC
       12910 Culver Boulevard, Suite I
       Los Angeles, California 90066-6709
       Attention: Christopher R. Schepper
       Telephone: (866) 381-9100

       BALLOTS MUST BE RECEIVED ON OR BEFORE 5:00 P.M. (PACIFIC STANDARD TIME) ON JUNE ___, 2004 (THE "<u>VOTING DEADLINE</u>").  ANY BALLOT WHICH (I) IS NOT EXECUTED, (II) IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, (III) HAS BOTH THE ACCEPTANCE AND REJECTION BOXES CHECKED OR (IV) IS SENT BY FAX, OR OTHER ELECTRONIC COMMUNICATION SHALL NOT BE COUNTED.  IF YOU ARE A BENEFICIAL HOLDER OF A SECURITY HELD BY A NOMINEE, PLEASE NOTE THAT BALLOTS MUST BE RETURNED BY HAND, MAIL, OR OVERNIGHT TRANSMISSION TO YOUR NOMINEE IN SUFFICIENT TIME FOR IT TO BE FORWARDED BY YOUR NOMINEE TO THE DEBTOR'S BALLOTING AGENT BY THE VOTING DEADLINE.

       If you have any questions regarding the procedures for voting on the Plan, please contact the Balloting Agent at the above address and telephone number.

## II.
## DESCRIPTION OF DEBTOR AND EVENTS LEADING TO
## COMMENCEMENT OF CHAPTER 11 CASE

### A.    Overview of the Debtor and its Business Operations

The Debtor and its direct and indirect non-debtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

The Debtor has generated and distributed electricity in South Dakota and has distributed natural gas in South Dakota and Nebraska through its energy division, NorthWestern Energy, since the Debtor's formation in 1923.  In February 2002, the Debtor completed its acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company (the "Montana Operations") for $478.0 million in cash and the assumption of $511.1 million in existing debt and preferred stock, net of cash received.  As a result of the acquisition, from February 15, 2002, the closing date of the acquisition, through November 15, 2002, the Debtor distributed electricity and natural gas in Montana through its wholly owned subsidiary, NorthWestern Energy, L.L.C.  Effective November 15, 2002, NorthWestern Energy, L.L.C. transferred all of the energy and natural gas transmission and distribution operations and assets and all related liabilities except certain designated liabilities to the Debtor and, since that date, the Debtor has operated the Montana Operations through its energy division, NorthWestern Energy.

The acquisition of the Montana Operations has contributed a significant component of the Debtor's revenues and operating income since February 1, 2002.  The Debtor's electric and natural gas utility segments, combined, reported 2003 operating income of $144.4 million compared with operating income of $143.6 million in 2002.  Revenues for 2003 were $1,017.8 million which represents an increase from revenues of $773.7 million in 2002.

### (1)    Electric Operations

The Debtor operates regulated electric utility businesses in Montana and South Dakota.  The Debtor is subject to the jurisdiction of, and regulation by, the Federal Energy Regulatory Commission ("FERC"), with respect to the issuance of securities and setting of wholesale electric rates.  The Debtor is not subject to the Public Utility Holding Company Act. With respect to electric service territorial issues, rates, terms and conditions of service, accounting records and other aspects of its operations, the Debtor's Montana operations are subject to the jurisdiction of, and regulation by, the Montana Public Service Commission, and its South Dakota operations are subject to the jurisdiction of, and regulation by, the South Dakota Public Utilities Commission.

The Debtor's Montana electric utility business consists of an extensive electric transmission and distribution network.  The Debtor's Montana service territory covers approximately 107,600 square miles, which represents approximately 73% of Montana's land area.  The Debtor delivers electricity to approximately 305,000 customers in 191 communities and their surrounding rural areas in Montana, including Yellowstone National Park.  It also

delivers electricity to rural electric cooperatives in Montana that serve approximately 76,000 customers.  The Debtor's Montana electric distribution system consists of approximately 19,700 miles of overhead and underground distribution lines and approximately 334 transmission and distribution substations.  The Debtor purchases substantially all of the power it transmits and distributes to Montana customers from third parties.  The Debtor believes that its power purchase arrangements, in conjunction with its ability to make open market purchases, are sufficient to meet its power supply needs through June 30, 2007, the end of the original deregulation transition period in Montana.  That transition period has now been extended to the year 2027 in the most recent Montana legislative session.

The Debtor operates in South Dakota as a vertically integrated generation, transmission and distribution utility.  The Debtor's electricity revenues in South Dakota are generated primarily through: (i) residential generation, transmission and distribution sales; (ii) commercial and industrial generation, transmission and distribution sales; and (iii) wholesale sales.  The Debtor has the exclusive right to serve an assigned service area in South Dakota comprised of 25 counties with a combined population of approximately 99,500 people and provides retail electricity to over 57,600 customers in 108 communities in South Dakota.  Residential, commercial and industrial services are generally bundled packages of generation, transmission, distribution, meter reading, billing and other services.  In addition, the Debtor provides wholesale transmission of electricity to a number of South Dakota municipalities, state government agencies and agency buildings.  For these sales, the Debtor is responsible for the transmission of contracted electricity to a substation or other distribution point, and the purchaser is responsible for further distribution, billing collection and other related functions.  The Debtor also provides sales of electricity to resellers, primarily including power pool or other utilities.  The Debtor's transmission and distribution network in South Dakota consists of approximately 3,100 miles of overhead and underground transmission and distribution lines across South Dakota as well as 120 substations.  Most of the electricity that the Debtor supplies to customers in South Dakota is generated by three power plants that the Debtor owns jointly with unaffiliated parties. The Debtor also owns several peaking/standby generating units that are installed at nine locations throughout its service territory.

    **(2)**    <u>Natural Gas Operations</u>

The Debtor operates regulated natural gas utility businesses in Montana, South Dakota and Nebraska.  The Debtor's natural gas services generally include fully bundled services consisting of natural gas supply and interstate pipeline transmission services and distribution services to its customers, although certain large commercial and industrial customers, as well as wholesale customers, may buy the natural gas commodity from another provider and utilize the Debtor's transportation and distribution service.  The Debtor's natural gas transportation pipelines are generally not subject to the jurisdiction of the FERC, although they are subject to state regulation.  The Debtor conducts limited interstate transportation in Montana that is subject to FERC jurisdiction, but the FERC has allowed the Montana Public Service Commission to set the rates for this interstate service.  The Debtor is subject to Montana Public Service Commission jurisdiction when it issues, assumes or guarantees securities in Montana, and when it creates liens on its Montana properties.  Rates for the Debtor's Montana natural gas supply are set by the Montana Public Service Commission.  The Debtor is subject to the jurisdiction of the South Dakota Public Utilities Commission with respect to rates, terms and conditions of service,

accounting records and other aspects of its natural gas distribution and transmission operations in South Dakota. In Nebraska, the Nebraska Public Service Commission regulates rates and terms and conditions of service for natural gas companies as of the second quarter of 2003. However, a natural gas company in Nebraska may continue to negotiate rates for natural gas service with the cities which it serves when the natural gas company files an application for increased rates with the Nebraska Public Service Commission.

The Debtor distributed approximately 55 billion cubic feet of natural gas to nearly 163,000 customers located in 109 Montana communities during 2003. The Debtor's natural gas distribution system consisted of approximately 3,500 miles of underground distribution pipelines as of December 31, 2003. The Debtor also transmits natural gas in Montana from production receipt points and storage facilities to distribution points and other nonaffiliated transmission systems. The Debtor provided natural gas to approximately 82,000 customers in 59 South Dakota communities and 4 Nebraska communities during 2003. The Debtor has approximately 2,100 miles of distribution gas mains in South Dakota and Nebraska with distribution capacity of approximately 15,000 MMBTU per day as of December 31, 2003. The Debtor also transports natural gas for other gas suppliers and marketers in South Dakota and Nebraska. The Debtor's natural gas supply requirements are fulfilled through third party fixed term purchase contracts, natural gas storage services contracts and short-term market purchases. The Debtor believes that its Montana, South Dakota and Nebraska natural gas supply, storage and distribution facilities and agreements are sufficient to meet its ongoing supply requirements.

    **(3)**    <u>Non-regulated businesses</u>

The Debtor made investments in three primary non-regulated businesses: (a) Expanets, Inc. ("<u>Expanets</u>"), a provider of network communications and data services and solutions to small to mid-sized businesses nationwide; (b) Blue Dot Services Inc. ("<u>Blue Dot</u>"), a nationwide provider of air conditioning, heating, plumbing and related services; and (c) through November 1, 2002, the Debtor held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, L.P. ("<u>CornerStone</u>"), a publicly traded limited partnership that is a retail propane and wholesale energy related commodities distributor. In November 2002, the Debtor divested itself of its economic equity interests in Cornerstone and deconsolidated Cornerstone and its affiliates from the Debtor and its affiliates. The Debtor's remaining interest in Cornerstone is evidenced by a note receivable with accrued claims thereon of approximately $27.0 million. On November 25, 2003, Expanets sold substantially all of its assets to Avaya, Inc. (NYSE: AV) ("<u>Avaya</u>"). As of February 6, 2004, Blue Dot had sold 53 of the 62 retail locations it owned or operated on January 1, 2003.

The Debtor maintains its principal offices in Sioux Falls, South Dakota. As of the filing of its petition, the Debtor had approximately 1,400 employees employed in its electric and gas utility business in Montana, South Dakota and Nebraska.

In October 2003, in connection with the filing of the Debtor's petition, the NYSE delisted the Debtor's common stock and all series of its trust preferred securities. The Debtor now participates in the Over-the-Counter Bulletin Board Quotation Service maintained by National Association of Securities Dealers, Inc., or the "OTCBB." The OTCBB is an electronic quotation medium for securities traded outside of the Nasdaq Stock Market and prices for the

Debtor's common stock are published on the OTCBB under the trading symbol "NTHWQ.PK". The first trade of the Debtor's common stock on the OTCBB occurred in October 2003.

## B.    Pre-Petition Debt Structure of the Debtor

The Debtor's outstanding secured debt obligations immediately prior to the Petition Date included approximately $619.0 million in outstanding bonds secured by the Debtor's Montana assets, and approximately $224.0 million in outstanding bonds secured by the Debtor's South Dakota assets.[10]   In addition, to secure its obligations with respect to approximately $21.0 million in outstanding county and municipal revenue bonds, the Debtor pledged an interest in three of its electric generating plants as collateral, subject to the first priority security interest held by the mortgage bondholders discussed above.  The Debtor's interest in certain transitional charges collected by the Montana utility operations are pledged to secure approximately $48.0 million in outstanding gas transition bonds issued by a trust. Notwithstanding the foregoing, and exclusive of its debtor-in-possession financing facility with Bank One, N.A., the Debtor has not granted to any lender or indenture trustee a security interest in any of the Debtor's cash collateral and certain other excluded assets.  The Debtor also has approximately $9.7 million of capital lease obligations and $13.75 million of outstanding letters of credit as of the Petition Date.

In addition to its secured debt obligations, the Debtor has approximately $865.0 million in outstanding unsecured senior notes and debentures and approximately $377.0 million in outstanding unsecured subordinated debentures issued to five wholly-owned, special-purpose business trusts.[11]   The trusts used the interest payments received on the subordinated debentures to make quarterly cash distributions on their preferred securities, although the terms of the subordinated debentures permitted the Debtor to defer interest payments on the subordinated debentures for up to twenty consecutive quarters.  The Debtor guarantees payment of the dividends on the preferred securities only to the extent that it has made the corresponding interest payments on the subordinated debentures held by the trusts.  These subordinated debentures are unsecured and subordinated to all of the Debtor's senior debt and rank equally with the guarantees related to the other trusts.[12]   It is the Debtor's position that the bankruptcy filing automatically constituted a termination event under the terms of the special purpose business trusts.  Pursuant to the terms of the various trust documents, the debentures are to be distributed pro rata to all holders of the securities.  The Plan proposes to convert the debentures to equity and distribute on a pro rata basis as fully set forth below.

## C.    Current Compensation and Benefits Programs

The Debtor employs approximately 1,400 individuals, of which approximately 1,270 are full-time employees and the remainder are part-time, supplemental, seasonal or

---

[10]  Inclusive of the debt claims represented by the Montana and South Dakota bonds is a credit facility in the original principal amount of $390.0 million for which Credit Suisse First Boston, acting through its Cayman Islands Branch, serves as agent. Collateral for the CSFB Facility is $110.0 million of South Dakota first mortgage bonds and $280.0 million of Montana first mortgage bonds.

[11]  The subsidiary trusts are: NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II, NorthWestern Capital Financing III and Montana Power Capital I.

[12]  The Debtor's pre-petition debt structure is set forth on Exhibit C.

temporary employees.  As discussed below, the Debtor also retains a number of consultants on a full-time and part-time basis and, except as noted herein, the Debtor is current on all compensation and benefit programs.

        In addition, the Debtor is a party to seven collective bargaining agreements (the "CBAs") with the following unions:  Local Union No. 44 of the International Brotherhood of Electrical Workers, AFL-CIO; Local No. 41 and Local No. 459 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry; Butte Teamsters' Union, Local No. 2; Kalispell Unit of Hourly Gas Employees; Butte Machinists Local Union No. 88, District Lodge No. 86; Paper, Allied Chemical and Energy Workers' International Union, AFL-CIO Local No. 2-493; and System Council U-26 of the International Brotherhood of Electrical Workers representing Local Nos. 690, 706, 754 and 766.  Of the approximately 1,400 individuals employed by the Debtor, approximately 600 are union members.  The Debtor is actively negotiating with certain unions in connection with the expiration of certain CBA's.  At present the Debtor expects negotiations to proceed to an agreement.

    **(1)**    <u>Qualified Plans</u>.  As of the filing of the petition, the Debtor had actuarially determined liabilities of approximately $142.1 million under qualified pension plans.  In addition, the Debtor had actuarially determined liabilities of approximately $41.8 million under qualified postretirement welfare benefit plans.  At present the Debtor is current on its obligations under existing qualified plans.

    **(2)**    <u>Non-Qualified Compensation and Benefit Plans</u>.  At present the Debtor anticipates modifying and or rejecting and terminating certain non-qualified plans.  The Debtor expects to file motions seeking orders to permit these modifications and/or terminations.[13]  As of the filing of the petition, the Debtor had accrued and unpaid liabilities of approximately $26.1 million under the non-qualified plans.  The $26.1 million of liabilities includes approximately $8.6 million under the Family Protector Plan.  The Debtor does not anticipate modification or termination of the Family Protector Plan described below.

    **(3)**    <u>FlexLeave Programs</u>.  Pre-petition, the Debtor offered a FlexLeave Program ("<u>FlexLeave</u>") pursuant to which its employees located in Montana received paid time off.  Under FlexLeave an employee can opt to cash in a certain amount of hours in his or her FlexLeave bank in lieu of taking time off from work.  The Debtor is exploring whether and what modifications to the FlexLeave Program may be appropriate given that the FlexLeave Program is offered to union and non-union employees.  As of the filing of the petition, the Debtor had accrued and unpaid liabilities of approximately $2.4 million in connection with the FlexLeave program.

---

[13] In reviewing the rejection of certain non-qualified plans, the Debtor has determined that approximately ninety (90) directors, officers and retirees are likely to be impacted.  Those impacted include, but are not limited to, the following:  (i) Randy Darcy; (ii) Gary Drook; (iii) Michael Hanson; (iv) Richard Hylland; (v) Jerry Johnson; (vi) Merle Lewis; (vii) Dennis Lopach; (viii) Larry Ness; (ix) Dan Newell; (x) Marilyn Seymann; (xi) Bruce Smith; (xii) Bart Thielbar; (xiii) Greg Trandem; and (xiv) John Van Camp.

**(4)**   <u>Family Protector Plan</u>.  By its terms the Family Protector Plan provides severance benefits to terminated employees or death benefits to the beneficiaries of employees or retirees covered by the plan.  Currently, the only individuals receiving benefits under the plan or with vested benefits under the plan are retirees or the beneficiaries of deceased retirees.  There are no active employees currently covered by the plan.  The Family Protector Plan currently pays benefits to the beneficiaries of 68 deceased retirees, and another 49 retired employees have vested benefits under the plan.  Under the Family Protector Plan the beneficiaries of the deceased retirees are entitled to receive monthly payments for 18 years following the death of the retiree.  As of the filing of the petition, the Debtor had accrued and unpaid liabilities of approximately $8.6 million in connection with the Family Protector Plan.

## D.   **Proceedings Before Montana Public Service Commission**

On August 22, 2003, the Montana Public Service Commission ("MPSC") issued an order  (the "Initial Order") with respect to a petition filed by the Montana Consumer Counsel ("MCC") requesting initiation of an investigation (the "Financial Investigation") into NorthWestern Energy ("NWE"), a division of the Debtor.  The Initial Order directed NWE to provide certain information, including information about (i) debt reduction payments; (ii) sale of non-utility assets; (iii) investments by the Debtor in its non-utility subsidiaries; (iv) maintenance plan and budget; and (v) compensation and benefits for members of the Debtor's board of directors and certain management positions.

On September 5, 2003, NWE, individually and along with the Debtor, responded to the Initial Order (the "First Response") by providing narrative answers and supporting documents to the information requests in the Initial Order.  Furthermore, on September 12, 2003 NWE provided the Commission with additional documents that were responsive to the Initial Order.

On December 30, 2003, the Commission issued a supplemental order (the "Supplemental Order") which modified the information requested in the Initial Order.  On January 15, 2004, NWE, individually along with the Debtor, responded to the Supplemental Order by providing narrative answers and supporting documents to the information requests in the Supplemental Order.

In addition to providing the aforementioned responses, the Debtor and its counsel have provided information to staff of the MPSC and the MCC and have responded to questions from certain staff members of the MPSC and the MCC during numerous teleconferences.  For example, the Debtor has provided the staff members of the MPSC and the MCC with (i) weekly cash flow reports, (ii) monthly operating reports, and (iii) copies of the Debtor's schedules and statements of affairs filed in the Chapter 11 Case.

As of the date hereof, the Financial Investigation is in the discovery phase, and according to a procedural order issued by the MPSC, the Financial Investigation will culminate in a hearing before the MPSC scheduled for June 16, 2004.  Although it is the Debtor's position that the Financial Investigation is stayed by operation of the automatic stay in the Chapter 11

Case, the Debtor intends to continue to cooperate with the MPSC and the MCC in connection with the Financial Investigation to the extent that it does not interfere with the Chapter 11 Case of the Debtor. One of the ways that the Debtor is cooperating with the MPSC and the MCC in connection with the Financial Investigation is that the Debtor has issued a request for proposal to engage and pay for an independent third party to audit the Debtor's maintenance policies and practices related to its Montana utility assets. Responses to the request for proposal are due to be received by March 19, 2004, at which time the Debtor will choose, engage and pay for the auditor. The scope of work for the auditor was reviewed by the staff of the MPSC prior to issuance of the request for proposal.

The MPSC and the MCC do not agree that the Financial Investigation is subject to the automatic stay and the MCC seeks broad relief in the Financial Investigations. For example, the MCC has filed testimony seeking relief in the Financial Investigation which, if granted, would subject the Debtor and the Reorganized Debtor to post-bankruptcy regulatory controls that are neither contemplated nor addressed in the Plan. The MCC has also requested as relief in the Financial Investigation, in the absence of adoption of the regulatory controls requested by the MCC, the initiation of a rate case seeking an adjustment in the Debtor's or Reorganized Debtor's regulated return on common equity to account to Montana consumers for the absence of the regulatory controls sought by the MCC as soon as practicable after the termination of the Debtor's Chapter 11 proceeding.

The Debtor, the MPSC and the MCC have conducted, either directly or through representatives, a series of meetings and discussions with respect to the Debtor's Chapter 11 case, the Financial Investigation and the regulatory climate in Montana in which the Reorganized Debtor will operate. The Debtor remains hopeful of resolving issues raised by the MPSC and the MCC, and believes such parties are mutually committed, along with the Debtor to further meetings, discussions and negotiations.

## E.    Events Precipitating Chapter 11 Filing

Several factors contributed to the Debtor's pre-petition financial difficulties. The Debtor incurred a significant amount of debt as a result of the investments it made in Expanets, Blue Dot, and CornerStone, and with respect to the Debtor's purchase of the Montana Operations. The Montana Operations have contributed substantially to the Debtor's revenues and operating income, but Expanets, Blue Dot, and CornerStone performed poorly. The Debtor's non-regulated businesses adversely impacted its overall results of operations, financial condition and liquidity. By late 2002, the Debtor was significantly overleveraged, with current and projected income insufficient to support existing debt levels, and the Debtor determined that it would never recover its investments in Expanets, Blue Dot, and CornerStone, each of which is or was a non-regulated energy business, and that these entities would not generate cash flows in sufficient amounts to provide meaningful contributions to the Debtor's debt service. On December 31, 2002, the Debtor had a common stockholders' deficit of $456.1 million and at September 30, 2003, the common stockholders' deficit was $556.6 million. On the date that the Debtor filed its petition, it had approximately $2.2 billion in debt and trust preferred instruments outstanding.

Expanets was a nationwide provider of networked communications and data services and solutions to small to mid-sized businesses. Expanets' business and financial

condition was severely and adversely impacted by the downturn in the economy that began in 2000 and performance problems with its "EXPERT" enterprise system. The Debtor recorded losses before minority interests with respect to Expanets of $19.8 million, $87.0 million and $445.6 million in fiscal 2000, 2001 and 2002, respectively. As of December 31, 2003, after impairment charges and recognition of net losses, the net recorded book value of the Debtor's aggregate $364.1 million equity investment in Expanets and $225.7 million of intercompany advances to Expanets was reduced to $49.8 million. Expanets sold its assets to Avaya on November 25, 2003. Avaya paid Expanets (n/k/a Netexit, Inc.) ("Netexit") cash of approximately $50.8 million and assumed debt of approximately $38.1 million. In addition, Avaya deposited approximately $13.5 million and $1.0 million into escrow accounts to satisfy certain specified liabilities that were not assumed by Avaya, and certain indemnification obligations of Expanets, respectively. Avaya also reduced cash paid at closing by $44.6 million as a working capital adjustment, pending the determination of a final closing balance sheet. On February 24, 2004, Avaya submitted its proposed final calculation of the working capital adjustment asserting that there was a working capital shortfall at Expanets of approximately $48.8 million at closing, and claiming that Avaya should retain the entire holdback amount plus an additional $4.2 million. Netexit disputes this calculation and believes that pursuant to the terms of the asset purchase agreement Netexit is owed additional cash ranging from $10 million to $20 million. The dispute over the working capital adjustment is subject to an arbitration process, which is expected to be decided in May 2004. Pending resolution of the final balance sheet, the determination of the expenses that Netexit must pay in connection with the sale, and the resolution of open claims to Netexit creditors, the proceeds from the sale remain at Netexit. The proceeds to be received by Netexit from the transaction following post-closing adjustments and the payment of certain specified liabilities will be administered by Netexit in accordance with the terms of the applicable lending agreements, its corporate charter and provisions of Delaware law. If and when the Debtor receives any distribution from Netexit, such distribution shall be used to reduce the Debtor's secured debt.

Blue Dot provides heating, ventilating, and air conditioning (or HVAC) services; plumbing services; and, related services through its direct and indirect subsidiaries. Blue Dot rapidly expanded following its inception in 1997, eventually providing services from over 60 subsidiary entities in or near major metropolitan areas across the United States by the end of 2002. Blue Dot's business and financial condition was negatively impacted by the failure to achieve expected efficiencies of scale. In many cases, Blue Dot determined that products and services may be obtained at more competitive terms on a local or regional basis than could be obtained on an enterprise basis. The Debtor recorded losses before minority interests with respect to Blue Dot of $2.3 million, $13.6 million and $320.7 million in fiscal 2000, 2001 and 2002, respectively. As of December 31, 2003, after impairment charges and recognition of net losses, the net recorded book value of the Debtor's aggregate $384.8 million equity investment in Blue Dot and $17.3 million of intercompany advances to Blue Dot was reduced to $11.9 million. As of February 6, 2004, Blue Dot had sold 53 of the 62 retail locations it had on January 1, 2003. If and when the Debtor receives any distribution from Blue Dot, such distribution shall be used to reduce the Debtor's secured debt.

Effective November 1, 2002, the Debtor relinquished its direct and indirect equity interests in CornerStone. During 2002, the Debtor recorded charges totaling $101.7 million for the write down of the value of its investment and financial arrangements in CornerStone and its share of net operating losses. As of December 31, 2003, the net recorded value of the Debtor's

receivables from CornerStone was $11 million.  A number of large claims have been filed by various deconsolidated Cornerstone entities.  The Debtor intends to object to all of these claims.

The Debtor's consolidated revenues in 2002 were $2 billion, approximately $775 million of which was generated by the Debtor's core electric and natural gas utility business. The poor performance of the Debtor's non-energy businesses and its significant indebtedness negatively affected the Debtor throughout 2002.  In 2002, the Debtor reported consolidated losses of $892.9 million.

In February 2003, the Debtor obtained funding on a new $390 million senior secured financing (the "CSFB Facility" or the "Pre-petition Credit Facility") from a syndicate of banks led by Credit Suisse First Boston (the "CSFB Secured Lenders") to refinance a $280 million revolving credit facility incurred in connection with the acquisition of the Montana Operations and to provide additional liquidity for operations.  Under the terms of the CSFB Facility, the CSFB Secured Lenders made loans and advances to the Debtor, $280 million of which was secured by first mortgage bonds relating to the Debtor's Montana assets and $110 million of which was secured by first mortgage bonds relating to the Debtor's South Dakota assets.

To address further the developing financial drain on the Debtor, in late Spring and early Summer 2003, the Debtor implemented a series of cost reduction measures.  These measures included a reduction in the Debtor's salaried and wage workforce, elimination of certain benefit programs for salaried employees, and other measures.  The Debtor also suspended dividend payments on its common stock and payments on its subordinated debentures. Regardless of these efforts, financial pressure on the Debtor continued through Summer 2003.

In May 2003, the Debtor also deferred interest payments on the subordinated debentures of all series of its trust preferred securities.  As a result, cash distributions on all series of the trust preferred securities issued by the Debtor's affiliated trusts were deferred.

Prior to the issuance of the Debtor's quarterly report on Form 10-Q for its fiscal quarter ended June 30, 2003, the Debtor determined based on its liquidity situation that it may not be able to meet its interest and tax obligations due during the next six (6) months and consequently, all of the Debtor's long term debt obligations were classified as current.  As a result of this development and previous publicly announced events, the Debtor lost its investment grade credit rating, and counterparties on energy contracts demanded enhancements in the form of deposits and letters of credit to collateralize the Debtor's performance under energy purchase contracts with such counterparties.  These demands resulted in further erosion of the Debtor's liquidity.

In an effort to address its liquidity needs, the Debtor deferred payments on account of real property taxes owing of approximately $24.3 million and the Debtor negotiated to enter into a $50 million accounts receivable securitization facility with General Electric Capital Corporation ("GE Capital").  Had the Debtor been able to close such facility, it may have been able to sustain its operations through Fall 2003.  However, the requisite lenders under the CSFB Credit Facility did not consent to the Debtor entering into the accounts receivable securitization facility with GE Capital and thus, this source of liquidity was unavailable to the Debtor.

In addition, throughout Summer 2003 the Debtor was actively exploring implementation of a debt-for-equity exchange with respect to some of its outstanding unsecured debt obligations, and to issue additional stock both for the debt-for-equity exchange and by way of a private issuance in an effort to address its over-leveraged situation and to raise additional capital. To implement either or both of these actions required approval by the Debtor's stockholders to amend the Debtor's corporate charter to increase the number of shares which could be issued and outstanding and to also allow a debt-for-equity exchange. The Debtor was unable to obtain approval by the requisite number of stockholders for these actions at its annual shareholders meeting held in August 2003.

During Summer 2003, the Debtor was also actively in negotiations to dispose of non-core assets such as its Expanets and Blue Dot Service subsidiary operations. The disposition of these assets, especially Expanets' assets, was delayed such that the Debtor could not avail itself of the liquidity which might otherwise be available to it from the sale of these assets.

During late Summer 2003 an informal committee of senior unsecured bondholders (the "Informal Committee") was formed and the Debtor was in discussions with the Informal Committee and its professionals concerning financial restructuring and liquidity issues facing the Debtor. Prior to the Petition Date, the Debtor engaged in substantive negotiations with the Informal Committee and other interested parties in an effort to develop a plan for an out-of-court restructuring with respect to the Debtor's indebtedness and liabilities. However, faced with tightening liquidity and the failure of the Debtor's stockholders to approve necessary amendments to its corporate charter to implement an out-of-court restructuring, the inability to timely complete asset sales of non-core assets from subsidiaries, and the inability to close on the accounts receivable securitization facility with GE Capital, the Debtor chose not to make a scheduled $31 million interest payment with respect to the Debtor's outstanding unsecured senior indebtedness due September 15, 2003 and to seek relief under Chapter 11 of the United States Bankruptcy Code. At the Petition Date, the Debtor was not in default under any of its senior secured credit facilities.

## III.
## SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A.    Overview of Chapter 11 and Commencement of Chapter 11 Case

On September 14, 2003 (the "Petition Date"), the Debtor filed the instant Chapter 11 Case. The Debtor's Chapter 11 Case was initially assigned to the Honorable Peter J. Walsh, Bankruptcy Judge for the District of Delaware. On October 6, 2003, the case was reassigned to the Honorable Charles G. Case, II, Bankruptcy Judge for the District of Arizona, sitting by special designation in Delaware. Since the Petition Date, the Debtor has continued to operate its business and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of Chapter 11 is to promote the optimization of the debtor's assets and equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of the debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing of the debtor's bankruptcy petition. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 reorganization case. Confirmation of a plan of reorganization by a bankruptcy court makes such plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan. Before soliciting acceptances of the proposed plan, however, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtor is submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtor as required by Section 1125 of the Bankruptcy Code.

The following is a brief description of some of the more material events that have occurred to date during the Chapter 11 Case.

## B.    First Day Orders

On the Petition Date or shortly thereafter, the Bankruptcy Court entered several orders authorizing the Debtor to pay various pre-petition claims and granting other relief necessary to help the Debtor stabilize its day-to-day business operations. These orders were designed to allow the Debtor to continue business operations with minimum disruption and to ease the strain on the Debtor's relationships with its employees, vendors, customers and other parties. Included among the orders entered by the Court on or shortly after the Petition Date were orders authorizing the Debtor to: (i) pay pre-petition payroll, business expenses and other employee-related obligations; (ii) continue and maintain its pre-petition consolidated cash management system, pre-petition bank accounts, and to use pre-petition business forms; (iii) continue its insurance programs; (iv) retain a claims agent; (v) continue to perform under certain post-petition forward contracts and assume those contracts; (vi) obtain post-petition secured credit card financing; and, (vii) obtain post-petition DIP financing.

## C.    Professional Retentions

The Bankruptcy Court entered orders authorizing the Debtor to retain, among others: (i) the law firms of Paul, Hastings, Janofsky & Walker, LLP, 600 Peachtree Street, N.E., Atlanta, Georgia 30308, (404) 815-2400, Attn: Jesse H. Austin, III, Esq. and Karol K. Denniston, Esq., as bankruptcy and reorganization counsel; and Greenberg Traurig, LLP, the Brandywine Building, 1000 West Street, Suite 1540, Wilmington, Delaware 19801, (302) 661-7000, Attn: Scott D. Cousins, Esq. and William E. Chipman, Jr., Esq., as local Delaware bankruptcy counsel; and (ii) the firm of Lazard Fréres & Co., LLC ("Lazard"), 30 Rockefeller Plaza, New York, New York 10020, (212) 632-6000, Attn: David Kurtz and Andrew Yearley, as financial and restructuring advisors.

Pursuant to an order of the Bankruptcy Court dated October 10, 2003, the Debtor also was authorized to retain and employ certain professionals in the ordinary course of business.

Pursuant to an order of the Bankruptcy Court dated November 6, 2003, the Debtor was authorized to retain Alvarez and Marsal ("A&M") as advisors to the Debtor.

### D.    Appointment of Creditors' Committee and Professionals

On October 2, 2003, the United States Trustee appointed a nine (9) member Official Committee of Unsecured Creditors (the "Committee") in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Court to represent the interest of all holders of unsecured claims. The present members of the Committee are: (i) OCM Opportunities Fund IV, LP; (ii) The Bank of New York; (iii) Franklin Templeton Mutual Series Fund; (iv) Wilmington Trust Co.; (v) HSBC Bank USA; (vi) Rocky Mountain Contractors, Inc.; (vii) Avenue Capital Management; (viii) AG Capital Recovery Partners III, LP; and (ix) Comanche Park, LLC. Thereafter, the Court entered orders authorizing the Committee to retain: (i) the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York 10019, (212) 373-3009, Attn: Alan W. Kornberg, Esq., as counsel; and (ii) the firm of Houlihan, Lokey, Howard & Zukin Financial Advisors, Inc., 225 S. Sixth Street, Minneapolis, MN 55402, Attn: P. Eric Seigert, as financial advisors. By notice dated November 25, 2003, the United States Trustee added Magten Asset Management Corp. to the Committee following Rocky Mountain Contractors, Inc. declining to serve on the Committee.

### E.    Post-Petition Financing

As noted above, operation of the Debtor's business was hampered by, among other things, substantial declines in operating income and increasingly restricted liquidity. Accordingly, following the Petition Date, an important issue addressed by the Debtor was obtaining access to an adequate post-petition working capital facility to enable it to continue to operate its businesses on a competitive basis and, thus, to successfully reorganize.

In that regard, on the Petition Date, the Debtor filed a motion for orders (A) authorizing the Debtor to obtain post-petition financing from Bank One, N.A., on an interim and permanent basis, with superpriority over administrative expenses and secured by senior liens pursuant to sections 103(a), 364(c) and 364(d) of the Bankruptcy Code, (B) authorizing adequate protection payments to senior secured claimants, (C) scheduling final hearing and establishing notice requirements and (D) granting related relief. The Bankruptcy Court entered *nunc pro tunc* to November 7, 2003, a final Order (the "Final DIP Order") (i) granting adequate protection in connection therewith and (ii) approving an $100 million secured revolving credit facility pursuant to the DIP Loan Agreement. The obligations of the Debtor under the DIP Loan Agreement are secured by valid, binding, enforceable and perfected first priority liens on and security interest in substantially all of the Debtor's pre-petition unencumbered assets with priority over all administrative expense and subject only to the Carve-Out and the Senior Liens (as defined in the Final DIP Order), and junior liens and security interests on all other encumbered property of the Debtor. Additionally, the Debtor was authorized to make adequate protection payments and to continue paying principal, non-default interest and other recoverable costs and expenses on the obligations secured by the Senior Liens as such amounts become due and payable in the ordinary course. In addition, in order to protect against actual diminution in value of the collateral securing the Senior Liens, the holders of Senior Liens were granted replacement liens on all replacement collateral of the Debtor of the same nature, extent and priority as the Senior Liens that existed on the Petition Date.

On or about October 29, 2003, the Debtor filed a motion pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 for entry of an order (A) amending the CSFB Facility, (B) providing protections under Section 364(c)(1), on an interim and permanent basis, (C) scheduling hearings and establishing notice requirements and (D) granting related relief.  On or about January 13, 2004, the Bankruptcy Court entered a final order (the "CSFB Final Order") authorizing the amendment of the CSFB Facility and granting protection in connection therewith.  The obligations of the Debtor under the CSFB Facility are secured by the CSFB Facility Montana First Mortgage Bonds and the CSFB Facility South Dakota First Mortgage Bonds (both as defined in the Plan).  The primary purposes of amending the CSFB Facility were to continue the facility and to reduce the interest rate paid on the facility, and so long as there were no non-consensual modifications to the facility and the facility remained current during the Chapter 11 Case, to allow the Reinstatement of the CSFB Facility upon the Debtor's exit from Chapter 11.

On or about December 11, 2003, the Court approved the Stipulation and Order: (I) Authorizing and Restricting Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2)(A) and Bankruptcy Rules 4001(b) and (d); and (II) Scheduling a Final Hearing, if necessary, Pursuant to Bankruptcy Rules 4001(b), (c) and (d) (the "Colstrip Stipulation").  Pursuant to the Colstrip Stipulation, the Debtor is authorized to use cash collateral subject to the terms and conditions of the Colstrip Stipulation including the Debtor's obligation (i) to maintain the funds in a segregated account (the "Colstrip 4 Security Account"), (ii) to promptly deposit all revenues generated from the operation of the power-generation facility generally known as Colstrip 4 (the "Colstrip 4 Facility") into the Colstrip 4 Security Account, (iii) to restrict expenditures from the Colstrip 4 Security Account in accordance with the budget, and (iv) to make prepayments of Excess Cash Amounts (as defined in the Colstrip Stipulation).  The Colstrip Stipulation granted the Secured Lease Financing Parties (as defined in the Colstrip Stipulation) a first priority lien and security interest in and to the proceeds of the Colstrip 4 Security Account and certain replacement liens and administrative claims as described in the Colstrip Stipulation.

**F.    Sale of Expanets Assets**

By Order dated October 10, 2003, the Debtor was authorized to proceed with implementing whatever action was required of it to complete the sale of Expanets' assets.  By a certain contract dated September 14, 2003, Expanets had entered into an asset purchase agreement to sell all or substantially all of Expanets' assets, along with the assumption of designated liabilities, to Cerberus California, Inc. ("Cerberus").  While Expanets itself has not filed a Chapter 11 case, the sale of Expanets' assets occurred in a manner similar to a Section 363 sale of assets under the Bankruptcy Code.  An active solicitation for sale of the assets and due diligence thereon had occurred from about July 1, 2003 through October 29, 2003, with a public auction and sale of Expanets' assets occurring on October 29, 2003.  At the auction, active bidding among four qualified bidders (including Cerberus) ensued.  Avaya was the successful purchaser of Expanets' assets for a gross purchase price of $152 million, which included the assumption of certain liabilities and the payment of a $4 million "topping fee" to Cerberus.

The closing of the sale to Avaya occurred on November 25, 2003.  Avaya paid Expanets (n/k/a Netexit) cash of approximately $50.8 million and assumed debt of approximately $38.1 million.  In addition, Avaya deposited approximately $13.5 million and $1.0 million into escrow accounts to satisfy certain specified liabilities that were not assumed by Avaya, and certain indemnification obligations of Expanets, respectively.  Avaya also reduced

cash paid at closing by approximately $44.6 million as a working capital adjustment, pending the determination of a final closing balance sheet.  On February 24, 2004, Avaya submitted its proposed final calculation of the working capital adjustment asserting that there was a working capital shortfall at Expanets of approximately $48.8 million at closing, and claiming that Avaya should retain the entire holdback amount plus an additional $4.2 million.  Netexit disputes this calculation and believes that pursuant to the terms of the asset purchase agreement Netexit is owed additional cash ranging from $10 million to $20 million.  The dispute over the working capital adjustment is subject to an arbitration process, which is expected to be decided in May 2004.  Pending resolution of the final balance sheet, the determination of the expenses that Netexit must pay in connection with the sale, and the resolution of open claims to Netexit creditors, the proceeds from the sale remain at Netexit.

## G.    Sale of Blue Dot Assets

As of February 6, 2004, Blue Dot had sold 53 of the 62 retail locations it had on January 1, 2003.  Blue Dot repaid its credit facility from sales proceeds and plans to maintain enough cash on hand to meet working capital purposes and fulfill any remaining claims and obligations.  Blue Dot anticipates selling substantially all of its remaining businesses by June 30, 2004.  The Debtor hopes to receive in excess of $15 million in cash from Blue Dot during the liquidation of the operations; provided however, that the anticipation of receiving cash from Blue Dot assumes satisfactory resolutions of remaining stock obligations, potential or pending litigation, insurance and bonding reserves, and no new material additional claims or litigation.  Furthermore, it assumes that the remaining businesses produce their projected cash proceeds, and that receivables from various sold locations are collectible.  If and when the Debtor receives a distribution from Blue Dot, such distribution shall be used to reduce the Debtor's secured debt.

## H.    Extension of Time to Assume or Reject Leases

Pursuant to Section 365(d)(4) of the Bankruptcy Code, the Debtor was required to assume or reject its nonresidential real property leases within sixty (60) days of filing its Chapter 11 petition (i.e., by November 13, 2003) absent an extension of such time period by the Bankruptcy Court.  By Order dated October 10, 2003, the Bankruptcy Court extended the time within which the Debtor may assume or reject its nonresidential real property leases through and including January 12, 2004.

## I.    Extension of Exclusive Periods

Pursuant to Section 1121(b) of the Bankruptcy Code, the Debtor's exclusive period to file a plan of reorganization expired on January 12, 2004, and the Debtor's initial 180 day exclusive period to solicit votes on a filed plan expires on March 12, 2004 (together, the "Exclusive Periods").  By order dated January 14, 2004, the Bankruptcy Court extended the Exclusive Periods for an additional 60 days to file a plan through and including March 12, 2004, and of the time to solicit votes thereon through and including May 11, 2004.

## J.    Claims Process and Bar Date

On or about November 4, 2003, the Debtor filed its Schedules of Assets and Liabilities, Statements of Financial Affairs and Schedule of Executory Contracts and Unexpired

Leases (which were amended on December 12, 2003). Previously, on October 10, 2003, the Bankruptcy Court, pursuant to Sections 501 and 1111(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), entered an Order: (i) fixing January 15, 2004 (the "Bar Date") as the deadline for all creditors of the Debtor, except governmental units, to file proofs of claim against the Debtor's estate; and (ii) fixing 180 days from the Petition Date as the deadline for all governmental unit creditors of the Debtor to file proofs of claim against the Debtor's estate. The Bar Date order provides, except as set forth therein, that any holder of a Claim that fails to file a timely proof of claim on or before the Bar Date (or solely with respect to governmental units, by the deadline for governmental claims): (a) shall be forever barred, estopped and permanently enjoined from asserting such claim against the Debtor, its successors or its property (or filing a proof of claim with respect thereto) and the Debtor, its successors and its property shall be forever discharged from any and all indebtedness or liability with respect to such claim; (b) shall not be treated as a creditor for purposes of voting on and Distribution under a plan of reorganization in the Chapter 11 Case with respect to such claim; and (c) shall not be entitled to receive any further notices regarding such claim.

A total of approximately 1,031 Claims were filed against the Debtor's estate with an aggregate asserted liability of approximately $8.8 billion (not including those claims that did not designate a claim amount instead identifying their claims as contingent and unliquidated). After a preliminary review of such Claims and a comparison to its books and records, the Debtor believes that the foregoing Claims include, among other things, invalid, overstated, objectionable and duplicative claims. The Debtor estimates that the approximate amount of Claims[14] as of and arising from the occurrence of the Effective Date per category and Class will be as follows:

| CLASS | DESCRIPTION | ESTIMATED AMOUNT OF CLAIMS AS OF 3/11/04[15] |
|-------|-------------|----------------------------------------------|
| Class 1 | Priority Claims | $0 |
| Class 2 | Unsecured Priority Claims | $443,874.43 |
| Class 3 | Bank One DIP Financing Claims | $0 |
| Class 4[16] | CSFB Financing Claims | $395,218,146 |
| Class 5[17] | Secured Bondholder Claims | |

[14] The Debtor is actively reconciling filed proofs of claim with its books and records and anticipates filing initial claims objections beginning in April 2004. The Debtor believes the Claims set forth above are reasonable and accurate. This amount is likely to change as the claim reconciliation and objection process move forward. In the estimated numbers set forth above, the Debtor has not included or has reduced the filed claim amount for those disputed claims to which the Debtor believes it has strong defenses and to which the Debtor intends to object. Also eliminated from this initial analysis are those disputed liquidated and contingent claims to which the Debtor intends to object and otherwise estimate at zero for voting purposes. The Debtor will amend, supplement and update this Disclosure Statement as and when the Debtor revises its estimates

[15] The estimated amounts for Classes 4, 5 and 6 are as of the Petition Date.

[16] The estimated amount provided for Class 4 is as of the Petition Date.

| CLASS | DESCRIPTION | ESTIMATED AMOUNT OF CLAIMS AS OF 3/11/04[15] |
|---|---|---|
| | South Dakota First Mortgage Bond Claims | $115,830,805 |
| | Montana First Mortgage Bond Claims | $173,748,766 |
| | Montana Pollution Control Bond Claims | $173,627,950 |
| | South Dakota, Nebraska and Iowa Pollution Control Bond Claims | $21,712,807 |
| | Gas Transition Bond Claims | $49,849,982 |
| Class 6[18] | Other Secured Claims | |
| | Capital Lease Obligations | $9,689,766 |
| | Letters of Credit | $13,750,000 |
| Class 7 | Unsecured Note Claims | |
| | November 1, 1998 Indenture Claims | $857,362,385 |
| | December 1, 1989 Indenture Claims | $40,624,396 |
| Class 8 | Unsecured Subordinated Note Claims | |
| | August 1, 1995 Indenture Claims | $321,069,383 |
| | November 1, 1996 Indenture Claims | $69,537,873 |
| Class 9 | General Unsecured Claims | $44,933,508.72 |
| Class 10 | Unsecured Convenience Claims of $100,000 or Less | $4,605,149.07 |
| Class 11 | Environmental Claims | $0<br><br>(assumed and to be paid in ordinary course as and when such claims may arise) |

(...continued)

[17] The estimated amount provided for Class 5 is as of the Petition Date.

[18] The estimated amount provided for Class 6 is as of the Petition Date.

| CLASS | DESCRIPTION | ESTIMATED AMOUNT OF CLAIMS AS OF 3/11/04[15] |
|---|---|---|
| Class 12 | D&O Trust Claims | $0 <br><br> (to be channeled to D&O Trust) |
| Class 13 | Other Equity and Interest Holder Claims | $0 |
| Class 14 | Securities Claims | $0 |
| Class 15 | Opt-Out Securities Claims | $0 <br><br> (to be channeled to D&O Trust) |

## K.    Performance Bonuses

In January, 2004, the Debtor filed a motion to approve amendments to an existing Employee Incentive Plan (as so amended, the "Employee Incentive Plan").  The Debtor believes that the commencement of the Chapter 11 case engendered uncertainty and anxiety among the Debtor's employees, particularly their critical senior and mid-level management employees.  Accordingly, to prevent the departure of management and employees, and the concomitant disruption to the Debtor's operations and reorganization efforts occasioned thereby, the Debtor amended its existing Employee Incentive Plan to provide incentives to employees and to reduce costs.  An order approving the amendments to the existing Employee Incentive Plan was entered on February 3, 2004.

## L.    Litigation

(1)    AEP Adversary.  On or about November 24, 2003, the Debtor filed an adversary complaint against American Electric Power Company, Inc., American Electric Power Service Corporation and Ohio Power Corporation (collectively, "AEP").  The Debtor and AEP are parties to a Letter of Confirmation entered on or about December 3, 2002 for the sale by the Debtor of a certain quantity of power to AEP.  The Debtor contends AEP breached this contract by improperly terminating.  The Debtor also contends AEP violated the automatic stay by attempting to collect additional funds post-petition.  The Debtor and AEP are currently working to resolve the accounting issues relating to the termination and are exploring whether settlement is possible.

(2)    Cornerstone and Mewhinney Litigation.  The Debtor, and certain of its present and former officers and directors, are named as defendants in certain complaints filed against CornerStone Propane Partners LP, and other defendants filed in the United States District Court for the Northern District of California.  This litigation is stayed.

(3)    Hylland Arbitration.  On April 30, 2003, Mr. Richard Hylland filed a demand for arbitration of contract claims under his employment agreement, as well as tort

claims for defamation, infliction of emotional distress and tortious interference and a claim for punitive damages. The arbitration has been stayed by the Debtor's bankruptcy filing and Mr. Hylland's motion seeking lifting of the automatic stay was denied by the Bankruptcy Court pursuant to a written Memorandum Order. On or about January 23, 2004, Mr. Hylland filed a notice of appeal of the Bankruptcy Court's order denying his motion for relief from stay.[19] The Debtor will be moving to dismiss Mr. Hylland's appeal.

**(4)**    <u>McGreevey, et al. v. The Montana Power Company</u> (the "<u>McGreevey Litigation</u>"). The Debtor is one of several defendants in the McGreevey Litigation now pending in federal court in Montana. The lawsuit was filed by former stockholders of The Montana Power Company (most of whom became stockholders of Touch America Holdings, Inc. as a result of a corporate reorganization of The Montana Power Company). The parties to the McGreevey Litigation have proposed to mediate before a federal court judge in Montana.

**(5)**    <u>Milltown Dam</u>. On September 10, 2003, Atlantic Richfield Company ("<u>ARCO</u>") and NorthWestern Energy executed a confidential settlement agreement ("<u>Milltown Settlement</u>") which, among other things, caps the Debtor's potential liability for remediation of the Milltown Reservoir superfund site at no more than $10.0 million. On October 17, 2003, the Debtor filed a motion with the Bankruptcy Court seeking approval of the Milltown Settlement. Commencing the month following Bankruptcy Court approval and each month thereafter, the Debtor is to pay $500,000 into an escrow account until the total settlement amount of $10.0 million is fully funded. No interest is to accrue on the unpaid settlement amount. The escrow account is to remain funded until a final, nonappealable consent decree is entered by the United States District Court. If a final decree acceptable to all parties is not implemented, the escrowed funds are to be returned to the Debtor. The Debtor currently has a 10-year, $100 million environmental insurance policy, effective as of May 31, 2002, to mitigate the risk of future environmental liabilities arising from catastrophic failure of Milltown Dam caused by an act of God.

Since the filing of the motion to approve the Milltown Settlement, the Debtor has been in active negotiation with Clark Fork and Blackfoot, LLC, ARCO, the United States, the State of Montana and the Salish and Kootenai Tribes regarding a final consent decree acceptable to all of the parties. As of the filing of the Disclosure Statement, a draft stipulation of settlement (the "Stipulation") has been prepared and is being finalized. The Stipulation provides the foundation for a final consent decree. The Debtor intends to file a motion seeking approval of the Stipulation as soon as it is finalized.

---

[19] Mr. Hylland has filed numerous claims totaling approximately $61.2 million of which $30.6 million are duplicative. The Debtor intends to strongly object to all of Mr. Hylland's claims.

**(6)**     QF Adversary.  On or about January 28, 2004, Colstrip Energy Limited Partnership ("CELP") and Yellowstone Energy Limited Partnership ("YELP") each filed complaints initiating adversary proceedings in the Debtor's bankruptcy case.  On or about February 27, 2004, the Debtor filed its answers to both the CELP and YELP complaints.  The Debtor has also demanded from CELP and YELP a written FERC determination of past and continuing "Qualifying Facility" status.  Since responding to the adversary proceedings, the Debtor has had initial discussions with counsel to CELP and YELP to explore what matters could be resolved consensually.

**(7)**     PPL Montana, LLC.  The Debtor is pursuing various claims against PPL Montana, LLC ("PPL") arising from PPL's refusal to purchase certain assets under a certain asset purchase agreement.  PPL, in turn, has asserted a number of counterclaims against the Debtor (and Clark Fork and Blackfoot, LLC) based, in large part, upon PPL's claim that The Montana Power Company and/or NorthWestern Energy, LLC breached two Wholesale Transition Service Agreements and certain indemnification obligations under the APA.  The Debtor has moved to transfer venue to the Federal District Court of Delaware and hearing on the Debtor's Motion has been set before Judge Haddon in the Federal District Court of Montana on March 19, 2004.  In connection with PPL Montana's Motion to lift stay PPL Montana and the Debtor have stipulated that the case will proceed in the federal district court of Delaware if the Debtor's Motion to transfer venue is granted or before Judge Haddon if the Motion is denied.

**(8)**     Securities and Exchange Commission Investigation.  In December 2003, the SEC notified the Debtor that it had issued a formal order of private investigation relating to questions regarding the restatements and other accounting and financial reporting matters.  The Debtor is fully cooperating with the SEC investigation and has provided requested information as expeditiously as possible.

**(9)**     Securities Litigation and Proposed Class Settlement (the "Securities Litigation").  The Debtor and various non-debtors (collectively, the "Contributors") have tentatively agreed, to settle the securities litigation which provides for a settlement fund (the "Settlement Fund") in the amount of $41 million, $37 million of which is being contributed by certain of the D&O Policies and $4 million of which is being contributed by other persons and parties.

<div align="center">

**IV.**
**OVERVIEW OF THE PLAN**

</div>

**A.**     **General**

        The following is a summary intended as a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan and any supplement to the Plan which may be filed.  Holders of Claims and Equity Interests are respectfully referred to the

relevant provisions of the Bankruptcy Code and are encouraged to review the Plan and this Disclosure Statement with their counsel.

In general, a Chapter 11 plan of reorganization must: (i) divide claims and equity interests into separate categories and classes; (ii) specify the treatment that each category and class is to receive under such plan; and (iii) contain other provisions necessary to implement the reorganization of a debtor. A Chapter 11 plan may specify that the legal, equitable, and contractual rights of the holders of claims or equity interests in certain classes are to remain unchanged by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to vote to accept the plan. Accordingly, it is not necessary to solicit votes from holders of claims or equity interests in such "unimpaired" classes. Pursuant to Section 1124(1) of the Bankruptcy Code, a class of claims or interests is "impaired," and entitled to vote on a plan, unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."

The Debtor believes that: (i) under the Plan, holders of impaired Claims will obtain a greater recovery than they would otherwise obtain if the assets of the Debtor were liquidated under Chapter 7 of the Bankruptcy Code; and (ii) the Plan will enable the Debtor to emerge from Chapter 11 as a viable and competitive enterprise, and enhance the Debtor's ability to effect a return to profitability.

## B.    Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims and equity interests of a debtor's creditors and equity interest holders. In compliance with Section 1122, the Plan divides the holders of Claims into fifteen Classes, and sets forth the treatment offered to each Class.[20] These Classes take into account the differing nature and priority of Claims against the Debtor. Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. §101(5). A "Claim" against the Debtor also includes a Claim against property of the Debtor, as provided in Section 102(2) of the Bankruptcy Code. 11 U.S.C. § 102(2). An interest is an equity interest in a debtor.

---

[20]  A debtor is required under Section 1122 of the Bankruptcy Code to classify the claims and interests of its creditors and interest holders into classes containing claims and interests that are substantially similar to the other claims or interests in such class. While the Debtor believes that its classification of all Claims and Equity Interests is in compliance with the provisions of Section 1122 of the Bankruptcy Code, it is possible that a holder of a Claim or Equity Interest may challenge the Debtor's classification scheme and the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, it is the present intent of the Debtor, to the extent permitted by the Bankruptcy Court, to modify the Plan to provide for whatever reasonable classification might be required by the Bankruptcy Court for confirmation, and to use the acceptances received by the Debtor from any holder of a Claim or Equity Interest pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder of a Claim or Equity Interest is ultimately deemed to be a member.

For the holder of a Claim to participate in a reorganization plan and receive the treatment offered to the class in which it is classified, its Claim must be "Allowed." Under the Plan, an Allowed Claim is defined as: (a) a Claim that has been listed by the Debtor in its Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim as to which a proof of claim has been filed; (b) a Claim as to which a timely proof of Claim has been filed as of the Bar Date in a sum certain and either (i) no objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been interposed, the extent to which such Claim (whether in whole or in part) has been allowed by a Final Order; (c) a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; (d) any Claim expressly allowed under the Plan; or (e) any Claim expressly allowed by Final Order.

## C.    Treatment of Claims and Equity Interests Under the Plan

The Plan segregates the various Claims against, and Equity Interests in, the Debtor into holders of Priority Claims in Class 1, Unsecured Priority Claims in Class 2, Bank One DIP Financing Claims in Class 3, CSFB Financing Claims in Class 4, Secured Bondholder Claims in Class 5, Other Secured Claims in Class 6, Unsecured Note Claims in Class 7, Unsecured Subordinated Note Claims in Class 8, General Unsecured Claims in Class 9, Unsecured Convenience Claims each of $100,000 or Less in Class 10, Environmental Claims in Class 11, D&O Trust Claims in Class 12, Other Equity and Interest Holders in Class 13, Securities Claims in Class 14 and Opt-out Securities Claims in Class 15.

Under the Plan, Classes 1, 2, 3, 4, 5, 6, 10, 11, and 14 are unimpaired, and Classes 7, 8, 9, 12, 13 and 15 are impaired. Class 15 may or may not be impaired depending on the treatment of Allowed Claims elected by the Debtor. In the Debtor's opinion, the treatment accorded to the impaired Classes of Claims and Equity Interests under the Plan represents the best treatment that can be provided to such Classes under the circumstances and is superior to the treatment that would be afforded to such Classes in the event of a liquidation of the Debtor. Set forth below is a summary of the Plan's treatment of the various categories and Classes of Claims and Equity Interests. This summary is qualified in its entirety by the full text of the Plan. In the event of an inconsistency between the Plan and the description contained herein, the terms of the Plan shall govern. The Plan is complicated and substantial. Time should be allowed for its analysis and consultation with a legal and/or financial advisor is recommended and should be considered.

### (1)    Classes of Claims

#### a.    CLASS 1 — PRIORITY CLAIMS

Priority Claims are Claims constituting a cost or expense of administration of the Chapter 11 Case allowed under Sections 503(b) and 507(a)(1) of the Bankruptcy Code. Priority Claims include all costs incurred in the operation of the Debtor's businesses after the Petition Date, the fees and expenses of Professionals retained by the Debtor and the Committee, and the fees due to the United States Trustee pursuant to 28 U.S.C. § 1930. Under the Plan, all Allowed Priority Claims shall be paid in full, in cash, in such amounts as: (a) are incurred in the ordinary

course of business by the Debtor when and as such Claims become due and owing; (b) are Allowed by the Bankruptcy Court upon the later of the Effective Date, the date upon which there is a Final Order allowing such Priority Claim or any other date specified in such order; or (c) may be agreed upon between the holder of such Priority Claim and the Debtor or Reorganized Debtor, as the case may be. The Debtor estimates that Priority Claims to be paid on the Effective Date will aggregate approximately $0.

All entities seeking an award by the Bankruptcy Court of Professional Fees, or of compensation for services rendered to the Debtor or the Committee or reimbursement of expenses incurred in this representation through and including the Confirmation Date under Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, (a) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within thirty (30) days after the Confirmation Date, and (b) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Claim and the Debtor or, on and after the Effective Date, Reorganized Debtor, or (iii) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court. All Professional Fees for services rendered in connection with the Chapter 11 Case and the Plan after the Confirmation Date, including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of Causes of Action preserved under the Plan and the resolution of Disputed Claims, shall be paid by Reorganized Debtor upon receipt of an invoice therefor, or on such other terms as Reorganized Debtor may agree to, without the need for further Bankruptcy Court authorization or entry of a Final Order. If Reorganized Debtor and any Professional cannot agree on the amount of post-Confirmation Date fees and expenses to be paid to such Professional, such amount shall be determined by the Bankruptcy Court.

b.    CLASS 2 — UNSECURED PRIORITY CLAIMS.

Unsecured Priority Claims are Unsecured Claims entitled to priority status pursuant to Section 507 of the Bankruptcy Code. Each holder of an Allowed Unsecured Priority Claim shall receive Cash in an amount equal to such Allowed Unsecured Priority Claim on the later of (i) the Effective Date and (ii) the date such Unsecured Priority Claim becomes an Allowed Unsecured Priority Claim or as soon thereafter as is practicable, unless the holder of an Allowed Unsecured Priority Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

The Debtor estimates that Unsecured Priority Claims to be paid on the Effective Date will aggregate approximately $443,874.43.

c.    CLASS 3 — BANK ONE DIP FINANCING CLAIMS.

Bank One DIP Financing Claims are the Claims of Bank One, N.A., as agent, or any successor agent thereto, under the DIP Financing Order and DIP Loan Documents. Each holder of an Allowed Bank One DIP Financing Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, of such Allowed Bank One DIP Financing Claim distributions pursuant to the DIP Financing Order and the DIP Loan Documents on Effective Date, unless the holder of the Allowed Bank One DIP Financing Claim and the

Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof. The Debtor estimates that the Bank One DIP Financing Claims to be paid on Effective Date will be approximately $0.[21]

       d.      CLASS 4 — CSFB FINANCING CLAIMS.

CSFB Financing Claims are the Claims of Credit Suisse First Boston, as agent, under the CSFB Order and the CSFB Financing Documents. Each holder of an Allowed CSFB Financing Claim shall receive full satisfaction and settlement thereof through the full Reinstatement of such Allowed CSFB Financing Claim pursuant to the CSFB Order and the CSFB Financing Documents. The Debtor estimates that the principal amount of the CSFB Financing Claim to be Reinstated on the Effective Date will be approximately $383,175,000.00.

       e.      CLASS 5 — SECURED BONDHOLDER CLAIMS.

Secured Bondholder Claims are Claims of the holder of any of the Gas Transition Bonds, the South Dakota First Mortgage Bonds, the Montana First Mortgage Bonds, the Montana Pollution Control Bonds, or the South Dakota, Nebraska and Iowa Pollution Control Bond Obligations. The holder of an Allowed Secured Bondholder Claims shall receive in full satisfaction and settlement thereof through the full Reinstatement of such Allowed Secured Bondholder Claims. The Debtor estimates that the Secured Bondholder claims to be Reinstated on the Effective Date will be as set forth below:

| Class 5 | Secured Bondholder Claims | |
|---|---|---|
| | South Dakota First Mortgage Bond Claims | $115,830,805 |
| | Montana First Mortgage Bond Claims | $173,748,766 |
| | Montana Pollution Control Bond Claims | $173,627,950 |
| | South Dakota, Nebraska and Iowa Pollution Control Bond Claims | $21,712,807 |
| | Gas Transition Bond Claims | $42,450,000 |

       f.      CLASS 6 — OTHER SECURED CLAIMS.

Other Secured Claims are any Secured Claim, exclusive of Priority Claims, Bank One DIP Financing Claims, CSFB Financing Claims and Secured Bondholder Claims. Holders of an Allowed Other Secured Claim shall receive in full satisfaction and settlement thereof through full Reinstatement of such Allowed Other Secured Claim. The Debtor estimates that the

---

[21] As of the date hereof, the Debtor has not drawn any funds under the DIP Loan Agreement. However, as of the date hereof, $12.9 million in letters of credit have been issued under the DIP Loan Agreement.

Other Secured Claims to be Reinstated on the Effective Date will be approximately $9,689,766 plus contingent and unliquidated claims.[22]

g.    CLASS 7 — UNSECURED NOTE CLAIMS.

Unsecured Note Claims are Claims by the holder of any Unsecured Note. On the Effective Date, the Unsecured Notes shall be cancelled, annulled and extinguished. On the Effective Date, or as soon thereafter as practicable, each holder of an Allowed Unsecured Note Claims and Class 9 General Unsecured Claims, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Allowed Claim its Pro Rata Share of: 34,790,000 shares of New Common Stock (such 34,790,000 shares representing 98% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution), plus (b) the 710,000 shares of New Common Stock allocated to Class 8, if Class 8, as a class, votes to reject the Plan. The Debtor estimates that the Unsecured Note Claims to be converted to equity shall be approximately $897,986,781.00 and Class 9 General Unsecured Claims to be converted to equity shall be approximately $44,933,508.72 plus contingent and unliquidated claims. The total estimate of both Unsecured Note Claims and General Unsecured Claims to be converted to equity shall be approximately $942,920,289.72. The New Common Stock issued pursuant to Section 4.7(c) of the Plan shall be subject to dilution by any shares of New Common Stock issued and distributed in accordance with the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter.

As of the Effective Date, all Unsecured Notes, the Unsecured Note Indentures, and all agreements, instruments and other documents evidencing the Unsecured Notes and the rights of holders thereof shall be canceled and deemed null and void and of no further force and effect (all without further act or action by any Person), other than as evidence of any right to receive Distributions under the Plan, and all obligations of any Person under such instruments and agreements shall be fully and finally satisfied and released without any further act or order of the Bankruptcy Court or any other Person. Without limiting the foregoing, each holder of an Unsecured Note Claim shall be deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or Reorganized Debtor. Notwithstanding the termination of the Unsecured Notes and the Unsecured Notes Indentures, the provisions of such documents shall govern the Unsecured Notes Trustees and holders of the Unsecured Notes.

h.    CLASS 8 — UNSECURED SUBORDINATED NOTE CLAIMS.

Unsecured Subordinated Note Claims are Claims by the holder of an Unsecured Subordinated Note. On the Effective Date, the Unsecured Subordinated Notes shall be cancelled, annulled and extinguished. On the Effective Date, or as soon thereafter as practicable, each holder of Allowed Unsecured Subordinated Note Claims, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Allowed Claim its Pro Rata Share of: 710,000 shares of New Common Stock (such 710,000 shares representing 2% of the New

---

[22] The Debtor has capital lease obligations and letters of credit in total approximate amount as of the Petition Date of $23,439,766. As of the date hereof, the letters of credit have all expired or been replaced with letters of credit under the Debtor's DIP Loan Agreement.

Common Stock issued and outstanding on the Effective Date prior to any dilution). The Debtor estimates that the Unsecured Subordinated Note Claims to be converted to equity shall be approximately $390,607,256.00. In the event that Class 8, as a class, votes to reject the Plan, then the holders of Unsecured Subordinated Note Claims shall receive nothing under the Plan and the New Common Stock to be distributed to such holders shall be distributed, Pro Rata, to the holders of Class 7 and Class 9 Claims. The New Common Stock issued pursuant to Section 4.7(c) of the Plan shall be subject to dilution by any shares of New Common Stock issued and distributed in accordance with the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter.

As of the Effective Date, all Unsecured Subordinated Notes, the Unsecured Subordinated Note Indentures, and all agreements, instruments and other documents evidencing the Unsecured Subordinated Notes and the rights of holders thereof shall be canceled and deemed null and void and of no further force and effect (all without further act or action by any Person), other than as evidence of any right to receive Distributions under the Plan, and all obligations of any Person under such instruments and agreements shall be fully and finally satisfied and released without any further act or order of the Bankruptcy Court or any other Person. Without limiting the foregoing, each holder of an Unsecured Subordinated Note Claim shall be deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Subordinated Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or Reorganized Debtor. Notwithstanding the termination of the Unsecured Subordinated Notes and the Unsecured Subordinated Notes Indentures, the provisions of such documents shall govern the Unsecured Subordinated Notes Trustees and holders of the Unsecured Subordinated Notes.

i.    CLASS 9 —GENERAL UNSECURED CLAIMS

General Unsecured Claims shall be any Claim that is not a Secured Claim, Administrative Claim, Priority Claim, Priority Tax Claim, Subordinated Claim, Unsecured Note Claim or Unsecured Subordinated Note Claim, but shall specifically include Allowed QF Claims.

On the Effective Date, or as soon thereafter as practicable, each holder of a General Unsecured Claim, along with holders of Class 7 Unsecured Note Claims, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim its Pro Rata Share of: (a) 34,790,000 shares of New Common Stock (such 34,790,000 shares representing 98% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution), plus (b) the 710,000 shares of New Common Stock allocated to Class 8 if Class 8, as a class, votes to reject the Plan. The Debtor estimates that the Unsecured Note Claims to be converted to equity shall be approximately $897,986,781.00 and Class 9 General Unsecured Claims to be converted to equity shall be approximately $44,933,508.72 plus contingent and unliquidated claims.[23] The total estimate of both Unsecured Note Claims and General Unsecured

---

[23] A significant portion of the Class 9 General Unsecured Claims consists of claims related to ongoing litigation. The holders of these litigation-related claims include: (i) Cornerstone Propane Partners LLP; (ii) Comanche Park LLC; (iii) Hydrodynamics; (iv) Douglas Nelson and Shila Fisher; (v) Estate of Orval Meyer; (vi) Harold and Rynee Steward; (vii) Jim Gilman Excavating; (viii) Paladin Associates; (ix) Roger Rohr and Carol Rohr; (x) Superior Enterprises LLC; and (xi) a workers' compensation class action. The estimates of Class 9 General Unsecured

(continued...)

Claims to be converted to equity shall be approximately $942,920,289.72.  The New Common Stock issued pursuant to Section 4.10(c)(ii) of the Plan shall be subject to dilution by any shares of New Common Stock issued and distributed in accordance with the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter.

As described above, the rejection of non-qualified plans may lead to General Unsecured Claims held by certain of the Debtor's Insiders.  Insider Claims related to employment with the Debtor are also included in Class 9 – General Unsecured Claims.[24]  To the extent that Insiders have claims for indemnification, advancements, and/or legal fees and expenses channeled under this Plan and D&O Trust Documents such claims shall be included in Class 12 – D&O Trust Claims.

j.     CLASS 10 — UNSECURED CONVENIENCE CLAIMS EACH OF $100,000 OR LESS

Unsecured Convenience Claims are Unsecured Claims that are $100,000 or less and held by a Person that is not an Insider.  Holders of Allowed General Unsecured Claims of up to $100,000 or less in Class 9, may elect to participate in Class 10 up to $100,000 by voting to accept the Plan and marking the Ballot in the space provided.  Holders of Allowed General Unsecured Claims in excess of $100,000 may elect to reduce the amount of such holders Allowed Claim to $100,000 and participate in the Distributions to be paid to Class 10 Convenience Claims.  Such an election constitutes a waiver of the amount of such holder's Allowed General Unsecured Claim in excess of $100,000, and such holder shall be deemed to release the Debtor and Reorganized Debtor from any and all liability for such excess amount.

Each holder of an Allowed Convenience Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Convenience Claim, one of the following forms of treatment:

(i) Cash equal to the amount of the Allowed Convenience Claim up to $100,000, on or as soon as practicable after the later of (1) the Effective Date and (2) the date that is ten (10) Business Days after a Class 2 Unsecured Priority Claim becomes an Allowed Convenience Claim by a Final Order; or

(ii) Such other treatment as the Debtor and such holder shall have agreed upon in writing.  The Debtor estimates that the payments to be made to Holders of Class 10 shall be approximately $4,605,149.07.

k.     CLASS 11 — ENVIRONMENTAL CLAIMS

Environmental Claims are all Claims against the Debtor, including, but not limited to the Claims listed on Attachments 17(a), (b), and (c) of the Debtor's Statement of Financial Affairs, as may be amended from time to time.  The Debtor has reviewed the scope of its anticipated environmental liabilities and is evaluating the acquisition of insurance coverage to

---

(...continued)

Claims provided in this Disclosure Statement are based on the Debtor's risk assessments, litigation analysis and book values.

[24] Richard Hylland filed a claim in the amount of $30.4 million in connection with his employment with the Debtor and benefits under the Debtor's non-qualified benefit plans.  The Debtor intends to object to Mr. Hylland's claims.

address the potential risks associated with certain of Debtor's known environmental liabilities. As of the filing of this Disclosure Statement the Debtor estimates that it has environmental liabilities of approximately $44 million. The Debtor is seeking insurance coverage for approximately $28 million of this liability. The Debtor will update this Disclosure Statement as and when more information becomes available.

The Debtor's environmental liabilities include certain liabilities related to a hydroelectric dam located approximately five (5) miles southeast of Missoula, Montana at the confluence of the Clark Fork River and Blackfoot River at Milltown, Montana known as the Milltown Dam (the "Milltown Dam"). On November 15, 2002, the Debtor entered into that certain Environmental Liabilities Support Agreement (the "Environmental Support Agreement") with NorthWestern Energy, LLC ("NWE LLC"), the Debtor's wholly-owned subsidiary, which is the operator and FERC licensee of the Milltown Dam. Pursuant to the Environmental Support Agreement, the Debtor's maximum liability to NWE LLC for environmental liabilities is limited to a maximum cumulative amount of $10.0 million. NWE LLC was subsequently renamed Clark Fork and Blackfoot LLC. As discussed in detail above in Section III(N)(5), the Debtor is seeking approval of various matters relating to Milltown Dam.

The Debtor has excluded from this analysis Environmental Claims that have been fully settled, liquidated or determined by a Final Order or a binding award, agreement or settlement prior to the Petition Date for amounts payable by the Debtor for damages or other obligations in a fixed dollar amount payable in a lump sum or by a series of payments.

l.      CLASS 12 — D&O TRUST CLAIMS

D&O Trust Claims are all claims related to Defense Costs or a Final Award apportioned to an individual plaintiff in any D&O Proceeding in accordance with any court order fully and finally awarding a judgment to the plaintiffs in any D&O Proceeding.

D&O Trust Claims shall include the amount of any Final Award apportioned to an individual plaintiff in any D&O Case in accordance with any court order fully and finally awarding a judgment to the plaintiffs in any D&O Case. D&O Trust Claims shall be paid from the D&O Trust in FIFO order based on the date of entry of the D&O Proceeding Final Order providing for a Final Award in the D&O Proceeding giving rise to such D&O Trust Claim. Among D&O Trust Claims created by the same D&O Proceeding Final Order, D&O Trust Claims will be paid in accordance with the D&O Proceeding Final Order giving rise to such D&O Trust Claim. In addition, post confirmation, on a monthly basis Reorganized Debtor and any other Insured (as defined in the Defense Cost Motion) shall submit to the Trustee a notice setting forth the amount of Debtor Defense Costs approved and incurred during the previous month, together with all documentation necessary to reasonably satisfy the Trustee of the validity of such Debtor Defense Costs (collectively, the "Defense Cost Notice"). The Trustee shall reimburse the Debtor and any other Insureds promptly upon the submission of a Defense Cost Notice and the Trustee's determination that such Debtor Defense Costs are valid.

The D&O Trust shall be funded by the balance of the remaining proceeds in the D&O Policies after contributions to the Settlement Fund as described above. The Debtor estimates the remaining proceeds to be approximately $13.0 million. In the event the D&O Trust funds are exhaused and directors and officers of the Debtor as of the Petition Date have outstanding and unpaid Defense Cost Claims, the Reorganized Debtor shall pay such claims up

to and not to exceed $5.0 million when such claims are determined to valid by the Trustee under the D&O Trust.

m.     CLASS 13 — OTHER EQUITY AND INTEREST HOLDER CLAIMS

Other Equity and Interest Holder Claims are claims of holders of (a) a share in the Debtor, whether or not transferable or denominated "stock" or a similar security, or (b) an option, warrant, or a right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (a) of this paragraph, whether vested or unvested, exercised or outstanding.  On the Effective Date, all Equity Interests shall be canceled, annulled and extinguished and holders of Equity Interests shall not be entitled to receive or retain any property or interest in property under the Plan on account of such Equity Interests.

n.     CLASS 14 – SECURITIES CLAIMS

Pursuant to the Plan and the Stipulation of Settlement, the Debtor and various D&O Insurance Contributors will establish a settlement fund (the "Settlement Fund") in the amount of $41 million (of which approximately $37 million is to be contributed from the D&O Policies, and $4 million is to be contributed from other Persons and parties) to settle the Class Action.

Class 14 Claims will be discharged and the Holders thereof shall be forever barred from seeking to recover any payment on their Securities Claims from the Debtor, Reorganized Debtor, or the Released Parties.

Holders of Securities Claims may elect to refuse to accept the proposed treatment provided in the Class Action Settlement Documents (the "Opt-Out Election").  The holders of Securities Claims who exercise the Opt-Out Election and preserve their rights to proceed against the Debtor in the District Court in accordance with the requirements of the Class Action Settlement Documents, shall be holders of Class 15 Claims.

Holders of Securities Claim who do opt-out and become holders of Class 15 Claims shall not be entitled to any Distributions under the Plan and Class 15 Claims when liquidated and a D&O Proceedings Final Order obtained shall be channeled to the D&O Trust.

Distributions from the Settlement Fund shall be made in the amounts, at the times and in the manner provided for in the Class Action Settlement Documents, which shall also govern requirements for qualifying for distributions, the manner and time of the giving of notices, the forms of the documents to be filed by holders of Securities Claims and all other matters concerning the Class Action and its settlement other than as specifically provided for in the Plan.  Neither the Debtor nor Reorganized Debtor shall have any responsibility with respect to the Class Action Settlement Documents or the disposition of the Settlement Fund, other than to cooperate in certain respects in the gathering of certain information with respect thereto and coordinating with the carriers of the D&O Policies regarding payment.

The defendants in the Class Action have the option, in their sole discretion, to terminate the Stipulation of Settlement if the amount of the securities as to which an Opt-Out Election is properly exercised exceeds five percent (5%) of such securities, or an amount otherwise agreed to by the defendants in the Class Action.

If the option to terminate the Stipulation of Settlement is not exercised, each holder of a Class 14 Claim will, pursuant to the Class Action Settlement Documents, release all Securities Claims such holder may have against the Debtor, its subsidiaries and affiliates, the other defendants in the Class Action and the present or former officers and directors of the Debtor, its subsidiaries and affiliates or those directors who are defendants. Class 14 Claims are unimpaired, and therefore, shall not be entitled to vote to accept or reject the Plan.

o.    CLASS 15   OPT-OUT SECURITIES CLAIMS

On the Effective Date, all holders of Opt-Out Securities Claims upon receipt of a D&O Proceeding Final Order shall be channeled to the D&O Trust and shall receive the same treatment as Class 12. Holders of Class 15 Claims shall not be entitled to receive or retain any property or interest in property under the Plan. In order to preserve any Securities Claim it may have against the Debtor, each holder of an Opt-Out Securities Claim must execute an Opt-Out Form. Submission of an Opt-Out Form that does not indicate to the contrary, will be deemed to be an election to preserve such Claim in the District Court sitting in bankruptcy and seek a D&O Proceedings Final Order from the District Court.

**D.    Description of Means of Execution and Transactions to be Implemented in Connection with the Plan**

(1)    Plan Funding.

The funds utilized to make Cash payments under the Plan have been and/or will be generated from, among other things, the operation of the Debtor's businesses, the sale of certain subsidiary assets and distribution of the proceeds to the Debtor, and cash on hand on the Effective Date. In addition, the Debtor anticipates entering into a new $75 million working capital credit facility to be effective upon the Debtor's exit from Chapter 11.

The D&O Trust shall be funded by the balance of the remaining proceeds in the D&O Policies after contributions to the Settlement Fund as described in the Plan. The Debtor estimates the remaining proceeds to be approximately $13.0 million. In the event the D&O Trust Funds are exhausted and directors and officers of the Debtor as of the Petition Date have outstanding and unpaid Defense cost claims, the Reorganized Debtor shall pay such claims up to and not to exceed $5.0 million when such claims are determined to be valid by the Trustee under the D&O Trust.

(2)    Reorganized Debtor Charter.

On the Effective Date, the Reorganized Debtor Charter will become effective. The Reorganized Debtor Charter, together with the provisions of the Plan, shall, as applicable, provide for, among other things, the incorporation of Reorganized Debtor as a "C" corporation, the authorization and issuance of the New Debtor Common Stock, and such other provisions as are necessary to facilitate consummation of the Plan, including provisions prohibiting the issuance of non-voting equity securities in accordance with Section 1123(a)(6) of the Bankruptcy Code, all without any further action by the stockholders or directors of the Debtor, Debtor-in-Possession or Reorganized Debtor.

**(3)**    New Debtor Common Stock.

On the Effective Date, Reorganized Debtor shall:  (i) have authorized capital of 200,000,000 shares of New Debtor Common Stock and 50,000,000 shares of "blank check" preferred stock; and (ii) issue, in accordance with the terms of the Plan, 35,500,000 shares of New Debtor Common Stock.  All shares of New Debtor Common Stock to be issued pursuant to the Plan shall be, upon issuance, fully paid and non-assessable, and shall be subject to dilution only as may be expressly set forth in the Plan or in the Plan Documents or as may be allowed pursuant to the Reorganized Debtor Charter, and the holders thereof shall have no preemptive or other rights to subscribe for additional shares.

**(4)**    Cancellation and Surrender of Existing Securities and Agreements.

Except as may otherwise be provided in the Plan, on the date Distributions are made, the promissory notes, share certificates, bonds and other instruments evidencing any Claim or Equity Interest shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtor under the certificate of incorporation, agreements, indentures and certificates of designations governing such Claims and Equity Interests, as the case may be, shall be discharged and released.

Except as otherwise provided herein or agreed by Reorganized Debtor, each holder of a promissory note, share certificate, bond or other instrument evidencing a Claim or Equity Interest, shall surrender such promissory note, share certificate, bond or instrument to Reorganized Debtor (or the Disbursing Agent).  No Distribution of property hereunder shall be made to or on behalf of any such holders unless and until such promissory note, share certificate, bond or instrument is received by Reorganized Debtor (or the Disbursing Agent), or the unavailability of such promissory note, share certificate, bond or instrument is established to the reasonable satisfaction of Reorganized Debtor (or the Disbursing Agent), or such requirement is waived by Reorganized Debtor.  Reorganized Debtor may require any holder that is unable to surrender or cause to be surrendered any such promissory notes, share certificates, bonds or instruments to deliver an affidavit of loss and indemnity reasonably satisfactory to Reorganized Debtor.  Any holder that fails within the later of one year after the Effective Date and the date of Allowance of its Claim or Equity Interest: (i) to surrender or cause to be surrendered such promissory note, share certificate, bond or instrument; and (ii) if requested, to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to Reorganized Debtor (or the Disbursing Agent), shall be deemed to have forfeited all rights, Claims and Causes of Action against the Debtor and Reorganized Debtor and shall not participate in any Distribution hereunder.

**(5)**    Continuation of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Each of the injunctions relating to the D&O Proceedings and the D&O Trust as set forth in the Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan.  Notwithstanding anything to the

contrary contained in the Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

In the event that the D&O Trust determines that an Injunction Default may have occurred, the D&O Trust shall be entitled, by motion or adversary proceeding, in its sole discretion, to seek a determination by the Bankruptcy Court that an Injunction Default has occurred, and the D&O Trust Channeling Injunction shall be of no further force and effect with respect to the Released Parties.

**(6)**    Revesting of Assets.

Except as otherwise provided by the Plan, upon the Effective Date, title to all properties and assets of the Debtor dealt with by the Plan shall pass from the Debtor to Reorganized Debtor free and clear of all Claims, Liens, encumbrances and interests of creditors and of equity security holders (except those Claims, Liens, encumbrances and interests created or permitted to continue to be retained pursuant to the Plan) and the Confirmation Order shall be a judicial determination of discharge and extinguishment of all Claims, Liens or Equity Interests (except those created or permitted to continue to be retained pursuant to the Plan). All pre-Effective Date liabilities of the Debtor are treated and/or discharged in accordance with the terms of the Plan and shall not in any manner be (or be deemed to be) transferred or assumed by Reorganized Debtor. On the Effective Date, or as soon thereafter as practicable, the Disbursing Agent shall make all Distributions required under the Plan in satisfaction of Allowed Claims against the Debtor including, but not limited to, the following: (i) the consideration described in Section 4.1(b) of the Plan to the holders of Allowed Priority Claims in full and final satisfaction of such Priority Claims; (ii) the consideration described in Section 4.2(b) of the Plan to the holders of Allowed Unsecured Priority Claims in full and final satisfaction of such Unsecured Priority Claims; (iii) the consideration described in Section 4.3(b) of the Plan to the holders of Allowed Bank One DIP Financing Claims in full and final satisfaction of such Bank One DIP Financing Claims; (iv) the consideration described in Section 4.7(c) of the Plan to the holders of Allowed Unsecured Note Claims in full and final satisfaction of such Unsecured Note Claims; (v) the consideration described in Section 4.8(c) of the Plan to the holders of Allowed Unsecured Subordinated Note Claims in full and final satisfaction of such Unsecured Subordinated Note Claims; (vi) the consideration described in Section 4.9(c) of the Plan to the holders of the Allowed General Unsecured Claims in full and final satisfaction of such General Unsecured Claims; and (vii) the consideration described in Section 4.10(b) of the Plan to the holders of the Allowed Unsecured Convenience Claims, in full and final satisfaction of such Unsecured Convenience Claims.

**(7)**    Revesting of Railroad Licenses in Reorganized Debtor's Name.

On November 15, 2002, the Debtor acquired certain utility operating assets previously held by the Montana Power Company from Northwestern Energy, LLC, including certain railroad permits. Consistent with the terms of the underlying transaction, the Debtor obtained blanket assignments of permits for a fee of $1,000 from Union Pacific Railroad. On the Effective Date, or as soon thereafter as practicable, the Disbursing Agent shall pay $1,000 to Burlington Northern Santa Fe Railroad Company, Montana Rail Link, Inc., Montana Western

Railway Company, and Rarus Railway Company and shall receive blanket assignment of all permits currently held in the name of Montana Power Company or NorthWestern Energy, LLC.

    **(8)**    <u>General Release of Liens.</u>

    Except as otherwise provided in the Plan, or in any contract, instrument, indenture or other agreement or document created in connection with the Plan or the implementation thereof, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against property of the Estate are hereby released and extinguished, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests will revert to Reorganized Debtor as applicable, and the successors and assigns thereof.

    **(9)**    <u>Full and Final Satisfaction.</u>

    All payments and all Distributions hereunder shall be in full and final satisfaction, settlement, release and discharge of all Claims and Equity Interests, except as otherwise provided in the Plan.

    **(10)**    <u>Waiver of Avoidance Actions.</u>

    As of and subject to the occurrence of the Effective Date, the Debtor and Reorganized Debtor, for and on behalf of themselves and their Estate, hereby waive and release any Avoidance Actions; <u>provided</u>, <u>however</u>, that the foregoing waiver and release shall not apply to any such Causes of Action that are pending on the Effective Date.

    **(11)**    <u>Termination of Subordination Rights.</u>

    Except as otherwise provided in the Plan, the classification and manner of satisfying all Claims and Equity Interests under the Plan take into consideration all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, Sections 510(b) and (c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Equity Interest may have against other Claim or Equity Interest holders with respect to any Distribution made pursuant to the Plan. On the Effective Date, all contractual, legal or equitable subordination rights that a holder of a Claim or Equity Interest may have with respect to any Distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined and Distributions pursuant to the Plan shall not be subject to payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by any beneficiary of such terminated subordination rights.

    **(12)**    <u>Effect of Convenience Class Election.</u>

    By voting to accept the Plan and marking the Ballot in the space provided for electing treatment as a Convenience Claim in accordance with Section 4.10 of the Plan, the holder of an Allowed General Unsecured Claim of $100,000 or more may elect to reduce the amount of such holder's Allowed Claim to $100,000 and only receive treatment as an Allowed Convenience Claim having a value of $100,000 on the terms provided in Section 4.10 of the Plan. Such an election constitutes a waiver of the amount of such holder's Allowed General

Unsecured Claim in excess of $100,000, and such holder shall be deemed to release the Debtor and Reorganized Debtor from any and all liability for such excess amount.  In order to be treated as an Allowed Convenience Claim, the holder of an Allowed General Unsecured Claim must vote to accept the Plan and mark its ballot in the space provided for electing treatment as a Convenience Claim.

**(13)** Administration Pending Effective Date.

Prior to the Effective Date, the Debtor shall continue to operate its businesses as a debtor-in-possession, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.  After the Effective Date, Reorganized Debtor may operate its businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article 13 of the Plan.

**(14)** Setoffs.

Nothing contained in the Plan shall constitute a waiver or release by the Debtor of any rights of setoff the Debtor may have against any Person unless otherwise agreed in writing by the Debtor prior to the Effective Date or Reorganized Debtor after the Effective Date.

**(15)** Post-Confirmation Fees, Final Decree.

Reorganized Debtor shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C.§ 1930(a)(6) and the filing of post-confirmation reports, until a final decree is entered.  A final decree shall be entered as soon as practicable after Distributions have commenced under the Plan.

**(16)** Section 1145 Exemption.

The issuance of the New Common Stock and other securities that may be deemed to be issued pursuant to the Plan shall be exempt from registration requirements in accordance with Section 1145 of the Bankruptcy Code.

**(17)** Indenture Trustee Charging Liens.

On the Effective Date, in full satisfaction of Allowed Claims secured by any Indenture Trustee Charging Lien, the Unsecured Note Trustee and the Unsecured Subordinated Note Trustees will receive from Reorganized Debtor, Cash equal to the amount of such Allowed Claims, and upon such payment, the Indenture Trustee Charging Lien will be automatically deemed released.  Any Distributions to holders of Unsecured Notes and Unsecured Subordinated Notes pursuant to the Plan will not be reduced on account of payment of Allowed Claims secured by Indenture Trustee Charging Liens.

On the Effective Date, in full satisfaction of Allowed Claims secured by any Lien or other priority in payment or right available to a trustee of the Montana Indenture or South Dakota Indenture pursuant to the Montana Indenture or the South Dakota Indenture or otherwise available to such trustee under applicable law, for the payment of reasonable fees, costs and

expenses, including, without limitation, the reasonable fees and expenses of such trustee's professionals, such trustee will receive from Reorganized Debtor, Cash equal to the amount of such Allowed Claims, and upon such payment, such Liens will be automatically deemed released.  Any Distributions to holders of Montana First Mortgage Bondholders Claims and South Dakota First Mortgage Bondholders Claims pursuant to the Plan will not be reduced on account of payment of Allowed Claims secured by the Liens described in the paragraph.

## E.     **Distributions and Treatment of Disputed, Contingent and Unliquidated Claims and Equity Interests**

### (1)     Disbursement of Funds and Delivery of Distribution

Subject to Bankruptcy Rule 9010, all Distributions under the Plan shall be made by Reorganized Debtor (or the Disbursing Agent) to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Confirmation Date, unless the Debtor or Reorganized Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules; provided however, all Distributions to the DIP Lenders under Section 4.3 of the Plan shall be made by Reorganized Debtor (or the Disbursing Agent) to Bank One, N.A. for disbursement to the DIP Lenders.

Any payment of Cash made by Reorganized Debtor (or the Disbursing Agent) pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer; provided that all Distributions of Cash to the DIP Lenders shall be made by Reorganized Debtor (or the Disbursing Agent) to Bank One, N.A. by wire transfer of immediately available funds for disbursement to the DIP Lenders.

Any payment or Distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (rounding down in the case of $.50 or less and rounding up in the case of more than $.50).

No fractional shares of New Common Stock shall be distributed under the Plan. When any Distribution on account of an Allowed Claim pursuant to the Plan would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, such fractional interests shall be combined into as many whole shares as possible and shall be redistributed to holders of Allowed Claims with fractional interests, in descending order, until all such whole shares are distributed.

As of the close of business on the Confirmation Date, the claims register (for Claims) and the transfer ledgers (for Secured Notes and Unsecured Notes) shall be closed, and there shall be no further changes in the record holders of any Claims or Equity Interests.  The Debtor, Reorganized Debtor, the Unsecured Note Trustee and the Unsecured Subordinated Note Trustees shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the close of business on the Confirmation Date, and shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan

pursuant to Section 7.1 of the Plan) with only those holders of record as of the close of business on the Confirmation Date.

### (2)    Objections to and Resolutions of Administrative Expense Claims, Claims and Equity Interest

Except as to applications for allowance of compensation and reimbursement of expenses under Sections 330 and 503 of the Bankruptcy Code (with respect to which procedures respecting objections shall be governed by Section 2.2(b) of the Plan and the Confirmation Order or other Final Order), any party in interest may file objections to the allowance of any Administrative Expense Claims, Claims and Equity Interests subsequent to the Confirmation Date. All objections shall be litigated to Final Order; provided, however, that the Reorganized Debtor shall have the authority to compromise, settle, otherwise resolve or withdraw any objections filed by Reorganized Debtor. Unless otherwise ordered by the Bankruptcy Court, all objections to the allowance of Administrative Expense Claims, Claims or Equity Interests that are the subject of proofs of claim or requests for payment filed with the Bankruptcy Court (other than applications for allowances of compensation and reimbursement of expenses), shall be filed and served upon the holder of the Administrative Expense Claim, Claim or Equity Interest as to which the objection is made as soon as is practicable, but in no event later than ninety (90) days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

### (3)    Disputed Claims Reserve

The Plan provides that Reorganized Debtor shall maintain a Disputed Claim Reserve equal to the aggregate of any distributable amounts of Cash and New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in their Disputed Claim Amounts or such lesser amount as required by a Final Order. For the purposes of effectuating the provisions of the Plan and the Distributions to holders of Allowed Claims, the Bankruptcy Court, on or prior to the Effective Date or such date or dates thereafter as the Bankruptcy Court shall set, may fix or liquidate the amount of Disputed Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed the amounts of the Disputed Claims for purposes of Distribution under the Plan. In lieu of fixing or liquidating the amount of any Disputed Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed Claim (singularly or in the aggregate), or such amount may be fixed by agreement in writing by and between the Debtor and the holder of a Disputed Claim.

### (4)    Distributions Upon Allowance of Disputed Claims

The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive Distributions from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such Distributions shall be made in accordance with the Plan based upon the Distributions that would have been made to such holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus any interest, dividends or other Distributions earned thereon. No holder of a Disputed Claim shall have any Claim against the Disputed Claims Reserve or Reorganized Debtor with respect to such Claim until such Disputed

Claim shall become an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest, dividends or other Distribution on such Disputed Claim except as provided in Section 7.6 of the Plan.

**(5)**    Surplus Distribution

The following assets constitute Surplus Distributions: (i) Distributions under the Plan that are unclaimed for a period of one year after the date of such Distribution, and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the amount of Cash or New Common Stock in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash or New Common Stock actually distributed on account of such Disputed Claim, plus any interest, dividends or other Distributions earned thereon. On each Subsequent Distribution Date, the holders of Allowed Claims shall receive a Pro Rata Share in the Surplus Distributions attributable to such holders' Class; provided, however that Reorganized Debtor shall not be under any obligation to make Surplus Distributions on a Subsequent Distribution Date unless the aggregate market value of the Surplus Distributions to be distributed on such Subsequent Distribution Date exceeds $50,000 in any Class; provided, further that if the final distribution required under the Plan is less than $25,000 aggregate market value in any Class such Surplus Distributions shall revest in Reorganized Debtor.

**(6)**    Aggregation of Claims.

Subject to Article 8 of the Plan, each and every General Unsecured Claim filed or to be filed in the Chapter 11 Case of a single holder against the Estate of the Debtor shall be aggregated and deemed one single Claim filed in Class 9.

**(7)**    Distributions Relating to Allowed Insured Claims.

Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law. Nothing contained in this Section shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any entity may hold against any other entity, including, without limitation, insurers under any policies of insurance.

**F.    Executory Contracts and Unexpired Leases; Indemnification Claims; and Retiree Benefits**

**(1)**    Executory Contracts and Unexpired Leases

Any unexpired lease or executory contract that has not been expressly rejected by the Debtor or treated in the Plan with the Bankruptcy Court's approval on or prior to the Confirmation Date shall, as of the Effective Date, be deemed to have been assumed by the Debtor unless there is pending before the Bankruptcy Court on the Effective Date a motion to reject such unexpired lease or executory contract (including, but not limited to, any CBAs) or such executory contract or unexpired lease is otherwise designated for rejection (including, but

not limited to, any collective bargaining agreements), provided, that (a) such lease or executory contract is ultimately rejected, (b) the filing of the Confirmation Order shall be deemed to be a rejection of all then outstanding unexercised stock options, warrants and similar rights and (c) in accordance with Section 1123(a)(5)(G) of the Bankruptcy Code, on the Effective Date, or as soon as practicable thereafter, Reorganized Debtor shall cure all defaults under any executory contract or unexpired lease assumed pursuant to Section 8.1 of the Plan by making a Cash payment in an amount agreed to between Reorganized Debtor and the claimant, or as otherwise fixed pursuant to a Final Order.

(2)    Claims Deadline for Filing Proofs of Claims Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.

Claims arising out of the rejection of an executory contract or unexpired lease designated for rejection pursuant to the Confirmation Order, must be filed with the Bankruptcy Court and/or served upon the Debtor or Reorganized Debtor or as otherwise may be provided in the Confirmation Order by no later than thirty (30) days after the notice of entry of an order approving such rejection. Any Claims not filed within such time will be forever barred from assertion against the Debtor, its Estate, Reorganized Debtor and its property, and the holders thereof shall not be entitled to any Distribution under the Plan or otherwise from the Debtor or Reorganized Debtor. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims under the Plan.

(3)    Insurance Policies.

Each of the Debtor's insurance policies (except for the proceeds of certain D&O Policies being assigned to the D&O Trust) and any agreements, documents or instruments relating thereto, including, without limitation, any retrospective premium rating plans relating to such policies, are treated as executory contracts under the Plan. Notwithstanding the foregoing, distributions under the Plan to any holder of a Claim covered by any such insurance policies and related agreements, documents or instruments that are assumed hereunder, shall be in accordance with the treatment provided under Article 4 and Article 6 hereof. Each of the D&O Policies being assigned to the D&O Trust and any agreements, documents or instruments relating thereto, including, without limitation, any retrospective premium rating plans relating to such policies, are treated as assumed under the Plan. Nothing contained in this Section 8.3 shall constitute or be deemed a waiver of any Cause of Action that the Debtor may hold against any Person, including, without limitation, the insurer under any of the Debtor's policies of insurance.

(4)    Indemnification Claims

Indemnity claims not channeled to the D&O Trust shall be paid: (i) if Allowed on the Effective Date, in full in cash on the Effective Date; and (ii) if not then Allowed, such indemnity claim shall be assumed and paid in the ordinary course when such claim is Allowed.

(5)    Compensation and Benefit Programs

Except as otherwise provided in the Plan or subsequent motion prior to the Effective Date, all employment plans, practices, programs and policies maintained by the Debtor

as of the Effective Date shall remain in full force and effect following the Effective Date, subject to any and all rights of the Debtor under applicable non-bankruptcy law to amend or terminate such plans, practices, programs and policies.

**(6)**    Retiree Benefits

Payment of any Retiree Benefits (as such benefits may have been modified during the Chapter 11 Case) shall be continued solely to the extent, and for the duration of the period, the Debtor is contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtor under applicable law (including, without limitation, the Debtor's right to amend or terminate such benefits prior to or after the Effective Date).

**(7)**    QF Agreements

As of the Petition Date, the Debtor was party to approximately fourteen (14) power purchase agreements giving rise to the QF Claims as defined herein. As of the filing of the Plan, the Debtor has elected not to file a motion seeking to request the rejection of any of the QF agreements. Unless the Debtor files a motion to reject any of the QF agreements on or before the Confirmation Date, as of the Effective Date, such QF agreements shall be deemed assumed by the Reorganized Debtor.

**G.    Corporate Governance and Management**

**(1)**    Management of Reorganized Debtor.

On the Effective Date, the management, control and operation of Reorganized Debtor shall become the general responsibility of the board of directors of Reorganized Debtor (the "New Board"), which shall, thereafter, have responsibility for the management, control and operation of Reorganized Debtor in accordance with applicable law.

**(2)**    Directors and Officers of Reorganized Debtor.

a.    BOARD OF DIRECTORS OF REORGANIZED DEBTOR.

The initial members of the New Board of Reorganized Debtor shall consist of seven (7) of which six (6) shall be designated by the Committee and one (1) of which shall be the Chief Executive Officer of the Reorganized Debtor. It is anticipated that a number of members of the New Board will have experience and expertise in the regulated utility industry. The Debtor is also hopeful that at least one (1) member of the New Board will be a resident of the State of Montana. The Debtor intends to advise the MPSC, the MCC, the SDPUC and the NPSC regarding the process used to nominate members of the New Board. The designation of the board members for Reorganized Debtor shall be filed with the Bankruptcy Court on or prior to five (5) business days prior to the commencement date of the Confirmation Hearing, or such other date as the Bankruptcy Court may establish. On the Effective Date, the authority, power and incumbency of the persons then acting as directors of the Debtor shall be terminated and such directors shall be deemed to have been removed by unanimous vote of stockholders, and the

directors of Reorganized Debtor that are selected in accordance with this Section 9.2 shall be deemed to have been elected by unanimous vote of the stockholders and shall have responsibility for the management, control and operations of Reorganized Debtor.

        b.     OFFICERS OF REORGANIZED DEBTOR.

On the Effective Date, the officers of the Debtor immediately prior to the Effective Date shall serve as the officers of Reorganized Debtor.  After the Effective Date, the officers of Reorganized Debtor shall be determined by the New Board in accordance with Delaware law.

    **(3)**     Corporate Action.

Pursuant to Section 303 of the Delaware General Corporation Law, all terms of the Plan may be put into effect and carried out without further action by the directors or stockholders of the Debtor or Reorganized Debtor, who shall be deemed to have unanimously approved the Plan and all agreements and transactions provided for or contemplated herein, including, without limitation:  (i) the adoption of the Reorganized Debtor Charter and by-laws; (ii) removal of existing directors and the initial selection of directors and officers of Reorganized Debtor; and (iii) the distribution of Cash and the issuance and distribution of New Common Stock pursuant to the Plan; and (iv) implementation of the New Incentive Plan.

    **(4)**     Reorganized Debtor Corporate Structure

Reorganized Debtor's regulated energy and utility businesses and assets will be "ring fenced" in that such assets and businesses will be owned by Reorganized Debtor as the parent company.  All of the Debtor's and Reorganized Debtor's non-regulated energy related or other business will be held in wholly owned subsidiaries of Reorganized Debtor.  These wholly owned subsidiaries have, and are anticipated to have, no employees of their own, but will be served by Reorganized Debtor's utility employees whose costs will be charged to the non-regulated subsidiaries through intercompany transfer pricing, which pricing mechanisms have heretofore been established with the approval of the SDPUC.  Any debt incurred by the non-regulated subsidiaries operations will be incurred at the subsidiary level and will be non-recourse to Reorganized Debtor.

## H.    Exculpation; Release; Injunctions; and Discharge

    **(1)**     Exculpation.

None of the Debtor, Reorganized Debtor, the DIP Lenders, the Committee or any of their respective Affiliates or any of their respective stockholders, members, officers (both former and current), directors (both former and current), employees, advisors, attorneys, financial advisors, agents or Professionals (collectively, the "Exculpated Parties") shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the preparation or formulation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan;

provided, however, that nothing in the Plan shall, or shall be deemed to, release the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, their respective obligations or covenants arising pursuant to the Plan.

    **(2)**    <u>Release of General Released Parties.</u>

    As of the Effective Date, in consideration for, and as part of the treatment afforded to the holders of Claims and Equity Interests under the Plan, and for other valuable consideration, each of the Debtor, Reorganized Debtor, the DIP Lenders, the Committee, and each of their respective Affiliates and their respective parents, subsidiaries, Affiliates, stockholders, members, officers (both former and current), directors (both former and current), employees, advisors, attorneys, financial advisors, accountants, auditors, agents or Professionals (collectively, the "<u>General Released Parties</u>") shall be deemed forever released and discharged from any and all known and unknown Causes of Action of any nature that any Person (including, without limitation, any holder of Claims and Equity Interests under the Plan) may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the General Released Parties based on any act or omission relating to the Chapter 11 Case on or prior to the Effective Date, excluding gross negligence and willful misconduct; <u>provided</u>, <u>however</u>, that the foregoing release and discharge shall not apply to Causes of Action that arise from obligations or rights created under or in connection with the Plan or any agreement provided for or contemplated in the Plan.

    **(3)**    <u>Mutual Releases by General Released Parties.</u>

    As of the Effective Date, each of the General Released Parties hereby unconditionally forever releases, waives and discharges all known and unknown Causes of Action of any nature that such General Released Party has may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the other General Released Parties based on any act or omission relating to the Debtor or the Debtor's business operations (including, without limitation, the organization or capitalization of the Debtor or extensions of credit and other financial services and accommodations made or not made to the Debtor) or the Chapter 11 Case on or prior to the Effective Date; <u>provided</u>, <u>however</u>, that the foregoing release, waiver and discharge shall not apply to Causes of Action that arise from obligations or rights created under or in connection with the Plan or any agreement provided for or contemplated in the Plan.

    **(4)**    <u>Discharge.</u>

    Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the Distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release and discharge as against the Debtor of any debt that arose before the Effective Date, and any debt of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims and Equity Interests of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of claim or Equity Interest based on such debt, obligation or equity interest is filed or deemed filed under Section 501 of the Bankruptcy Code,

(ii) such Claim or Equity Interest is Allowed under Section 502 of the Bankruptcy Code or (iii) the holder of such Claim or Equity Interest has accepted the Plan.

**(5)**    Injunctions.

a.    INJUNCTION RELATED TO DISCHARGE.

As of the Effective Date and subject to its occurrence, all Persons that have held, currently hold or may have asserted, directly, indirectly, derivatively or otherwise, a Claim, a Cause of Action or an Equity Interest or other right of a holder of an Equity Interest that is discharged, released or terminated pursuant to the Plan, are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, creating, perfecting or enforcing any lien or encumbrance, asserting a set-off, right or subrogation or recoupment of any kind against any debt, liability or obligation due to any such releasing Person, and from commencing or continuing any action, in any manner or in any place where the foregoing does not comply with or is inconsistent with the provisions of the Plan, and the Confirmation Order shall provide for such injunctions.

b.    INJUNCTION RELATING TO EXCULPATION AND RELEASE.

As of the Effective Date, except as otherwise provided in the Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, derivatively or otherwise against any or all of the Exculpated Parties or General Released Parties, on account of or respecting any Claims, debts, rights, Causes of Action or liabilities exculpated, released or discharged pursuant to the Plan, and the Confirmation Order shall provide for such injunctions.

**I.    Confirmation and Effectiveness of Plan**

**(1)**    Condition to Confirmation.

It is a condition to the entry of the Confirmation Order that the following conditions have been satisfied or waived pursuant to Section 11.1 of the Plan:

a.    the Confirmation Order shall be in form and substance reasonably satisfactory to the Debtor;

b.    the Bankruptcy Court shall have made findings and determinations, among others, substantially to the effect as follows:

(i)    The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are to be implemented in accordance with the Plan and the D&O Trust;

(ii)    As of the Petition Date, the Debtor has been named as a defendant in securities actions seeking damages to which the Debtor is entitled to reimbursement from the D&O Policies;

(iii)    The D&O Trust is to use its assets and income to pay D&O Trust Claims;

(iv)    The Debtor may be subject to substantial future demands for payment arising out of the same or similar conduct or events that

gave rise to the D&O Trust Claims, which are addressed by the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction;

(v) The actual amounts, numbers, and timing of demands cannot be determined;

(vi) Pursuit of demands outside the procedures prescribed by the Plan and the TDP is likely to threaten the Plan's purpose to deal equitably with D&O Trust Claims;

(vii) The terms of the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in the Plan and described in the Disclosure Statement;

(viii) Pursuant to court orders, the TDP, or otherwise, the D&O Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of D&O Trust Claims or other comparable mechanisms, that provide reasonable assurance that the D&O Trust shall value, and be in a financial position to pay, D&O Trust Claims that involve similar D&O Trust Claims in substantially the same manner;

(ix) The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are essential to the Plan and the Debtor's reorganization efforts;

(x) An identity of interests exists among the Debtor and the Released Parties such that a Claim asserted against any of the Released Parties gives rise to a Claim against the Debtor by the operation of the law of indemnity and contribution;

(xi) In light of the benefits provided, or to be provided, to the D&O Trust on behalf of each Released Party, the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are fair and equitable with respect to the persons that might subsequently assert demands that would constitute D&O Trust Claims against any Released Party; and

(xii) The Plan and its acceptance otherwise comply with Section 105 of the Bankruptcy Code;

c. the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction shall have been implemented in connection with the D&O Trust and the Plan; and

d. the D&O Trust shall have the sole and exclusive authority as of the Effective Date to defend all D&O Trust Claims.

**(2)** <u>Conditions Precedent to Effective Date of the Plan.</u>

The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 11.3 of the Plan:

a.    the Confirmation Order, in form and substance reasonably acceptable to the Debtor and the Committee, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

b.    the Bankruptcy Court shall have entered or affirmed an order or orders entering the D&O Trust Channeling Injunction and the D&O Entity Injunction;

c.    each of the Plan Documents and the New Common Stock, in form and substance reasonably acceptable to the Debtor and the Committee, shall have been effected or executed and delivered, and shall be validly issued and outstanding;

d.    the Debtor shall have entered into modified CBAs, to the extent necessary, with its labor unions in form and substance acceptable to the Debtor;

e.    all outstanding fees of Professionals retained by the Debtor and the Committee that are due and payable and have been authorized to be paid as of the Effective Date pursuant to an order of the Bankruptcy Court shall have been paid, and a reserve, sufficient to pay the reasonable estimated post-Effective Date fees and expenses of such Professionals shall have been established by the Debtor for the benefit of such Professionals;

f.    all actions, other documents, and agreements necessary to implement the Plan shall have been effected or executed and delivered;

g.    the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction shall be in full force and effect;

h.    the Debtor and the Trustee shall have executed the D&O Trust Agreement;

i.    the D&O Insurance Entities shall have executed and delivered counterparts of the Insurance Assignment Agreement and such agreement shall be in full force and effect;

j.    all Trust Assets that are to be delivered to the D&O Trust on the Effective Date shall have been delivered to the D&O Trust in accordance with the requirements of all applicable Plan Documents;

k.    the Reorganized Debtor Charter shall be in full force; and

l.    the Debtor shall have obtained either (i) a private letter ruling establishing that the D&O Trust is a "qualified settlement fund" pursuant to Section 468B of the Internal Revenue Code and the regulations issued pursuant thereto, or (ii) other decisions, opinions, or assurances regarding the tax consequences of the Plan satisfactory to the Debtor and the Committee.

**(3)**    Waiver of Conditions.

One or more of the conditions contained in Sections 11.1 and 11.2 of the Plan may be waived by the execution of a written consent by or on behalf of the Debtor in its judgment reasonably exercised.

       **(4)**    <u>Effect of Failure of Conditions.</u>

       In the event that one or more of the conditions specified in Section 11.2 of the Plan have not occurred on or before 120 days after the Confirmation Date, upon notification submitted by the Debtor to the Bankruptcy Court, counsel for the Committee, counsel for the DIP Lenders, and counsel for the CSFB Lenders (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtor and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (d) the Debtor's obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

**J.**    <u>**Regulation**</u>

       The Debtor is subject to both federal and state regulation.  The Debtor shall continue to be regulated by: (i) FERC; (ii) the MPSC in accordance with the Montana Public Utilities Law, the MPSC's policies and practices, and any other laws and regulations applicable to investor-owned utilities in the State of Montana with respect to the Debtor's Montana assets and operations; (iii) the SDPUC in accordance with South Dakota Public Utilities Law, the SDPUC's policies and procedures, and any other laws and regulations applicable to investor-owned utilities in the State of South Dakota with respect to the Debtor's South Dakota assets and operations; and (iv) the NPSC in accordance with the Nebraska Sate Gas Regulation Act and the NPSC's rules and regulations applicable to jurisdictional utilities in the State of Nebraska with respect to the Debtor's Nebraska assets and operations.

       No provision in this Plan is intended to alter, modify, increase or decrease any rates, tariffs or agreements relating to rates and/or tariffs.

       Upon emerging from Chapter 11 Reorganized Debtor is not anticipated to be engaged in any non-energy business except for the few Blue Dot locations Blue Dot, as a wholly owned subsidiary of Reorganized Debtor, will continue to own.  Reorganized Debtor will, however, own through wholly owned subsidiaries a few non-regulated energy ventures that are not material to Reorganized Debtor as a whole.  These operations include the non-regulated gas marketing operations with respect to South Dakota and Nebraska, the non Blue Dot HVAC operation with respect to South Dakota and Nebraska; (iii) the non-regulated intrastate pipeline assets located in South Dakota and Nebraska; and (iv) the pipeline assets owned by Reorganized Debtors Canadian-Montana pipeline subsidiary.  To the extent that assets owned by Montana First Megawatts, LLC have not otherwise been disposed of prior to the Effective Date then these assets will continue to be owned by Reorganized Debtor through its wholly owned subsidiary Montana First Megawatts, LLC.

       All of the non-regulated, energy related businesses will continued to be held in wholly owned subsidiaries of Reorganized Debtor.  These companies have and will have no employees of their own but are served and will continue to be served by the Debtor and Reorganized Debtor employees whose costs are and will continue to be charged to the non-

regulated subsidiaries by intercompany transfers. The transfer pricing mechanisms have been established with the approval of the SDPUC.

## K.    Retention of Jurisdiction

Following the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

a.    to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims;

b.    to hear and determine any and all applications by Professionals for compensation and reimbursement of reasonable fees and expenses;

c.    to hear and determine any and all pending applications for the rejection and disaffirmance of executory contracts (including, without limitation, any collective bargaining agreements) and unexpired leases, and fix and allow any Claims resulting therefrom;

d.    to liquidate any Disputed Claim;

e.    to enforce the provisions of the Plan, including the injunction, exculpation and releases provided for in the Plan;

f.    to enable the Debtor to prosecute any and all proceedings which have been or may be brought prior to the Effective Date, or subsequent to the Effective Date, to set aside liens or encumbrances and to recover any transfers, assets, properties, or damages to which the Debtor may be entitled under applicable provisions of the Bankruptcy Code or any federal state, or local laws;

g.    to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;

h.    to determine any Claim or liability to a governmental unit which may be asserted as a result of the transactions contemplated herein;

i.    to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

j.    to hear and determine any matters or disputes respecting the Debtor under the Sections 1113 and 1114 of the Bankruptcy Code;

k.    to hear and determine matters arising under or related to the D&O Trust; and

l.    to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code.

**V.**

**SUMMARY OF CERTAIN MATERIAL DOCUMENTS TO BE EXECUTED OR IMPLEMENTED IN CONNECTION WITH THE PLAN** [25]

The following is a brief summary of the documents and agreements to be executed in connection with the Plan.

**A.    Reorganized Debtor Corporate Charter**

**(1)    Authorized Stock**

The Reorganized Debtor Charter will authorize the issuance of up to 200 million shares of common stock and 50 million shares of preferred stock.  However, the Reorganized Debtor will be prohibited from issuing nonvoting stock to the extent that such issuance is prohibited by Sections 1123 and 365 of the Bankruptcy Code.

**(2)    Board of Directors**

The Reorganized Debtor Charter will provide that the New Board will consist of seven (7) directors.  The New Board will be staggered with the directors divided into three classes.

**(3)    Amendments to Reorganized Debtor Charter and Bylaws**

Generally, amendments to (I) the provisions of the Reorganized Debtor Charter addressing directors, stockholders, liability and indemnity, compromises with creditors, amendments to the Reorganized Debtor Charter, and (II) the amended and restated Bylaws must be approved by at least a majority of the voting power of the outstanding shares entitled to vote on the election of directors, voting together as a single class.

**(4)    Interested Stockholder Transactions**

Generally, any merger with or transfer of assets to an interested stockholder (i.e., a stockholder who beneficially owns 15% of the Reorganized Debtor's voting shares) must be approved by a majority of the disinterested directors.  If a majority of the disinterested directors do not approve the transaction, then the transaction must be approved by at least 66 2/3% of the voting power of the outstanding shares entitled to vote on the election of directors, voting together as a single class, excluding the shares held by the interested stockholder.

---

[25]  The descriptions of the agreements set forth herein are qualified in all respects to the terms and conditions of the agreements themselves.

## B.    The New Incentive Plan

The New Incentive Plan to be developed prior to the Confirmation Date shall be implemented by the Reorganized Debtor's Board of Directors pursuant to the terms of such New Incentive Plan.

## VI.
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

The following is a brief summary of the provisions of the Bankruptcy Code respecting acceptance and confirmation of a plan of reorganization. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

## A.    Acceptance of the Plan

This Disclosure Statement is provided in connection with the solicitation of acceptances of the Plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the allowed Claims of that class that have actually voted or are deemed to have voted to accept or reject a plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of interests as acceptance by at least two-thirds in amount of the allowed interests of that class that have actually voted or are deemed to have voted to accept or reject a plan.

If one or more impaired Classes rejects the Plan, the Debtor may, in its discretion, nevertheless seek confirmation of the Plan if the Debtor believes that it will be able to meet the requirements of Section 1129(b) of the Bankruptcy Code for confirmation of the Plan (which are set forth below), despite lack of acceptance by all impaired classes.

## B.    Confirmation

### (1)    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. Notice of the Confirmation Hearing of the Plan will be provided to all known holders of Claims and Equity Interests or their representatives along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objectant, the nature and amount of Claims or Equity Interests held or asserted by the objectant against the Debtor's Estate or property, and the basis for the objection and the specific grounds in support thereof. Such objection must be filed with the Bankruptcy Court, with a copy forwarded directly to the Chambers of the Honorable Charles G. Case, II,

United States Bankruptcy Court, 844 N. King Street, Wilmington, DE 19801 together with proof of service thereof, and served upon: (a) counsel to the Debtor, Paul, Hastings, Janofsky & Walker, LLP, 600 Peachtree Street, N.E., Suite 2400, Atlanta, Georgia 30308, Attn:  Jesse H. Austin, III, Esq. and Karol K. Denniston, Esq. and Greenberg Traurig, LLP, The Brandywine Building, 1000 West Street, Suite 1540, Wilmington, Delaware 19801, Attn:  Scott D. Cousins, Esq. Victoria Watson Counihan, Esq. and William Chipman, Esq.; (b) counsel to the Committee, Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Alan W. Kornberg, Esq. and Ephraim Diamond, Esq. and The Bayard Firm, 222 Delaware Avenue, Wilmington, Delaware 19801, Attn: Neil B. Glassman, Esq. and Charlene D. Davis, Esq.; (c) counsel to Bank One, N.A., Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606, Attn: Timothy R. Pohl, Esq.; (d) counsel to CSFB, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attn: Mark B. Joachim, Esq.; and (e) the Office of the United States Trustee, 844 King Street, Suite 2313, Lockbox 35, Wilmington, Delaware 19801, Attn: Mark Kenney, Esq. so as to be received no later than the date and time designated in the notice of the Confirmation Hearing.

(2)    Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code.  If so, the Bankruptcy Court shall enter an order confirming the Plan.  The applicable requirements of Section 1129 of the Bankruptcy Code are as follows:

a.    The Plan must comply with the applicable provisions of the Bankruptcy Code;

b.    The Debtor must have complied with the applicable provisions of the Bankruptcy Code;

c.    The Plan has been proposed in good faith and not by any means forbidden by law;

d.    Any payment made or promised to be made by the Debtor under the Plan for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Plan is reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

e.    The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor under the Plan.  Moreover, the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and Equity Interests and with public policy, and the Debtor has disclosed the identity of any insider that Reorganized Debtor will employ or retain, and the nature of any compensation for such insider;

f.    Best Interests of Creditors Test.  With respect to each Class of impaired Claims or Equity Interests, either each holder of a Claim or Equity Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount

that such holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code.  In a Chapter 7 liquidation, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments from the Debtor's estate until all amounts due to senior classes have either been paid in full or payment in full is provided for: (i) first to secured creditors (to the extent of the value of their collateral), (ii) next to priority creditors, (iii) next to unsecured creditors, (iv) next to debt expressly subordinated by its terms or by order of the Bankruptcy Court, and (v) last to holders of equity interests.  Annexed hereto as Exhibit D is a liquidation analysis prepared by the Debtor.  As set forth therein, in light of the foregoing priority, the Debtor believes that if the Chapter 11 Case were converted to a Chapter 7 liquidation, holders of Claims in Classes 7, 8, 9, 10, 11, and 12 would receive less than they will receive under the Plan and holders of all other Claims and Equity Interests would receive no Distributions under the Plan;

g.    All impaired Claims that will receive a Distribution under the Plan are as set forth above at Section IV.

h.    Each class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan;

i.    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Priority Claims (other than Allowed Priority Tax Claims) will be paid in full on the Effective Date and that Allowed Priority Tax Claims will receive on account of such Claims deferred Cash payments, over a period not exceeding six (6) years after the date of assessment of such Claim, of a value, as of the Effective Date, equal to the Allowed amount of such Claim;

j.    At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such class; and

k.    Feasibility.  Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan.  Annexed hereto as Exhibit E are projections for approximately five (5) years following confirmation and a pro forma balance sheet as of the Effective Date which demonstrate that, given estimated expenses and income, and taking into account Cash reserves, Reorganized Debtor will be able to satisfy its obligations under the Plan, as well as its obligations arising in connection with its ongoing business operations.

(3)    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired class.  If any impaired classes reject or are deemed to have rejected the Plan, the Debtor reserves its right to seek the application of the statutory requirements set forth in Section 1129(b) of the Bankruptcy Code for confirmation of the Plan despite the lack of acceptance by all impaired classes.

Section 1129(b) of the Bankruptcy Code provides that notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan shall be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan

does not "discriminate unfairly" and is "fair and equitable" with respect to each class of Claims or interests that is impaired under and has not accepted the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured Claims includes the requirements that (a) the holders of such secured Claims retain the liens securing such Claims to the extent of the allowed amount of the Claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (b) each holder of a secured Claim in the class receive deferred Cash payments totaling at least the allowed amount of such Claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the Debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured Claims includes the requirement that either: (a) such class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such Claim; or (b) if the class does not receive such amount, no class junior to the non-accepting class will receive a Distribution under the plan from the Debtor's estate.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of Equity Interests includes the requirements that either: (a) the plan provides that each holder of an Equity Interest in such class receive or retain under the plan, on account of such Equity Interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such Equity Interest; or (b) if the class does not receive such amount, no class of equity interests junior to the non-accepting class will receive a Distribution under the plan.

## VII.
## VALUATION OF REORGANIZED DEBTOR

**THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO REORGANIZED DEBTOR IS NOT A PREDICTION OR GUARANTEE OF THE FUTURE PRICE OF REORGANIZED DEBTOR OR THE NEW COMMON STOCK; SUCH PRICES ARE SUBJECT TO MANY UNFORESEEABLE CIRCUMSTANCES AND THEREFORE CANNOT BE ACCURATELY PREDICTED.**

## A.    Overview

The Debtor has been advised by Lazard Freres & Co. LLC ("Lazard"), with respect to the consolidated enterprise value of the Reorganized Debtor on a going-concern basis. Lazard has undertaken this valuation analysis for the purpose of determining value available for Distribution to creditors and interest holders pursuant to the Plan and to analyze the relative recoveries to creditors and interest holders thereunder. The estimated total value available for Distribution to creditors and interest holders is comprised of three primary components: (i) an estimated value of the Reorganized Debtor's utility operations on a going concern basis ("Enterprise Value"); (ii) the value of certain expected net operating loss carry forwards ("NOLs") of the Reorganized Debtor; plus (iii) cash available for Distribution to creditors in excess of the Reorganized Debtor's minimum operating cash requirements ("Distributable Cash").

Based in part on information provided by the Debtor, Lazard has concluded that the Enterprise Value of the Reorganized Debtor including the value of its NOLs ranges from $1.435 billion to $1.585 billion, with a midpoint value of $1.510 billion as of an assumed Effective Date of the Plan of September 30, 2004. With assumed secured debt and capital leases upon emergence from Chapter 11 of approximately $800 million reflecting the application of an estimated $135 million of Distributable Cash to reduce secured debt and settle claims, Lazard estimates the range of equity values ("Equity Values") for the Reorganized Debtor between $635 million and $785 million, with a midpoint Equity Value of $710 million. Assuming 35.50 million shares of New Common Stock are distributed pursuant to the Plan, the Equity Value ranges between $17.89 and $22.11 per share with a mid-point estimate of $20.00 per share. Lazard's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF SEPTEMBER 30, 2004, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF MARCH 8, 2004. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

With respect to the financial projections prepared by the management of the Debtor and included as Exhibit E to this Disclosure Statement, Lazard assumed that such financial projections were reasonably prepared in good faith and on a basis reflecting the Debtor's most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtor. Lazard's Enterprise Value range assumes the Reorganized Debtor will achieve its operating projections in all material respects, including improvements in operating margins, earnings and cash flow. The Reorganized Debtor's forecasted financial performance is better than the recent financial performance of the Debtor. As a result, if the business performs at levels below those set forth in the financial projections, such performance may have a material impact on Enterprise Value.

In estimating the Enterprise Value and Equity Value of the Reorganized Debtor, Lazard: (i) reviewed certain historical financial information of the Debtor for recent years and interim periods; (ii) reviewed certain internal financial and operating data of the Debtor, including the financial projections as described in this Disclosure Statement, which data was prepared and provided to Lazard by the management of the Debtor and which relate to the Reorganized Debtor's business and its prospects; (iii) met with certain members of senior management to discuss the Debtor's operations and future prospects; (iv) reviewed publicly available financial data and considered the market value of public companies that Lazard deemed generally comparable to the operating business of the Debtor; (v) considered precedent transactions in the industry; (vi) considered certain economic and industry information relevant to the operating business; and (vii) conducted such other studies, analysis, inquiries, and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Debtor's business, operating assets and liabilities and the Reorganized Debtor's business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtor, as well as publicly available information.

In addition, Lazard did not independently verify management's projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtor were sought or obtained in connection herewith. Such valuation estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to creditors thereunder.

Such valuation estimates reflect the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtor set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtor, Lazard, nor any other person assumes responsibility for their accuracy. In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Debtor, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by pre-petition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors which generally influence the prices of securities.

## B.    Valuation Methodology

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its estimated range of Enterprise Values for the Reorganized Debtor. Lazard performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the management of the Debtor on which such analyses were based. Lazard's valuation analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create a misleading or incomplete conclusion as to Enterprise Value.

Under the valuation methodologies summarized below, Lazard derived a range of Enterprise Values for the Reorganized Debtor assuming the Reorganized Debtor was a full taxpayer. Lazard separately valued the Debtor's NOLs and added this value to the valuation range for the utility to arrive at a total Enterprise Value.

### (1)    Comparable Company Analysis

Comparable company analysis estimates the value of a company based on the implied valuations of other similar companies that are publicly traded. Under this methodology, the Enterprise Values for the selected public companies are typically expressed as multiples of earnings. The analysis also includes a multi-year financial comparison of each company's performance, profitability, operating margins, leverage and business trends are examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation statistics as compared to the Reorganized Debtor.

The primary valuation metrics applied in this analysis include Enterprise Value to earnings before interest, taxes and depreciation and amortization ("EBITDA"), Enterprise Value to earnings before interest and taxes ("EBIT") and Equity Value to net income (price earnings ratio).

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtor. Criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence, size, scale of operations, and regulatory environments. The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

Lazard selected the following publicly traded companies (collectively, the "Peer Group") deemed generally comparable to the Reorganized Debtor in one or more of the factors described above: Black Hills Corp., Consolidated Edison Inc., Duquesne Light Holdings Inc, Energy East Corp., Northeast Utilities, Inc., Nstar Inc., Pepco Holdings Inc. and Puget Energy Inc.

Lazard calculated Enterprise Value to EBITDA and EBIT multiples by dividing the Enterprise Value of each comparable company by its estimated 2004 EBITDA and EBIT as provided in market research. Lazard also prepared and considered price to earnings ratios for the Peer Group.

Lazard concluded that it was appropriate to apply a discount to the various Peer Group valuation multiples when valuing the Reorganized Debtor to reflect: (i) the Debtor's low growth profile given the market it serves relative to its Peer Group; (ii) the Debtor's small market capitalization relative to its Peer Group; and (iii) the challenging regulatory environment in which the Debtor operates relative to its Peer Group.

Lazard selected Enterprise Value to EBITDA multiples ranging from 6.5x to 7.5x with a mid-point multiple of 7.0x and EBIT multiples ranging from 9.5x to 10.5x with a mid-point multiple of 10.0x. Finally, Lazard utilized price to earnings ratios ranging from 12.0x to 13.0x, with a mid-point multiple of 12.5x.

These multiples were then applied to the Debtor's normalized projected 2004 EBITDA, EBIT, and net income to determine a range of Enterprise Values. To calculate "normalized" EBITDA, EBIT, and net income, Lazard adjusted the Debtor's projected 2004 results by several factors including non-recurring expenses, restructuring fees, accelerated pension funding requirements, and other non-recurring charges. The normalized earnings numbers also exclude losses related to the out-of-market portion of qualified facility contracts and as such the present value of these out-of-market liabilities are subtracted from the Enterprise Values derived under this approach.

**(2)     Precedent Transactions Analysis**

Precedent transactions analysis estimates the value of a company based on the implied valuations of merger and acquisition transactions in the target company's industry. Valuation multiples for these transactions are calculated based on the purchase price (including any debt assumed where appropriate) paid for the acquired company as a multiple of EBITDA, EBIT, and net income.

Lazard evaluated various merger and acquisition transactions that have occurred in the utility industry and focused where possible on transactions involving utilities with significant energy transmission and distribution operations in their business mix. Similar to the comparable company analysis, Lazard applied a discount to the observed precedent transaction valuation multiples in consideration of: (i) the Debtor's relatively low growth profile given the market it serves; (ii) its relatively small market capitalization; and (iii) the challenging regulatory environment in which the Debtor operates.

Based on this approach, Lazard derived an Enterprise Value to 2004 EBITDA multiple range of 6.25x to 7.25x, with a mid-point of 6.75x. Similarly, Lazard assumed an Enterprise Value to 2004 EBIT multiples range from 10.0x to 11.0x, with a mid-point of 10.5x. Lastly, Lazard assumed price to earnings multiples ranging from 13.5x to 14.5x, with a midpoint of 14.0x.

These multiples were then applied to the Debtor's normalized projected 2004 EBITDA, EBIT, and net income to determine a range of Enterprise Values. Similar to the comparable company approach, Lazard calculated "normalized" EBITDA, EBIT, and net income by adjusting the Debtor's projected results by several factors including non-recurring expenses, restructuring fees, accelerated pension funding requirements, and other non-recurring charges. The normalized earnings numbers also exclude losses related to the out-of-market portion of qualified facility contracts and as such the present value of these out-of-market liabilities are subtracted from the Enterprise Values derived under this approach.

**(3)**    <u>Discounted Cash Flow Analysis</u>

The discounted cash flow ("<u>DCF</u>") methodology values a business by determining the current value of the estimated future cash flows to be generated by that business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "<u>Discount Rate</u>"). The Discount Rate reflects the estimated blended rate of return debt and equity investors would require to invest in the business based on its capital structure. The value of the firm is determined by calculating the present value of the Reorganized Debtor's after-tax free cash flows provided in the Debtor's business plan (five-year projection) plus a proxy for the value of the firm beyond the projection period known as the terminal value. The terminal value is derived by applying a multiple to the Debtor's projected EBITDA in the year following the Projection Period.

To estimate the Discount Rate, Lazard estimated the cost of equity and the after-tax cost of debt for the Reorganized Debtor, assuming a capital structure comprised of approximately 55% debt and 45% equity. The cost of equity was estimated based on the Capital Asset Pricing Model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation ("<u>Beta</u>") of a publicly traded stock's performance to the return

on the broader market. To estimate the cost of debt, Lazard considered a number of factors including the likely credit rating associated with the Reorganized Debtor's post-emergence debt, the expected terms of such debt, and the effective yield for publicly traded debt securities for comparable companies with comparable debt ratings in the industry.

Though formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtor which in turn impact its cost of capital and terminal multiples. With respect to the Reorganized Debtor, Lazard considered: (i) its relatively low growth profile given the market it serves; (ii) its relatively small market capitalization; and (iii) the challenging regulatory environment in which it operates. Based on these considerations, Lazard's DCF valuation was based upon a range of Discount Rates between 6.5% and 7.5%, with a mid-point of 7.0% and an EBITDA multiple range used to derive a terminal value of 6.25x to 7.25x, with a mid-point of 6.75x.

In applying the above methodology, Lazard utilized management's financial projections for the fourth quarter of 2004 through December 31, 2008 to derive un-levered after-tax cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF, the Reorganized Debtor is assumed to be a full taxpayer and the value of its NOLs is calculated separately. The Reorganized Debtor's unlevered after-tax cash flows along with the terminal value are discounted back to the Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Values. The cash flows utilized exclude negative cash flows related to the out-of-market portion of qualified facility contracts and as such the present value of these out-of-market liabilities are subtracted from the derived Enterprise Values under this approach.

(4)     Distributable Cash

When calculating expected recoveries pursuant to the Plan, Lazard added Distributable Cash to Enterprise Value to derive the total distributable value available to satisfy Claims ("Total Distributable Value").  Distributable Cash is expected to be generated through the Debtor's operations and the sale of non-core assets.  Management projects Distributable Cash to be approximately $135.0 million upon the Effective Date.  Under the Plan, Distributable Cash is used to satisfy normal course bankruptcy related professional fees and expenses, satisfy Priority Claims, reduce secured debt, and satisfy Convenience Claims.

(5)     Net Operating Losses

The Reorganized Debtor is expected to have substantial NOLs after it emerges from bankruptcy, which should significantly reduce the Reorganized Debtor's current tax liability over the Projection Period.  Lazard valued the NOLs by calculating the present value of the tax savings provided relative to the taxes the Reorganized Debtor would otherwise pay absent application of such NOLs.  These cash flows are discounted at the Reorganized Debtor's estimated cost of equity.  Based on this approach, Lazard arrived at a valuation of the Reorganized Debtor's NOLs of approximately $45.0 million.

The summary set forth above does not purport to be a complete description of the analyses performed by Lazard.  The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily suitable to summary description.  In performing its analyses, Lazard and the Debtor made numerous assumptions with respect to industry performance, business and economic conditions and other matters.  The analyses performed by Lazard are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses.

**AS A RESULT, THE ESTIMATE OF THE RANGE OF THE ENTERPRISE VALUE OF REORGANIZED DEBTOR'S BUSINESS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN.  BECAUSE SUCH ESTIMATE IS INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER REORGANIZED DEBTOR, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR ITS ACCURACY.  IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES SUCH AS THE REORGANIZED DEBTOR'S NEW COMMON STOCK IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.**

Many of the analytical assumptions upon which these valuations are based are beyond the Debtor's control, and accordingly, there will be variations between such assumptions and the actual results.  These variations may be material and thus the New Common Stock is likely to trade at levels that differ from any values indicated by this analysis.  In the event that the estimated values of Reorganized Debtor are different from its actual value after the Effective Date, actual recoveries realized by one or more of the classes of creditors may be significantly

higher or lower than estimated in the Disclosure Statement.  Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings of pre-petition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and the factors that generally influence the prices of securities.

<div align="center">

**VIII.**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

</div>

The following is a summary of certain U.S. federal income tax consequences of the Plan to holders of the Class 7, Class 8 and Class 10 Unsecured Claims (referred to in this section as the "Class 7, 8 and 10 Claims") and to the Debtor and Reorganized Debtor.  This summary is based on the Internal Revenue Code of 1986, as amended ("Tax Code"), Treasury Regulations issued thereunder, and administrative and judicial interpretations and practice, all as in effect on the date hereof and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, Debtor and Reorganized Debtor do not intend to seek a ruling from the IRS as to any of such tax consequences other than a private letter ruling regarding the D&O Trust as described above in IV.I(2), and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Class 7, 8 and 10 Claims that are not United States persons (as defined in the Tax Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, and holders who hold Class 7, 8 and 10 Claims as part of a hedge, straddle, constructive sale, or conversion transaction). The following discussion assumes that all holders of Class 7, 8 and 10 Claims discussed herein hold such Class 7, 8 and 10 Claims as "capital assets" within the meaning of Section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to Debtor and to holders of Class 7, 8 and 10 Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under state, local, and/or foreign tax law.

**THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF CLASS 7, 8 AND 10 CLAIMS.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES, AS WELL AS ANY APPLICABLE STATE, LOCAL, AND/OR FOREIGN TAX CONSEQUENCE, OF THE PLAN.**

**A.**    **Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Class 7, 8 and 10 Claims**

Pursuant to the Plan, each holder of a Class 7, 8 and 10 Claim shall receive on the Effective Date, on account of such Class 7, 8 and 10 Claim, shares of New Common Stock (subject to dilution as set forth in the Plan), subject to the terms and conditions set forth in Section IV.C above.

The U.S. federal income tax consequences to a holder of Class 7, 8 and 10 Claims of the respective transactions described above will depend on whether (a) the debt instruments constituting the surrendered Class 7, 8 and 10 Claims are treated as "securities," and (b) such transaction qualifies as a tax-free reorganization under the Tax Code.

**(1)**    Treatment of a Debt Instrument as a "Security".  Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

**(2)**    Treatment if Debt Instrument is a Security.  If debt instruments constituting surrendered Class 7, 8 and 10 Claims are treated as securities, the exchange of a holder's Class 7, 8 and 10 Claims for New Common Stock, should be treated as an exchange pursuant to a reorganization under the Tax Code to the extent the transaction qualifies as a reorganization.  In such case, a holder should obtain a tax basis in the New Common Stock equal to the tax basis of the debt instrument constituting the Class 7, 8 and 10 Claim surrendered therefor, and should have a holding period for the New Common Stock that includes the holding period for the debt instrument constituting the surrendered Class 7, 8 and 10 Claim; provided that the tax basis of any New Common Stock treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such New Common Stock should not include the holding period of the debt instrument constituting the surrendered Class 7, 8 and 10 Claims.

**(3)**    Treatment if Debt Instrument is not a Security.  If a debt instrument constituting a surrendered Class 7, 8 and 10 Claim is not treated as a security, a holder of such a Claim should be treated as exchanging its Class 7, 8 and 10 Claim for New Common Stock, in a fully taxable exchange. A holder of a Class 7, 8 and 10 Claim who is subject to fully taxable exchange treatment should recognize gain or loss equal to the difference between (i) the fair market value of the New Common Stock as of the Effective Date that is not allocable to accrued interest, and (ii) the holder's basis in the debt instrument constituting the surrendered Class 7, 8 and 10 Claim.  Such gain or loss should be capital in nature (subject to the "market discount"

rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Unsecured Claim were held for more than one year. To the extent that a portion of the New Common Stock received in the exchange is allocable to accrued interest, the holder may recognize ordinary income. See "Accrued Interest," below. A holder's tax basis in the New Common Stock received should equal the fair market value of the New Common Stock as of the Effective Date. A holder's holding period for the New Common Stock should begin on the day following the Effective Date.

(4)    <u>Accrued Interest</u>.  To the extent that any amount received by a holder of a surrendered Class 7, 8 and 10 Claim under the Plan is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, if the exchange is a taxable exchange, a holder of a surrendered Class 7, 8 and 10 Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the holder's gross income but was not paid in full by Debtor. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a holder of a surrendered Class 7, 8 and 10 Claim will be attributable to accrued interest on the debts constituting the surrendered Class 7, 8 and 10 Claim is unclear. Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Pursuant to the Plan, all Distributions in respect of any Claim will be allocated first to the principal amount of such Claim, to the extent otherwise permitted and as determined for federal income tax purposes, and thereafter to the remaining portion of such Claim, if any.

(5)    <u>Market Discount</u>.  Under the "market discount" provisions of Sections 1276 through 1278 of the Tax Code, some or all of the gain realized, if any, by a holder exchanging the debt instruments constituting its Class 7, 8 and 10 Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debts constituting the surrendered Class 7, 8 and 10 Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder on the taxable disposition of surrendered debts (determined as described above) that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for New Common Stock (as may occur here), any market discount that accrued on such debts but was not recognized by the holder may be required to be carried over and any gain recognized on the

subsequent sale, exchange, redemption or other disposition of such New Common Stock may thereby be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

**B.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor**

(1)     Cancellation of Indebtedness and Reduction of Tax Attributes

As a result of the Plan, Debtor's aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt income ("CODI") upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of cash paid and the fair market value of any other consideration (including stock of Debtor) given in exchange for such indebtedness at the time of the exchange.

A debtor is not, however, required to include any amount of CODI in gross income if such debtor is under the jurisdiction of a court in a Title 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, as a price for such exclusion, Section 108 of the Tax Code requires the debtor to reduce (as of the first day of the next taxable year) its tax attributes by the amount of CODI which it excluded from gross income. As a general rule, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"), (b) most tax credits, (c) capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (e) foreign tax credits. A debtor with CODI may elect first to reduce the basis of its depreciable assets under Section 108(b)(5) of the Tax Code.

The amount of CODI (and accordingly the amount of tax attributes required to be reduced), will depend, among other things, on the issue prices of the debt instruments issued under the Plan, and on the fair market value of the New Common Stock to be issued. These values cannot be known with certainty until after the Effective Date. Thus, although it is expected that a reduction of tax attributes will be required, the exact amount of such reduction cannot be predicted.

Pursuant to temporary regulations issued by the United Stated Treasury Department in August 2003, any required reduction in tax attributes of a member of a consolidated group applies first to any tax attributes attributable to the debtor realizing the CODI at issue. To the extent the debtor reduces its tax basis in the stock of another member of the consolidated group, such other member is required to reduce its tax attributes by an equivalent amount. In addition, if the amount of CODI exceeds the tax attributes subject to reduction attributable to such debtor, the regulations require the reduction of consolidated tax attributes (other than tax basis in assets) attributable to other members of the debtor's consolidated group.

**(2)** Limitation of Net Operating Loss Carryovers and Other Tax Attributes

Section 382 of the Tax Code generally imposes an annual limitation on a corporation's use of its NOLs (and may limit a corporation's use of certain built-in losses if such built-in losses are recognized within a five-year period following an ownership change) if a corporation undergoes an "ownership change." This discussion describes the limitation determined under Section 382 of the Tax Code in the case of an "ownership change" as the "Section 382 Limitation". The annual Section 382 Limitation on the use of pre-change losses (the NOLs and built-in losses recognized within the five year post-ownership change period) in any "post change year" is generally equal to the product of the fair market value of the loss corporation's outstanding stock immediately before the ownership change multiplied by the long term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. Section 383 of the Tax Code applies a similar limitation to capital loss carryforward and tax credits. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by them at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation). A "5 percent shareholder" for this purpose includes, generally, an individual or entity that directly or indirectly owns 5 percent or more of a corporation's stock during the relevant period and one or more groups of shareholders that own less than 5 percent of the value of the corporation's stock. Under applicable Treasury Regulations, an ownership change with respect to an affiliated group of corporations filing a consolidated return that have consolidated NOLs is generally measured by changes in stock ownership of the parent corporation of the group.

The issuance under the Plan of New Common Stock, along with the cancellation of existing Equity Interests in Debtor through the Plan, is expected to cause an ownership change to occur with respect to Debtor's consolidated group on the Effective Date. As a result, the Section 382 Limitation will be applicable to the utilization by Debtor's consolidated group of their NOLs and built-in losses following the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of CODI. Similarly, the ability of Debtor's consolidated group to use any remaining capital loss carryforwards and tax credits will also be limited.

Section 382(l)(5) of the Tax Code provides a special rule applicable in the case of a bankruptcy reorganization (the "Section 382(l)(5) Rule"). If a corporation qualifies for the Section 382(l)(5) Rule, the annual Section 382 Limitation will not apply to the corporation's NOL on account of an ownership change occurring as a result of the bankruptcy reorganization. The Section 382(l)(5) Rule does, however, require that the corporation's NOL and credit carryovers be computed without taking into account the aggregate amount of all interest deductions in respect of debt exchanged for the corporation's stock during the three prior taxable years and the portion of the current taxable year ending on the date of the ownership change

(such interest hereinafter called "Disqualified Interest").  The corporation will qualify under the Section 382(l)(5) Rule if the corporation's pre-bankruptcy shareholders and holders of certain debt ("Qualifying Debt") own at least 50% of the stock of the corporation after the bankruptcy reorganization, and the corporation does not elect not to apply the Section 382(l)(5) Rule. Qualifying Debt is a claim which (i) was held by the same creditor for at least 18 months prior to the bankruptcy filing or (ii) arose in the ordinary course of a corporation's trade or business and has been owned, at all times, by the same creditor.  Indebtedness will be treated as arising in the ordinary course of a corporation's trade or business if such indebtedness is incurred by the corporation in connection with the normal, usual or customary conduct of the corporation's business.  For the purpose of determining whether a claim constitutes Qualifying Debt, special rules may in some cases apply to treat a subsequent transferee as the transferor creditor.

If the exchanges contemplated by the Plan qualify for tax treatment under the Section 382(l)(5) Rule, Debtor's NOL carryover will be available for future use without any Section 382 Limitation (after reduction of Debtor's NOLs by Disqualified Interest).  However, under the Section 382(l)(5) Rule, if there is a second ownership change during the two-year period immediately following consummation of the Plan, the Section 382 Limitation after the second ownership change shall be zero.  The determination of the application of the Section 382(l)(5) Rule is highly fact specific and dependent on circumstances that are difficult to assess accurately, and thus, Debtor is uncertain whether it will qualify for the Section 382(l)(5) Rule.

If the exchanges do not qualify for tax treatment under the Section 382(l)(5) Rule or Debtor elects not to utilize the Section 382(l)(5) Rule, Debtor's use of NOLs to offset taxable income earned after an ownership change will be subject to the annual Section 382 Limitation. Since Debtor is in bankruptcy, however, Section 382(l)(6) of the Tax Code will apply.  Section 382(l)(6) of the Tax Code provides that, in the case of an ownership change resulting from a bankruptcy proceeding of a debtor, the value of the debtor's stock for the purpose of computing the Section 382 Limitation will generally be calculated by reference to the net equity value of debtor's stock immediately after the ownership change (rather than immediately before the ownership change, as is the case under the general rule for non-bankruptcy ownership changes). Accordingly, under this rule the Section 382 Limitation would generally reflect the increase in the value of a debtor's stock resulting from the conversion of debt to equity in the proceeding. Although it is impossible to predict what the net equity value of Debtor will be immediately after the exchanges contemplated by the Plan, Debtor's use of NOLs is expected to be substantially limited after those exchanges.

(3)    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMT, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002 which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.  Additionally, under Section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having

a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation (determined under Section 382(h) of the Tax Code) immediately before the ownership change.

THE DISCUSSION IN THIS SECTION VIII.B CONTAINS CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF DEBTOR, INCLUDING BUT NOT LIMITED TO EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES.  THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE OR ACTUAL RESULTS.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

## C.    Backup Withholding and Reporting

The Debtor will withhold all amounts required by law to be withheld from payments of interest and dividends.  Debtor will comply with all applicable reporting requirements of the Tax Code.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## IX.
## RISK FACTORS

## A.    Regulated Industry

The Debtor's and Reorganized Debtor's operations are subject to extensive governmental regulation that could impose significant costs or change rates of operations and changes in existing regulations, and future deregulation may have a detrimental effect on the business and could increase competition.

The operations of the Debtor and Reorganized Debtor are and will be subject to extensive federal, state and local laws and regulations concerning service areas, tariffs, taxes, issuance of securities, employment, occupational health and safety and other matters.

The Debtor is required to obtain and comply with a wide variety of licenses, permits and other approvals in order to operate its facilities. Reorganized Debtor will be subject to the same requirements. In the course of complying with these requirements, the Debtor and Reorganized Debtor may incur significant costs and the failure to comply with these requirements could result in civil or criminal liability and the imposition of liens or fines. In addition, existing regulations may be revised or reinterpreted, new laws and regulations may be adopted or become applicable to the Debtor and Reorganized Debtor or their facilities and future changes in laws and regulations may have a detrimental on the utility business.

The Debtor's and Reorganized Debtor's utility businesses are and will be regulated by FERC and certain state commissions, such as the Public Service or Utility Commissions of Montana, South Dakota and Nebraska. FERC and the identified commissions are generally vested with the supervision, regulation and control of public utilities pursuant to their respective federal and state laws and grants of authority, whatever they may be, with respect to the Debtor's and the Reorganized Debtor's utility business within a respective state. This supervision, regulation and control of the Debtor's and Reorganized Debtor's utility businesses could result, *inter alia*, in negative adjustments to regulated rates which could have a negative prospective impact on Reorganized Debtor's projected revenue, or in the imposition of other regulatory requirements that could significantly affect the assumptions on which the Plan is predicated.

The United States electric utility and natural gas industries are currently experiencing increasing competitive pressures as a result of consumer demands, technological advances, deregulation, greater availability of natural gas-fire generation and other factors. Competition for various aspects of electric and natural gas services are being introduced throughout the country that will open these markets to new providers of some or all traditional electric utility and natural gas services. Competition is likely to result in the further unbundling of electric utility and natural gas services as has occurred in Montana for electricity and Montana, South Dakota and Nebraska for natural gas. Separate markets may emerge for generation, transmission, distribution, meter reading, billing and other services currently provided by the electric utility and natural gas providers as a bundled service. As a result, significant additional competitors could become active in the generation, transmission and distribution segments of the Debtor and reorganization Debtor's industry.

Proposals have been introduced in Congress to repeal the Public Utility Holding Company Act of 1935 or PUHCA. To the extent competitive pressures increase and the price and sale of electricity assume more characteristics of commodity business, the economics of domestic independent power generation products may come under increasing pressure.

## B.    Commodity Price and Supply Risks

The Debtor's wholesale costs for electricity and natural gas are recovered through various pass-through mechanisms in each of the states its serves. These cost tracking

mechanisms are based on varying prospective or historic averages, so a rapid increase in supply costs would not be immediately reflected in rates.

Also, to the extent not covered by long-term fixed price purchase contracts, the Debtor is exposed to changes in the price and availability of coal because most of its generating capacity is coal-fired. Changes in the cost of coal and changes in the relationship between those costs and the market prices of power may affect its financial results. In addition, natural gas and electricity are commodities; the market price of which can be subject to volatile changes in response to changes in crude oil markets, refinery operations, fuel supply, power plant outages, weather conditions, market supply and prices or other market conditions.

State regulatory authorities set the rates at which the Debtor sells electricity and natural gas, and may modify the costs that the Debtor may pass through cost adjustments. As a result, the Debtor may not be able to immediately pass on to its retail customers rapid increases in energy supply costs, which could negatively impact liquidity.

The Debtor does not own any natural gas reserves and does not own electric generation assets to service its Montana operations. The Debtor owns interests in generation assets that substantially cover its electric supply requirements in South Dakota. As a result, the Debtor is required to procure its entire natural gas supply and all of its Montana electricity supply pursuant to contracts with third party suppliers. In light of this reliance on third party suppliers, the Debtor is exposed to certain risks in the event a third party supplier is unable to satisfy its contractual obligation.

## C.      Seasonal and Quarterly Energy Demand Fluctuations.

The Debtor's electric and gas utility business is seasonal and weather patterns can have a material impact on operating performance. Demand for electricity is often greater in the summer and winter months associated with cooling and heating. Because natural gas is heavily used for residential and commercial heating, the demand for this product depends heavily upon weather patterns throughout the Debtor's market areas, and a significant amount of natural gas revenues are recognized in the first and fourth quarters related to the heating season. Accordingly, the Debtor's operations have historically generated less revenues and income when weather conditions are milder in the winter and cooler in the summer. In the event that the Debtor experiences unusually mild winters or summers in the future, its results of operations and financial condition could be adversely affected. In addition, exceptionally hot summer weather could add significantly to working capital needs to fund higher than normal power purchases to meet customer demand for electricity.

## D.      Dependence on Key Personnel

The Debtor is dependent upon the continued services of certain senior executives and certain key technical and engineering personnel. The Debtor believes that the loss of the services of key individuals could have a material adverse effect on Reorganized Debtor.

E.    **Compliance With Environmental Laws**

The Debtor's operations are governed by a variety of federal, state and local environmental, safety and health laws and requirements with regard to the environment, including environmental regulations relating to air and water quality, solid waste disposal and other environmental considerations. Many of these environmental laws and regulations create permit and license requirements and provide for substantial civil and criminal fines which, if imposed, could result in material costs or liabilities. The Debtor regularly monitors its operations to prevent adverse environmental impacts and to assess potential environmental liabilities, but the Debtor cannot predict with certainty the occurrence of a private tort allegation or government claim for damages associated with specific environmental conditions. The Debtor may be required to make significant expenditures in connection with the investigation and remediation of alleged or actual spills, personal injury or property damage claims, and the repair and upgrade of its facilities in order to meet future requirements and obligations under environmental laws. To the extent that the Debtor's environmental liabilities are greater than its reserves or the Debtor is unsuccessful in recovering anticipated insurance proceeds under relevant policies, its results of operations and financial condition could be adversely affected.

F.    **Projected Financial Information**

The Debtor failed to operate profitably for an extended period preceding the Chapter 11 filing. The financial projections annexed as Exhibit F to this Disclosure Statement are dependent upon the successful implementation of the business plan and the validity of the other assumptions contained therein. These projections reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtor, industry performance, expected market pricing for key products, results of cost savings programs, technical process improvements, certain assumptions with respect to competitors of the Debtor, general business and economic conditions, and other matters, many of which are beyond the control of the Debtor. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtor. Although the Debtor believe that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and may be material.

G.    **Lack of Market for Securities Issued Pursuant to the Plan**

There is no currently existing market for the New Common Stock and there can be no assurance that an active trading market will develop. There can also be no assurance as to the degree of price volatility in any such particular market. Accordingly, no assurance can be given that a holder of securities issued pursuant to the Plan will be able to sell such securities in the future or as to the price at which any such sale may occur. If such market were to exist, the liquidity of the market for such securities and the prices at which such securities will trade will depend upon many factors, including the number of holders, investor expectations for the Debtor, and other factors beyond the Debtor's control.

**H.**     **Delay in Distributing Asset Sale Proceeds to Debtor**

The Debtor can give no assurance as to when or if net proceeds received from the sale of Blue Dot's and Expanets' assets may be available for distribution to the Debtor.  As of January 31, 2004, Blue Dot was holding approximately $6.0 million in net proceeds received from the sale of its assets, and Netexit (f/k/a Expanets) was holding approximately $48.5 million in net proceeds received from the sale of its assets.  Netexit is engaged in a dispute with Ayava over an additional $10 million to $20 million which could be available to Netexit.  Each of Blue Dot and Netexit have direct claims against them being asserted by various creditors.  In addition, Netexit has certain minority shareholders which have asserted claims against the proceeds from the sale of Netexit's assets.  Before any of the asset sales net proceeds can be distributed to the Debtor, either on account of intercompany claims owed by Blue Dot and Netexit, respectively, to the Debtor or by way of distribution on the equity interests in Blue Dot and Netexit ultimately owned by the Debtor, direct claims against Blue Dot and Netexit may have to be resolved.

**I.**     **Securities Class Action Settlements**

The Debtor's Plan incorporates various compromises and settlements, which, to the extent not already approved by order of the Bankruptcy Court, will be made operative and effective under Section 1123(b)(3)(A) of the Bankruptcy Code.  That section expressly permits a plan of reorganization to provide for the settlement of any claim or any interest belonging to the debtor or to the estate.  However, each of the compromises and settlements incorporated into the Plan, including settlement of several class action lawsuits and shareholder derivative actions commenced in or removed to federal court naming the Debtor and certain of its present and former officers and directors, is subject to the approval of the Bankruptcy Court as part of confirmation of the Plan.  As part of confirmation of the Plan, the Bankruptcy Court must make an independent determination that each of the settlements is fair and equitable and is in the best interests of the Debtor's estate.

The Debtor believes that the each of the settlements incorporated into the Plan is fair and reasonable, and thus should be approved by the Bankruptcy Court as part of confirmation of the Plan.

Holders of Securities Claims may elect not to participate in and be bound by the Class Action Settlement Documents by timely submitting Opt-Out Forms, in which case they will be treated as Class 15 Claimants under the Plan, and upon submission of a D&O Proceedings Final Order, shall be channeled to the D&O Trust.  Class 15 Claimants shall receive the same treatment as class 12 Claimants.  Opt-Out Securities Claimants may also pursue their claims against non-Debtor defendants in the class action and derivative actions which may give rise to claims for indemnification by such defendants against Reorganized Debtor.

No assurances can be given as to the outcome of Class Action or as to the magnitude of any liability of Reorganized Debtor to the Opt-Out Securities Claimants and to the officers, directors, employees and agents of the Debtor and its subsidiaries with respect to the Debtor's indemnification obligations, including any such indemnification obligations with respect to claims which may be asserted by Opt-Out Securities Claimants against non-Debtor defendants

in the Class Action.  Liabilities arising under the opt-out provisions could be substantial and the Class Action Settlement could fail if more than 5% of the Securities Claimant's Opt-Out.

**J.    Certain Bankruptcy Related Considerations**

   **(1)    Risk of Non-Confirmation of the Plan**

        Although the Debtor believes that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can also be no assurance that modifications of the Plan will not be required for Confirmation, that such negotiations would not adversely affect the holders of the Allowed Claims or that such modifications would not necessitate the re-solicitation of votes.

   **(2)    Nonconsensual Confirmation**

        In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan of reorganization at the proponent's request if at least one impaired class has accepted the plan of reorganization (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan of reorganization, the bankruptcy court determines that the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes.  In the event that any impaired Class of Claims or Equity Interests fails to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right to request nonconsensual Confirmation of the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

   **(3)    Risk That Conditions to Effectiveness Will Not Be Satisfied**

        Article 11 of the Plan contains certain conditions precedent to the effectiveness of the Plan.  Included, among others, are the conditions that Reorganized Debtor shall have credit availability under the CSFB Facility to provide Reorganized Debtor with financing sufficient to meet their Cash obligations under the Plan.  There can be no assurances that the conditions contained in Article 11 of the Plan will be satisfied.

**K.    Dividends**

        The Debtor presently intends to begin paying a dividend on the New Common Stock upon emergence; however, there is no certainty as to when Reorganized Debtor will pay Cash or other dividends on any shares of New Common Stock.

**X.**
**EXEMPTIONS FROM SECURITIES ACT REGISTRATION;**
**REGISTRATION RIGHTS**

        The Plan contemplates the issuance of certain securities to holders of Allowed Claims.  Section 1145 of the Bankruptcy Code creates certain exemptions from the registration

and licensing requirements of federal and state securities laws with respect to the issuance and distribution of securities by a debtor under a plan of reorganization to holders of claims or interests wholly or principally in exchange for those claims or interests.

## A.    Issuance of New Securities Pursuant to the Plan

With respect to the New Common Stock to be issued on the Effective Date, the Debtor intends to rely upon the exemption from the registration requirements of the Securities Act (and the equivalent state securities or "blue sky" laws) provided by Section 1145(a)(1) of the Bankruptcy Code.  Generally, Section 1145(a)(1) of the Bankruptcy Code exempts the issuance of securities from the requirements of the Securities Act and the equivalent state securities and "blue sky" laws if the following conditions are satisfied: (i) the securities are issued by a debtor, an affiliate participating in a joint plan of reorganization with the debtor, or a successor of the debtor under a plan of reorganization, (ii) the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense against, the debtor, and (iii) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" for Cash or property.  The Debtor believes that the issuance of securities contemplated by the Plan will satisfy the aforementioned requirements and therefore is exempt from federal and state securities law, although as discussed in Section B below, under certain circumstances, subsequent transfers of such securities may be subject to registration requirements under such securities laws.

## B.    Subsequent Transfer of Securities Issued Under the Plan

The securities issued pursuant to the Plan may be resold by the holders thereof without restriction unless, as more fully described below, any such holder is deemed to be an "underwriter" with respect to such securities, as defined in Section 1145(b)(1) of the Bankruptcy Code.  Generally, Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who (1) purchases a claim against, or interest in, a bankruptcy case, with a view towards the distribution of any security to be received in exchange for such claim or interest, (2) offers to sell securities issued under a bankruptcy plan on behalf of the holders of such securities, (3) offers to buy securities issued under a bankruptcy plan from persons receiving such securities, if the offer to buy is made with a view towards distribution of such securities, or (4) is an issuer as contemplated by Section 2(11) of the Securities Act.  Although the definition of the term "issuer" appears in Section 2(4) of the Securities Act, the reference (contained in Section 1145(b)(1)(D) of the Bankruptcy Code) to Section 2(11) of the Securities Act purports to include as "underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract or otherwise.  Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the Debtor's (or successor's) voting securities.  Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the voting securities of a reorganized debtor may be presumed to be a "control person."

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES.  THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE ANY OPINION OR ADVICE WITH RESPECT TO, THE SECURITIES LAW AND BANKRUPTCY LAW MATTERS DESCRIBED ABOVE.  IN LIGHT OF THE COMPLEX AND SUBJECTIVE INTERPRETIVE NATURE OF WHETHER A PARTICULAR RECIPIENT OF SECURITIES UNDER THE PLAN MAY BE DEEMED TO BE AN "UNDERWRITER" WITHIN THE MEANING OF SECTION 1145(b)(1) OF THE BANKRUPTCY CODE AND/OR AN "AFFILIATE" OR "CONTROL PERSON" UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS AND, CONSEQUENTLY, THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE SECURITIES AND "BLUE SKY" LAWS, THE DEBTOR ENCOURAGES POTENTIAL RECIPIENTS OF NEW COMMON STOCK TO CONSIDER CAREFULLY AND CONSULT WITH HIS, HER, OR ITS OWN LEGAL ADVISOR(S) WITH RESPECT TO SUCH (AND ANY RELATED) MATTERS.**

## XI.
## ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following:  (1) an alternative plan could be proposed or confirmed; or (2) the Chapter 11 Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code.

**A.      Alternative Plans**

As previously mentioned, with respect to an alternative plan, the Debtor and its professional advisors have explored various alternative scenarios including, but not limited to, the sale of the Debtor's businesses as a going concern or otherwise, and believe that the Plan enables the holders of Claims and Equity Interests to realize the maximum recovery under the circumstances.  The Debtor believe the Plan is the best plan that can be proposed and serves the best interests of the Debtor and other parties-in-interest.

**B.      Chapter 7 Liquidation**

As discussed above in Section VI(b)(2), with respect to each Class of impaired Claims or Equity Interests, either each holder of a Claim or Equity Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.  In a Chapter 7 liquidation, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have either been paid in full or payment in full is provided for: (i) first to secured creditors (to the extent of the value of their collateral), (ii) next to priority creditors, (iii) next to unsecured creditors, (iv) next to debt expressly subordinated by its terms or by order of the Bankruptcy Court, and (v) last to holders of equity interests.  Based

on the liquidation analysis annexed hereto as <u>Exhibit D</u>, the Debtor believe that if the Chapter 11 Case were converted to a Chapter 7 liquidation, holders of Unsecured Note Claims, General Unsecured Claims, Environmental Claims and D&O Trust Claims would receive less than they would under the Plan and holders of Unsecured Subordinated Note Claims and all other Claims and Equity Interests would receive no Distributions under the Plan.

## XII.
## RECOMMENDATION AND CONCLUSION

The Debtor and its professional advisors have analyzed different scenarios and believe that the Plan will provide for a larger Distribution to holders of Allowed Claims than would otherwise result if an alternative restructuring plan were proposed or the assets of the Debtor were liquidated.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially smaller Distributions to the holders of Allowed Claims.  Accordingly, the Debtor recommends confirmation of the Plan and urges all holders of impaired Claims to vote to accept the Plan, and to evidence such acceptance by returning their Ballots so that they will be received by no later than the Voting Deadline.

**[SIGNATURE PAGE FOLLOWS]**

Date: Wilmington, Delaware
March 11, 2004

**NorthWestern Corporation**

Debtor and Debtor-in-Possession

By: _____

     William M. Austin

     Chief Restructuring Officer

**PAUL, HASTINGS,**
**JANOFSKY & WALKER , LLP**

By: _____

Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia  30308
Telephone:  (404) 815-2400

- and-

**GREENBERG TRAURIG, LLP**

By: _____

Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone:  (302) 661-7000

Co-Counsel to the Debtor and Debtor-in-Possession

Disclosure Statement

Date: Wilmington, Delaware
March 11, 2004

NorthWestern Corporation

Debtor and Debtor-in-Possession


By: _William M. Austin_

William M. Austin
Chief Restructuring Officer


**PAUL, HASTINGS,
JANOFSKY & WALKER, LLP**

By: _____

Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
Telephone: (404) 815-2400


- and-

**GREENBERG TRAURIG, LLP**


By: _____

Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

Co-Counsel to the Debtor and Debtor-in-
Possession


Disclosure Statement