| | | | | |
|---|---|---|---|---|
| interests | $ | (24,543) | $ | (15,749) |

Expanets' income before income taxes and minority interests for the nine months ended September 30, 2003 includes a gain on debt extinguishment of $27.3 million.

Blue Dot has sold 25 businesses (with annualized revenues of approximately $179.1 million) during the nine months ended September 30, 2003, generating approximately $13.8 million in cash, of which a portion was used to pay down its credit facility provider and a portion was retained for working capital purposes. An additional 13 businesses (with annualized revenues of approximately $112.4 million) have

15

been sold between September 30, 2003 and November 7, 2003, for proceeds of approximately $10.6 million. As of September 30, 2003, the Blue Dot credit facility balance was $9.1 million. Since September 30, 2003, the credit facility has been paid off in its entirety from sales proceeds and available working capital at Blue Dot. Blue Dot anticipates selling substantially all of its remaining businesses by June 30, 2004. Summary financial information for the discontinued Blue Dot operations is as follows (in thousands). The operating results for the three and nine months ending September 30, 2003 reflect the results of operations of the 25 sold businesses through the dates of such sales:

| | | September 30, 2003 | | December 31, 2002 |
|---|---|---|---|---|
| Accounts receivable, net | $ | 47,722 | $ | 56,393 |
| Other current assets | | 28,911 | | 36,668 |
| Current assets of discontinued operations | $ | 76,633 | $ | 93,061 |
| Other noncurrent assets of discontinued operations | $ | 722 | $ | 185 |
| Accounts payable | $ | 20,417 | $ | 18,945 |
| Other current liabilities | | 36,278 | | 61,266 |
| Current liabilities of discontinued operations | $ | 56,695 | $ | 80,211 |
| Other noncurrent liabilities of discontinued operations | $ | 4,953 | $ | 10,611 |

| | | Three months ended | | |
|---|---|---|---|---|
| | | September 30, 2003 | | September 30, 2002 |
| Revenues | $ | 112,186 | $ | 131,925 |
| Income before income taxes and minority interests | | 3,153 | | 2,420 |
| Gain on disposal | | 12,921 | | — |
| Income tax provision | | (441) | | (801) |
| Income from discontinued operations, net of income taxes | $ | 15,633 | $ | 1,619 |

|  | Nine months ended | |
|---|---|---|
|  | September 30, 2003 | September 30, 2002 |
| Revenues | $ 338,427 | $ 344,183 |
| Income (Loss) before income taxes and minority interests | 3,500 | (317) |
| Gain on disposal | 11,208 | — |
| Minority interests | — | 3,762 |
| Income tax benefit (provision) | (1,032) | 115 |
| Income (Loss) from discontinued operations, net of income taxes | $ 13,676 | $ 3,560 |

During the second and third quarters of 2003, we also sold our interest in two other subsidiaries. The sale of One Call Locators, Ltd., was completed in June for consideration of $6.6 million in cash and a note receivable of $4.7 million. We recorded the carrying value of the note receivable based on the fair value of our trust preferred securities at the date of the transaction and we recognized a loss of approximately $3.4 million on this sale. The acquiring entity elected to prepay the note receivable on August 25, 2003 by presenting trust preferred obligated securities of NorthWestern, which were

16

accepted at face value. We recognized a gain of $3.3 million on the extinguishment of trust preferred obligated securities during the third quarter of 2003. We sold assets of the other subsidiary in July for $0.2 million in cash and a note receivable of $0.3 million. We recognized a loss of approximately $2.2 million on this sale. We have classified the results of these subsidiaries and CornerStone Propane Partners, L.P. (see discussion below) in discontinued operations and summary financial information is as follows (in thousands):

|  | Three months ended | |
|---|---|---|
|  | September 30, 2003 | September 30, 2002 |
| Revenues | $ — | $ 66,258 |
| Loss before income taxes and minority interests | (41) | (12,380) |
| Loss on disposal | — | (57,055) |
| Income tax benefit (provision) | — | 14,607 |
| Income (Loss) from discontinued operations, net of income taxes and minority interests | $ (41) | $ (54,828) |

|  | Nine months ended | |
|---|---|---|
|  | September 30, 2003 | September 30, 2002 |
| Revenues | $ 19,493 | $ 422,400 |

|  |  |  |
|---|---:|---:|
| Income (Loss) before income taxes and minority interests | 376 | (17,803) |
| Loss on disposal | (5,624) | (97,055) |
| Income tax benefit (provision) | (3,724) | 15,369 |
| Loss from discontinued operations, net of income taxes and minority interests | $ (8,972) | $ (99,489) |

Effective November 1, 2002, we relinquished our direct and indirect equity interests in CornerStone Propane Partners, L.P. and CornerStone Propane, L.P. We do, however, own a non-economic voting interest in a limited liability company, which owns 100 percent of the stock of the managing general partner of CornerStone. As a result, the assets and liabilities of CornerStone are no longer included in our Consolidated Balance Sheets subsequent to November 1, 2002. Effective November 1, 2002, we no longer reflect the results of CornerStone's operations in the Consolidated Income Statements. The results for CornerStone's operations and impairments related to our investments in and advances to CornerStone for the three and nine months ended September 30, 2002, have been presented as discontinued operations in the Consolidated Statements of Loss.

On August 20, 2002, NorthWestern purchased the lenders' interest in approximately $19.9 million of CornerStone short-term debt outstanding under CornerStone's credit facility together with approximately $6.1 million in letters of credit, which NorthWestern had previously guaranteed. No further drawings may be made under this facility. In addition, NorthWestern is owed $13.5 million from CornerStone and NorthWestern also has $9.2 million in letters of credit outstanding on behalf of CornerStone. During the third quarter of 2003, included in investment income and other on the Consolidated Statement of Loss is an impairment charge of $9.1 million to reduce our note receivable to an estimated recoverable amount. As of September 30, 2003, the net recorded value of our receivables from CornerStone was $11 million. In October 2003, the $9.2 million in letters of credit outstanding on behalf of CornerStone were drawn by their respective beneficiaries.

17

**(7) Regulatory Matters**

On June 2, 2003, we filed an annual gas cost tracker request with the MPSC for the projected gas costs for the twelve-month period ending June 30, 2004. On July 3, 2003, the MPSC issued two separate orders, a final order and an interim order, with respect to our recovery of gas costs.

The final order issued by the MPSC disallowed our estimated recovery of $6.2 million of natural gas costs we incurred during the past eight months. The MPSC also rejected a motion for reconsideration filed by us. We filed suit in district court on July 28, 2003 seeking to overturn the MPSC's decision to disallow recovery of these costs. Included in other current assets was $6.2 million, which was written off during June to comply with the final order. In the event the MPSC's decision is overturned, we will reinstate the asset.

The MPSC also granted an interim order on July 3, 2003 for the projected gas cost adjusted for a portion of the gas portfolio at a fixed price of $3.50 per MMbtu as opposed to the market price submitted in the original filing, which was higher. Assuming our average forecast price over the next nine months occurs, the impact of this disallowance on the volumes at the imputed price compared to market price would be approximately $4.1 million for the period July 1, 2003, through June 30, 2004.

In Nebraska, where natural gas companies have been regulated by the municipalities in which they serve, the 2003 Nebraska Unicameral Legislature enacted a new law during the second quarter of 2003, shifting the regulation to the Nebraska Public Service Commission (NPSC). Under the new law, the NPSC regulates rates and terms and conditions of service for natural gas companies, however, the law provides that a natural gas company and the cities in which it serves have the ability to negotiate rates for natural gas service when the natural gas company files an application for increased rates. If the cities and the company choose not to negotiate or they are unable to reach an agreement, the NPSC will review the rate filing. Our initial tariffs, including our rates, terms and conditions for service consistent with those formerly filed with the municipalities, were filed with and accepted by the NPSC.

On August 12, 2003, the MCC has filed a Petition for Investigation, Adoption of Additional Regulatory Controls and Related Relief with the MPSC. On October 21, 2003, the MPSC issued an order initiating an investigation of NorthWestern Energy relating to, among others, finances, corporate structure, capital structure, cash management practices, and affiliated transactions. The relief sought includes adoption of new regulatory controls that would specifically apply to NorthWestern, including additional reporting, cost allocation and financing rules and requirements, and examination of affiliate transactions necessary to ensure that we are not operating our energy division, and will not in the future operate, in a manner that would prejudice our ability to furnish reasonably adequate service and facilities at reasonable and just charges as required under Montana law. Although we believe this matter is stayed as result of our bankruptcy filing, the MPSC and MCC disagree. We cannot determine the impact or resolution of this petition, however, any action taken by the MPSC to increase the regulatory controls under which we operate may have a material affect on our liquidity, operations and financial condition. If we are unable to comply with any MPSC orders in a timely manner, we may become subject to material monetary penalties and fines. Notwithstanding the foregoing, we are providing certain requested information to the MPSC and MCC on a voluntary informational basis.

### (8) Other Comprehensive Loss

The Financial Accounting Standards Board defines comprehensive income as all changes to the equity of a business enterprise during a period, except for those resulting from transactions with owners. For example, dividend distributions are excepted. Comprehensive income consists of net income and other comprehensive income. Net income may include such items as income from continuing operations, discontinued operations, extraordinary items, and cumulative effects of changes in accounting principles. Other comprehensive income may include foreign currency translations,

18

adjustments of minimum pension liability, and unrealized gains and losses on certain investments in debt and equity securities. Comprehensive income (loss) is calculated as follows (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2003 | 2002 | 2003 | 2002 |
| Net loss | $ (52,740) | $ (55,361) | $ (85,685) | $ (115,384) |
| Other comprehensive income (loss), net of tax: | | | | |
|   Unrealized gain (loss) on investments | — | 944 | (349) | 1,334 |
|   Gain on termination of hedge | — | — | — | 5,121 |
|   Amortization of hedge gain | (137) | (176) | (416) | (385) |
|   Foreign currency translation | 5 | (52) | 211 | 2 |
|   Minimum pension liability | — | (1,424) | — | (1,424) |
| Comprehensive loss | $ (52,872) | $ (56,069) | $ (86,239) | $ (110,736) |

### (9) Restructuring Reserve

We recognized a restructuring charge in the fourth quarter of 2001 related to certain cost savings initiatives. We summarize the activity in accrued expenses related to the restructuring charge in our Consolidated Balance Sheets in the following table (in thousands):

|  | December 31, 2002 | Payments | September 30, 2003 |
| --- | --- | --- | --- |
| Employee termination benefits | $ 1,783 | $ (1,549) | $ 234 |

## (10) Income Taxes

The following table reconciles our effective income tax rate to the federal statutory rate:

|  | Three months ended September 30, 2003 | Nine months ended September 30, 2003 |
|---|---|---|
| Federal statutory rate | (35.0)% | (35.0)% |
| State income, net of federal provisions | (2.5) | (3.3) |
| Amortization of investment tax credit | (0.4) | (0.6) |
| Minority interest preferred stock | — | (7.8) |
| Dividends received deduction and other investments | (0.6) | (0.6) |
| Valuation allowance | 35.2 | 46.5 |
| Other, net | (2.0) | (0.9) |
|  | (5.3)% | (1.7)% |

For the three and nine months ended September 30, 2003, we have recorded a valuation allowance against the tax benefits resulting from our net operating losses, as it is more likely than not that these benefits will not be realized. Additionally, we have recorded a benefit in the third quarter to reflect tax refunds received related to net operating losses that were carried back to prior years.

## (11) Segment Information

We currently operate our business in three reporting segments: (i) electric utility operations; (ii) natural gas utility operations; and (iii) all other, which primarily consists of our other miscellaneous service and non-energy related operations and activities that are not included in the other identified

19

segments, together with the unallocated corporate costs and investments, and any eliminating amounts. Items below operating income are not allocated between our electric and natural gas segments.

The results of operations of our electric and natural gas utility segments and all other operations for the nine months ended September 30, 2002, include the results of our Montana operations since February 1, 2002, the effective date of our acquisition. The operations of Expanets, Blue Dot and CornerStone, which were formerly additional reporting segments, and our interest in these subsidiaries has been reflected in the consolidated financial statements as Discontinued Operations (see Note 6 for further discussion).

The accounting policies of the operating segments are the same as the parent except that the parent allocates some of its operating expenses and interest expense to the operating segments according to a methodology designed by management for internal reporting purposes and involves estimates and assumptions. Financial data for the business segments, excluding discontinued operations, are as follows (in thousands):

**Three Months Ended September 30, 2003**

|  | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
|---|---|---|---|---|---|
| Operating Revenues | $ 183,937 | $ 48,907 | $ 232,844 | $ 2,544 | $ 235,388 |
| Cost of Sales | 88,762 | 31,670 | 120,432 | 654 | 121,086 |

|  | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
|---|---|---|---|---|---|
| Gross Margin | 95,175 | 17,237 | 112,412 | 1,890 | 114,302 |
| Operating, general, & administrative | 46,395 | 14,400 | 60,795 | 17,858 | 78,653 |
| Depreciation | 13,814 | 3,671 | 17,485 | 463 | 17,948 |
| Reorganization expenses | — | — | — | 174 | 174 |
| Operating income (loss) | 34,966 | (834) | 34,132 | (16,605) | 17,527 |
| Interest expense | N/A | N/A | (25,205) | (19,649) | (44,854) |
| Gain on debt extinguishment | N/A | N/A | — | 3,300 | 3,300 |
| Investment income and other | N/A | N/A | 1,670 | (8,976) | (7,306) |
| Income (Loss) before taxes | N/A | N/A | 10,597 | (41,930) | (31,333) |
| Benefit (provision) for taxes | N/A | N/A | (2,884) | 4,530 | 1,646 |
| Loss from continuing operations | N/A | N/A | $ 7,713 | $ (37,400) | $ (29,687) |
| Total Assets | N/A | N/A | $ 2,038,319 | $ 179,884 | $ 2,218,203 |
| Capital Expenditures | N/A | N/A | $ 20,793 | $ 74 | $ 20,867 |

20

**Three Months Ended September 30, 2002**

|  | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
|---|---|---|---|---|---|
| Operating Revenues | $ 152,740 | $ 28,681 | $ 181,421 | $ 2,844 | $ 184,265 |
| Cost of Sales | 55,591 | 12,025 | 67,616 | 3,071 | 70,687 |
| Gross Margin | 97,149 | 16,656 | 113,805 | (227) | 113,578 |
| Operating, general, & administrative | 46,643 | 15,149 | 61,792 | 4,609 | 66,401 |
| Depreciation | 13,148 | 2,581 | 15,729 | 860 | 16,589 |
| Reorganization expenses | — | — | — | — | — |
| Operating income (loss) | 37,358 | (1,074) | 36,284 | (5,696) | 30,588 |
| Interest expense | N/A | N/A | (4,585) | (29,000) | (33,585) |
| Gain (loss) on debt extinguishment | N/A | N/A | — | — | — |
| Investment income and other | N/A | N/A | 962 | 101 | 1,063 |
| Income (loss) before taxes | N/A | N/A | 32,661 | (34,595) | (1,934) |
| Benefit (provision) for taxes | N/A | N/A | (2,391) | 891 | (1,500) |
| Income (loss) from continuing operations | N/A | N/A | $ 30,270 | $ (33,704) | $ (3,434) |
| Total Assets | N/A | N/A | $ 2,049,064 | $ 186,906 | $ 2,235,970 |
| Capital Expenditures | N/A | N/A | $ 43,258 | $ 5,678 | $ 48,936 |

Nine Months Ended September 30, 2003

|  | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
|---|---|---|---|---|---|
| Operating Revenues | $ 514,585 | $ 237,845 | $ 752,430 | $ 7,210 | $ 759,640 |
| Cost of Sales | 242,088 | 161,419 | 403,507 | 2,036 | 405,543 |
| Gross Margin | 272,497 | 76,426 | 348,923 | 5,174 | 354,097 |
| Operating, general, & administrative | 140,222 | 44,432 | 184,654 | 42,172 | 226,826 |
| Impairment on assets held for sale | — | — | — | 12,399 | 12,399 |
| Depreciation | 40,889 | 10,589 | 51,478 | 1,325 | 52,803 |
| Reorganization expenses | — | — | — | 174 | 174 |
| Operating income (loss) | 91,386 | 21,405 | 112,791 | (50,896) | 61,895 |
| Interest expense | N/A | N/A | (75,312) | (50,723) | (126,035) |
| Gain on debt extinguishment | N/A | N/A | — | 3,300 | 3,300 |
| Investment income and other | N/A | N/A | 2,658 | (8,809) | (6,151) |
| Income (loss) before taxes | N/A | N/A | 40,137 | (107,128) | (66,991) |
| Benefit (provision) for taxes | N/A | N/A | (17,196) | 18,341 | 1,145 |
| Income (loss) from continuing operations | N/A | N/A | $ 22,941 | $ (88,787) | $ (65,846) |
| Total Assets | N/A | N/A | $ 2,038,319 | $ 179,884 | $ 2,218,203 |
| Capital Expenditures | N/A | N/A | $ 52,619 | $ 74 | $ 52,693 |

21

Nine Months Ended September 30, 2002

|  | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
|---|---|---|---|---|---|
| Operating Revenues | $ 368,572 | $ 159,970 | $ 528,542 | $ 9,230 | $ 537,772 |
| Cost of Sales | 126,751 | 86,988 | 213,739 | 7,346 | 221,085 |
| Gross Margin | 241,821 | 72,982 | 314,803 | 1,884 | 316,687 |
| Operating, general, & administrative | 122,155 | 40,356 | 162,511 | 11,527 | 174,038 |
| Depreciation | 36,468 | 8,058 | 44,526 | 1,739 | 46,265 |
| Reorganization expenses | — | — | — | — | — |
| Operating income (loss) | 83,198 | 24,568 | 107,766 | (11,382) | 96,384 |
| Interest expense | N/A | N/A | (24,265) | (58,504) | (82,769) |
| Loss on debt extinguishment | N/A | N/A | — | (20,688) | (20,688) |
| Investment income and other | N/A | N/A | 2,087 | (3,001) | (914) |
| Income (loss) before taxes | N/A | N/A | 85,588 | (93,575) | (7,987) |
| Benefit (provision) for taxes | N/A | N/A | (14,984) | 19,265 | 4,281 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Income (loss) from continuing operations | N/A | N/A | $ | 70,604 | $ | (74,310) | $ | (3,706) |
| Total Assets | N/A | N/A | $ | 2,049,064 | $ | 186,906 | $ | 2,235,970 |
| Capital Expenditures | N/A | N/A | $ | 43,258 | $ | 5,678 | $ | 48,936 |

**(12) New Accounting Standards**

In June 2001, the Financial Accounting Standards Board issued SFAS No. 143, *Accounting for Asset Retirement Obligations,* which was effective January 1, 2003. The statement provides accounting and disclosure requirements for retirement obligations associated with long-lived assets. The statement requires the present value of future retirement costs for which the Corporation has a legal obligation be recorded as liabilities with an equivalent amount added to the asset cost and depreciated over the asset life.

We have completed an assessment of the specific applicability and implications of SFAS No. 143. We have identified, but have not recognized, asset retirement obligation, or ARO, liabilities related to our electric and natural gas transmission and distribution assets. Many of these assets are installed on easements over property not owned by us. The easements are generally perpetual and only require retirement action upon abandonment or cessation of use of the property for the specified purpose. The ARO liability is not estimable for such easements as we intend to utilize these properties indefinitely. In the event we decide to abandon or cease the use of a particular easement, an ARO liability would be recorded at that time.

Our regulated utility operations have, however, previously recognized removal costs of transmission and distribution assets as a component of depreciation in accordance with regulatory treatment. To the extent these amounts do not represent SFAS No. 143 legal retirement obligations, they are to be disclosed upon adoption of the statement. As of September 30, 2003, we have estimated accrued removal costs related to our Montana transmission and distribution operations in the amount of $117.3 million and $4.8 million for our South Dakota and Nebraska operations, all of which are included in accumulated depreciation.

For our generation properties, we have accrued decommissioning costs since the generating units were first put into service in the amount of $11.7 million, which is classified as a noncurrent regulatory liability.

22

SFAS No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Correction*s, was issued in April 2002. SFAS No. 145 eliminates the requirement that gains and losses from the extinguishments of debt be aggregated and classified as extraordinary items, net of the related income tax. It also requires sale-leaseback treatment for certain modifications of a capital lease that result in the lease being classified as an operating lease. We adopted SFAS No. 145 on January 1, 2003. As a result of the adoption, effective January 1, 2003, we reclassified the recognition of deferred costs related to interim financing of $20.7 million, incurred for the three months ended March 31, 2002, from an extraordinary loss to loss on debt extinguishment on the Consolidated Statement of Loss. The related tax benefit of $7.2 million has been reclassified from an extraordinary loss to benefit (provision) for income taxes on the Consolidated Statement of Loss.

SFAS No. 146, *Accounting for Costs Associated with Exit or Disposal Activities*, was issued in June 2002. SFAS No. 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan, including lease termination costs and certain employee termination benefits that are associated with a restructuring, discontinued operation, plant closing or other exit or disposal activity. SFAS No. 146 will be applied prospectively and is effective for exit or disposal activities that are initiated after December 31, 2002. We adopted SFAS No. 146 on January 1, 2003. The adoption of SFAS No. 146 did not have a material impact on our consolidated results of operations, financial position, or cash flows.

FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* (FIN 45), was issued in November 2002. FIN 45 elaborates on the

existing disclosure requirements for most guarantees. It also clarifies that at the time a company issues a guarantee, the company must recognize an initial liability for the fair market value of the obligations it assumes under that guarantee and must disclose that information in its interim and annual financial statements. The initial recognition and measurement provisions of the FIN 45 apply on a prospective basis to guarantees issued or modified after December 31, 2002. We adopted FIN 45 effective December 2002 and the applicable disclosures are reflected in Note 18, "Commitments and Contingencies."

SFAS No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure—an Amendment of FASB Statement No. 123*, was issued in December 2002. It provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. SFAS No. 148 is effective for fiscal years beginning after December 15, 2003. We do not expect to voluntarily adopt the fair value based method of SFAS No. 123 and, therefore, do not expect the measurement provisions of SFAS No. 148 to affect our financial position or results of operations. We have included disclosures required by SFAS No. 148 in these financial statements. We apply the intrinsic value based method of Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations in accounting for our stock option plan. No compensation cost is recognized, as the option exercise price is equal to the market price of the underlying stock on the date of grant. For the three and six months ended June 30, our pro forma net income and earnings per share would have been as indicated below had the fair value of option

23

grants been charged to compensation expense in accordance with SFAS No. 123 (in thousands, except per share amounts):

|  | Three months ended September 30, | | Nine months ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2003 | 2002 | 2003 | 2002 |
| Earnings (loss) on common stock: | | | | |
| As reported | $ (52,740) | $ (63,130) | $ (100,630) | $ (136,948) |
| Less: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | 38 | (437) | 112 | (1,176) |
| Pro forma | $ (52,702) | $ (63,567) | $ (100,518) | $ (138,124) |
| Basic and diluted earnings per average common share: | | | | |
| As reported | $ (1.41) | $ (2.30) | $ (2.69) | $ (5.00) |
| Pro forma | $ — | $ (2.32) | $ — | $ (5.04) |

FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), was issued in January 2003. This interpretation changes the method of determining whether certain entities, including securitization entities, should be included in a company's Consolidated Financial Statements. An entity is subject to FIN 46 and is called a variable interest entity, or VIE, if it has equity that is insufficient to permit the entity to finance its activities without additional subordinated financial support from other parties, or equity investors that cannot make significant decisions about the entity's operations, or that do not absorb the expected losses or receive the expected returns of the entity. All other entities are evaluated for consolidation in accordance with SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries*. A VIE is consolidated by its primary beneficiary, which is the party involved with the VIE that has a majority of the expected losses or a majority of the expected residual returns or both. The provisions of the interpretation are to be applied immediately to VIEs created after January 31, 2003, and to VIEs in which an enterprise obtains an interest after that date. For VIEs in which an enterprise holds a variable interest that it acquired before February 1, 2003, FIN 46 applies in the first fiscal period beginning after June 15, 2003. For any VIEs that must be consolidated under FIN 46 that were created before February 1, 2003, the assets, liabilities and non-controlling interest of the VIE would be initially measured at their carrying amounts with any difference between the net amount added to the balance sheet and any previously recognized interest being recognized as the cumulative effect of an accounting

change. If determining the carrying amounts is not practicable, fair value at the date FIN 46 first applies may be used to measure the assets, liabilities and non-controlling interest of the VIE. FIN 46 also mandates new disclosures about VIEs, some of which are required to be presented in financial statements issued after January 31, 2003. In October 2003, the FASB deferred the implementation date of FIN 46 to the fourth quarter of 2003. We will be required to deconsolidate our Subsidiary Trusts, which hold our Company Obligated Mandatorily Redeemable Preferred Securities, upon adoption of FIN 46. The impact of deconsolidation is that we will report our investments in Subsidiary Trusts as a separate investment in unconsolidated entity and reflect notes payable to the Subsidiary Trusts on our consolidated balance sheet.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*, which amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*. SFAS No. 149 is effective prospectively for contracts entered into or modified after June 30, 2003, and for hedging relationships designated after June 30, 2003. The exception to these requirements are the provisions of SFAS No. 149 related to SFAS No. 133

24

implementation issues that have been effective for fiscal quarters that began prior to June 15, 2003, should continue to be applied in accordance with their respective effective dates. In addition, paragraphs 7(a) and 23(a), which relate to forward purchases or sales of when-issued securities or other securities that do not yet exist, should be applied to both existing contracts and new contracts entered into after June 30, 2003. The adoption of SFAS No. 149 did not have a material impact on our consolidated results of operations, financial condition or cash flows.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Instruments with Characteristics of Both Liabilities and Equity*, which establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. SFAS No. 150 requires that an issuer classify a financial instrument that is within its scope, which may have previously been reported as equity, as a liability or an asset in some circumstances. SFAS No. 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. In accordance with SFAS No. 150, we have presented our Company Obligated Mandatorily Redeemable Preferred Securities of Subsidiary Trusts as liabilities as of September 30, 2003, and the respective dividends of approximately $7.4 million have been reflected as interest expense for the three months ended September 30, 2003. Prior period amounts have not been reclassified.

### (13) Reclassifications

Certain 2002 amounts have been reclassified to conform to the 2003 presentation. Such reclassifications have no impact on net loss or shareholders' deficit as previously reported.

### (14) Earnings (Loss) per Average Common Share

Basic earnings per share is computed on the basis of the weighted average number of common shares outstanding. Diluted earnings per share is computed on the basis of the weighted average number of common shares outstanding plus the effect of the outstanding stock options and warrants. The following table presents the shares used in computing the basic and diluted earnings per share for 2003 and 2002:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2003 | 2002 | 2003 | 2002 |
| Average Common Shares Outstanding For Basic Computation | 37,396,762 | 27,396,762 | 37,396,792 | 27,396,762 |
| Dilutive Effect of: | | | | |

| | | | | |
|---|---|---|---|---|
| Stock Options | — | — | — | — |
| Average Common Shares Outstanding For Diluted Computation | 37,396,762 | 27,396,762 | 37,396,762 | 27,396,762 |

Certain outstanding antidilutive options have been excluded from the earnings per share calculation. These options total 1,697,501 and 2,659,981 for the three months ended September 30, 2003 and 2002, respectively. For the nine months ended September 30, 2003 and 2002, these options total 1,697,501 and 2,659,981, respectively.

**(15) Impairment on assets held for sale**

During the second quarter of 2003, we recorded an additional impairment charge of $12.4 million due to further decline in the estimated realizable value of our investment in our Montana First Megawatts project. We had previously recorded an impairment charge of $35.7 million during the

25

fourth quarter of 2002. We are actively attempting to sell the equipment and land related to this project.

**(16) Gain (Loss) on Debt Extinguishment**

As discussed in Note 6, on August 25, 2003, we recognized a gain of $3.3 million on the extinguishment of trust preferred obligated securities.

In March 2002, we retired a $720 million term loan, due February 2003, that was used for interim financing for the acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company. The recognition of deferred costs related to the interim financing resulted in a loss of $20.7 million.

**(17) Employee Benefit Plans**

We offered an Early Retirement Incentive (ERI) Program for eligible team members of our pension plan in South Dakota and Nebraska effective August 31, 2003. As a result of the ERI, during the third quarter we recognized a Special Termination Benefit expense of $785,000 due to the increased benefits paid to the 13 eligible participants.

In May 2003, our Board of Directors adopted a resolution to terminate or amend various employee benefit plans. We terminated our non-qualified supplemental 401(k) plan effective May 6, 2003. Any investment elections in our common stock were presented as Treasury Stock; other investments as part of Investments; and an offsetting liability for both as part of Other Noncurrent Liabilities in the Consolidated Balance Sheets. In June 2003, plan assets were distributed to participants (including 174,019 treasury shares) and no further liability remains. Our employee stock purchase plan was also terminated, with no impact to our operating results.

Two nonqualified postretirement defined benefit plans were amended effective May 6, 2003 to permit vested participants the option of continuing the current benefits level or take a present value lump sum distribution. We recognized a loss of approximately $0.3 million in the second quarter due to the amendment of these plans. A third nonqualified postretirement defined benefit plan was terminated effective May 6, 2003, with no impact to our operating results.

Our Employee Stock Ownership Plan ("ESOP") was terminated effective July 19, 2003. Due to the suspension of our common stock dividend and the declining stock price, we accrued $5.9 million as of December 31, 2002, to satisfy the ESOP loan requirement. This loan was paid off in the second quarter and no further liability remains. Shares held by the plan were included in the number of average shares outstanding when computing our basic and diluted earnings per share, therefore the termination has no impact on these calculations.

**(18) Commitments and Contingencies**

*Environmental Liabilities*

We are subject to numerous state and federal environmental regulations. Because laws and regulations applicable to our businesses are continually developing and are subject to amendment, reinterpretation and varying degrees of enforcement, we may be subject to, but can not predict with certainty the nature and amount of future environmental liabilities. The Clean Air Act Amendments of 1990 (the Act) stipulate limitations on sulfur dioxide and nitrogen oxide emissions from coal-fired power plants. We believe we can comply with such sulfur dioxide emission requirements at our generating plants and that we are in compliance with all presently applicable environmental protection requirements and regulations. We also are subject to other environmental statutes and regulations including those that related to former manufactured gas plant sites and other past and present operations and facilities. In addition, we may be subject to financial liabilities related to the

26

investigation and remediation from activities of previous owners or operators of our industrial and generating facilities. The range of exposure for environmental remediation obligations at present is estimated to range between $35.3 million to $72.6 million. We have an environmental reserve of $35.3 million at September 30, 2003, primarily related to liabilities from our Montana operations. This reserve was established in anticipation of future remediation activities at our various environmental sites and does not factor in any exposure arising from private tort actions or government claims for damages allegedly associated with specific environmental conditions. We are in the process of engaging a third party environmental consulting firm to perform a comprehensive evaluation of our operations, facilities and regulated business. We will use this third party information to evaluate the adequacy of our current environmental reserve. Based upon the results of this evaluation, we may be required to increase the reserve amount. It is possible that the increase could be material in amount.

In light of the Environmental Protection Agency's (EPA's) public announcement in early 2003, favoring removal of the Milltown Dam structure as part of the remedy to address heavy metals contamination in the Milltown Reservoir, we commenced negotiations with The Atlantic Richfield Company, or ARCO, to prevent a challenge from ARCO to our statutorily exempt status under the Comprehensive Environmental Response Compensation and Liability Act as a potentially responsible party. On September 10, 2003, ARCO and the Corporation executed a confidential settlement agreement which, among other things, caps our maximum contribution towards remediation of the Milltown Reservoir superfund site. The amount of our expected contribution has been fully accrued in the accompanying financial statements. Commencing in January 2004 and each month thereafter, we will pay $500,000 into the escrow account until our total agreed upon amount is funded. No interest will accrue on the unpaid balance due ARCO. The escrow account will remain funded until a final, non-appealable consent decree is entered by the United States District Court. If, however, we are unable to negotiate an acceptable consent decree with the interested parties, then we can terminate the settlement agreement with ARCO, which will trigger the return of the escrowed funds to us. The settlement agreement, which is subject to Bankruptcy Court approval, provides us with appropriate ARCO releases and indemnifications. There can be no assurance that the proposed settlement with ARCO will be approved by the Bankruptcy Court.

*Legal Proceedings*

We, and certain of our present and former officers and directors, were named as defendants in numerous complaints purporting to be class actions filed in the United States District Court for the District of South Dakota, Southern Division, alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The complaints contained varying allegations, including that the defendants misrepresented and omitted material facts with respect to our 2000, 2001, and 2002 financial results and operations included in our filings with the SEC, press releases, and registration statements and prospectuses disseminated in connection with certain offerings of debt, equity, and trust preferred securities. The complaints seek unspecified compensatory damages, rescission, and attorneys' fees and costs as well as accountants' and experts' fees. In June 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Securities Litigation*, Case No. 03-4049, and Carpenters Pension Trust for Southern California, Oppenheim Investment Management, LLC, and Richard C. Slump were named as co-lead plaintiffs (the "Lead Plaintiffs"). In July 2003, the Lead Plaintiffs filed a consolidated amended class action complaint naming as defendants NorthWestern, NorthWestern Capital Financing II and III, Blue Dot, Expanets, certain of our present and former officers and directors, along with a number of investment banks that

participated in the securities offerings. The amended complaint alleges that the defendants misrepresented and omitted material facts concerning the business operations and financial performance of NorthWestern, Expanets, Blue Dot and CornerStone, overstated NorthWestern's revenues and earnings by, among other things, maintaining insufficient reserves for accounts receivable

27

at Expanets, failing to disclose billing problems and lapses and data conversion problems, failing to make full disclosures of problems (including the billing and data conversion issues) arising from the implementation of Expanets' EXPERT system, concealing losses at Expanets and Blue Dot by improperly allocating losses to minority interest shareholders, maintaining insufficient internal controls, and profiting from improper related-party transactions. We, and certain of our present and former officers and directors, were also named as defendants in two complaints purporting to be class actions which were filed in the United States District Court for the Southern District of New York, entitled *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.*, Case No. 03CV3223, and *Arthur Laufer v. Merle Lewis, et al.*, Case No. 03CV3716, which were brought on behalf of the purchasers of our 7.20%, 8.25%, and 8.10% trust preferred securities which were offered and sold pursuant to our registration statement on Form S-3 filed on July 12, 1999. The plaintiffs' claims are based on similar allegations of material misrepresentations and omissions of fact relating to the registration statement in violation of Sections 11 and 12 of the Securities Act of 1933 and they seek unspecified compensatory damages, rescission and attorneys', accountants' and experts' fees. In July 2003, *Arthur Laufer v. Merle Lewis, et al.* was transferred to the District of South Dakota and consolidated with the consolidated actions pending in that court. In September 2003, *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.* was also transferred to the District of South Dakota. The actions have been stayed as to NorthWestern Corporation due to its bankruptcy filing. In October 2003, Expanets, Blue Dot, and certain of NorthWestern's present and former officers and directors filed motions to dismiss the consolidated amended class action complaint for failure to state a claim, which are currently pending in the District of South Dakota. We intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

Certain of our present and former officers and directors and NorthWestern, as a nominal defendant, have been named in two shareholder derivative actions commenced in the United States District Court for the District of South Dakota, Southern Division, entitled *Deryl Lusty, et al. v. Richard R. Hylland, et al.*, Case No. CIV034091 and *Jerald and Betty Stewart, et al. v. Richard R. Hylland, et al.*, Case No. CIV034114. These shareholder derivative lawsuits allege that the defendants breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal shareholder suits. The plaintiffs seek unspecified compensatory damages, restitution of improper salaries, insider trading profits and payments from NorthWestern, and disgorgement under the Sarbanes Oxley Act of 2002. In July 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Derivative Litigation*, Case No. 03-4091. In October 2003, the action was stayed pending a ruling on defendants' motions to dismiss in the related securities class action, *In re NorthWestern Corporation Securities Litigation*. On November 6, 2003, the Bankruptcy Court entered an order preliminarily enjoining the plaintiffs in *In re NorthWestern Corporation Derivative Litigation* from prosecuting the litigation against NorthWestern, its subsidiaries and its current and former officers and directors until further order of the Bankruptcy Court. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

In April 2003, the SEC notified NorthWestern that it is conducting an informal inquiry relating to questions regarding the restatements of our 2002 quarterly reports on Form 10-Q and other accounting and financial reporting matters. We are cooperating fully with the SEC's informal inquiry and have provided requested information as expeditiously as possible. Other than the informal SEC inquiry, as of the date hereof, we are not aware of any additional litigation or inquiry or investigation having been commenced against us related to these matters, but we cannot predict whether or not any such

28

litigation or regulatory inquiry or investigation will be commenced or, if it is, the outcome of any such litigation or regulatory inquiry or investigation.

We are one of several defendants in a class action lawsuit entitled McGreevey, et al. v. The Montana Power Company, et al., now pending in federal court in Montana. The lawsuit, which was filed by the former shareholders of The Montana Power Company (many of whom became shareholders of Touch America Holdings, Inc. as a result of a corporate reorganization of The Montana Power Company), claims that the disposition of various generating and energy-related assets by The Montana Power Company was void because of the failure to obtain shareholder approval for the transactions. Plaintiffs thus seek to reverse those transactions, or receive fair value for their stock as of late 2001, when plaintiffs claim shareholder approval should have been sought. NorthWestern Corporation is named as a defendant due to the fact that we purchased Montana Power LLC, which plaintiffs claim is a successor to The Montana Power Company. We intend to vigorously defend against this lawsuit. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or our ability to timely confirm a plan of reorganization.

We are also one of several defendants in a class action lawsuit entitled In Re Touch America ERISA Litigation, which is currently pending in federal court in Montana. The lawsuit was filed by participants in the former Montana Power Company retirement savings plan and alleges that there was a breach of fiduciary duty in connection with the employee stock ownership aspects of the plan. The federal court has recently entered orders indefinitely staying the ERISA litigation because of Touch America Holdings Inc.'s bankruptcy filing. We intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or our ability to timely confirm a plan of reorganization.

We, and certain of our present and former officers and directors, were named as defendants in certain complaints filed against CornerStone Propane Partners LP, and other defendants purporting to be class actions which were filed in the United States District Court for the Northern District of California by purchasers of units of CornerStone Propane Partners alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. Through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, L.P. Certain present and former officers and directors of NorthWestern who are named as defendants in certain of these actions have also been sued in their capacities as directors of the managing general partner. These complaints allege that defendants sold units of CornerStone Propane Partners, L.P. based upon false and misleading statements and failed to disclose material information about CornerStone Propane Partners' financial condition and future prospects, including overpayment for acquisitions, overstating earnings and net income, and that it lacked adequate internal controls. All of the lawsuits have now been consolidated and Gilbert H. Lamphere has been named as lead plaintiff. The actions have been stayed as to NorthWestern Corporation due to its bankruptcy filing. On October 27, 2003, the plaintiffs filed an amended consolidated class action complaint. The new complaint does not name NorthWestern as a defendant, although it alleges facts relating to NorthWestern's conduct. Certain of our former officers and directors are named as defendants in the amended consolidated complaint. The plaintiffs seek compensatory damages, prejudgment and post judgment interest and costs, injunctive relief, and other relief. We intend to vigorously defend against these lawsuits. On November 6, 2003, the Bankruptcy Court entered an order approving a stipulation between NorthWestern and plaintiffs in this litigation. The stipulation provides that litigation as against NorthWestern shall be temporarily stayed for 180 days from the date of the stipulation. Pursuant to the stipulation and after providing notice to Northwestern,

the plaintiffs may move the Bankruptcy Court for termination of the temporary stay. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or our ability to timely confirm a plan of reorganization.

Certain of our present and former officers and directors, and CornerStone Propane Partners, L.P., as a nominal defendant, are among other defendants named in two derivative actions commenced in the Superior Court for the State of California, County of Santa Cruz, entitled *Adelaide Andrews v. Keith G. Baxter, et al.*, Case No. CV146662 and *Ralph Tyndall v. Keith G. Baxter, et al.*, Case No. CV146661. These derivative lawsuits allege that the defendants

breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal unitholder suits. The plaintiffs seek unspecified compensatory damages, treble damages pursuant to the California Corporations Code, injunctive relief, restitution, disgorgement, costs, and other relief. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

On April 30, 2003, Mr. Richard Hylland, our former President and Chief Operating Officer, filed a demand for arbitration of contract claims under his employment agreement, as well as tort claims for defamation, infliction of emotional distress and tortuous interference and a claim for punitive damages. Mr. Hylland is seeking relief in an amount of $25 million, plus interest, attorney's fees, costs, and punitive damages. We dispute Mr. Hylland's claims and intend to vigorously defend the arbitration. On May 8, 2003, we reported that the Special Committee of the Board formed to evaluate Mr. Hylland's performance and conduct in connection with the management of NorthWestern and its subsidiaries had completed its evaluation. Based on the recommendations of the Special Committee, on May 6, 2003, the Board determined that Mr. Hylland's performance and conduct as President and Chief Operating Officer warranted termination under his employment contract. This arbitration has been stayed due to our bankruptcy filing.

We are also subject to various other legal proceedings and claims that arise in the ordinary course of business. In the opinion of management, the amount of ultimate liability with respect to these actions will not materially affect our financial position or results of operations or ability to timely confirm a plan of reorganization.

*Residual value guarantees*

We have residual value guarantees related to certain vehicles under operating leases by Expanets and Blue Dot, in the event of default and subsequent failure to cure such default. At September 30, 2003, the maximum exposure under these residual value guarantees is approximately $0.8 million and $13.5 million related to Expanets and Blue Dot, respectively.

*Performance Bonds*

Expanets has various performance bonds and guarantees in place to cover the installation of equipment and inventory purchases. The maximum potential payout under these performance bonds is $16.6 million and $49.9 million as of September 30, 2003 and December 31, 2002, respectively.

In May 2003 a vendor of Expanets presented a claim against a performance bond. We advanced $10 million in satisfaction of this claim pursuant to a previously existing indemnity agreement supporting the performance bond. Expanets has repaid $500,000 on the advance. Expanets has located and is using alternative supply sources.

30

Blue Dot has various license, bid and performance bonds in place to secure performance of contracts and the adequate provision of services. The maximum potential payout under these performance bonds is $7.2 million and $14.3 million as of September 30, 2003 and December 31, 2002, respectively.

We have issued indemnity agreements that support the outstanding performance bonds of Expanets and Blue Dot.

*Letters of Credit*

We have various letter of credit requirements and other collateral obligations of approximately $24.0 million and $48.1 million as of September 30, 2003 and December 31, 2002, respectively. Approximately $9 million and $18.6 million of these obligations as of September 30, 2003 and December 31, 2002, respectively, serve to support performance bonds primarily related to Expanets and Blue Dot. In addition, included in other assets at September 30, 2003 is $7.1 million of deposits that support performance bonds related to Expanets and Blue Dot. No such amounts existed at December 31, 2002.