*Other Contractual Obligations*

On June 19, 2002, NorthWestern Energy Marketing, LLC (NEM), our power marketing subsidiary, entered into two five-year power supply contracts to supply a total of approximately 20 megawatts of electricity to customers located in Montana. These supply obligations commenced on July 1, 2002 and continue through June 30, 2007. NEM secured supply to cover these contractual obligations through June 30, 2003. Due to our financial condition, NEM has been unable to secure a source of power to cover its contractual obligation subsequent to June 30, 2003. Based on the uncertainty of supply, as of July 1, 2003, the two customers elected to secure their power supply needs from the Montana default supply. Shortly thereafter, the customers notified NEM that they would seek damages to compensate them for their increased power supply costs. NEM reached a settlement with its two customers on October 27, 2003, and subsequently paid $1.5 million in full settlement of its obligations.

We are party to various commitment contracts to purchase and sell electric and gas. On September 15, 2003, we received a notice of termination from a party with a contract to purchase electricity from us during off-peak hours. This party has demanded a termination payment based on the difference between the contract price for electricity and the market value at the date of termination. This party is currently holding a $3 million deposit from us related to the contract. We have attempted to schedule power with this party and we are disputing their claim based on various terms of the contract and the methodology for calculating the termination payment.

The proposed sale of Expanets' assets and business could result, upon the lapse of various notice and cure periods, in a default in Expanets' credit agreement with Avaya. The holder of the note issued under the credit agreement, could accelerate payment of the note upon such default. We guaranteed payment by Expanets of the note, which was formerly held by Avaya and currently evidences indebtedness in an amount equal to $27.1 million. Expanets may not have sufficient funds to satisfy this obligation and our guarantee could be called on by the holder of the note, although any action to enforce the guarantee would likely be subject to a stay in Bankruptcy Court and would, while subject to the stay, not trigger any cross-defaults under other NorthWestern debt instruments. If the sale of Expanets' assets to Avaya is consummated, the note will be paid from the proceeds at closing and our obligations under the guarantee will be cancelled. If the sale of Expanets' assets is not consummated, Expanets will remain obligated to pay the amounts owing under the note, which unless accelerated comes due in 2004. We have no intention of providing additional funds to Expanets if it does not have sufficient funds to satisfy this obligation. We are also prohibited by the MPSC from making advances of more than $10 million in the aggregate to our non-regulated businesses without their prior consent.

Default in our obligation to pay the note pursuant to our guarantee could result in a default under our various credit agreements.

Blue Dot and Expanets, in making certain of their business acquisitions, issued equity in various classes and series to the former owners of such businesses. In connection with those issuances, in certain cases, Blue Dot and Expanets entered into agreements providing exchange or put rights giving the security holders certain rights related to those shares. NorthWestern Growth Corporation entered into agreements with Blue Dot and Expanets, under which it agreed to support obligations related to the exercise of the exchange or put rights in certain of the underlying agreements. Blue Dot and Expanets have requested that NorthWestern Growth Corporation provide funds necessary to perform their obligations under those agreements.

NorthWestern has indicated that it believes its obligations with respect to Expanets' instruments have expired and that, in any event, no additional funds will be provided while NorthWestern pursues the sale or disposition of those businesses or their assets. The maximum aggregate amount of payments that may be required of NorthWestern under the various Expanets agreements is $3.2 million as of September 30, 2003.

The maximum aggregate amount of payments that may be required of NorthWestern under the various Blue Dot agreements is approximately $10.3 million as of September 30, 2003, of which approximately $2.9 million may be required within the next twelve months. For the period of September 30, 2003 to November 7, 2003, Blue Dot has sold 13 businesses that will result in a decrease in the maximum aggregate amount of payments that may be required of NorthWestern of $3.8 million, of which approximately $0.6 million would have been required within the next twelve months.

32

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*Unless the context requires otherwise, references to "we," "us," "our" and "NorthWestern" refer specifically to NorthWestern Corporation and its subsidiaries.*

### OVERVIEW

Our financial condition has been significantly and negatively affected by the poor performance of our non-energy businesses and our significant indebtedness. In early 2003, we undertook a series of steps designed to refinance, reduce and extend the maturities of our debt. Notwithstanding these efforts, our financial position continued to deteriorate, principally due to the poor performance of our non-utility subsidiaries and our leveraged condition. As a result of these developments, in June 2003 we announced that we would seek to fundamentally restructure our capital, and announced that we had retained legal and financial advisors to assist us in these efforts. We ultimately decided to seek to reorganize under Chapter 11 of the Federal Bankruptcy Code.

On September 14, 2003 (the "Petition Date"), we filed a voluntary petition for relief under the provisions of Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (Bankruptcy Court) under Chapter 11 Case number 03-12872 (CGC). Pursuant to Chapter 11, we retain control of our assets and are authorized to operate our business as a debtor-in-possession while being subject to the jurisdiction of the Bankruptcy Court. Included in the consolidated financial statements are subsidiaries that are not party to the Chapter 11 case and are not debtors. The assets and liabilities of such non-debtor subsidiaries are not considered to be material to the consolidated financial statements or are included in discontinued operations.

As a result of our Chapter 11 filing, we operate our business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and applicable court orders. All vendors are being paid for all goods furnished and services provided after the Petition Date under the supervision of the Bankruptcy Court. As a debtor-in-possession, we are authorized to continue to operate as an ongoing business, but may not engage in transactions outside the ordinary course of business without the approval of the Court, after notice and an opportunity for a hearing.

On September 16, 2003, following first day hearings held on September 15, 2003, the Court entered orders granting us authority to, among other things, pay pre-petition and post-petition employee wages, salaries, benefits and other employee obligations, pay selected vendors and other providers for the post-petition delivery of goods and services, continue bank accounts and existing cash management system, and continue existing forward power contracts and enter into additional similar contracts in the ordinary course of business. Additionally, the court approved, under interim order, access of up to $50 million of the $100 million debtor-in-possession financing facility arranged by the company with Bank One, N.A. (the DIP Facility). Following hearings held on November 6, 2003, the Bankruptcy Court gave final approval to the DIP Facility and our access will increase to $85 million under this facility. A final order to evidence the Court's oral ruling is in the process of being entered. Access to the balance is subject to obtaining necessary regulatory approvals. The DIP Facility bears interest at a variable rate tied to the Eurodollar rate plus a spread of 3.00% or at the prime rate plus a spread of 1.00%. The DIP Facility expires on September 18, 2004. The DIP Facility will provide a source of liquidity during the course of our bankruptcy, but requires that we maintain certain financial covenants and restricts liens, indebtedness, capital expenditures, dividend payments, sales of assets, investments and acquisitions. As of November 13, 2003, there were no amounts outstanding under the DIP facility, however we have issued letters of credit in the approximate amount of $6 million. At a hearing held on November 6, 2003, the Bankruptcy Court entered an order preliminarily enjoining prosecution of *In re NorthWestern Corporation Derivative Litigation*, Case No. 03-4091 as against

33

NorthWestern, its subsidiaries and its current and former officers and directors. The Bankruptcy Court also approved the following two stipulations (i) stipulation staying the *McGreevey, et al. v. The Montana Power Company, et al.* litigation as against NorthWestern, Clark Fork & Blackfoot LLC, the Montana Power Company, Montana Power LLC and Jack Haffey for 180 days from the date of the stipulation and (ii) stipulation staying the complaints filed against CornerStone Propane Partners LP, and other defendants purporting to be class actions which were filed in the United States District Court for the Northern District of California by purchasers of units of CornerStone Propane Partners alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder as against NorthWestern for 180 days from the date of the stipulation.

The Chapter 11 filing triggered defaults, or termination events, on substantially all of our debt and lease obligations, and certain contractual obligations. As such, we have classified all of our secured debt as current as of September 30, 2003. Subject to certain exceptions under the Bankruptcy Code, our Chapter 11 filing automatically enjoined, or stayed, the continuation of any judicial or administrative proceedings or other actions against us or our property to recover on, collect or secure a claim arising prior to the Petition Date. Thus, for example, creditor actions to obtain possession of our property, or to create, perfect or enforce any lien against our property, or to collect on or otherwise exercise rights or remedies with respect to a pre-petition claim are enjoined unless and until the Bankruptcy Court lifts the automatic stay.

On November 4, 2003, we filed our schedules and statements of financial affairs with the Bankruptcy Court, setting forth, among other things, the assets and liabilities of the Company. Our schedules, which were prepared by management and are unaudited, list total assets of approximately $1.7 billion and total liabilities of approximately $2.4 billion, as of September 14, 2003. However, the amount of the claims to be filed against us by our creditors could be significantly different than the amount of the liabilities that we have recorded. We also have numerous executory contracts and other agreements that could be assumed or rejected during the Chapter 11 proceedings. In the event we choose to reject an executory contract or unexpired lease, parties affected by these rejections may file claims with the court-appointed claims agent as proscribed by the Bankruptcy Code and/or orders of the Bankruptcy Court. Unless otherwise agreed, the assumption of an executory contract or unexpired lease will require us to cure all prior defaults under such executory contract or lease, including all pre-petition liabilities, some of which may be significant. We expect that liabilities that will be subject to compromise through the Chapter 11 process will arise in the future as a result of the rejection of additional executory contracts and/or unexpired leases, and from the determination of the Bankruptcy Court (or agreement by parties in interest) of allowed claims for items that we now claim as contingent or disputed. Conversely, we would expect that the assumption of additional executory contracts may convert some liabilities shown on our financial statements as subject to compromise to post-petition liabilities.

In order to successfully exit Chapter 11, we will need to propose, and obtain confirmation by the Bankruptcy Court of a plan of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would resolve, among other things, the debtor's pre-petition obligations, set forth the revised capital structure of the newly reorganized entity and provide for its corporate governance subsequent to exit from bankruptcy. Under the Chapter 11 proceedings, the rights of and ultimate payments to pre-petition creditors, rejection damage claimants and equity and trust preferred investors may be substantially altered. This could result in claims being allowed and/or satisfied in the Chapter 11 proceedings at less (possibly substantially less) than 100% of their face value, and we anticipate the interests of our equity investors will be cancelled. We have not yet proposed a plan of reorganization. Our "exclusivity period," during which we are the only party permitted to file a plan of reorganization extends to January 12, 2004. Absent an order of the Bankruptcy Court, substantially all pre-petition liabilities are subject to settlement under a plan of reorganization to be voted upon by our pre-petition creditors and equity investors and approved by the Bankruptcy Court. Although we expect to file a plan

of reorganization that provides for our emergence from bankruptcy as a going concern, there can be no assurance at this time that a plan of reorganization will be confirmed by the Bankruptcy Court or that any such plan will be implemented successfully. We have incurred, and will continue to incur pending emergence, significant costs associated with the reorganization.

The United States Trustee for the Bankruptcy Court has appointed an official committee of unsecured creditors (the Creditors' Committee). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court and may take positions on matters that come before the Bankruptcy

Court. We will negotiate the terms of our ultimate plan of reorganization with the Creditors' Committee. There can be no assurance that the Creditors' Committee will support our positions or our ultimate plan of reorganization, once proposed, and disagreements between us and the Creditors' Committee could protract the Chapter 11 case, could negatively impact our ability to operate during the Chapter 11 case and could prevent our emergence from Chapter 11.

At this time, it is not possible to predict accurately the effect of the Chapter 11 reorganization process on our business or when we may emerge from Chapter 11. The potential adverse publicity associated with the Chapter 11 filing and the resulting uncertainty regarding our future may hinder our ongoing business activities and our ability to operate, fund and execute our business plan. Such potential negative publicity may impair our relations with existing and potential customers, negatively impact our ability to attract and retain key employees, limit our ability to obtain trade credit and impair present and future relationships with vendors and service providers.

As a result of the Chapter 11 filing, the realization of assets and liquidation of liabilities are subject to uncertainty. While operating as a debtor-in-possession under the protection of the Bankruptcy Code, and while subject to Bankruptcy Court approval or otherwise as permitted in the normal course of business, we may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the consolidated financial statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the consolidated historical financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

Our future results depend on the timely and successful confirmation and implementation of a plan of reorganization. Under the system of priorities of claim established by the Bankruptcy Code, unless creditors agree otherwise, pre- and post-petition liabilities must be satisfied in full before shareholders are entitled to receive any distribution or retain any property under a plan. The ultimate recovery to creditors and/or holders of our common stock and trust preferred securities, if any, will not be determined until confirmation of a plan of reorganization. No assurance can be given as to what values, if any, will be ascribed in the bankruptcy proceedings to each of these constituencies, and it is probable that our common equity and trust preferred securities will be restructured in a manner that will eliminate or substantially reduce any remaining value. The value of these securities, therefore, is highly speculative. We have previously stated that our planned sale of non-core assets is not expected to change our view that our common stock has no value as a result of our bankruptcy filing and that the interests of our equity investors will be cancelled in connection with our reorganization. Accordingly, we urge that appropriate caution be exercised with respect to existing and future investments in any of our liabilities and/or securities.

On September 15, 2003, in connection with our Chapter 11 filing the New York Stock Exchange (NYSE) suspended trading and subsequently delisted our common stock and all series of our trust preferred securities. On October 10, 2003, the SEC issued an order granting the application of the New York Stock Exchange ("NYSE") to delist our common stock and trust preferred securities. As a result

35

of the delisting of our securities, there can be no assurance that a liquid trading market for those securities will continue.

Our ability to continue as a going concern is predicated upon numerous issues, including our ability to achieve the following:

- having a plan of reorganization confirmed by the Bankruptcy Court in a timely manner;

- being able to successfully implement our business plans and otherwise offset the negative effects that the Chapter 11 filing has had and may continue to have on our business, including the impairment of vendor relations;

- operating within the framework of our DIP Facility, including, among other things, limitations on capital expenditures and financial covenants, our ability to generate cash flows from operations or seek other sources of financing and the availability of projected vendor credit terms; and

- attracting, motivating and/or retaining key executives and associates.

These challenges are in addition to those operational, regulatory and other challenges that we face in connection with our business as a regional utility.

Certain additional risk factors associated with our Chapter 11 case include, but are not limited to, the following: potential adverse developments with respect to our liquidity, results of operations or ability to continue as a going concern; Bankruptcy Court approval of the motions that we may file from time to time; risks associated with third parties seeking and obtaining court approval (i) to terminate or shorten the exclusivity period during which we may propose and confirm a plan of reorganization, (ii) for the appointment of a Chapter 11 trustee or (iii) to convert our case to a Chapter 7 case for the liquidation of our businesses; and our ability to execute on our business plan. See "Special Note Regarding Forward-Looking Statements" and "Risk Factors".

NorthWestern, NorthWestern Capital Corporation, NorthWestern Growth Corporation and Expanets have entered into an Asset Purchase and Sale Agreement with Avaya, Inc. (NYSE: AV) in connection with the sale of substantially all of the assets and business of Expanets. Under the terms of the agreement, Avaya will purchase substantially all of the Expanets assets for $152 million in cash, less payment of an outstanding note of approximately $27 million to a third party, certain working capital adjustments, the payment of transaction costs and certain excluded other liabilities. We currently estimate that we will receive net cash proceeds ranging between $70 and $80 million. Expanets engaged Bear, Stearns & Co. to conduct an auction of the Expanets business subject to defined auction procedures. At the auction held on October 29, 2003, the final bid by Avaya was accepted by Expanets. NorthWestern, as controlling shareholder, has consented to the transaction. Expanets was not included in our Chapter 11 filing. Expanets will continue operations in the ordinary course of business until the transaction is closed. The closing is expected to occur prior to the end of November 2003, subject to the satisfaction of certain conditions. During the third quarter of 2003, we recognized an estimated loss on disposal of $30 million based on the terms of the transaction.

We are also attempting to sell other non-core assets, including the Montana First Megawatts generation project, and we are seeking to enforce an existing contract to sell certain Colstrip transmission assets to a third party. In an effort to facilitate the timely sale of the Montana First Megawatts project and its ultimate development at its current location in Great Falls, MT, we filed the power sales agreement with the FERC on August 18, 2003, requesting that the FERC accept for filing the cost-based power sales agreement between Montana Megawatts I, LLC and its affiliate, NorthWestern Energy. A late motion to intervene and protest was filed by the MPSC and the MCC. On October 17, 2003, the FERC issued an order conditionally accepting the power sales agreement, subject to suspension for a designated period, to permit resolution of certain concerns voiced by the

36

---

MPSC and MCC in their filing. We are currently working with the MPSC, MCC, FERC staff and the FERC-appointed settlement judge to resolve the documented MPSC and MCC concerns in a timely manner. During the second quarter of 2003, we consummated the sale of one non-core business for cash consideration of $6.6 million and a note receivable of $4.7 million (see Note 6 in the Notes to Consolidated Financial Statements for further discussion).

On August 12, 2003, the MCC has filed a Petition for Investigation, Adoption of Additional Regulatory Controls and Related Relief with the MPSC. On October 21, 2003, the MPSC issued an order initiating an investigation of NorthWestern Energy relating to, among others, finances, corporate structure, capital structure, cash management practices, and affiliated transactions. The relief sought includes adoption of new regulatory controls that would specifically apply to NorthWestern, including additional reporting, cost allocation and financing rules and requirements, and examination of affiliate transactions necessary to ensure that we are not operating our energy division, and will not in the future operate, in a manner that would prejudice our ability to furnish reasonably adequate service and facilities at reasonable and just charges as required under Montana law. Although we believe this matter is stayed as a result of our bankruptcy filing, the MPSC and MCC disagree. We cannot determine the impact or resolution of this petition, however, any action taken by the MPSC to increase the regulatory controls under which we operate may have a material affect on our liquidity, operations and financial condition. If we are unable to comply with any MPSC orders in a timely manner, we may become subject to material monetary penalties and fines. Not withstanding the foregoing, we are providing certain requested information to the MPSC and MCC on a voluntary informational basis.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. We base our estimates on historical experience and other assumptions that are believed to be proper and reasonable under the circumstances. We continually evaluate the appropriateness of our estimates and assumptions, including those related to goodwill and intangible assets, impairment of long-lived assets, revenue recognition, allowance for doubtful accounts, and minority interest in consolidated subsidiaries, among others. Actual results could differ from those estimates.

We have identified the policies and related procedures below as critical to understanding our historical and future performance, as these polices affect the reported amounts of revenue and the more significant areas involving management's judgments and estimates.

### *Goodwill*

We believe that the accounting estimate related to determining the fair value of goodwill, and thus any impairment, is a "critical accounting estimate" because: (i) it is highly susceptible to change from period to period since it requires company management to make cash flow assumptions about future revenues, operating costs and discount rates over an indefinite life; and (ii) recognizing an impairment has had a significant impact on the assets reported on our balance sheet and our operating results. Management's assumptions about future sales margins and volumes require significant judgment because actual margins and volumes have fluctuated in the past and are expected to continue to do so. In estimating future margins, we use our internal budgets.

SFAS No. 142 was issued during 2001 and is effective for all fiscal years beginning after December 15, 2001. According to the guidance set forth in SFAS No. 142, we are required to evaluate our goodwill and indefinite-lived intangible assets for impairment at least annually (October 1) and

37

more frequently when indications of impairment exist. Accounting standards require that if the fair value of a reporting unit is less than its carrying value including goodwill, an impairment charge for goodwill must be recognized in the financial statements. To measure the amount of the impairment loss to recognize, we compare the implied fair value of the reporting unit's goodwill with its carrying value.

We determined that our Chapter 11 bankruptcy filing constitutes an event that may reduce the fair value of our reporting unit below its carrying value. Therefore we have retained a third party to assist us in completing a goodwill impairment test as required by SFAS No. 142. Our impairment testing is currently in process and, while we have not yet completed our analysis, an impairment charge may be necessary during the fourth quarter of 2003.

### *Qualifying Facilities Liability*

Certain Qualifying Facilities, or QFs, require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. As of September 30, 2003, our gross contractual obligation related to the QFs is approximately $1.8 billion through 2029. A portion of the costs incurred to purchase this energy is recoverable though rates authorized by the MPSC, totaling approximately $1.4 billion though 2029. Upon completion of the purchase price allocation related to our acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, we established a liability of $134.3 million, based on the net present value of the difference between our obligations under the QFs and the related amount recoverable. The determination of the discount rate used to establish this liability was a significant assumption. We determined the appropriate discount rate to be 8.75%, in accordance with Statement of Financial Accounting Concepts No. 7, *Using Cash Flow Information and Present Value in Accounting Measures*. We believe that 8.75% approximates the rate we could have negotiated with an independent lender for a similar transaction under comparable terms and conditions as of the acquisition date. In computing the liability, we have also had to make various estimates in relation to contract costs, capacity utilization,

and recoverable amounts. Actual utilization and regulatory changes may significantly impact our results of operations. In light of the executory nature of the QF power sales agreements and certain out-of-market pricing and escalation terms, we are evaluating our options with respect to continued purchases under these contracts. On October 7, 2003, we entered into a formal stipulation agreement with the two largest QFs to ensure that all parties continue to perform their respective duties under the power sales contracts and to avoid litigation concerning rights and obligations of the parties. This stipulation will facilitate continued discussions among the parties with respect to possible restructuring of the QF power sales agreements.

### *Long-lived Assets*

We evaluate our property, plant and equipment for impairment whenever indicators of impairment exist. SFAS No. 144 requires that if the sum of the undiscounted cash flows from a company's asset, without interest charges that will be recognized as expenses when incurred, is less than the carrying value of the asset, impairment must be recognized in the financial statements. If an asset is deemed to be impaired, the amount of the impairment loss recognized represents the excess of the asset's carrying value as compared to its estimated fair value, based on management's assumptions and projections.

During the second quarter of 2003, we recorded an additional impairment charge of $12.4 million due to further decline in the estimated realizable value of our investment in our Montana First Megawatts project. We had previously recorded an impairment charge of $35.7 million during the fourth quarter of 2002.

38

### *Revenue Recognition*

Revenues are recognized differently depending on the type of revenue. For NorthWestern Energy's South Dakota and Nebraska operations, as prescribed by the respective regulatory authorities, electric and natural gas utility revenues are based on billings rendered to customers. Customers are billed on a monthly cycle basis. For NorthWestern Energy's Montana operations, as prescribed by the MPSC, operating revenues are recorded monthly on the basis of consumption or services rendered. To match revenues with associated expenses, we accrue unbilled revenues for electric and natural gas services delivered to the customers but not yet billed at month-end.

### *Regulatory Assets and Liabilities*

Our regulated operations are subject to the provisions of SFAS No. 71, *Accounting for the Effects of Certain Types of Regulations*. Our regulatory assets are the probable future revenues associated with certain costs to be recovered from customers through the ratemaking process, including our estimate of amounts recoverable for natural gas purchases. Regulatory liabilities are the probable future reductions in revenues associated with amounts to be credited to customers through the ratemaking process. If any part of our operations become no longer subject to the provisions of SFAS No. 71, the probable future recovery of or reduction in revenue with respect to the related regulatory assets and liabilities would need to be evaluated. In addition, we would need to determine if there was any impairment to the carrying costs of deregulated plant and inventory assets.

While we believe that our assumption regarding future regulatory actions is reasonable, different assumptions could materially affect our results.

### *Pension and Postretirement Benefit Plans*

Our reported costs of providing pension and other postretirement benefits are dependent upon numerous factors resulting from actual plan experience and assumptions of future experience.

Pension and other postretirement benefit costs, for example, are impacted by actual employee demographics (including age and compensation levels), the level of contributions we make to the plans, earnings on plan assets, and health care cost trends. Changes made to the provisions of the plans may also impact current and future pension and other postretirement benefit costs. Pension and other postretirement benefit costs may also be significantly affected by

changes in key actuarial assumptions, including anticipated rates of return on plan assets and the discount rates used in determining the postretirement benefit obligation and postretirement costs.

As a result of the factors listed above, significant portions of pension and other postretirement benefit costs recorded in any period do not reflect (and are generally greater than) the actual benefits provided to plan participants.

Our pension and other postretirement benefit plan assets are primarily made up of equity and fixed income investments. Fluctuations in actual equity market returns as well as changes in general interest rates may result in increased or decreased pension and other postretirement benefit costs in future periods. Likewise, changes in assumptions regarding current discount rates and expected rates of return on plan assets could also increase or decrease recorded pension and other postretirement benefit costs.

## RESULTS OF OPERATIONS

*Three-Month and Nine-Month Periods Ended September 30, 2003 Compared to Three-Month and Nine-Month Periods Ended September 30, 2002.*

39

## CONSOLIDATED OPERATING RESULTS

The following is a summary of our consolidated results of operations for the three-month and nine-month periods ended September 30, 2003 and September 30, 2002. Our consolidated results include the results of our divisions and subsidiaries constituting each of our business segments. This discussion is followed by a more detailed discussion of operating results by segment. The results of operations for the nine months ended September 30, 2002, include the results of our Montana operations since February 1, 2002, the effective date of the acquisition.

Consolidated losses on common stock were $52.7 million in the third quarter of 2003, a decrease of $10.4 million from consolidated losses of $63.1 million in the third quarter of 2002. This decrease in consolidated losses on common stock was due to a $28.9 million decrease in loss on discontinued operations offset by a $12.3 million increase in general and administrative expenses, primarily due to increased legal and other professional services and employee benefit costs, along with increased interest expense of approximately $11.3 million. Due to our reorganization efforts and bankruptcy filing, we anticipate our fees for professional services will continue to significantly exceed prior year amounts. Annual premium requirements for directors and officers liability insurance increased significantly beginning in June 2003, and as a result we expect general and administrative expenses to increase by approximately $2.0 million per quarter related to this matter. Included in investment income and other during the third quarter of 2003, we recorded an impairment charge of $9.1 million related to the carrying value of our note receivable from CornerStone. The impairment charge was based on our current estimate of recoverability of this asset. Consolidated losses on common stock were $100.6 million for the nine months ended September 30, 2003, an improvement of $36.3 million over 2002. The improvement was primarily a result of improved gross margin of $37.4 million, reduced losses on discontinued operations of $91.8 million and a loss on debt extinguishments of $20.7 million in 2002, offset by an increase in operating expenses of $71.9 million and increased interest expense of $43.3 million in 2003.

## SEGMENT INFORMATION

## ELECTRIC UTILITY SEGMENT OPERATIONS

Revenues in the third quarter of 2003 were $183.9 million, an increase of $31.2 million, or 20.4%, from results in the third quarter of 2002. The increase was primarily due to a $23.4 million increase in revenue recovered for purchased power supply costs. As these costs are also reflected in cost of sales, there is no gross margin impact. Also contributing to the increase was $8.1 million due to a 6.9% increase in retail volumes including the addition of Montana customers that moved back to retail from customer choice. In addition, a 10.5% increase in wholesale volumes caused a $1.3 million increase in revenue. Revenues for the nine months ended September 30, 2003 of $514.6 million were $146.0 million, or 39.6%, higher than revenues for the comparative nine months of 2002. The January 2003 results of our Montana operations contributed approximately $47.8 million of this increase. In addition, revenues from February through September 2003, as compared to the same period in 2002, increased approximately $98.2 million, primarily

due to an $85.7 million increase in revenue recovered for purchased power supply costs. Also contributing to the increase was $7.4 million due to a 10% increase in retail volumes and $5.1 million due to a 1.9% increase in wholesale volumes from our Montana operations and a 52.9% increase in average wholesale price from our South Dakota operations.

Cost of sales in the third quarter of 2003 was $88.8 million, an increase of $33.2 million, or 59.7%, from results in the third quarter of 2002. Purchased power supply costs, which are recovered in rates, increased $23.4 million as a result of new power supply agreements effective July 1, 2002. Retail and wholesale cost of sales increased approximately $9.5 million in 2003 as compared to 2002 due to the increased volumes discussed above. For the nine months ended September 30, 2003, costs of

40

$242.1 million were $115.3 million higher than costs for the nine months ended September 30, 2002. The January 2003 results of our Montana operations contributed approximately $23.9 million of this increase. Purchased power supply costs, which are recovered in rates, increased for February through September 2003, as compared to 2002, by $85.7 million as a result of new power supply agreements effective July 1, 2002. In addition, retail and wholesale cost of sales were approximately $7.3 million higher in 2003 as compared to 2002 due to the increased volumes discussed above. A $1.5 million decrease in costs for transmitting energy across our lines for others partially offset these increases.

Gross margin in the third quarter of 2003 was $95.2 million, a decrease of $2.0 million over gross margin in the third quarter of 2002. This decrease was primarily due to costs related to the increased volumes discussed above. As a percentage of revenue, gross margin in the third quarter of 2003 was 51.7%, compared to 63.6% in the second quarter of 2002. Gross margin as a percentage of revenue is impacted by the fluctuations that occur in power supply costs, which are collected in rates from customers. While these fluctuations impact gross margin as a percentage of revenue, they have no actual impact on gross margin amounts. For the nine months ended September 30, 2003, margins of $272.5 million were $30.7 million, or 12.7%, higher than margins for the nine months ended September 30, 2002. The January 2003 results of our Montana operations contributed $23.9 million of this increase. Higher retail and wholesale volume sales, higher average wholesale price and decreased transmission costs resulted in an increase of $6.8 million for the period of February through September of 2003 as compared to 2002. Margins as a percentage of revenues decreased to 53.0% for the nine months ended September 30, 2003, from 65.6% for the nine months ended September 30, 2002. Similar to the quarterly change, this is a result of power supply cost fluctuations, which do not impact gross margin amounts.

Operating, general and administrative expenses in the third quarter of 2003 were $46.4 million, compared to $46.6 million in the third quarter of 2002. Depreciation in the third quarter of 2003 was $13.8 million, a $0.7 million increase from depreciation in the third quarter of 2002 of $13.1 million. Operating, general and administrative expenses for the nine months ended September 30, 2003 were $140.2 million, an increase of $18.1 million over the comparative nine months of 2002. The January 2003 results of our Montana operations contributed approximately $12.2 million of this increase. The additional increase of $5.9 million was primarily due to increased legal, environmental, and employee benefit costs. Depreciation for the nine months ended September 30, 2003 was $40.9 million, an increase of $4.4 million over depreciation for the nine months ended September 30, 2002. The January 2003 results of our Montana operations contributed approximately $3.7 million of this increase.

Operating income in the third quarter of 2003 was $35.0 million, a decrease of $2.4 million, or 6.4%, from $37.4 million in the third quarter of 2002. The decrease was primarily attributable to the decreased gross margin and increased operating expenses discussed above. For the nine months ended September 30, 2003, operating income was $91.4 million, an increase of $8.2 million from $83.2 million in the nine months ended September 30, 2002. The January 2003 results of our Montana operations contributed approximately $8.1 million of this increase.

**NATURAL GAS UTILITY SEGMENT OPERATIONS**

Revenues in the third quarter of 2003 were $48.9 million, an increase of $20.2 million, or 70.5%, from results in the third quarter of 2002. Revenues increased $11.5 million due to increased gas supply costs. As these costs are also reflected in cost of sales, there is no gross margin impact. Also contributing to the increase was a $9.3 million increase in wholesale and retail revenues. Wholesale revenues increased due to 17.5% higher volumes resulting from the

addition of ethanol plants and higher daily gas prices of 73.2%. Retail revenues increased primarily due to a 3.1% increase in volumes. For the nine months ended September 30, 2003, revenues were $237.8 million, or $77.9 million higher than revenues for the comparative nine months of 2002 of $160.0 million. The

41

January 2003 results of our Montana operations contributed approximately $20.4 million of this increase. Revenues for February through September 2003, as compared to the same period in 2002, increased $57.5 million due in part to an $18.9 million increase in gas supply costs. These costs are also included in cost of sales, thereby having no impact on gross margin. Also contributing to this increase was a $38.8 million increase in wholesale and retail revenues. Wholesale revenues increased due to the addition of ethanol plant customers, an 11.6% increase in volumes, and higher gas prices in Nebraska of 47.4%. Retail revenues increased as a result of sales to other utilities, partially offset by a 5.9% decrease in volumes. As the revenue from the sales to other utilities benefits our general business customers, these sales are included in cost of sales, thereby having no impact on gross margin.

Cost of sales in the third quarter of 2003 was $31.7 million, an increase of $19.6 million, or 163.4%, from results in the third quarter of 2002. Wholesale and retail costs increased $7.2 million mainly as a result of the higher wholesale prices and increased volumes discussed above. In addition, gas supply costs increased $12.4 million, including $0.9 million in supply costs as a result of a July 3, 2003 interim order from the MPSC disallowing the recovery of certain gas supply costs. The MPSC also rejected a motion for reconsideration filed by us on July 14, 2003. We filed suit in district court on July 28, 2003 seeking to overturn the MPSC's decision to disallow recovery of these costs. Assuming our average forecast price over the next nine months occurs, the disallowance on the volumes at the imputed price compared to market price would be approximately $4.1 million for the period July 1, 2003, through June 30, 2004. For the nine months ended September 30, 2003, cost of sales was $161.4 million, an increase of $74.4 million as compared to the first nine months of 2002. The January 2003 results of our Montana operations contributed approximately $9.5 million of this increase. Gas supply costs increased $26.0 million, including a $7.1 million write-off of supply costs as a result of the MPSC's disallowance of certain gas supply costs. In addition, wholesale and retail costs increased $38.9 million. Wholesale costs increased as a result of the increased volumes and retail costs increased due to the sales to other utilities.

Gross margin in the third quarter of 2003 was $17.2 million, an increase of $0.6 million, or 3.5%, compared to the third quarter of 2002. This increase was primarily due to $1.5 million higher wholesale and retail sales. As a percentage of revenues, gross margin decreased to 35.2% in the third quarter of 2003 from 58.1% in the third quarter of 2002. Gross margin as a percentage of revenue is impacted by the fluctuations that occur in retail costs, which are collected from customers through rates. Margins for the nine months ended September 30, 2003 were $76.4 million, or $3.4 million higher than the comparative nine months of 2002. The January 2003 results of our Montana operations contributed approximately $10.6 million of this increase. Margins for February through September 2003, as compared to the same period in 2002, decreased $7.4 million primarily due to the MPSC's disallowance of $7.1 million in gas supply costs. As with the quarter, margin percentages decreased to 32.1% for the first nine months of 2003 from 45.6% for the first nine months of 2002.

Operating, general and administrative expenses in the third quarter of 2003 decreased $0.7 million due to operating efficiency measures instituted to counter decreased margins. Depreciation expense increased $1.1 million from depreciation in the third quarter of 2002 of $2.6 million. Operating, general and administrative expenses for the nine months ended September 30, 2003 were $44.4 million, an increase of $4.1 million, or 10.1%, from results in the comparative nine months of 2002. The January 2003 results of our Montana operations contributed approximately $3.5 million of this increase. The remaining increase was primarily due to increased legal and employee benefit costs. Depreciation expense increased $2.5 million over depreciation for the nine months ended September 30, 2002. The January 2003 results of our Montana operations contributed approximately $1.0 million of this increase.

Operating loss in the third quarter of 2003 was $0.8 million, compared to an operating loss of $1.1 million in the third quarter of 2002. For the nine months ended September 30, 2003, operating income of $21.4 million was $3.2 million less than operating income for the nine months ended September 30, 2002. The January 2003 results of our Montana operations contributed an increase of

42

approximately $6.4 million, which was offset by the MPSC's disallowance $7.1 million in gas supply costs and increased legal and employee benefit costs.

## ALL OTHER OPERATIONS

All Other primarily consists of our other miscellaneous service activities, which are not included in the other identified segments, together with the unallocated corporate costs and investments, and any reconciling or eliminating amounts. The miscellaneous service activities principally include non-utility businesses engaged in voice and data networks and systems, and a portfolio of services to residential and business customers, including product sales and maintenance contracts in areas such as home monitoring devices and appliances.

Revenues in the third quarter of 2003 were $2.5 million, a decrease of $0.3 million from results in the third quarter of 2002. For the nine months ended September 30, 2003, revenues were $7.2 million, a decrease of $2.0 million from revenues for the nine months ended September 30, 2002. The decrease is due primarily to the decrease in unregulated activities.

Cost of sales in the third quarter of 2003 was $0.7 million, a decrease of $2.4 million from results in the third quarter of 2002. Cost of sales for the nine months ended September 30, 2003 were $2.0 million, a decrease of $5.3 million as compared to cost of sales for the comparative nine months of 2002. These decreases are due to a decrease in unregulated activities.

Gross margin in the third quarter of 2003 was $1.9 million, an increase of $2.1 million from results in the third quarter of 2002. For the nine months ended September 30, 2003, margins of $5.2 million were $3.3 million higher than margins for the nine months ended September 30, 2002 due primarily to the addition of non-utility operations acquired with the Montana operations.

Operating, general and administrative expenses in the third quarter of 2003 were $17.9 million, an increase of $13.2 million over results in the third quarter of 2002 due primarily to a dramatic increase in legal and professional fees related to our restructuring efforts, defense of litigation and increased regulatory inquiries. Operating, general and administrative expenses for the nine months ended September 30, 2003, were $42.2 million as compared to $11.5 million for the nine months ended September 30, 2002. Approximately $6.1 million of reorganization related expenses were incurred prior to September 14, 2003. This increase was primarily due to legal and professional fees for the reasons discussed above. Annual premium requirements for directors and officers liability insurance increased significantly beginning in June 2003, and as a result we expect general and administrative expenses to increase by approximately $2.0 million per quarter related to this matter. In addition, we recognized a $12.4 million impairment charge on our Montana First Megawatts generation project during the second quarter of 2003.

Operating losses were $16.6 million in the third quarter of 2003, an increase of $10.9 million from losses of $5.7 million in the third quarter of 2002, due to increased legal and professional fees as discussed above. For the nine months ended September 30, 2003, operating losses were $50.9 million, an increase of $39.5 million from losses of $11.4 million for the nine months ended September 30, 2002, due to the impairment charges and professional fees discussed above.

## DISCONTINUED COMMUNICATIONS SEGMENT OPERATIONS

NorthWestern, NorthWestern Capital Corporation, NorthWestern Growth Corporation and Expanets have entered into an Asset Purchase and Sale Agreement with Avaya, Inc. (NYSE: AV) in connection with the sale of substantially all of the assets and business of Expanets. Under the terms of the agreement, Avaya will purchase substantially all of the Expanets assets for $152 million in cash, less payment of an outstanding note of approximately $27 million to a third party, certain working capital adjustments, the payment of transaction costs and certain other excluded liabilities. We currently

43

estimate that we will receive net cash proceeds ranging between $70 and $80 million. As previously announced, Expanets engaged Bear, Stearns & Co. to conduct an auction of the Expanets business subject to defined auction procedures. At the auction held on October 29, 2003, the final bid by Avaya was accepted by Expanets. NorthWestern, as controlling shareholder, has consented to the transaction. Expanets was not included in our Chapter 11 filing. Expanets will continue operations in the ordinary course of business until the transaction is closed. The closing is expected to occur prior to the end of November 2003, subject to the satisfaction of certain conditions. During the third quarter of 2003, we recognized an estimated loss on disposal of $30 million based on the terms of the transaction.

Summary financial information for the discontinued Expanets operations is as follows (in thousands):

|  | Three months ended | |
| --- | --- | --- |
|  | September 30, 2003 | September 30, 2002 |
| Revenues | $ 163,054 | $ 172,263 |
| Loss before income taxes and minority interests | (7,264) | (12,124) |
| Estimated loss on disposal | (30,000) | — |
| Income tax benefit (provision) | (1,381) | 13,406 |
| Income (Loss) from discontinued operations, net of income taxes and minority interests | $ (38,645) | $ 1,282 |

|  | Nine months ended | |
| --- | --- | --- |
|  | September 30, 2003 | September 30, 2002 |
| Revenues | $ 491,721 | $ 546,905 |
| Income (Loss) before income taxes and minority interests | 7,091 | (57,878) |
| Estimated loss on disposal | (30,000) | — |
| Minority interests | — | 11,152 |
| Income tax benefit (provision) | (1,634) | 30,977 |
| Income (Loss) from discontinued operations, net of income taxes and minority interests | $ (24,543) | $ (15,749) |

Expanets' income before income taxes and minority interests for the nine months ended September 30, 2003 includes a gain on debt extinguishment of $27.3 million.

**DISCONTINUED HVAC SEGMENT OPERATIONS**

Blue Dot has sold 25 businesses (with annualized revenues of approximately $179.1 million) during the nine months ended September 30, 2003, generating approximately $13.8 million in cash, of which a portion was used to pay down its credit facility provider and a portion was retained for working capital purposes. An additional 13 businesses (with annualized revenues of approximately $112.4 million) have been sold since September 30, 2003, for proceeds of approximately $10.6 million. As of September 30, 2003, the Blue Dot credit facility balance was $9.1 million. Since September 30, 2003, the credit facility has been paid off in its entirety from sales proceeds and working capital at Blue Dot. Blue Dot anticipates selling substantially all of its remaining businesses by June 30, 2004. Summary financial information for the discontinued Blue Dot operations is as follows (in thousands). The operating results

for the three and nine months ended September 30, 2003 reflect the results of operations of the 25 sold businesses through the dates of such sales:

|  | Three months ended | |
|---|---|---|
|  | September 30, 2003 | September 30, 2002 |
| Revenues | $ 112,186 | $ 131,925 |
| Income before income taxes and minority interests | 3,153 | 2,420 |
| Gain on disposal | 12,921 | — |
| Income tax provision | (441) | (801) |
| Income from discontinued operations, net of income taxes | $ 15,633 | $ 1,619 |

|  | Nine months ended | |
|---|---|---|
|  | September 30, 2003 | September 30, 2002 |
| Revenues | $ 338,427 | $ 344,183 |
| Loss before income taxes and minority interests | 3,500 | (317) |
| Gain on disposal | 11,208 | — |
| Minority interests | — | 3,762 |
| Income tax benefit (provision) | (1,032) | 115 |
| Income (Loss) from discontinued operations, net of income taxes | $ 13,676 | $ 3,560 |

## LIQUIDITY & CAPITAL RESOURCES

### Cash Flow and Cash Position

Our financial condition has been significantly and negatively affected by the poor performance of our non-energy businesses and our significant indebtedness.

Effective as of September 14, 2003, the Bankruptcy Court gave interim approval for access of up to $50 million of our $100 million DIP Facility. Following hearings held on November 6, 2003, the Bankruptcy Court gave final approval to the DIP Facility and our access will increase to $85 million under this facility. A final order to evidence the Court's oral ruling is in the process of being entered. Access to the balance is subject to obtaining necessary regulatory approvals. The DIP Facility bears interest at a variable rate tied to the Eurodollar rate plus a spread of 3.00% or at the prime rate plus a spread of 1.00%. The DIP Facility expires on September 18, 2004. The DIP Facility requires that we maintain certain other financial covenants and restricts liens, indebtedness, capital expenditures, dividend payments and sales of assets. As of November 13, 2003, we have not yet borrowed under the DIP Facility however, we have issued letters of credit in the approximate amount of $6 million.

We have reached an agreement with Credit Suisse First Boston, or CSFB, and a group of lenders, to amend and restate the terms of our $390 million pre-petition credit facility, or the Amended Credit Facility. The Amended Credit Facility has been approved by the Bankruptcy Court on an interim basis and we anticipate the Bankruptcy Court will enter final approval in December 2003. The Amended Credit Facility will provide advantages to NorthWestern,

including, among other things, lower interest expense and may remain outstanding upon NorthWestern's emergence from the Chapter 11 proceedings. At NorthWestern's option, the Amended Credit Facility bears interest at a variable rate tied to the Eurodollar rate, as defined in the Amended Credit Facility, plus a spread of 5.50%, or at an alternate base rate, as defined by the Amended Credit Facility, plus a spread of 3.50%. There is no

45

longer a minimum floor for the Eurodollar rate or the alternate base rate. As a result of this amendment, we estimate annualized interest expense will be reduced by approximately $6 million.

Due to the sharp declines in the United States equity markets since the third quarter of 2000, the value of our pension plan assets has decreased significantly. We made pension contributions of approximately $10.2 million during the third quarter of 2003. We estimate contributions of approximately $20 million could be necessary in each calendar year 2004 and 2005, based on current market conditions.

As of September 30, 2003, cash and cash equivalents were $28.2 million, compared to $26.6 million at December 31, 2002. The increase in cash is principally the result of the net proceeds received from the closing of our new senior secured term loan in February 2003 and investment sales, net of other debt principal payments and working capital needs.

Cash flows used in continuing operations during the nine months ended September 30, 2003 were $104.7 million compared to cash provided by continuing operations of $78.9 million during the nine months ended September 30, 2002. Cash used in operating activities was composed primarily of net loss of $85.7 million adjusted for non-cash items of $99.2 million offset by cash used due to changes in operating assets and liabilities of $118.3 million. Cash flows from operations have deteriorated significantly during the nine months ended September 30, 2003, primarily due to our deteriorating financial condition, reduced vendor credit terms (including requirement of deposits), increased legal and professional fees, and increased interest expense. As a result of our bankruptcy filing, we anticipate our cash flows from operations will improve during the fourth quarter of 2003, primarily due to our inability to pay certain pre-petition liabilities, including interest on unsecured debt. In addition, we expect to return to more favorable credit terms with our vendors.

Cash flows provided by investing activities were $27.9 million in the first nine months of 2003 compared to cash used of $563.7 million in the first nine months of 2002. The change was principally due to the acquisition of our Montana operations during 2002, which accounted for approximately $502.8 million. Cash flows provided by financing activities were $79.8 million in the first nine months of 2003 compared to $719.4 million in the first nine months of 2002. In the first nine months of 2003 we received proceeds of $390.0 million under a new senior secured term loan, which was used to repay $255.0 million on our credit facility. In the first nine months of 2002, we received proceeds of $720.0 million from the issuance of senior notes, which was used to acquire our Montana operations and repay existing debt.

46

**Material Borrowings**

At September 30, 2003, we had a common stockholders' deficit of $556.6 million and currently have approximately $2.2 billion in debt and trust preferred instruments outstanding. The following table shows our contractual cash obligations and commercial commitments as of September 30, 2003 without regard to the reclassification of long-term secured debt to current:

| Commitments | Total | 2003 | 2004 | 2005 | 2006 | 2007 | Thereafter |
|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | |

**Debt Not Subject to Compromise:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Senior Secured Term Loan(1) | $ 387,075 | $ 975 | $ 3,900 | $ 3,900 | $ 378,300 | $ — | $ — |
| South Dakota Mortgage Bonds, 7.00% and 7.10% | 115,000 | — | — | 60,000 | — | — | 55,000 |
| South Dakota Pollution Control Obligations, 5.85% and 5.90% | 21,350 | — | — | — | — | — | 21,350 |
| Montana First Mortgage Bonds, 7.00%, 7.30%, 8.25% and 8.95% | 157,197 | — | — | 5,386 | 150,000 | 365 | 1,446 |
| Discount on Montana First Mortgage Bonds | (3,716) | — | — | — | — | — | (3,716) |
| Montana Pollution Control Obligations, 6.125% and 5.90% | 170,205 | — | — | — | — | — | 170,205 |
| Montana Secured Medium Term Notes, 7.23% and 7.25% | 13,000 | — | — | — | — | — | 13,000 |
| Montana Natural Gas Transition Bonds, 6.20% | 46,502 | — | 4,052 | 4,744 | 4,712 | 5,248 | 27,746 |
| Other debt, various | 1,123 | — | 321 | 343 | 221 | 238 | — |
| Capital leases(2) | 13,154 | 460 | 3,327 | 1,987 | 1,882 | 1,535 | 3,963 |
| **Total Debt Not Subject to Compromise** | 920,890 | 1,435 | 11,600 | 76,360 | 535,115 | 7,386 | 288,994 |
| **Debt Subject to Compromise:** | | | | | | | |
| Senior Unsecured Notes, 7 7/8% and 8 3/4% | 720,000 | — | — | — | — | 250,000 | 470,000 |
| Senior Unsecured Debt, 6.95% | 105,000 | — | — | — | — | — | 105,000 |
| Montana Unsecured Medium Term Notes, 7.07%, 7.96% and 7.875% | 40,000 | — | — | — | 15,000 | — | 25,000 |
| **Total Debt Subject to Compromise** | 865,000 | — | — | — | 15,000 | 250,000 | 600,000 |
| **Total Mandatorily Redeemable Preferred Securities of Subsidiary Trusts:** | 365,550 | — | — | — | — | — | 365,550 |
| Future minimum operating lease payments(3) | 227,089 | 388 | 32,595 | 32,572 | 32,527 | 32,287 | 96,720 |
| Qualifying Facilities(4) | 425,768 | 7,162 | 10,171 | 3,932 | 5,787 | 7,412 | 391,304 |
| Power Purchase Contracts(5) | 1,518,249 | 70,452 | 267,772 | 256,408 | 194,583 | 126,891 | 602,143 |
| Interest payments on existing debt and preferred securities | 2,052,882 | 58,365 | 171,110 | 169,270 | 161,771 | 108,540 | 1,383,826 |
| **Total Commitments** | $ 6,375,428 | $ 137,802 | $ 493,248 | $ 538,542 | $ 944,783 | $ 532,516 | $ 3,728,537 |

(1) This facility was used to repay our $280 million credit facility on February 10, 2003.

(2) The capital lease obligations are principally used to finance equipment purchases.

(3) While not included on this schedule, NorthWestern has a residual value guarantee related to certain vehicles under operating leases by Expanets and Blue Dot, in the event of default and subsequent failure to cure such default. At September 30, 2003, the amount of this financial guarantee was approximately $0.8 million and $13.5 million related to Expanets and Blue Dot, respectively. In connection with the various sales of Blue Dot businesses, the buyers have assumed and/or the vehicle lessor has agreed to terminate the NorthWestern guarantee of Blue Dot's performance under the vehicle leases.

(4) With the acquisition of our Montana operations, we assumed a liability for expenses associated with certain Qualifying Facilities Contracts, or QFs. The QFs require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. Our gross contractual obligation related to the QFs is approximately $1.8 billion. A portion of the costs incurred to purchase this energy is recoverable through rates authorized by the MPSC, totaling approximately $1.4 billion. We established a liability as of the date of acquisition of $134.3 million, which represents the net present value, utilizing a discount rate of 8.75% of the difference between our obligations under the QFs and the related amount recoverable in rates. The obligation and payments reflected on this schedule represent the gross contractual obligation less amounts recoverable through rates. In light of the executory nature of the QF power sales agreements and certain out-of-market pricing and escalation terms, we are evaluating our options with respect to continued purchases under these contracts. On October 7, 2003, we entered into a formal stipulation agreement with the two largest QFs to ensure that all

47

parties continue to perform their respective duties under the power sales contracts and to avoid litigation concerning rights and obligations of the parties. This stipulation will facilitate continued discussions among the parties with respect to possible restructuring of the QF power sales agreements.

(5) We have entered into various purchase commitments, largely purchased power, coal and natural gas supply, electric generation construction and natural gas transportation contracts. These commitments range from one to 30 years.

Each of the debt agreements, mandatorily redeemable preferred securities of subsidiary trust and capital and operating leases described in the above-referenced table, as well as other contractual obligations including the Blue Dot exchange agreements and the obligations under the Defined Benefit Pension and Postretirement Benefit Plans are described under the caption "Description of Indebtedness and Other Contractual Obligations" in our most recent