# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | : Case No.  03-12872 (CGC) |
| | : |
| Debtor. | : |
| | : |
| | : |

### DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

| | |
|---|---|
| **PAUL, HASTINGS, JANOFSKY & WALKER LLP** | **GREENBERG TRAURIG, LLP** |
| Jesse H. Austin, III | Scott D. Cousins |
| Karol K. Denniston | Victoria Watson Counihan |
| Carolyn Chayavadhanangkur | William E. Chipman, Jr. |
| 600 Peachtree Street, N.E. | The Brandywine Building |
| Suite 2400 | 1000 West Street |
| Atlanta, Georgia 30308 | Suite 1540 |
| (404) 815-2400 | Wilmington, DE 19801 |
| | (302) 661-7000 |

Co-Counsel to the Debtor and Debtor-in-Possession

Dated:   March 11,May 14, 2004
        Wilmington, Delaware

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | : Case No. 03-12872 (CGC) |
| | : |
| Debtor. | : |
| | : |
| | : |

**DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

NorthWestern Corporation, the above captioned debtor and debtor-in-possession, proposes the following plan of reorganization (the "**Plan**") under Section 1121(a) of title 11 of the United States Code:

**ARTICLE 1**

**DEFINITIONS AND CONSTRUCTION OF TERMS**

Definitions; Interpretation; Application of Definitions and Rules of Construction. For purposes of this Plan, the following terms shall have the meanings specified in this Article 1. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code and the rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the construction hereof. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule or exhibit references in this Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, this Plan and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, sub-Section or clause contained in this Plan.

1.1    "Additional Indemnitees" shall mean each past, present and future member of the TAC.

1.2    "Administrative Claim" shall mean a right to payment under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estate or administering the Chapter 11 Case as authorized and approved by a

Final Order, (b) any actual and necessary costs and expenses incurred after the Petition Date in the ordinary course of the Debtor's business, (c) fees and expenses of Professionals to the extent allowed by Final Order under Sections 330, 331, or 503 of the Bankruptcy Code, and (d) all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

1.3     "Administrative Claim Bar Date" shall mean the last date established for filing Administrative Claims, as ordered by the Bankruptcy Court.

1.4     "Affiliate" shall have the meaning set forth in 11 U.S.C. § 101(2).

1.5     "Allowed" shall mean, with reference to any Claim: (a) a Claim that has been listed by the Debtor in its Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim as to which a proof of claim has been filed; (b) a Claim as to which a timely proof of claim has been filed as of the Bar Date in a sum certain and either (i) no objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been interposed, the extent to which such Claim (whether in whole or in part) has been allowed by a Final Order; (c) a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; (d) any Claim expressly allowed under this Plan; or (e) any Claim expressly allowed by Final Order.

1.6     "Allowed Class Designation/Type" shall mean an Allowed Claim of a specified class or of a specified type.

1.7     "Avoidance Action" shall mean an action brought pursuant to Section 544, 547, 548, 549, 550 or 553 of the Bankrtupcy Code by or on behalf of the Debtor.

1.8     "Ballot" shall mean the form or forms distributed to each holder of an impaired Claim entitled to vote on this Plan upon which an acceptance or rejection of this Plan shall be indicated in accordance with the instructions specified in such form or forms.

1.9     "Bank One DIP Financing Claims" shall mean the Claims of Bank One, N.A., as agent, or any successor agent thereto, under the DIP Financing Order and the DIP Loan Documents.

1.10    "Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case.

1.11    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Case and, to the extent of any reference under 28 U.S.C. § 157, the bankruptcy unit of such District Court under 28 U.S.C. § 151.

1.12    "Bankruptcy Rules" shall mean the following: (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under Section 2075 of Title 28 of the United States Code; (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under Section 2072 of Title 28 of the United States Code; (iii) the applicable Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware; and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case or proceeding therein, as the case may be.

1.13    "Bar Date" shall mean the date(s) fixed by the order of the Bankruptcy Court dated October 10, 2003 (the "Bar Date Order") by which Persons asserting a Claim against the Debtor, and who are required to file a proof of claim on account of such Claim, must file a proof of claim or be forever barred from asserting a Claim against the Debtor or its property and from voting on this Plan and/or sharing in distributions hereunder as provided in the Bar Date Order.

1.14    "Business Day" shall mean any day other than a Saturday, Sunday or a day which in Wilmington, Delaware or Sioux Falls, South Dakota, is a legal holiday or any day designated in Bankruptcy Rule 9006(a) as a "legal holiday".

1.15    "Cash" shall mean cash, cash equivalents and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

1.16    "Causes of Action" shall mean, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims and demands whatsoever, whether known or unknown, in law, equity or otherwise.

1.17    "Chapter 11 Case" shall mean the Debtor's case under Chapter 11 of the Bankruptcy Code administered in the Bankruptcy Court.

1.18    "Claim" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code, including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.19    "Claimant's Jurisdiction" shall mean the jurisdiction in which the Claim was filed (if at all) against the Debtor in the court system prior to the Petition Date.

1.20    "Claims Agent" shall mean Kurtzman Carson Consultants, LLC, the claims agent appointed by order of the Bankruptcy Court dated September 15, 2003.

1.21    "Class" shall mean any category of Claims or Equity Interests which are substantially similar to each other as classified.

1.22    "Class Action" shall mean those certain consolidated actions ~~including but not limited to~~:

(a)    In re NorthWestern Corporation Securities Litigation (Case No. CIV 03-3049), a consolidated securities class action lawsuit pending in the United States District Court for the District of South Dakota before the Honorable Lawrence L. Piersol; and

(b)    In re NorthWestern Corporation Derivative Litigation (Case No. 03-4091), a consolidated action of two derivative securities lawsuits pending in the United States District Court for the District of South Dakota before the Honorable Lawrence L. Piersol.

1.23    "Class Action Settlement Documents" shall mean the Stipulation of Settlement, memorandum of understanding and any agreements entered into in connection therewith or pursuant hereto or thereto and the orders of the District Court in the Class Action in furtherance thereof.

1.24    "Collateral" shall mean any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

1.25    "Committee" shall mean any committee appointed in the Chapter 11 Case pursuant to Section 1102(a) of the Bankruptcy Code by the

United States Trustee, as the membership of such committee is from time to time constituted and reconstituted.

1.26    "Confirmation Date" shall mean the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

1.27    "Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court to consider confirmation of this Plan pursuant to Section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.28    "Confirmation Order" shall mean the order of the Bankruptcy Court confirming this Plan pursuant to the provisions of the Bankruptcy Code.

1.29    "Contingent Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court which was not filed in a sum certain, or which has not accrued and is dependent upon a future event that has not occurred or may never occur.

1.30    "Convenience Claim" shall mean an Unsecured Claim that is $100,000 or less and held by a Person that is not an Insider.

1.31    "Creditor" shall mean a Person that has a Claim against the Debtor that arose at the time of or before the Petition Date, or a Person that has a Claim against the Estate of the Debtor of a kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**1.32    "Creditors' Committee" shall mean the Official Committee of Unsecured Creditors appointed in this Chapter 11 Case.**

**1.33**    ~~1.32~~ "CSFB Facility" shall mean that certain Amended and Restated Credit Agreement, dated as of November 10, 2003, amending a pre-petition financing arrangement with Credit Suisse First Boston, acting through its Cayman Islands Branch, as administrative agent, such amended pre-petition financing arrangement approved by the Bankruptcy Court on or about December 15, 2003, as the same shall be amended or modified from time to time.

**1.34**    ~~1.33~~ "CSFB Facility Montana First Mortgage Bonds" shall mean any outstanding First Mortgage Bonds, Credit Agreement (2002) Series, due 2006, issued under the Montana Indenture.

**1.35**   ~~1.34~~ "CSFB Facility South Dakota First Mortgage Bonds" shall mean any New Mortgage Bonds, Credit Agreement (2002) Series, due 2006, issued under the South Dakota Indenture.

**1.36**   ~~1.35~~ "CSFB Financing Claims" shall mean the Claims of Credit Suisse First Boston, as agent, under the CSFB Order and CSFB Financing Documents.

**1.37**   ~~1.36~~ "CSFB Financing Documents" shall mean the CSFB Facility and all other documents and instruments evidencing and/or setting forth the terms of the financing arrangements under the CSFB Facility as approved by the CSFB Order, as the same shall be amended or modified from time to time.

**1.38**   ~~1.37~~ "CSFB Lenders" shall mean the syndicate of financial institutions party to the CSFB Financing Documents.

**1.39**   ~~1.38~~ "CSFB Order" shall mean that certain Final Order Granting Motion pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 for Entry of an Order (A) Amending Pre-Petition Credit Facility, (B) Providing Protections under Section 364(c)(1), on a permanent basis, and (C) Granting Related Relief.

**1.40**   ~~1.39~~ "Current Employee Claim" shall mean an Allowed Claim entitled to priority under Section 507 of the Bankruptcy Code and any Unsecured Claims for wages in excess of the Claims entitled to priority under Section 507 of the Bankruptcy Code.

**1.41**   ~~1.40~~ "D&O Insurance Assignment" shall mean the transactions contemplated by the Insurance Assignment Agreement.

**1.42**   ~~1.41~~ "D&O Insurance Contributor" shall mean the Debtor, former and current directors and officers and any non-debtor affiliate of the Debtor who makes a D&O Insurance Assignment.

**1.43**   ~~1.42~~ "D&O Insurance Entity" shall mean any Person **other than the Debtor and Reorganized Debtor** including, but not limited to, any insurance company, broker, or guaranty association, that has issued or that has actual or potential liability, duties or obligations with respect to, any D&O Policies.

**1.44**   ~~1.43~~ "D&O Insurance Entity Injunction" shall mean the injunction described in Section 6.9 of this Plan.

**1.45**   ~~1.44~~ "D&O Insurance Rights" shall mean rights arising under or related to the D&O Policies.

**1.46** **1.45** "D&O Policies" shall mean the insurance policies**, to the extent such policies and the proceeds of such policies are property of the Debtor's estate,** held by the Debtor identified in Exhibit C to this Plan. **As reflected by Exhibit C, the** Cornerstone Propane Partners**, L.P. insurance policies are not being channeled to the D&O Trust.**

**1.47** **1.46** "D&O Proceedings" shall mean any proceeding and/or claim against the Debtor or D&O Protected Party, currently existing or initiated prior to the Effective Date, which may be covered by the D&O Policies, including, but not limited to, the following:

(a)    In re Cornerstone Propane Partners LP Securities Litigation (Case No. 03-2522 MHP), a consolidated securities class action pending in the United States District Court for the Northern District of California before the Honorable Marilyn Hall Patel;

(b)    Mewhinney v. Cornerstone Propane, GP, Inc. (Case No. 032-01181(a), Cir. Ct of the City of St. Louis, MO), a securities class action in the city court of St. Louis, Missouri;

(c)    McGreevey, *et al.* v. The Montana Power Company, *et al.* (Case No. CV 03-01-BU-SEH), a securities class action pending in the United States District Court for the District of Montana before the Honorable Sam E. Haddon;

(d)    In re Touch America ERISA Litigation (Case No. CV-02-106-BU-SEH), an ERISA class action pending in the United States District Court for the District of Montana before the Honorable Sam E. Haddon; **and**

(e)    Securities and Exchange Commission ("SEC") Inquiry (D-02572-A) (the "SEC Inquiry"), a non-public SEC inquiry into various issues**.; and**

**(f)    the Class Action.**

**1.48** **1.47** "D&O Proceedings Final Order" shall mean the final, non-appealable order of the relevant court providing a Final Award in any D&O Proceeding or finally approving a settlement, or the final judgment of the SEC (in the case of the SEC Inquiry).

**1.49** **1.48** "D&O Protected Party" shall mean the following: (i) the Debtor; (ii) Reorganized Debtor; (iii) any subsidiary and/or Affiliate of the Debtor; or (iv) any Person that, pursuant to this Plan or otherwise after the Effective Date, was a former or present director or officer of the Debtor or

becomes a director or officer or indirect transferee of, or successor to, the Debtor, Reorganized Debtor or any subsidiary or Affiliate of the Debtor.

**1.50**   ~~1.49~~ "D&O Protected Parties Settlement Agreement" shall mean that D&O Protected Parties Settlement Agreement attached as Exhibit D to this Plan.

**1.51**   ~~1.50~~ "D&O Trust" shall mean the trust created pursuant to the D&O Trust Agreement and related documents.

**1.52**   ~~1.51~~ "D&O Trust Agreement" shall mean that certain NorthWestern Corporation D&O Trust Agreement attached as Exhibit E to this Plan.

**1.53**   ~~1.52~~ "D&O Trust Assets" shall mean the proceeds of the D&O Insurance Rights assigned to the D&O Trust pursuant to the Insurance Assignment Agreement and any interest on or appreciation of such D&O Insurance Rights or any other sums collected by the **trustee of the** D&O Trust~~ee~~ to enforce such D&O Insurance Rights.

**1.54**   ~~1.53~~ "D&O Trust Channeling Injunction" shall mean the injunction described in Section 10.5(d) of this Plan.

**1.55**   ~~1.54~~ "D&O Trust Claim Holder" shall mean the holder of a D&O Trust Claim.

**1.56**   ~~1.55~~ "D&O Trust Claims" shall mean the amount of any Final Award apportioned to an individual plaintiff in any D&O Proceeding in accordance with any court order fully and finally awarding a judgment to the plaintiffs in any D&O Proceeding and the amount of any Defense Costs.

**1.57**   ~~1.56~~ "D&O Trust Distribution Procedures" or "TDP" shall mean that certain trust distribution procedures attached as Exhibit F to this Plan.

**1.58**   ~~1.57~~ "D&O Trust Documents" shall mean the D&O Trust Agreement, the by-laws of the D&O Trust and the other agreements, instruments and documents governing the establishment and administration of the D&O Trust as such may be amended from time to time.

**1.59**   ~~1.58~~ "Debt" shall mean liability on a Claim.

**1.60**   ~~1.59~~ "Debtor" shall mean NorthWestern Corporation, as debtor and debtor-in-possession in the Chapter 11 Case.

**1.61**    ~~1.60~~ "Debtor Indemnified Parties" shall mean the Persons which the Debtor is obligated to indemnify and exculpate, including its present and former officers and directors, as provided in any of: (i) the Debtor's certificate of incorporation; (ii) the Debtor's by-laws; (iii) any written agreement with the Debtor; (iv) similar documents or agreements of or with the Debtor; or (v) state or common law.

**1.62**    ~~1.61~~ "Defense Cost Motion" shall mean that certain Motion for an Order (I) Authorizing Reimbursement for Defense Costs Incurred on Behalf of Itself and its Present and Former Officers and Directors (II) Authorizing Reimbursement for Defense Costs Incurred by Other Insureds, and (III) Granting Related Relief, as such motion was approved by the Court on January 14, 2004 in an Order Authorizing (I) Reimbursement for Defense Costs Incurred on behalf of itself and its Present and Former Officers and Directors, (II) Reimbursement for Defense Costs Incurred by Other Insureds and (III) Granting Related Relief, as amended by a stipulated order entered on February 17, 2004.

**1.63**    ~~1.62~~ "Defense Costs" shall mean the legal fees and associated expenses (including expert fee(s)) incurred in defending the D&O Proceedings by the Debtor or any D&O Protected Party on behalf of the Debtor or any D&O Protected Party.

**1.64**    ~~1.63~~ "Delaware General Corporation Law" shall mean Title 8 of the Delaware Code, as now in effect or hereafter amended.

**1.65**    ~~1.64~~ "DIP Financing Order" shall mean that certain Final Order (I) Authorizing Debtor-in-Possession to Enter into Post-petition Credit Agreement and Obtain Post-petition Financing pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) Granting Liens, Security Interests and Superpriority Claims, (III) Authorizing Adequate Protection Payments to Debtor's Senior Secured Debt.

**1.66**    ~~1.65~~ "DIP Lenders" shall mean **Bank One, N.A., as agent and lender, and** the syndicate of financial institutions party to the DIP Loan Documents.

**1.67**    ~~1.66~~ "DIP Loan Agreement" shall mean that certain Senior Secured, Pari Passu Debtor-in-Possession Credit Agreement, dated as of September 19, 2003 (as same has been or may be amended), among the Debtor, the lender parties thereto and Bank One, N.A., as DIP Agent.

**1.68**    ~~1.67~~ "DIP Loan Documents" shall mean the DIP Loan Agreement and all other documents and instruments evidencing and/or setting forth the terms of debtor-in-possession financing arrangements in the Chapter 11 Case as approved by the DIP Financing Order.

**1.69** ~~1.68~~ "Disallowed" shall mean, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtor which: (a) has been disallowed, in whole or part, by a Final Order of the Bankruptcy Court; (b) has been withdrawn by agreement of the Debtor and the holder thereof, in whole or in part; (c) has been withdrawn, in whole or in part, by the holder thereof; (d) if listed in the Schedules as zero or as Disputed, contingent or unliquidated and in respect of which a proof of claim has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court or other applicable bankruptcy law; (e) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any proof of claim or proof of interest; or (f) is evidenced by a proof of claim or a proof of interest which has been filed, or which has been deemed to be filed under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court but as to which such proof of claim or proof of interest was not timely or properly filed. In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

**1.70** ~~1.69~~ "Disallowed Claim" shall mean a Claim, or any portion thereof, that is Disallowed.

**1.71** ~~1.70~~ "Disbursing Agent" shall mean Reorganized Debtor or such other Person to be identified by Reorganized Debtor at or prior to the Confirmation Hearing, which shall (i) make the distributions to be made pursuant to and in accordance with the terms of this Plan, the Confirmation Order or any other relevant Final Order of the Bankruptcy Court, and (ii) perform any other act or task that is or may be delegated to the Disbursing Agent under this Plan.

**1.72** ~~1.71~~ "Disclosure Statement" shall mean the disclosure statement relating to this Plan in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code and all exhibits and schedules thereto.

**1.73** ~~1.72~~ "Disputed" shall mean, with respect to Claims or Equity Interests, any such Claim or Equity Interest: (a) that is listed in the Schedules as unliquidated, disputed or contingent for which no proof of claim has been timely filed; (b) as to which the Debtor or any other party-in-interest has interposed a timely objection or request for estimation, or have sought to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, or which is otherwise disputed by the Debtor in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or

determined by Final Order; (c) which is a contingent Claim; or (d) which has not been Allowed.

        **1.74** ~~1.73~~ "Disputed Claims Reserve" shall mean the reserve established pursuant to Section 7.5 of this Plan.

        **1.75** **"Disputed Policies" shall have the meaning set forth on Exhibit C to this Plan.**

        **1.76** ~~1.74~~ "Distribution" shall mean the distribution in accordance with this Plan of Cash or other property, as the case may be.

        **1.77** ~~1.75~~ "Distribution Address" shall mean the last known address of a Creditor, whether derived from the Schedules, a proof of claim filed with the Bankruptcy Court or other written notification of the Debtor as to where a Distribution under this Plan is to be sent.

        **1.78** ~~1.76~~ "Distribution Date" shall mean any date that is:  (a) the Initial Distribution Date; (b) any Subsequent Distribution Date; or (c) the Final Distribution Date.

        **1.79** ~~1.77~~ "District Court" shall mean the United States District Court for the District of South Dakota.

        **1.80** ~~1.78~~ "Effective Date" shall mean a Business Day on or after the Confirmation Date specified by the Debtor on which all conditions precedent to the occurrence of the Effective Date set forth in Section 11.2 of this Plan have been satisfied or waived pursuant to Section 11.3 of this Plan.

        **1.81** ~~1.79~~ "Environmental Claims" shall mean all Claims against the Debtor, including, but not limited to, the Claims listed on Attachments 17(a), (b), and (c) of the Debtor's Statement of Financial Affairs, as may be amended from time to time, arising from (i) any accusation, allegation, notice of violation, action, claim, environmental Lien, demand, abatement or other order, restriction or direction (conditional or otherwise) by any governmental entity or other Person for personal injury (including, but not limited to, sickness, disease or death), tangible or intangible property damage, punitive damages, damage to the environment, nuisance, pollution, contamination or other adverse effect on the environment or costs (to the extent recoverable under applicable non-bankruptcy law) of any governmental entity related thereto, in each case resulting from or based upon (a) the existence, or the continuation of the existence, of a release of (including, but not limited to, sudden or non-sudden accidental or non-accidental releases), or exposure to, any hazardous or deleterious material, substance, waste, pollutant or contaminant, odor or audible noise in, into or onto the environment (including, but not limited to, the air, soil, surface water or groundwater) at, in,

by, from or related to any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor**, or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary,** or any activities or operations thereof, (b) the transportation, storage, treatment or disposal of any hazardous or deleterious material, substance, waste, pollutant or contaminant in connection with any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor~~ or~~**, or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary,** its operation or facilities, or (c) the violation or alleged violation, of any environmental law, order or environmental permit or license of or from any governmental entity relating to environmental matters connected with any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor **or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary** (including, without limitation, any FERC license pertaining to any environmental matter); and (ii) any claim for indemnification or contribution (whether based on contract, statute or common law) against the Debtor by any third party, where such indemnification or contribution claim of such third party is based on a claim against such third party that if asserted directly against the Debtor would be a claim included within the immediately preceding clause (i); provided, however, that Environmental Claims shall not include any Claims **[(other than the Claims of Atlantic Richfield Company addressed in the Milltown Settlement)]** fully settled, liquidated or determined by a ~~Final Order~~**final order of an appropriate court** or a binding award, agreement or settlement**, which has become fully effective on the terms of such final order, binding award, agreement or settlement,** prior to the Petition Date for amounts payable by the Debtor for damages or other obligations in a fixed dollar amount payable in a lump sum or by a series of payments.

**1.82** ~~1.80~~ "Equity Interests" or "Interests" shall mean: (a) a share in **the capital stock of** the Debtor, whether or not transferable or denominated "stock" or a similar security; or (b) an option, a warrant, or a right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (a) of this paragraph, whether vested or unvested, exercised or outstanding.

**1.83** ~~1.81~~ "Estate" shall mean the estate created in the Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code.

**1.84** ~~1.82~~ "Exculpated Parties" shall have the meaning set forth in Section 10.1 of this Plan.

**1.85** ~~1.83~~ "FERC" shall mean the Federal Energy Regulatory Commission.

**1.86** ~~1.84~~ "FIFO" shall mean first-in-first-out.

**1.87** ~~1.85~~ "Final Approval" shall mean the date on which all of the following events have occurred: (a) entry of judgment by the District Court in the Class Action, including a bar order, approving the Stipulation of Settlement and dismissing the Class Action as against all defendants in the Class Action with prejudice and without cost to any party, that has become final and no longer subject to further appeal or review, whether by exhaustion of any possible appeal, lapse of time, or otherwise; (b) an order of the Bankruptcy Court in the Chapter 11 Case approving the Stipulation of Settlement pursuant to the terms of any executed memorandum of understanding and that has become final and no longer subject to further appeal or review, whether by exhaustion of any possible appeal, lapse of time, or otherwise; and (c) an order in the Chapter 11 Case confirming a plan of reorganization for the Debtor that has become final and no longer subject to further appeal or review, whether by exhaustion of any possible appeal, lapse of time, or otherwise.

**1.88** ~~1.86~~ "Final Distribution Date" shall mean the date established by the Debtor pursuant to which all Distributions shall have been made.

**1.89** ~~1.87~~ "Final Order" shall mean an order, ruling or judgment of the Bankruptcy Court as to which the time to appeal, petition for *certiorari,* or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari,* or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for *certiorari,* reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtor or, on and after the Effective Date, Reorganized Debtor or, in the event that an appeal, writ of *certiorari,* or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari,* reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

**1.90** ~~1.88~~ "Gas Transition Bond" shall mean any outstanding bonds issued by MPC Natural Gas Funding Trust under the Natural Gas Funding Trust Indenture, dated as of December 22, 1998, between MPC Natural Gas Funding Trust, as issuer, and U.S. Bank National Association, as trustee.

**1.91**   ~~1.89~~ "General Released Parties" shall have the meaning set forth in Section 10.1(b) of the Plan.

**1.92**   ~~1.90~~ "General Unsecured Claim" shall mean any Claim that is not a ~~Secured Claim,~~ Administrative Claim, Fee Claim, Priority ~~Claim, Priority Tax Claim, Subordinated Claim, Unsecured Note Claim, or Unsecured Subordinated Note~~**Tax Claim, Priority Claim, Unsecured Priority Claim, Bank One DIP Financing Claim, CSFB Financing Claim, Secured Claim, Unsecured Note Claim, Unsecured Subordinated Note Claim, Unsecured Convenience Claim, D&O Trust Claim, Other Equity Interest, Securities Claim, Opt-Out Securities Claim or Environmental** Claim, but shall specifically include an Allowed QF Claim.

**1.93**   ~~1.91~~ "Indemnification Claims" shall mean all obligations relating to contribution, indemnification and exculpation by the Debtor Indemnified Parties as provided in any of: (i) the Debtor's certificate of incorporation as in effect prior to or as of the Confirmation Date; (ii) the Debtor's by-laws as in effect prior to or as of the Confirmation Date; (iii) any written agreement with the Debtor; (iv) similar documents or agreements of or with the Debtor as in effect prior to or as of the Confirmation Date; or (v) the result of the application of state or common law.

**1.94**   ~~1.92~~ "Indenture Trustee Charging Lien" shall mean any Lien or other priority in payment or right available to an Unsecured Note Trustee or an Unsecured Subordinated Note Trustee pursuant to an Unsecured Note Indenture or an Unsecured Subordinated Note Indenture or otherwise available to an Unsecured Note Trustee or an Unsecured Subordinated Note Trustee under applicable law, for the payment of reasonable fees, costs and expenses, including, without limitation, the reasonable fees and expenses of an Unsecured Note Trustee's or an Unsecured Subordinated Note Trustee's professionals.

**1.95**   **"Indentures" shall mean the Unsecured Note Indentures and the Unsecured Subordinated Note Indentures.**

**1.96**   **"Indenture Trustees" shall mean the Unsecured Notes Trustee, the Unsecured Subordinated Notes Trustees, and the trustee of the South Dakota Pollution Control Indentures.**

**1.97**   **"Indenture Trustees' Fees and Expenses" means the reasonable compensation, fees, costs, expenses and indemnity claims (including, without limitation, reasonable legal fees, costs and expenses) incurred by any of the Indenture Trustees, whether prior to or after the Petition Date.**

**1.98** ~~1.93~~ "Initial Distribution Date" shall mean, with respect to Allowed Claims in Class 10, the first Business Day which is twenty (20) days (or such longer period not to exceed sixty (60) days as may be reasonably determined by Reorganized Debtor) after the Effective Date.

**1.99** ~~1.94~~ "Injunction Default" shall mean a default under the D&O Trust Channeling Injunction.

**1.100** ~~1.95~~ "Insider" shall have the meaning set forth in Section 101(31) of the Bankruptcy Code.

**1.101** ~~1.96~~ "Insurance Assignment Agreement" shall mean that certain insurance assignment and funding agreement attached as Exhibit B to this Plan.

**1.102** ~~1.97~~ "Insured Claim" shall mean any claim arising from an incident or occurrence that is covered under any applicable insurance policy.

**1.103** ~~1.98~~ "Investment Grade" shall mean, when used in respect of a security, that such security has been rated higher than Ba1 and BB+ by Moody's Investors Service, Inc. and Standard & Poor's Rating Group, respectively.

**1.104** ~~1.99~~ "Landlord Priority Claim" shall mean a Claim held by a landlord or Person that leased non-residential property to the Debtor, that is entitled to priority under Section 507 of the Bankruptcy Code.

**1.105** ~~1.100~~ "Lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code; except that a lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548 or 549 of the Bankruptcy Code shall not constitute a lien.

**1.106** ~~1.101~~ "MPSC" shall mean The Montana Department of Public Service Regulation, Montana Public Service Commission, or any successor agency.

**1.107** "Milltown Settlement" shall mean that certain settlement agreement among the Debtor, Clark Fork and Blackfoot, LLC and Atlantic Richfield Company.

**1.108** "Milltown Stipulation" shall meant that certain stipulation among the Debtor, Clark Fork and Blackfoot, LLC, Atlantic Richfield Company, the United States, the State of Montana and the Confederated Salish and Kootenai Tribes.

**1.109** ~~1.102~~ "Montana Consumer Counsel" shall mean the State of Montana Consumer Counsel or any successor thereto.

**1.110** ~~1.103~~ "Montana Indenture" shall mean the First Mortgage and Deed of Trust, dated as of October 1, 1945, between the Montana Power Company, as issuer, and Guaranty Trust Company of New York and Arthur E. Burke, as trustees, and any supplements thereto.

**1.111** ~~1.104~~ "Montana First Mortgage ~~Bondholders~~ **Bond** Claims" shall mean an Allowed Claim by the holder of a Montana First Mortgage Bond.

**1.112** ~~1.105~~ "Montana First Mortgage Bonds" shall mean any outstanding bonds issued under the Montana Indenture other than any CSFB Facility Montana First Mortgage Bonds or any Montana Pollution Control Bonds, specifically any of the following:

First Mortgage Bonds, 7% Series due 2005;

First Mortgage Bonds, 7.30% Series due 2006;

First Mortgage Bonds, 8-1/4% Series due 2007;

First Mortgage Bonds, 8.95% Series due 2022; and

Secured Medium-Term Notes due 2008.

**1.113** ~~1.106~~ "Montana Pollution Control Bonds" shall mean**, collectively, the Montana Pollution Control Bond Obligations and** any outstanding bonds issued under the Montana Indenture of either of the following two series:

First Mortgage Bonds, 6-1/8% Series due 2023; and

First Mortgage Bonds, 5.90% Series due 2023.

**1.114 "Montana Pollution Control Bonds Obligations" shall mean any and all obligations under any of the following agreements and indentures:**

**Indenture of Trust dated as of December 1, 1993 between City of Forsyth, Rosebud County and the First National Bank of Chicago related to the $80,000,000 Pollution Control Revenue Refunding Bonds, Series 1993B;**

**Loan Agreement dated as of December 1, 1993 between City of Forsyth, Rosebud County and the Montana Power Company, related to the $80,000,000 Pollution Control Revenue Refunding Bonds, Series 1993B**

**1.115** ~~1.107~~ "Montana Pollution Control Bonds Claims" shall mean an Allowed Claim by the holders of a Montana Pollution Control Bond.

**1.116** ~~1.108~~ "Montana Public Utilities Law" means Title 69 of the Montana Code Annotated, Title 38 of the Administrative Rules of Montana, or any rules or regulations promulgated thereunder, as the same may be amended or modified from time to time.

**1.117** ~~1.109~~ "New Board" shall have the meaning set forth in Section 9.1 hereof.

**1.118** ~~1.110~~ "New Common Stock" shall mean the shares of authorized common stock of Reorganized Debtor issued pursuant to this Plan.

**1.119** ~~1.111~~ "New Incentive Plan" shall mean the incentive plan to be established prior to the Confirmation Hearing.  Any stock, warrants or options issued in connection with the New Incentive Plan when issued or fully exercised shall dilute New Common Stock issued by the Reorganized Debtor to the holders of Allowed Claims in Class 7, Class 8 and Class 9.

**1.120** ~~1.112~~ "NPSC" shall mean the Nebraska Public Service Commission, or any successor thereto.

**1.121** **"Officers and Directors" shall mean (i) with respect to the Debtor, Reorganized Debtor and their Affiliates all of the officers and directors of such entities, in each case, as determined commencing  with the Petition Date and (ii) with respect to all other entities, all present and former officers and directors of such entities.**

**1.122** ~~1.113~~ "Opt-Out Election" has the meaning set forth in Section 4.14 hereof.

**1.123** ~~1.114~~ "Opt-Out Form" means a form approved by the District Court for submission by a holder of a Securities Claim to evidence its exercise of the Opt-Out Election.

**1.124** ~~1.115~~ "Opt-Out Securities Claim" means a Securities Claim the holder of which has exercised the Opt-Out Election in compliance with the requirements of the Class Action Settlement Documents.

**1.125** ~~1.116~~ "Other Secured Claims" shall mean any Secured Claim, exclusive of Priority Claims, Bank One DIP Financing Claims, CSFB Financing Claims and Secured Bondholder Claims.

**1.126** ~~1.117~~ "Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, estate, trust, unincorporated association or organization, governmental agency or political subdivision thereof, or other entity.

**1.127** ~~1.118~~ "Petition Date" shall mean September 14, 2003, the date on which the Debtor filed its voluntary Chapter 11 petition with the Bankruptcy Court pursuant to the Bankruptcy Code.

**1.128** ~~1.119~~ "Plan" shall mean this Chapter 11 plan of reorganization, including, without limitation, all exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the terms hereof or as approved by the Bankruptcy Court.

**1.129 "Plan Committee" shall have the meaning set forth in Section 7.9 hereof.**

**1.130 ["Plan Committee By-Laws" shall mean the by-laws of the Plan Committee, which shall be substantially in the form attached hereto as Exhibit ____ ]**

**1.131** ~~1.120~~ "Plan Documents" shall mean the Plan, the Disclosure Statement, all exhibits and schedules attached to the Plan and to the Disclosure Statement, including the D&O Protected Parties Settlement Agreement (including all exhibits, schedules and documents referred to therein or attached thereto or to be entered into thereunder), the D&O Trust Agreement, the TDP and the Insurance Assignment Agreement.

**1.132** ~~1.121~~ "Priority Claims" shall mean any and all Claims (or portions thereof), if any, entitled to priority under ~~Section~~**Sections 503(b) and** 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims.

**1.133** ~~1.122~~ "Priority Tax Claim" shall mean any Claim of a governmental unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

**1.134** ~~1.123~~ "Pro Rata Share" shall mean a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the

amount of the consideration distributed on account of all Allowed Claims in such Class to the amount of all Allowed Claims in such Class.

**1.135** ~~1.124~~ "Professional Fees" shall mean the reasonable fees and expenses of Professionals.

**1.136** ~~1.125~~ "Professionals" shall mean those Persons (a) employed by the Debtor or the Committee pursuant to an order of the Bankruptcy Court in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

**1.137** ~~1.126~~ "QF Claim" shall mean any Claims related to the qualifying facilities operating pursuant to the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 2601, P.L. 95-617 and related regulations and include the following:

(a)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 14, 1984 (Barney Creek);

(b)     Cogeneration and Small Power Production Power Purchase Agreement dated March 1, 1991 (BGI);

(c)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 30, 1987 (Broadwater Dam);

(d)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 1, 1984 (Cascade Creek);

(e)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 26, 1984 (Jenni Hydro);

(f)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 15, 1984 (Montana One-Colstrip);

(g)     Power Purchase Agreement dated April 1, 1998 (Mission Creek);

(h)     Power Purchase Agreement dated January 1, 1998 (Montana Marginal Energy);

(i)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 15, 1984 (Pine Creek);

(j)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated July 1, 1984 (Pony Generating Station);

(k)     Power Purchase Agreement dated July 24, 1996 (Ross Creek Hydro);

(l)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 16, 1984 (Wisconsin Creek);

(m)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 15, 1984 (Strawberry Creek); and

(n)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 31, 1984 (South Dry Creek).

**1.138** ~~1.127~~ "QSF" shall mean a "qualified settlement fund" within the meaning of Section 1.468B-1(c) of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended from time to time.

**1.139** **"QUIPS" shall mean any outstanding 8.45% Cumulative Quarterly Income Preferred Securities, Series A, issued by Montana Power Capital I, a Delaware statutory business trust.**

**1.140** ~~1.128~~ "QUIPS Claims" shall mean an Allowed Claim by the holder of a QUIPS Note.

**1.141** ~~1.129~~ "QUIPS Indenture" shall mean the Indenture, dated as of November 1, 1996, between The Montana Power Company, as issuer, and The Bank of New York, as trustee, as amended or supplemented from time to time.

**1.142** ~~1.130~~ "QUIPS Notes" shall mean any outstanding 8.45% Junior Subordinated Debentures of the Montana Power Company due 2036, issued under the QUIPS Indenture.

**1.143** ~~1.131~~ "Record Date" shall mean the date established in the Confirmation Order for determining the identity of holders of Allowed Claims entitled to Distributions under this Plan.  If no Record Date is established in the Confirmation Order, then the Record Date shall be the Confirmation Date.

**1.144** ~~1.132~~ "Reinstated" or "Reinstatement" shall mean: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code; or (b) notwithstanding

any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitled the holder of such Claim; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence or which prohibit certain transactions or actions contemplated by this Plan, or conditioning such transactions or action on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement. **Anything to the contrary notwithstanding, the South Dakota Pollution Control Bond Obligations and the Montana Pollution Control Bond Obligations, and the documents evidencing same, shall remain in full force and effect and not be cancelled, and the Debtor's obligations thereunder shall not be discharged pursuant to the terms of this Plan or otherwise.**

**1.145** ~~1.133~~ "Released Parties" shall mean the Debtor, ~~all of its present and former officers and directors,~~ **Reorganized Debtor, Officers and Directors, or any of their former or present** employees, advisors, attorneys, financial advisors, accountants and other professionals **in their capacities as such**, and each of their representatives and agents (including any professionals retained by such persons or entities).

**1.146** ~~1.134~~ " "Reorganized Debtor" shall mean the Debtor after the Effective Date.

**1.147** ~~1.135~~ "Reorganized Debtor Charter" shall mean the certificate of incorporation of Reorganized Debtor attached as Exhibit A to this Plan.

**1.148** ~~1.136~~ "Retiree Benefits" shall mean payments to any Person for the purpose of providing or reimbursing payments for retired employees of the Debtor and of any other entities as to which the Debtor is obligated to provide retiree benefits and the eligible spouses and eligible dependents of such retired employees, for medical, surgical, or hospital care benefits, or in the event of death of a retiree under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established by the

Debtor prior to the Petition Date, as such plan, fund or program was then in effect or as heretofore or hereafter amended.

**1.149** ~~1.137~~ "SEC" shall have the meaning set forth in Section 1.46, D&O Proceedings definition, supra.

**1.150** ~~1.138~~ "SEC Inquiry" shall have the meaning set forth in Section 1.46, D&O Proceedings definition, supra.

**1.151** ~~1.139~~ "Securities Claims" means any Claim or claim asserted in, arising under or related to the Class Action other than any Claim asserted therein on behalf of any Person that is a defendant in the Class Action and other than any Claim asserted therein on behalf of any Person whose liability in respect of the subject matter of the Class Action will be released pursuant to the Class Action Settlement Documents.

**1.152** ~~1.140~~ "Schedules" shall mean, collectively, the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

**1.153** ~~1.141~~ "SDPUC" shall mean the South Dakota Public Utilities Commission, or any successor thereto.

**1.154** ~~1.142~~ "Secured Bondholder Claims" shall mean an Allowed Claim by the holder of **a**~~any~~ Secured Bond.

**1.155** ~~1.143~~ "Secured Bonds" shall mean any **and all** of the Gas Transition Bonds, the South Dakota First Mortgage Bonds, the Montana First Mortgage Bonds, the Montana Pollution Control Bonds, or the South Dakota Pollution Control Bond Obligations.

**1.156** ~~1.144~~ "Secured Claim" shall mean any Claim which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or in the event that such Claim is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

**1.157** ~~1.145~~ "Setoff" shall mean any right of a Creditor to offset a mutual debt owing by such Creditor and any right of the Debtor to offset a mutual debt owing by such Debtor to a Creditor against a Claim of the Debtor, including, without limitation, such rights under Section 553 of the Bankruptcy Code.

**1.158** ~~1.146~~ "South Dakota First Mortgage ~~Bondholders~~ Bond Claims" shall mean an Allowed Claim by the holder of a South Dakota Mortgage Bond.

**1.159** ~~1.147~~ "South Dakota First Mortgage Bonds" shall mean any outstanding bonds issued under the South Dakota Indenture other than any CSFB Facility South Dakota First Mortgage Bonds, specifically any of the following:

First Mortgage Bonds, 7% Series due 2023; and

New Mortgage Bonds, 7.10% Series due 2005.

**1.160** ~~1.148~~ "South Dakota Indenture" shall mean the General Mortgage Indenture and Deed of Trust, dated as of August 1, 1993, between Northwestern Public Service Company, as issuer, and The Chase Manhattan Bank, as trustee, and any supplements thereto.

**1.161** ~~1.149~~ "South Dakota Pollution Control Bond Obligation Claims" shall mean an Allowed Claim by the holder of a South Dakota~~, Nebraska and Iowa~~ Pollution Control Bond Obligations.

**1.162** ~~1.150~~ "South Dakota Pollution Control Bond Obligations" shall mean any obligations under any of the following agreements or indentures:

Sale Agreement, dated as of June 1, 1993, between Mercer County, North Dakota and Northwestern Public Service Company, relating to $7,550,000 Pollution Control Refunding Revenue Bonds Series 1993;

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to Mercer County, North Dakota, relating to $7,550,000 Pollution Control Refunding Revenue Bonds Series 1993;

Loan Agreement, dated as of June 1, 1993, between Grant County, South Dakota and Northwestern Public Service Company, relating to $6,400,000 Pollution Control Refunding Revenue Bonds Series 1993A;

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to Grant County, South Dakota, relating to $6,400,000 Pollution Control Refunding Revenue Bonds Series 1993A;

Loan Agreement, dated as of June 1, 1993, between Grant County, South Dakota and Northwestern Public Service Company, relating to $3,400,000 Pollution Control Refunding Revenue Bonds Series 1993B;

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to Grant County, South Dakota, relating to $3,400,000 Pollution Control Refunding Revenue Bonds Series 1993B;

Loan Agreement, dated as of June 1, 1993, between City of Salix, Iowa and Northwestern Public Service Company, relating to $4,000,000 Pollution Control Refunding Revenue Bonds Series 1993; and

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to City of Salix, Iowa, relating to $4,000,000 Pollution Control Refunding Revenue Bonds Series 1993.

**1.163** **"South Dakota Pollution Control Indentures" means the following indentures:**

**Indenture of Trust, dated as of June 1, 1993, between Grant County, South Dakota, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee (Series A);**

**Indenture of Trust, dated as of June 1, 1993, between Grant County, South Dakota, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee (Series B);**

**Indenture of Trust, dated as of June 1, 1993, between Mercer County, North Dakota, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee; and**

**Indenture of Trust, dated as of June 1, 1993, between the City of Salix, Iowa, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee.**

**1.164** ~~**1.151**~~ "South Dakota Public Utilities Law" means the provisions of Chapter 49-34A of the South Dakota Codified Laws, and any rules and regulations promulgated in connection therewith, and as the same may be

amended or modified from time to time**, including any order previously issued by the South Dakota Public Utilities Commission**.

**1.165** ~~1.152~~ "Stipulation of Settlement" shall mean that certain stipulation of settlement to be entered in the Class Action.

**1.166** ~~1.153~~ "Subordinated Claim" shall mean any Claim: (a) payment of which is subordinated in right of treatment or payment to other Claims under an agreement enforceable under applicable non-bankruptcy law, but only to the extent provided in such agreement; (b) for reimbursement or contribution of a Person that is liable with the Debtor on another Creditor's Allowed Claim unless and until such Claim is paid in full; or (c) subordinated in right of treatment or payment pursuant to Sections 509(c) or 510 of the Bankruptcy Code.

**1.167** ~~1.154~~ "Subsequent Distribution Date" shall mean each six (6) month anniversary of the Effective Date.

**1.168** ~~1.155~~ "Surplus Distributions" shall mean the Distributions created pursuant to Section 7.7 of this Plan.

**1.169** ~~1.156~~ "TAC" shall mean the Trust Advisory Committee established pursuant to Article V of the D&O Trust Agreement.

**1.170 "TA Debtors" shall mean the debtors and debtors-in-possession in the jointly administered bankruptcy cases of Touch America Holdings, Inc, *et al*.**

**1.171 "TDP" or "D&O Trust Distribution Procedures" shall mean that certain trust distribution procedures attached as Exhibit F to this Plan.**

**1.172** ~~1.157~~ "Tax Claim" shall mean an Allowed Claim for an amount entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

**1.173** ~~1.158~~ "TOPrS Indenture" shall mean the Subordinated Debt Securities Indenture, dated as of August 1, 1995, between Northwestern Public Service Company, as issuer, and The Chase Manhattan Bank, as trustee, as amended or supplemented from time to time.

**1.174** **1.159** "TOPrS Notes" shall mean any outstanding Subordinated Debentures issued pursuant to the TOPrS Indenture, specifically any of the following:

8.125% Junior Subordinated Deferrable Interest Debentures due 2025, issued pursuant to a First Supplemental Indenture, dated as of August 1, 1995;

7.20% Junior Subordinated Deferrable Interest Debentures due 2038, issued pursuant to a Second Supplemental Indenture, dated as of November 15, 1995;

8.25% Junior Subordinated Deferrable Interest Debentures due 2031, issued pursuant to a Third Supplemental Indenture, dated as of December 21, 2001; and

8.10% Junior Subordinated Deferrable Interest Debentures due 2032, issued pursuant to a Fourth Supplemental Indenture, dated as of January 31, 2002.

**1.175** **1.160** "Tort Claim" shall mean any Claim relating to personal injury, property damage or products liability or other similar Claim asserted against the Debtor, its subsidiaries and/or Affiliates that has not been compromised and settled or otherwise resolved. Tort Claims include Claims arising from or related to products or services provided by the Debtor, its subsidiaries and/or Affiliates or their predecessors prior to the Petition Date regardless of when the accident or injury occurs.

**1.176** **1.161** "Trust Expenses" shall mean the expenses incurred by the D&O Trust as contemplated by the D&O Trust Agreement.

**1.177** **1.162** "Trust Originated Preferred Securities (TOPrS) Claims" shall mean an Allowed Claim by the holder of a TOPrS Note.

**1.178** **1.163** "Trustee" shall mean any Person appointed by the Bankruptcy Court pursuant to Section 6.2 of this Plan and pursuant to the D&O Trust Agreement.

**1.179** **1.164** "Unclaimed Property" shall mean any Distribution of Cash or any other property made to the holder of an Allowed Claim pursuant to this Plan that: (a) is returned to Reorganized Debtor as undeliverable and no appropriate forwarding address is received within the later of (x) one (1) year after the Effective Date and (y) one (1) year after Distribution is made to such holder; or (b) in the case of a Distribution made in the form of a check, is not

negotiated and no request for reissuance is made by the holder of such Allowed Claim.

**1.180** ~~1.165~~ "Unsecured Claim" shall mean a Claim for which no property of any kind of the Debtor's Estate serves as security or Collateral other than Claims with respect to Unsecured Note Claims, Trust Originated Preferred Securites (TOPrS) Claims and QUIPS Claims.

**1.181** ~~1.166~~ "Unsecured Insider Claims" shall mean Unsecured Claims held by Insiders.

**1.182** ~~1.167~~ "Unsecured Note Claims" shall mean an Allowed Claim by the holder of an Unsecured Note.

**1.183** ~~1.168~~ "Unsecured Note Indentures" shall mean:

(a)     the Indenture, dated as of November 1, 1998, between the Debtor, as issuer, and The Chase Manhattan Bank, as trustee, and any supplements thereto (the "1998 Indenture"); and

(b)     the Indenture, dated as of December 1, 1989, between The Montana Power Company, as issuer, and Citibank, N.A., as trustee, and any supplements thereto (the "1989 Indenture").

**1.184** ~~1.169~~ "Unsecured Note Trustee" shall mean HSBC Bank USA, or any successor thereto (whether under the 1998 Indenture or the 1989 Indenture), in such Person's capacity as indenture trustee under such Unsecured Note Indenture.

**1.185** ~~1.170~~ "Unsecured Notes" shall mean any outstanding notes issued under:

(a)     the Indenture, dated as of November 1, 1998, between the Debtor, as issuer, and The Chase Manhattan Bank, as trustee, and any supplements thereto, specifically any of the following:

6.95% Senior Unsecured Debentures due 2028;

7.875% Senior Notes due 2007; and

8.75% Senior Notes due 2012; and

(b)     the Indenture, dated as of December 1, 1989, between The Montana Power Company, as issuer, and Citibank, N.A., as trustee, and any supplements thereto, specifically any of the following:

7.07% Unsecured Medium-Term Notes due 2006;

7.875% Unsecured Medium-Term Notes due 2026; and

7.96% Unsecured Medium-Term Notes due 2026.

**1.186** **1.171** "Unsecured Priority Claims" shall mean Unsecured Claims entitled to priority status pursuant to Section 507 of the Bankruptcy Code.

**1.187** **1.172** "Unsecured Subordinated Note Claims" shall mean an Allowed Claim by the holder of an Unsecured Subordinated Note.

**1.188** **1.173** "Unsecured Subordinated Note Indentures" shall mean the QUIPS Indenture and the TOPrS Indenture.

**1.189** **1.174** "Unsecured Subordinated Note Trustees" shall mean**:**

(a)     with respect to the QUIPS Indenture, Law Debenture Trust Company of New York; and

(b)     with respect to the TOPrS Indenture, Wilmington Trust Company,

in either case, or any successor thereto, in such Person's capacity as indenture trustee under such Unsecured Subordinated Note Indenture.

**1.190** **1.175** "Unsecured Subordinated Notes" shall mean the QUIPS Notes and the TOPrS Notes.

## ARTICLE 2

## TREATMENT OF ALLOWED ADMINISTRATIVE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS

2.1     Non-Classification.  As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims against the Debtor are not classified for the purposes of voting on or receiving Distributions under this Plan.  All such Claims are instead treated separately upon the terms set forth in this Article 2.

2.2     Administrative Claims.

(a)     In General.  All Administrative Claims shall be paid in full, in Cash, in such amounts as (a) are **actual and necessary costs and expenses** incurred **after the Petition Date** in the ordinary course of ~~business by~~ the Debtor**'s business** when and as such Claims become due and owing or (b) are

Allowed by the Bankruptcy Court upon the later of (i) the Effective Date, (ii) the date upon which there is a Final Order allowing such Claim as an Administrative Claim, or (iii) any other date specified in such order, or as may be agreed upon between the holder of such Administrative Claim and the Debtor.  Such Administrative Claims shall include all obligations owing to the DIP Lenders arising under the DIP Loan Documents and the DIP Financing Order (including, without limitation, the payment of all fees and expenses required thereunder), costs incurred in the operation of the Debtor's businesses after the Petition Date, the reasonable fees and expenses of Professionals retained by the Debtor and the Committee, and the fees due to the United States Trustee pursuant to 28 U.S.C. § 1930.

(b)     Professional Compensation and Expense Reimbursement Claims.  All Persons seeking an award by the Bankruptcy Court of Professional Fees, or of compensation for services rendered to the Debtor or the Committee or reimbursement of expenses incurred through and including the Effective Date under Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, (a) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days after the Effective Date, and (b) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Claim and the Debtor or, on and after the Effective Date, Reorganized Debtor, or (iii) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court.  All Professional Fees for services rendered in connection with the Chapter 11 Case and this Plan after the Effective Date, including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of Causes of Action preserved hereunder and the resolution of Disputed Claims, shall be paid by Reorganized Debtor upon receipt of an invoice therefor, or on such other terms as Reorganized Debtor may agree to, without the need for further Bankruptcy Court authorization or entry of a Final Order.  If Reorganized Debtor and any Professional cannot agree on the amount of post-Effective Date fees and expenses to be paid to such Professional, such amount shall be determined by the Bankruptcy Court.

(c)     Claims of DIP Lenders.  On the Effective Date, all outstanding obligations of the Debtor to the DIP Lenders pursuant to the DIP Loan Documents, if any, shall be fully and finally satisfied in accordance with the terms of the DIP Loan Documents, the DIP Financing Order, and this Plan.

(d)    U.S. Trustee's Claims.  U.S. Trustee Claims that are unpaid as of the Effective Date will be paid in cash on the Effective Date.

2.3    Priority Tax Claims.  Allowed Priority Tax Claims shall be paid in full, in Ccash, upon the later of: (a) the Effective Date; (b) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim; (c) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Case had not been commenced; or (d) upon such other terms as may be agreed to between the Debtor and any holder of an Allowed Priority Tax Claim; provided, however, that the Debtor may, at its option, in lieu of payment in full of Allowed Priority Tax Claims on the Effective Date, make Ccash payments respecting Allowed Priority Tax Claims deferred to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code and, in such event, the principal amount of such Allowed Priority Tax Claims shall be amortized in equal annual installments over six (6) years from the Effective Date and interest shall accrue from the Effective Date on the unpaid portion of such Allowed Priority Tax Claim at: (x) any applicable statutory rate; (y) the rate applicable to federal judgments pursuant to 28 U.S.C. § 1961; or (z) a rate to be agreed to by the Debtor (or Reorganized Debtor, as the case may be) and the appropriate governmental unit or, if they are unable to agree, as determined by the Bankruptcy Court.

# ARTICLE 3

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims (other than Allowed Administrative Claims and Allowed Priority Tax Claims) and Equity Interests are classified for all purposes, including voting on, confirmation of and distribution pursuant to this Plan, as follows:

| Class | | Status |
|---|---|---|
| Class 1 - - | Priority Claims | Unimpaired |
| Class 2 - - | Unsecured Priority Claims | Unimpaired |
| Class 3 - - | Bank One DIP Financing Claims | Unimpaired |
| Class 4 - - | CSFB Financing Claims | Unimpaired |
| Class 5 - - | Secured Bondholder Claims | Unimpaired |
| Class 6 - - | Other Secured Claims | Unimpaired |
| Class 7 - - | Unsecured Note Claims | Impaired |
| Class 8 - - | Unsecured Subordinated Note Claims | Impaired |
| Class 9 - - | General Unsecured Claims | Impaired |
| Class 10 - - | Unsecured Convenience Claims of $100,000 or Less | Unimpaired |
| Class 11 - - | Environmental Claims | Unimpaired |
| Class 12 - - | D&O Trust Claims | Impaired |
| Class 13 - - | Other Equity and Interest HoldersInterests | Impaired |
| Class 14 - - | Securities Claims | Unimpaired |
| Class 15 - - | Opt-Out Securities Claims | Impaired |

# ARTICLE 4

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 4.1    CLASS 1 – PRIORITY CLAIMS

(a)    *Impairment and Voting*. Class 1 is unimpaired by this Plan. Consequently, each holder of an Allowed Priority Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    *Distributions*. Each holder of an Allowed Priority Claim shall receive, **in full satisfaction, settlement, release and discharge thereof,** Cash in an amount equal to such Allowed Priority Claim on the later of: (i) the

Effective Date; and (ii) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Claim or any other date specified in such Final Order, or as soon thereafter as is practicable, unless the holder of an Allowed Priority Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

4.2    **CLASS 2 – UNSECURED PRIORITY CLAIMS**

(a)    <u>Impairment and Voting</u>. Class 2 is unimpaired by this Plan. Consequently, each holder of an Allowed Unsecured Priority Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Unsecured Priority Claim shall receive**, in full satisfaction, settlement, release and discharge thereof,**  Cash in an amount equal to such Allowed Unsecured Priority Claim on the later of: (i) the Effective Date; and (ii) **the date that is ten (10) Business Days after** the date upon which there is a Final Order allowing such Claim as an Allowed Unsecured Priority Claim or any other date specified in such Final Order, or as soon thereafter as is practicable, unless the holder of an Allowed Unsecured Priority Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

4.3    **CLASS 3 – BANK ONE DIP FINANCING CLAIMS**

(a)    <u>Impairment and Voting</u>. Class 3 is unimpaired by this Plan. Consequently, each holder of an Allowed Bank One DIP Financing Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions</u>. Each holder of an Allowed Bank One DIP Financing Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, the amount of such Allowed Claim pursuant to the DIP Financing Order and the DIP Loan Documents on the Effective Date, unless the holder of the Allowed Bank One DIP Financing Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

4.4    **CLASS 4 – CSFB FINANCING CLAIMS**

(a)    <u>Impairment and Voting</u>. Class 4 is unimpaired by this Plan. Consequently, each holder of an Allowed CSFB Financing Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed CSFB Financing Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, full Reinstatement of such Allowed Claim pursuant to the CSFB Order and the CSFB Financing Documents.

### 4.5    <u>CLASS 5 – SECURED BONDHOLDER CLAIMS</u>

(a)    <u>Impairment and Voting</u>.  Class 5 is unimpaired by this Plan. Consequently, each holder of an Allowed Secured Bondholder Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Secured Bondholder Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, full Reinstatement of such Allowed Claim.

### 4.6    <u>CLASS 6 – OTHER SECURED CLAIMS</u>

(a)    <u>Impairment and Voting</u>.  Class 6 is unimpaired by this Plan. Consequently, each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Other Secured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, full Reinstatement of such Allowed Claim.

### 4.7    <u>CLASS 7 – UNSECURED NOTE CLAIMS</u>

(a)    <u>Impairment and Voting</u>.  Class 7 is impaired by this Plan and holders of Allowed Unsecured Note Claims are entitled to vote to accept or reject this Plan.

(b)    <u>Allowance of Unsecured Note Claims</u>.  On the Effective Date, the Unsecured Note Claims shall be deemed Allowed in the aggregate amount of $~~897,986,781.~~**897,986,781.00,** which includes accrued and unpaid interest on the Unsecured Note Claims relating to the period up to but not including the Petition Date.

(c)    <u>Distributions and Effects Thereof</u>.  On the Effective Date the Unsecured Notes shall be **<u>automatically</u>** cancelled, annulled and extinguished.  On the Effective Date, or as soon thereafter as practicable, each holder of an Unsecured Note Claim, along with holders of Class 9 General Unsecured Claims, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim its Pro Rata Share of: (i) 34,790,000

shares of New Common Stock (such 34,790,000 shares representing 98% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution), plus (ii) the 710,000 shares of New Common Stock allocated to Class 8 if Class 8 as a class rejects the Plan.  The New Common Stock issued pursuant to this Section 4.7(c) shall be subject to dilution by shares of New Common Stock issued and distributed in accordance with the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter**, as may be amended from time to time**.

(d)    Cancellation of Unsecured Notes and Related Instruments. As of the Effective Date, **(i)** all Unsecured Notes, **shall be cancelled and deemed null and void and of no further force and effect, and (ii)** all obligations of any Person under **the Unsecured Notes,** the Unsecured Note Indentures, and all **other** agreements, instruments and ~~other~~ documents evidencing the Unsecured Notes and the rights of the holders thereof, shall be ~~canceled~~**automatically cancelled** and deemed null and void and of no further force and effect (all without further act or action by any Person), ~~other than as evidence of any right to receive Distributions under this Plan, and~~ all obligations of any Person under ~~such instruments and agreements shall be fully and finally satisfied and released without any further act or order of the Bankruptcy Court or any other Person~~**except that such Unsecured Notes Indentures and other agreements that govern the rights of** holders of the Unsecured Notes **shall continue in effect solely for the purposes of allowing the Indenture Trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Plan, as provided herein, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 hereof**.  Without limiting the foregoing, each holder of an Unsecured Note Claim shall be deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or Reorganized Debtor~~.  Notwithstanding the termination of the Unsecured Notes and the Unsecured Note Indentures, the provisions of such documents shall govern the Unsecured Note Trustees and the~~ holders of the Unsecured Notes.

4.8    **CLASS 8 – UNSECURED SUBORDINATED NOTE CLAIMS**

(a)    Impairment and Voting.  Class 8 is impaired by this Plan and holders of Allowed Unsecured Subordinated Note Claims are entitled to vote to accept or reject this Plan.

(b)    Allowance of Unsecured Subordinated Note Claims.  On the Effective Date, the Unsecured Subordinated Note Claims shall be deemed

Allowed in the aggregate amount of $390,607,256.00, which includes accrued and unpaid interest on the Unsecured Subordinated Note Claims relating to the period up to but not including the Petition Date.

(c)     Distributions and the Effects Thereof.  On the Effective Date the Unsecured Subordinated Notes shall be **automatically** cancelled, annulled and extinguished.  On the Effective Date, or as soon thereafter as practicable, and so long as the holders of Class 8 Unsecured Subordinated Note Claims as a class vote to accept the Plan, each holder of an Unsecured Subordinated Note Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim a Pro Rata Share of: 710,000 shares of New Common Stock (such 710,000 shares representing 2% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution).  In the event that Class 8, as a class, votes to reject the Plan, then the holders of Unsecured Subordinated Note Claims shall receive nothing under the Plan and the New Common Stock to be distributed to such holders shall be distributed, pro rata, to Class 7 and Class 9.  The New Common Stock issued pursuant to this Section 4.8(c) of this Plan shall be subject to dilution by shares of New Common Stock issued and distributed in accordance with the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter **as the same may be amended from time to time**.

(d)     Cancellation of Unsecured Subordinated Notes and Related Instruments.  As of the Effective Date, **(i)** all Unsecured Subordinated Notes, **shall be automatically cancelled and deemed null and void and of no further force and effect, and (ii)** all obligations of any Person under **the Unsecured Subordinated Notes, the** Unsecured Subordinated Note Indentures and all **other** agreements, instruments and ~~other~~ documents evidencing the Unsecured Subordinated Notes and the rights of the holders thereof, shall be cancelled and deemed null and void and of no further force and effect (all without further act or action by any Person), ~~other than as evidence of any right to receive Distributions under this Plan, and~~ all obligations of any Person under ~~such instruments and agreements shall be fully and finally satisfied and released without any further act or order of the Bankruptcy Court or any other Person~~**except that such Unsecured Subordinated Notes Indentures and other agreements that govern the rights of the holders of the Unsecured Subordinated Notes shall continue in effect solely for the purposes of allowing the Indenture Trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Plan, as provided herein, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 hereof**.  Without limiting the foregoing, each holder of an Unsecured Subordinated Note Claim shall be deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other

documents respecting payment of the Unsecured Subordinated Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or Reorganized Debtor. ~~Notwithstanding the termination of the Unsecured Subordinated Notes and the Unsecured Subordinated Note Indentures, the provisions of such documents shall govern the Unsecured Subordinated Notes Trustee and the holder of the Unsecured Subordinated Notes.~~

### 4.9    CLASS 9 –GENERAL UNSECURED CLAIMS

(a)    <u>Impairment and Voting</u>.  Class 9 is impaired by this Plan and holders of Allowed General Unsecured Claims are entitled to vote to accept or reject this **Plan.  Insisters are entitled to vote on the Debtor's** Plan; provided, however, ~~Insiders holding General Unsecured Claims are not entitled to vote to accept or reject this Plan~~**that Insider votes do not count in determining whether at least one class of impaired claims has accepted the plan, as required by Section 1129(a)(10) of the Bankruptcy Code**.

(b)    <u>Allowance of General Unsecured Claims</u>.  On the Effective Date, the holders of Allowed General Unsecured Claims shall be deemed, at their election, eligible to participate in Distributions, as described in Sections 4.9(c) and/or 4.10 up to the amount of the Allowed Claim.

(c)    <u>Distributions</u> ~~and the Effects Thereof~~.  Each holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof one of the following forms of treatment in the sole discretion of the Debtor and Reorganized Debtor, as applicable:

(i)    The Claim is Reinstated;

(ii)    On the Effective Date, or as soon thereafter as practicable, each holder of a General Unsecured Claim, along with holders of Class 7 Unsecured Note Claims, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim its Pro Rata Share of:  (i) 34,790,000 shares of New Common Stock (such 34,790,000 shares representing 98% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution), plus (ii) the 710,000 shares of New Common Stock allocated to Class 8 if Class 8, as a class, votes to reject the Plan. The New Common Stock issued pursuant to this Section 4.9(c)(ii) shall be subject to dilution by shares of New Common Stock issued and distributed in accordance with the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter **as the same may be amended from time to time**; or

(iii)    Such other treatment as the Debtor or Reorganized Debtor, as the case may be, and such holder shall have agreed upon in writing, or as the Bankruptcy Court has ordered.

**(d)**    ~~(iv)~~ Classification of Insider Claims.    Insider claims included in Class 9 – General Unsecured Claims include, but are not limited to, claims related to the rejection of certain non-qualified plans and claims related to employment and separation of Insiders by the Debtor.[1]  To the extent that Insiders have claims for indemnification, advancements, and/or legal fees and expenses related to the Class Action and D&O Proceedings, such claims shall be channeled to and included in Class 12 – D&O Trust Claims.

4.10    **CLASS 10 – UNSECURED CONVENIENCE CLAIMS OF    $100,000 OR LESS**

(a)    Impairment and Voting.  Class 10 is unimpaired by this Plan.  Consequently, each holder of an Allowed Convenience Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    Distributions ~~and the Effects Thereof~~.  Each holder of an Allowed Convenience Claim shall receive in full satisfaction, settlement, release extinguishment and discharge of such Claim, one of the following forms of treatment:

(i)    Cash equal to the amount of the Allowed Convenience Claim up to $100,000, on or as soon as practicable after the later of (1) the Effective Date and (2) the date that is ten (10) Business Days after a Class 2 Unsecured Priority Claim becomes an Allowed Convenience Claim by a Final Order; or

(ii)    Such other treatment as the Debtor and such holder shall have agreed upon in writing.

(c)    Effect of Convenience Class Election.  Holders of Allowed General Unsecured Claims of up to $100,000 or less in Class 9, may elect to participate in Class 10 up to $100,000 by voting to accept this Plan and marking the Ballot in the space provided.  Holders of Allowed General Unsecured Claims in excess of $100,000 may elect to reduce the amount of such holder's Allowed

---

[1] The Debtor intends to object to the allowance of a number of Insider claims, including, but not necessarily limited to, the claims of Cornerstone Propane, L.P., Cornerstone Propane Partners LP, John Charters, Richard Hylland, Merle Lewis, and Daniel K. Newell.  Richard Hylland filed a claim in the amount of $30.4 million in connection with his employment with the Debtor and benefits under the Debtor's non-qualified benefit plans.  The Debtor intends to object to M r. Hylland's claim.

Claim to $100,000 and participate in Distributions to be paid to holders of Class 10 Convenience Claims.  Such an election constitutes a waiver of the amount of such holder's Allowed General Unsecured Claim in excess of $100,000, and such holder shall be deemed to release the Debtor and Reorganized Debtor from any and all liability for such excess amount.

### 4.11    CLASS 11 - ENVIRONMENTAL CLAIMS

(a)    Impairment and Voting.  Class 11 is not impaired under this Plan and holders of Allowed Environmental Claims are not entitled to vote to accept or reject this Plan.

**(b)    Distributions.  All of the Debtor's federal, state and local environmental and regulatory obligations including all Environmental Claims, shall be unaffected by the Plan and shall become obligations of the Reorganized Debtor and its Affiliates except as specifically provided for herein.  Holders of an Allowed Environmental Claim shall receive in full satisfaction and settlement thereof full Reinstatement of such Allowed Environmental Claim; provided however, that Claims related to the Milltown Settlement and Stipulation shall be treated as provided for in the Milltown Settlement, Milltown Stipulation, the final consent decree and FERC order related to Milltown Dam.**

**Claims related to the Milltown Settlement and the Milltown Stipulation shall be treated in accordance with the Milltown Settlement, Milltown Stipulation and any consent decree entered by a court relating to the Milltown Dam site.  Assuming that the Debtor's Plan is confirmed and the Effective Date occurs before a consent decree is entered or becomes fully effective, and if such consent decree is subsequently not entered or does not become fully effective, then all of the United States, the State of Montana, and the Confederated Salish and Kootenai Tribes' rights, claims, arguments and objections with respect to matters within the scope of the Milltown Settlement and Milltown Stipulation shall be preserved until the consent decree is entered and effective.  In the event that (a) the consent decree is not entered after it is lodged with the court, (b) the consent decree does not become fully effective pursuant to the conditions in the consent decree, or (c) after entry of the consent decree, the consent decree is overturned on appeal and subsequent negotiations are required, and any of the parties to the Milltown Stipulation assert that the negotiations have irretrievably broken down, then the Milltown Settlement shall be deemed void *ab initio*, and all funds in the escrow account shall continue to be held in trust in the escrow account pending further order of the Bankruptcy Court.**

### 4.12    CLASS 12 - D&O TRUST CLAIMS

(a)    Impairment and Voting.  Class 12 is impaired under this Plan and holders of Allowed D&O Trust Claims are ~~not~~ entitled to vote to accept

or reject this Plan ~~as Insiders~~.  **To the extent that holders of Allowed D&O Trust Claims are Insiders, such votes shall not be counted in determining whether at least one class of impaired claims has accepted the Plan, as required by Section 1129(a)(10) of the Bankruptcy Code**.

        (b)    <u>Allowance of D&O Claims</u>.  All Allowed D&O Trust Claims shall be determined and paid pursuant to the terms, provisions, and procedures of the D&O Trust, the D&O Trust Agreement, and the D&O Trust Distribution Procedures.  The D&O Trust will be funded in accordance with the provision of Article 6 of this Plan and the D&O Trust Documents, including the Insurance Assignment Agreement.

        (c)    <u>Distributions</u>.

        (i)    D&O Trust Claims shall be paid from the D&O Trust in FIFO order based on the date of entry of the D&O Proceeding Final Order providing for a Final Award in the D&O Proceeding giving rise to such D&O Trust Claim.  Among D&O Trust Claims created by the same D&O Proceeding Final Order, D&O Trust Claims will be paid in accordance with the D&O Proceeding Final Order giving rise to such D&O Trust Claim.

        (ii)    Post Effective Date, on a monthly basis the Reorganized Debtor and any other applicable D&O Trust Claim Holders shall submit to the Trustee a notice setting forth the amount of such D&O Trust Claim Holders' Defense Costs **approved and** incurred during the previous month, together with all documentation necessary to reasonably satisfy the Trustee of the reasonableness of the claimed Defense Costs (collectively, the "<u>Defense Cost Notice</u>").  The Trustee shall reimburse the **<u>Reorganized</u>** Debtor and any applicable D&O Trust Claim Holders promptly upon receipt of a Defense Cost Notice and the Trustee's determination that such Defense Costs are reasonable but in no event later than thirty (30) days afer receipt of the Defense Cost Notice.

        (iii)    The D&O Trust shall be funded by the balance of the remaining proceeds in the D&O Policies after contributions to the Settlement Fund ~~as described above~~.  The Debtor estimates the remaining proceeds to be approximately $13.0 million, after funding the Settlement Fund and payment of Defense Costs reimbursable pursuant to the Defense Cost Motion.  In the event the D&O Trust funds are ~~exhaused and directors and officers of the Debtor as of the Petition Date have outstanding and unpaid Defense Cost Claims~~**exhausted, so long as the SEC Investigation is pending**, the Reorganized Debtor shall pay such claims up to and not to exceed $~~5.0~~**5** million when such claims are determined to be valid by the **<u>t</u>T**rustee under the D&O Trust ~~by paying such amount not to exceed $5.0 million into the D&O Trust for the sole benefit of directors and officers of the Debtor as of the Petition Date~~.

4.13    **CLASS 13 - OTHER EQUITY ~~AND INTEREST HOLDERS~~INTERESTS**

(a)    Impairment and Voting.  Class 13 is impaired under this Plan, the holders of Class 13 Claims are entitled to no Distributions under this Plan, and all Equity Interests shall be deemed canceled as of the Effective Date. Class 13 is deemed to have rejected this Plan, and therefore, shall not be entitled to vote to accept or reject this Plan.

(b)    Distributions.  On the Effective Date, all Equity Interests shall be canceled, annulled and extinguished **and all other agreements, instruments and documents evidencing the Equity Interests and the rights of the holders thereof, shall be automatically cancelled and deemed null and void and of no further force and effect (all without further actor action by any Person)** and holders of Equity Interests shall not be entitled to receive or retain any property or interest in property under this Plan on account of such Equity Interests.

4.14    **CLASS 14 – SECURITIES CLAIMS**

**Class 14 Claims are claims of holders of claims pursuant to the proposed Stipulation of Settlement entered in the Class Action.**[2]  Pursuant to the Plan and the Stipulation of Settlement, the Debtor and various D&O Insurance Contributors will establish a settlement fund (the "Settlement Fund") in the amount of $41 million (of which approximately $37 million is to be contributed from certain of the D&O Policies, **excluding the Cornerstone and Montana Power Company policies identified on Exhibit C,** and $4 million is to be contributed from other Persons and parties) to settle the Class Action.

Class 14 Claims will be discharged and the Holders thereof shall be forever barred from seeking to recover any payment on their Securities Claims from the Debtor, **the** Reorganized Debtor, or the Released Parties.

Holders of Securities Claims may elect to refuse to accept the proposed treatment provided in the Class Action Settlement Documents (the "Opt-Out Election"). The holders of Securities Claims who exercise the Opt-Out Election and preserve their rights to proceed against the Debtor in the District Court in accordance with the

---

[2] **In the event the proposed Stipulation of Settlement is not approved and does not become effective: (a) the Plan and any proposed Order confirming the Plan (i) will not release any non-Debtor for that matter, from the claims asserted or to be asserted in the Securities Litigation; and (ii) will not affect, in any way, the Class Claimants' rights to obtain relief for their claims in the Securities Litigation; (b) the Lead Plaintiffs and the Class Claimants shall retain their rights to pursue their claims and access the proceeds of any available D&O Policies that provide coverage for the claims asserted in the Securities Litigation; and (c) the Debtor's current and former officers and directors, financial advisors, accountants, auditors, agents or professional will not be released and discharged from any cause of action in connection with the Class Action.**

requirements of the Class Action Settlement Documents, shall be holders of Class 15 Claims.

Holders of Securities Claim who ~~do opt-out of the Stipulation of Settlement~~**choose the Opt-Out Election** prior to Final Approval and become holders of Class 15 Claims shall not be entitled to any Distributions under the Plan and Class ~~15~~**14** Claims when liquidated. Any D&O Proceedings Final Order obtained by such holders of Securities Claims shall be channeled to the D&O Trust.

Distributions from the Settlement Fund shall be made in the amounts, at the times and in the manner provided for in the Class Action Settlement Documents, which shall also govern requirements for qualifying for distributions, the manner and time of the giving of notices, the forms of the documents to be filed by holders of Securities Claims and all other matters concerning the Class Action and its settlement other than as specifically provided for in the Plan. Neither the Debtor nor Reorganized Debtor shall have any responsibility with respect to the Class Action Settlement Documents or the disposition of the Settlement Fund after Final Approval, other than to cooperate in certain respects in the gathering of certain information with respect thereto and coordinating with the carriers of the D&O Policies regarding payment.

The defendants in the Class Action have the option, in their sole discretion, to terminate the Stipulation of Settlement if the amount of the securities as to which an Opt-Out Election is properly exercised exceeds five percent (5%) of such securities, or an amount otherwise agreed to by the defendants in the Class Action.

If the option to terminate the Stipulation of Settlement is not exercised, each holder of a Class 14 Claim will, pursuant to the Class Action Settlement Documents, release all Securities Claims such holder may have against the D&O Protected Parties and the other defendants in the Class Action. Class 14 Claims are unimpaired, and therefore, shall not be entitled to vote to accept or reject this Plan.

### 4.15    CLASS 15 – OPT-OUT SECURITIES CLAIMS

(a)    Impairment and Voting. Class 15 is impaired under this Plan and the holders thereof are entitled to no Distributions under this Plan. Class 15 is deemed to have rejected this Plan, and therefore, shall not be entitled to vote to accept or reject this Plan.

(b)    Distributions. On the Effective Date, all holders of Opt-Out Securities Claims upon receipt of a D&O Proceeding Final Order shall be channeled to the D&O Trust and shall receive the same treatment as **holders of** Class ~~12.~~**12 Claims.** Holders of Class 15 Claims shall not be entitled to receive or retain any property or interest in property under this Plan.

(c)    In order to preserve any Securities Claim it may have against the Debtor, each holder of an Opt-Out Securities Claim must execute an Opt-Out Form.  Submission of an Opt-Out Form that does not indicate to the contrary, will be deemed to be an election to preserve such Claim in the District Court sitting in bankruptcy and seek a D&O Proceedings Final Order from the District Court.

## ARTICLE 5

## MEANS OF IMPLEMENTATION AND EFFECT OF CONFIRMATION OF PLAN

5.1    Plan Funding.  The funds utilized to make ~~Cc~~ash payments under this Plan have been and/or will be generated from, among other things, the operation of the Debtor's businesses, the sale of certain subsidiary assets and distribution of the proceeds to the Debtor, and cash on hand on the Effective Date. In addition, the Debtor ~~anticipates~~may enteri~~ng~~ into a new ~~$75 million working capital~~revolving credit facility to be effective upon the Debtor's exit from Chapter 11.

The D&O Trust shall be funded by the balance of the remaining proceeds in the D&O Policies after contributions to the Settlement Fund as described above.  The Debtor estimates the remaining proceeds to be approximately $13 million~~, after funding the Settlement Fund and payment of Defense Costs reimbursable pursuant to the Defense Cost Motion~~.  In the event the D&O Trust ~~Assets~~Funds are exhausted ~~and directors and officers of the Debtor as of the Petition Date have outstanding and unpaid Defense Cost Claims~~, the Reorganized Debtor shall ~~pay such claims~~contribute up to ~~and not to exceed $5 million when such claims are determined to be reasonable by the Trustee under the D&O Trust~~$5 million for defense costs until the SEC Investigation has concluded.

5.2    CSFB Facility and Secured Bonds.  Claims and interests granted by the CSFB Facility ~~and~~ ~~Secured Bonds~~ will ~~be Reinstated~~continue on the Effective Date pursuant to the CSFB Order and the CSFB Financing Documents and will be an obligation of the Reorganized Debtor.  The Secured Bonds will be Reinstated on the Effective Date and will be an obligation of the Reorganized Debtor.

5.3    Reorganized Debtor Charter.  On the Effective Date, the Reorganized Debtor Charter and by-laws will become effective.  The Reorganized Debtor Charter, together with the provisions of this Plan, shall, as applicable, provide for, among other things, the incorporation of Reorganized Debtor as a "C" corporation and the authorization of the New Common Stock, and such other provisions as are necessary to facilitate consummation of this Plan, including a provision prohibiting the issuance of non-voting equity securities in

accordance with Section 1123(a)(6) of the Bankruptcy Code, all without any further action by the stockholders or directors of the Debtor or Reorganized Debtor. The issuance of New Common Stock is hereby authorized without the need for any further corporate action or action by the New Board or stockholders of Reorganized Debtor.

5.4   New Common Stock. On the Effective Date, Reorganized Debtor shall: (i) have authorized capital of 200,000,000 shares of New Common Stock and 50,000,000 shares of "blank check" preferred stock; and (ii) issue, in accordance with the terms of this Plan, 35,500,000 shares of New Common Stock. All shares of New Common Stock to be issued pursuant to this Plan shall be, upon issuance, fully paid and non-assessable, and shall be subject to dilution as of the Effective Date only as may be expressly set forth in this Plan or in, the Plan Documents, and after the Effective Date as may otherwise be allowed pursuant to or the Reorganized Debtor Charter and. After the Effective Date, the holders thereof shall have no preemptive or other rights to subscribe for additional shares except as may otherwise be allowed pursuant to the Reorganized Debtor Charter.

5.5   Cancellation and Surrender of Existing Securities Agreements

(a)   Except as may otherwise be provided in this Plan, on the date Distributions are made, (i) the promissory notes, share certificates, bonds and other instruments evidencing any Claim or Equity Interest, to the extent not already cancelled shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule; and (ii) the obligations of the Debtor under the certificate of incorporation, agreements, indentures and certificates of designations governing such Claims and Equity Interests, as the case may be, shall be discharged and released.; provided, however, that any such indenture or other agreement that governs the rights of the holder of a Claim based on an existing promissory note, bond and other instrument that is administered by an Indenture Trustee, agent or servicer shall continue in effect solely for the purposes of allowing such Indenture Trustee, agent, or servicer to make the distributions to be made on account of such Claims under the Plan, as provided hereunder, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 hereof. Notwithstanding the foregoing, the documents and instruments evidencing Claims that are Reinstated and rendered unimpaired pursuant to Article 4 hereof, including without limitation the South Dakota Pollution Control Bond Obligations and the Montana Pollution Control Bond Obligations, shall not be deemed cancelled.

**(b)** Except as otherwise provided herein or agreed by Reorganized Debtor, each holder of a promissory note, share, certificate, bond or other instrument evidencing a Claim or Equity Interest, shall surrender such promissory note, share certificate, bond or instrument to Reorganized Debtor (or the Disbursing Agent), **or, with respect to indebtedness that is governed by the Unsecured Note Indentures or the Unsecured Subordinated Note Indentures, the respective indenture trustee, agent or servicer, as the case may be. Notwithstanding the foregoing, each holder of a promissory note, share certificate, bond or other instrument evidencing those Claims that are Reinstated and rendered unimpaired pursuant to Article 4 hereof, including without limitation the South Dakota Pollution Control Bond Obligations and the Montana Pollution Control Bond Obligations, shall not be required to surrender such promissory note, share certificate, bond or instrument to Reorganized Debtor (or the Disbursing Agent).**

**(c)** ~~(b)~~ ~~Except as otherwise provided herein or agreed by Reorganized Debtor, each holder of a promissory note, share certificate, bond or other instrument evidencing a Claim or Equity Interest, shall surrender such promissory note, share certificate, bond or instrument to Reorganized Debtor (or the Disbursing Agent).~~ No Distribution of property hereunder shall be made to or on behalf of any such holders unless and until such promissory note, share certificate, bond or instrument is received by Reorganized Debtor (or the Disbursing Agent)**, or the respective Indenture Trustee, agent or servicer, as the case may be**, or the unavailability of such promissory note, share certificate, bond or instrument is established to the reasonable satisfaction of Reorganized Debtor (or the Disbursing Agent), or such requirement is waived by Reorganized Debtor. Reorganized Debtor may require any holder that is unable to surrender or cause to be surrendered any such promissory notes, share certificates, bonds or instruments to deliver an affidavit of loss and indemnity reasonably satisfactory to Reorganized Debtor. Any holder that fails within the later of one year after the Effective Date and the date of Allowance of its Claim or Equity Interest: (i) to surrender or cause to be surrendered such promissory note, share certificate, bond or instrument; and (ii) if requested, to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to Reorganized Debtor (or the Disbursing Agent), shall be deemed to have forfeited all rights, Claims and Causes of Action against the Debtor and Reorganized Debtor and shall not participate in any Distribution hereunder.

5.6     Continuation of Bankruptcy Injunction or Stays.

(a)     All injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

(b)    Each of the injunctions relating to the D&O Proceedings and the D&O Trust as set forth in this Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by this Plan.  Notwithstanding anything to the contrary contained in this Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

(c)    In the event that the D&O Trust determines that an Injunction Default may have occurred, the D&O Trust shall be entitled, by motion or adversary proceeding, in its sole discretion, to seek a determination by the Bankruptcy Court that an Injunction Default has occurred, and the D&O Trust Channeling Injunction shall be of no further force and effect with respect to the Released Parties.

**(d)    Any and all injunctions contemplated by the Plan shall be limited to the extent necessary to permit the Debtor and/or the TA Debtors, or any trustee, agent or committee of creditors acting on behalf of or in the place of the Debtor and/or the TA Debtors, to commence and litigate any and all Claims or Causes of Action with respect to the alleged ownership interests in the Montana Power Company Policies.**

**5.7**    Revesting of Assets.  Except as otherwise provided by this Plan, upon the Effective Date, title to all properties and assets of the Debtor ~~dealt with by this Plan~~ shall pass from the Debtor to Reorganized Debtor free and clear of all Claims, Liens, encumbrances and interests of creditors and ~~of equity security holders~~ (except those Claims, Liens, encumbrances and interests created or permitted to continue to be retained pursuant to this Plan) and the Confirmation Order shall be a judicial determination of discharge and extinguishment of all Claims, Liens or Equity Interests (except those created or permitted to continue to be retained pursuant to this Plan).  All pre-Effective Date **Claims,** liabilities **and obligations** of the Debtor are treated and/or discharged in accordance with the terms of this Plan and**, except as otherwise set forth herein,** shall not in any manner be (or be deemed to be) transferred or assumed by Reorganized Debtor.  On the Effective Date, or as soon thereafter as practicable, the Disbursing Agent shall make all Distributions required under this Plan in satisfaction of Allowed Claims against the Debtor including, but not limited to, the following: (i) the consideration described in Section 4.1(b) of this Plan to the holders of Allowed Priority Claims in full and final satisfaction of such Priority Claims; (ii) the consideration described in Section 4.2(b) of this Plan to the holders of Allowed Unsecured Priority Claims in full and final satisfaction of such Unsecured Priority Claims; (iii) the consideration described in Section 4.3(b) of this Plan to the holders of Allowed Bank One DIP Financing Claims in full and final satisfaction of such Bank One DIP Financing Claims; (iv) the consideration described in Section 4.7(c) of this Plan to the holders of Allowed Unsecured Note Claims in full and final satisfaction of such Unsecured Note Claims; (v) the consideration described in Section 4.8(c) of this Plan to the holders of

Allowed Unsecured Subordinated Note Claims in full and final satisfaction of such Unsecured Subordinated Note Claims; (vi) the consideration described in Section 4.9(c) of this Plan to the holders of the Allowed General Unsecured Claims in full and final satisfaction of such General Unsecured Claims; and (vii) the consideration described in Section 4.10(b) of this Plan to the holders of the Allowed Unsecured Convenience Claims, in full and final satisfaction of such Unsecured Convenience Claims.

**Nothing in the Plan or Confirmation Order releases or nullifies any liability to a governmental entity under police and regulatory statutes and regulations that any entity would be subject to as the owner or operator of property after the Effective Date. Nothing in the Plan or Confirmation Order shall release, discharge, or preclude any Claim that arises after the Effective Date that the United States Environmental Protection Agency or any state environmental agency may have against the Debtor or any remedies of the United States Environmental Protection Agency or state environmental agencies that are not within the definition of Claim as set forth in Section 101(5) of the Bankruptcy Code.**

**5.7** ~~5.8~~ Revesting of Railroad ~~Licenses~~**Permits** in Reorganized Debtor's Name.

On November 15, 2002, the Debtor acquired certain utility operating assets previously held by the Montana Power Company from Northwestern Energy, LLC, including certain railroad permits. Consistent with the terms of the underlying transaction, the Debtor obtained blanket assignments of permits for a fee of $1,000 from Union Pacific Railroad. On the Effective Date, or as soon thereafter as practicable, the Disbursing Agent shall pay $1,000 to Burlington Northern Santa Fe Railroad Company, Montana Rail Link, Inc., Montana Western Railway Company, and Rarus Railway Company and the Reorganized Debtor shall receive blanket assignment of all permits currently held in the name of Montana Power Company or NorthWestern Energy, LLC.

**5.8** ~~5.9~~ General Release of Liens. Except as otherwise provided in this Plan, or in any contract, instrument, indenture or other agreement or document created in connection with this Plan or the implementation thereof, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against property of the Estate are hereby released and extinguished, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests will revert to Reorganized Debtor as applicable, and the successors and assigns thereof.

**5.9** ~~5.10~~ Full and Final Satisfaction. All payments and all Distributions hereunder shall be in full and final satisfaction, settlement, release and discharge of all Claims and Equity Interests, except as otherwise provided in this Plan.

**5.10**   ~~5.11~~ Waiver of Avoidance Actions.  ~~As of and subject to the occurrence~~ **The Debtor shall provide notice of any Avoidance Actions 30 days prior to the voting deadline and shall initiate them within 180 days** of the Effective Date**.  After such date**, the Debtor and Reorganized Debtor, for and on behalf of themselves and their Estate, hereby waive and release any Avoidance Actions; provided, however, that the foregoing waiver and release shall not apply to any such ~~C~~**c**auses of Action that are pending on ~~the Effective Date~~**such date**.

**5.11**   ~~5.12~~ Termination of Subordination Rights.  Except as otherwise provided in this Plan, the classification and manner of satisfying all Claims and Equity Interests under this Plan take into consideration all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, Sections 510(b) and (c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Equity Interest may have against other Claim or Equity Interest holders with respect to any Distribution made pursuant to this Plan.  On the Effective Date, all contractual, legal or equitable subordination rights that a holder of a Claim or Equity Interest may have with respect to any Distribution to be made pursuant to this Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined and Distributions pursuant to this Plan shall not be subject to payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by any beneficiary of such terminated subordination rights.

**5.12**   ~~5.13~~ No Successor Liability; No Liability for Certain Released Claims.

(a)     Except as otherwise expressly provided in this Plan, with respect to the Debtor, Reorganized Debtor and the D&O Trust, the Debtor, Reorganized Debtor, the other Released Parties, and the D&O Trust do not, pursuant to this Plan, assume, agree to perform, pay, or indemnify creditors for any **Claims,** liabilities or obligations of the Debtor relating to or arising out of the operations of or assets of the Debtor whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to**,** the Confirmation Date. Neither the Released Parties, Reorganized Debtor, nor the D&O Trust is, or shall be, a successor to the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that Reorganized Debtor and the D&O Trust shall assume the obligations specified in this Plan and the Confirmation Order.

(b)     Except as otherwise expressly provided in this Plan, effective automatically on the Effective Date, the Released Parties, their respective representatives and the Additional Indemnitees shall ~~unconditionally and irrevocably be fully~~**not be** released from any and all Claims and Causes of

Action arising under Section 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or similar Claims **or Causes of Action** arising under state or any other law, including, if applicable, Claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type Claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor (or any of its predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

**5.13**    ~~5.14~~ Administration Pending Effective Date.  Prior to the Effective Date, the Debtor shall continue to operate its businesses as a debtor-in-possession, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.  After the Effective Date, Reorganized Debtor may operate its businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article 13 hereof.

**5.14**    ~~5.15~~ Setoffs.    Nothing contained in this Plan shall constitute a waiver or release by the Debtor of any rights of setoff a Debtor may have against any Person unless otherwise agreed in writing by the Debtor prior to the Effective Date or Reorganized Debtor after the Effective Date.

**5.15**    ~~5.16~~ Post-Confirmation Fees, Final Decree.  Reorganized Debtor shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. § 1930(a)(6) and the filing of post-confirmation reports, until a final decree is entered.  A final decree shall be entered as soon as practicable after distributions have commenced under this Plan.

**5.16**    ~~5.17~~ Section 1145 Exemption.  The issuance of the New Common Stock and other securities that may be deemed to be issued pursuant to this Plan shall be exempt from registration requirements in accordance with Section 1145 of the Bankruptcy Code.

**5.17**    ~~5.18~~ Indenture Trustees Charging Lien.  On the Effective Date, **upon an Indenture Trustee's compliance with Section 503(b) of the Bankruptcy Code,** Reorganized Debtor will pay the ~~reasonable fees, costs, and expenses of the Unsecured Notes Trustee and~~ the Unsecured Subordinated Notes ~~Trustee~~**Indenture Trustee's Fees and Expenses** in full and in Cash, in an amount to be agreed upon among the Debtor and ~~the Unsecured Notes Trustee or the Unsecured Subordinated Note Trustee, as applicable, or in~~**each of the Indenture Trustees.  In** the event that the parties cannot reach agreement on the amount thereof, ~~such~~**any disputed** amount shall be determined by the Bankruptcy Court**, pursuant to a motion filed with the Court, and in accordance with the reasonableness standard set forth in the applicable Indenture.  The Indenture Trustees shall not be required to file an application with the Bankruptcy Court pursuant to the requirements of Section 503(b)(3) and (4)**

**of the Bankruptcy Code for payment of Indenture Trustee Fees and Expenses**.  Upon receipt of ~~such~~ payment **by any Indenture Trustee of all Indenture Trustees' Fees and Expenses owed to such Indenture Trustee**, any Indenture Trustee Charging Lien **under the applicable Indenture** shall automatically be deemed released.  Such payment**s** shall be in full and final satisfaction of all pre- and post-petition Claims of the ~~Unsecured Notes Trustee and the Unsecured Subordinated Note Trustee.~~    Distributions**Indenture Trustees.  Subject to Reorganized Debtor's obligations under this Section, distributions** to holders of Unsecured Notes or Unsecured Subordinated Notes pursuant to this Plan will not be reduced on account of payments made to the ~~Unsecured Notes Trustee or the Unsecured Subordinated Note Trustee~~**Indenture Trustees**, as applicable, ~~for fees and expenses secured by any~~**on account of the** Indenture Trustee Charging Liens.

**Notwithstanding anything to the contrary herein, Reorganized Debtor shall pay in the ordinary course of the Reorganized Debtor's business the reasonable fees and expenses of the Indenture Trustees incurred after the Effective Date in connection with the** Distributions **to holders of the Unsecured Notes or** the Unsecured Subordinated Notes **under this Plan.**

## ARTICLE 6

## IMPLEMENTATION OF THE D&O TRUST

6.1    <u>Creation of the D&O Trust</u>.  On the Effective Date, the D&O Trust shall be created in accordance with this Plan and the D&O Trust Documents.  The D&O Trust shall be a "qualified settlement fund" within the meaning of Section 468E of the Internal Revenue Code and the regulations issued thereunder.  The purpose of the D&O Trust is to assume liability for any D&O Trust Claims that arise out of the D&O Proceedings and to use the D&O Trust Assets to pay such D&O Trust Claims and the Defense Costs in accordance with the D&O Trust Agreement and the TDP, and in such a way that all holders of D&O Trust Claims that involve similar Claims are treated in substantially the same manner.  On the Effective Date, all right, title and interest in and to the D&O Trust Assets and any proceeds or Causes of Action thereunder shall be transferred to and vested in the D&O Trust, free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Person without any further action of any Person.

6.2    <u>Appointment of the Trustee</u>.  Prior to or at the Effective Date, the Debtor shall nominate the Trustee of the D&O Trust, who shall be a resident of the State of Delaware (if a natural person) or which (in all other cases) have a principal place of business in Delaware.  The Bankruptcy Court, after notice and opportunity for hearing, shall appoint the initial Trustee to serve as

Trustee of the D&O Trust in accordance with the D&O Trust Agreement, effective as of the Effective Date.

6.3    Appointment of Trust Advisory Committee Members. Prior to or at the hearing with respect to the confirmation of this Plan, the Debtor, the Committee and the holders of D&O Trust Claims shall nominate three (3) members to the TAC.  On the Confirmation Date, effective as of the Effective Date, the Bankruptcy Court shall appoint the initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the D&O Trust Agreement.

6.4    Insurance Assignment.  On the Effective Date, Debtor and each of the D&O Insurance Entities shall execute and deliver the Insurance Assignment Agreement and such agreement shall thereupon be the valid, binding and enforceable obligation of each party thereto in accordance with the terms thereof.  Within six (6) months of the Effective Date, at the direction and request of the D&O Trust, a D&O Insurance Entity or Reorganized Debtor, as applicable, shall pursue any D&O Insurance Rights for the benefit of and to the fullest extent required by the D&O Trust, by negotiation or, if necessary, by the initiation of all appropriate and necessary legal action, to secure such D&O Insurance Rights and shall take such other action as the D&O Trust may request, including but not limited to granting **to D&O Trust** a security interest in the D&O Insurance Rights and commencing a declaratory judgment action to ascertain whether assignment of those D&O Insurance Rights constitutes a breach thereof.  A D&O Insurance Entity or the **Reorganized** Debtor, as applicable, shall immediately transfer any amounts recovered under or on account of any of the D&O Insurance Rights to the D&O Trust; provided, however, that while any such amounts are held by or under the control of a D&O Insurance Entity, such amounts shall be held in trust for the benefit of the D&O Trust.

6.5    Transfer of Claims and Demands to the D&O Trust.  On the Effective Date, all liabilities, obligations, and responsibilities relating to all D&O Trust Claims shall be transferred to the D&O Trust.

6.6    Discharge of Liabilities to Holders of D&O Trust Claims. Except as provided in the Plan Documents and the Confirmation Order, the transfer to, vesting in, and assumption by the D&O Trust of the D&O Trust Assets and the D&O Insurance Assignment as contemplated by this Plan, the D&O Protected Parties Settlement Agreement, and the Insurance Assignment Agreement, among other things, on the Effective Date shall (a) discharge**, release and extinguish all obligations and liabilities of** the Debtor and Reorganized Debtor for and in respect of all D&O Trust Claims, and (b) discharge, release and extinguish all obligations and liabilities of the Released Parties for and in respect of all D&O Trust Claims.  On the Effective Date, the D&O Trust shall assume

liability for any D&O Trust Claims that arise out of the D&O Proceedings and shall pay the D&O Trust Claims and Defense Costs in accordance with the TDP.

6.7    Institution and Maintenance of Legal and Other Proceedings.  As of the Effective Date, the D&O Trust shall be empowered to initiate, prosecute, defend, and resolve all ~~legal actions and other proceedings~~**Causes of Action** related to any asset, liability, or responsibility of the D&O Trust.  The D&O Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all ~~actions~~**Causes of Action** arising from or related to the D&O Insurance Rights. The D&O Insurance Entities shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all ~~actions~~**Causes of Action** arising from or related to their respective insurance rights to the extent permitted or required by the Insurance Assignment Agreement.

6.8    Indemnification by the D&O Trust.  As and to the extent provided in the D&O Trust Agreement, the D&O Trust will indemnify and hold harmless each of: (a) the Debtor and Reorganized Debtor and their respective Subsidiaries and their respective past, present and future representatives, in their capacities as such, and (b) the Released Parties.

6.9    D&O Insurance Entity Injunction.

(a)    Purpose and Provisions.  To protect the D&O Trust and preserve its assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under Section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue the D&O Insurance Entity Injunction, as described in Section 10.5(c) of this Plan; provided, however, that: (i) the D&O Trust shall have the sole and exclusive authority at any time to terminate or reduce or limit the scope of, the D&O Insurance Entity Injunction with respect to any D&O Insurance Entity upon express written notice to such D&O Insurance Entity; and (ii) the D&O Insurance Entity Injunction is not issued for the benefit of any D&O Insurance Entity and no D&O Insurance Entity is a third-party beneficiary of the D&O Insurance Entity Injunction.

(b)    Terms.  Subject to the provisions provided in Section 6.9(c) of this Plan, all Persons (not including the D&O Trust and, to the extent permitted or required under Section 6.7 of this Plan or the Insurance Assignment Agreement, Reorganized Debtor and the D&O Insurance Entities) that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, demand or Cause of Action (including any D&O Trust Claim or any Claim or demand for or respecting any Trust Expenses), against any D&O Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Claim, demand, D&O Insurance Rights, D&O Policies, or Release Parties Settlement Agreement whenever and wherever arisen or asserted (including all

Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction or recovery with respect to any such Claim, demand, or Cause of Action, including:

       (i)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such Claim, demand, or **eC**ause of **aA**ction against any D&O Insurance Entity or against the property of any D&O Insurance Entity, with respect to any such Claim, demand or Cause of Action;

       (ii)    enforcing, levying, attaching, collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any D&O Insurance Entity, or against the property of any D&O Insurance Entity, with respect to any such Claim, demand, or Cause of Action;

       (iii)    creating, perfecting, or enforcing in any manner, directly or indirectly any Lien against any D&O Insurance Entity, or the property of any D&O Insurance Entity, with respect to any such Claim, demand, or Cause of Action;

       (iv)    except as otherwise specifically provided in this Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, **or** contribution~~, or recoupment~~ of any kind, directly or indirectly, against any obligation due any D&O Insurance Entity or against the property of any D&O Insurance Entity, with respect to any such Claim, demand, or Cause of Action; and

       (v)    taking any act in any manner in any place whatsoever that does not conform to, or comply with, the provisions of th~~is~~**e** Plan Documents relating to such Claim, demand, or Cause of Action,

provided, however, that (x) the D&O Trust shall have the sole and exclusive authority at any time to terminate, or reduce, or limit the scope of, the D&O Insurance Entity Injunction with respect to any D&O Insurance Entity upon express written notice to such D&O Insurance Entity and (y) the D&O Insurance Entity Injunction is not issued for the benefit of any D&O Insurance Entity and no D&O Insurance Entity is a third-party beneficiary of the D&O Insurance Entity Injunction.

       (c)    <u>Reservations</u>.  Notwithstanding anything to the contrary above, this D&O Insurance Entity Injunction shall not enjoin:

(i)     the rights of Persons to the treatment accorded them under this Plan, including the rights of Persons with D&O Trust Claims or Defense Costs to assert such D&O Trust Claims or Defense Costs against the D&O Trust in accordance with the TDP;

(ii)     the rights of Persons to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the D&O Trust;

(iii)     the rights of the D&O Trust to prosecute any action based on or arising from the D&O Insurance Rights.;

(iv)     the rights of Reorganized Debtor and the D&O Insurance Entities for the benefit of the D&O Trust (but only to the extent permitted or required under Section 6.7 of this Plan or the Insurance Assignment Agreement) to prosecute any action based on or arising from D&O Insurance Rights;

(v)     the rights of the D&O Trust to assert any Claim, debt, obligation, or liability for payment against a D&O Insurance Entity based on or arising from the D&O Insurance Rights;

(vi)     the rights of Reorganized Debtor and the D&O Insurance Entities for the benefit of the D&O Trust (but only to the extent permitted or required under Section 6.7 of this Plan or the Insurance Assignment Agreement) to assert any Claim, debt, obligation, or liability for payment against such D&O Insurance Entity based on or arising from the D&O Insurance Right; and

(vii)     the rights of Reorganized Debtor and the D&O Insurance Entities for the benefit of the D&O Trust (but only to the extent permitted or, required under Section 6.7 of this Plan or the Insurance Assignment Agreement) to assign a Cause of Action against any D&O Insurance Entity to a holder of a D&O Trust Claim or Defense Costs and for such Claimant to assert any Claim, debt obligation, or liability for payment against such D&O Insurance Entity.

6.10     The D&O Trust Channeling Injunction. Pursuant to and in connection with the Confirmation Order, the Bankruptcy Court shall enter or affirm the D&O Trust Channeling Injunction.

## ARTICLE 7

## VOTING AND DISTRIBUTIONS; AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND EQUITY INTERESTS

7.1    Voting of Claims.  Each holder of an Allowed Claim in an impaired Class which is entitled to retain or receive property under this Plan shall be entitled to vote separately to accept or reject this Plan and indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject this Plan, or any other order or orders of the Bankruptcy Court.

7.2    Nonconsensual Confirmation.  If any impaired Class entitled to vote shall not accept this Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected this Plan, the Debtor reserves the right (a) to undertake to have the Bankruptcy Court confirm this Plan under Section 1129(b) of the Bankruptcy Code and (b) to amend this Plan in accordance with Section 13.3 of this Plan to the extent necessary to obtain entry of the Confirmation Order.

7.3    Method of Distributions Under this Plan

(a)    In General.  Subject to Bankruptcy Rule 9010, all Distributions under this Plan, other than **on account of** D&O Trust **Claims and South Dakota Pollution Control Bond Obligation** Claims, shall be made by Reorganized Debtor (or the Disbursing Agent) to the holder of each Allowed Claim at the address of such holder as listed in the Debtor's books and records or on the Schedules as of the Confirmation Date, unless the Debtor or Reorganized Debtor have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address, if any, for such holder different from the address reflected in the Debtor's books and records or on the Schedules; provided that all Distributions to the DIP Lenders under Section 4.3(b) of this Plan shall be made by Reorganized Debtor (or the Disbursing Agent) to Bank One, N.A., as agent, or any successor agent thereto, for disbursement to the DIP Lenders.  With respect to D&O Trust Claims, Distributions to holders of D&O Trust Claims shall be made in accordance with the terms of the D&O Trust Documents**.  With respect to South Dakota Pollution Control Bond Obligation Claims, Distributions to holders of South Dakota Pollution Control Bond Obligation Claims shall be made to the respective indenture trustees.  Each indenture trustee shall, in turn, administer the distribution to the holders of the debt issues under the applicable indenture in accordance with the terms of such indenture.  The reasonable fees and expenses of each indenture trustee incurred on or after the Effective Date in connection with the Distributions described herein, including the reasonable fees and expenses of the indenture trustee's professionals and agents, shall be paid by the Reorganized Debtor without further application to or order of the Bankruptcy Courtt**.

(b)     <u>Distributions of Cash</u>.  Any payment of Cash made by Reorganized Debtor (or the Disbursing Agent) or the D&O Trust pursuant to this Plan shall be made by check drawn on a domestic bank or by wire transfer; provided that all Distributions of Cash to the DIP Lenders shall be made by Reorganized Debtor (or the Disbursing Agent) to Bank One, N.A., as agent, or any successor DIP Agent under the DIP Loan Agreement, by wire transfer of immediately available funds for disbursement to the DIP Lenders.

(c)     <u>Timing of Distributions</u>.  Any payment or Distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)     <u>Fractional Dollars</u>.  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollars (rounding down in the case of $0.50 or less and rounding up in the case of more than $0.50).

(e)     <u>Fractional Shares</u>.  No fractional shares of New Common Stock shall be distributed under this Plan.  When any Distribution on account of an Allowed Claim pursuant to this Plan would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, such fractional interests shall be ~~rounded up or down to the nearest whole number (rounding down in the case of 0.50 or less and rounding up in the case of more than 0.50)~~ **combined into as many whole shares as possible and shall be redistributed to holders of Allowed Claims with fractional interests, in descending order, until all such whole shares are distributed**.

(f)     <u>Distributions to Holders as of the Confirmation Date</u>.  As of the close of business on the Confirmation Date, the claims register **(for Claims) and the transfer ledgers (for Secured Notes and Unsecured Notes)** shall be closed, and there shall be no further changes in the record holders of any Claims **or Equity Interests**.  The Debtor and Reorganized Debtor shall have no obligation to recognize any transfer of any Claims **or Equity Interests** occurring after the close of business on the Confirmation Date, and shall instead be entitled to recognize and deal for all purposes under this Plan (except as to voting to accept or reject this Plan pursuant to Section 7.1 of this Plan) with only those holders of record as of the close of business on the Confirmation Date.

7.4     <u>Objections to and Resolution of Administrative Claims, Claims and Equity Interests</u>.  Except as to applications for allowance of compensation and reimbursement of expenses under Sections 330 and 503 of the Bankruptcy Code (with respect to which procedures respecting objections shall be governed by Section 2.2(b) of this Plan and the Confirmation Order or other Final Order), any party in interest may file objections to the allowance of any Administrative Claims, Claims and Equity Interests subsequent to the

Confirmation Date.  All objections shall be litigated to Final Order; provided, however, that Reorganized Debtor shall have the exclusive authority to compromise, settle, otherwise resolve or withdraw any objections filed by Reorganized Debtor.  **If any joinder is made with respect to an objection, and the objection is subsequently withdrawn, the joinder shall be deemed withdrawn as well.**  Unless otherwise ordered by the Bankruptcy Court, all objections to the allowance of Administrative Claims, Claims or Equity Interests that are the subject of proofs of claim or requests for payment filed with the Bankruptcy Court (other than applications for allowances of compensation and reimbursement of expenses), shall be filed and served upon the holder of the Administrative Claim, Claim or Equity Interest as to which the objection is made as soon as is practicable, but in no event later than ninety (90) days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

7.5     Establishment and Maintenance of Reserve for Disputed Claims.  Reorganized Debtor shall maintain the Disputed Claims Reserve equal to the aggregate of any distributable amounts of Cash and New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order.  For the purposes of effectuating the provisions of this Section and the Distributions to holders of Allowed Claims, the Debtor may, at any time and regardless of whether an objection to the Disputed Claim has been brought, request that the Bankruptcy Court estimate, set, fix or liquidate the amount of Disputed Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so estimated, fixed or liquidated shall be deemed the Allowed amounts of such Claims for purposes of distribution under this Plan.  In lieu of estimating, fixing or liquidating the amount of any Disputed Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed Claim (singularly or in the aggregate), or such amount may be fixed by an agreement in writing by and between the Debtor and the holder of a Disputed Claim.

7.6     Distributions Upon Allowance of Disputed Claims.  The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive Distributions from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.  Such Distributions shall be made in accordance with this Plan based upon the Distributions that would have been made to such holder under this Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus any interest, dividends or other Distributions earned thereon.  No holder of a Disputed Claim shall have any Claim against the Disputed Claims Reserve or Reorganized Debtor with respect to such Claim until such Disputed Claim shall become an Allowed Claim, and no

holder of a Disputed Claim shall have any right to interest, dividends or other Distribution on such Disputed Claim except as provided in this Section.

       7.7    <u>Surplus Distribution</u>.  The following assets shall constitute Surplus Distributions:  (i) Unclaimed Property; and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, any excess of the amount of Cash or New Common Stock in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash or New Common Stock actually distributed on account of such Disputed Claim plus any interest, dividends or other Distributions earned thereon.  On each Subsequent Distribution Date, the holders of Allowed Claims shall receive a Pro Rata Share in the Surplus Distributions attributable to such holders' Class; <u>provided</u>, <u>however</u> that Reorganized Debtor shall not be under any obligation to make Surplus Distributions on a Subsequent Distribution Date unless the aggregate market value of the Surplus Distributions (which value shall be determined based on the intrinsic value as of the Effective Date) to be distributed on such Subsequent Distribution Date exceeds $50,000 in any Class; <u>provided</u>, <u>further</u> that if the Final Distribution required under this Plan is less than $25,000 in aggregate market value in any Class such Surplus Distributions shall revest in Reorganized Debtor.

       7.8    <u>Distributions Relating to Allowed Insured Claims</u>. Distributions under this Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under this Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law.   Nothing contained in this Section shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Person may hold against any other Person, including, without limitation, insurers under any policies of insurance.

       **7.9    Plan Committee.  On or before the Effective Date, the Committee shall appoint members of the Plan Committee from the existing Committee members for the purpose of overseeing the remaining Claims reconciliation and settlement process.  Notwithstanding any other provision in this Plan, after the Effective Date, both the Debtor and Reorganized Debtor shall settle and compromise Claims according to the following procedures:  (i) if the resulting settlement provides for an Allowed Claim in an amount less than or equal to $100,000, Reorganized Debtor may settle the claim and execute necessary documents, including a stipulation of settlement or release, in its sole discretion and without notice to any party; and (ii) if the resulting settlement provides for an Allowed Claim in an amount greater than $100,001, Reorganized Debtor may settle the claim and execute necessary documents, including a stipulation of settlement or release, with**

**notice to the Plan Committee; provided, however, that the Plan Committee shall have ten (10) Business Days from receipt of such notice to review the proposed settlement and to object to such settlement.  In the event of any objection by the Plan Committee, such objection shall be resolved by the Bankruptcy Court.  The Plan Committee may make application to the Bankruptcy Court for the reimbursement of any legal fees and reasonable out-of-pocket expenses (e.g., telephone, fax, post, travel), if any, incurred by the Plan Committee or its members in furtherance of their obligations hereunder.  The Plan Committee shall act in accordance with the Plan Committee By-Laws.**

<div align="center">

**ARTICLE 8**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
INDEMNIFICATION CLAIMS; AND RETIREE BENEFITS**

</div>

8.1     <u>Executory Contracts and Unexpired Leases</u>.

(a)     Subject to Section 8.1(b) of this Plan, **and excluding the Milltown Settlement and Milltown Stipulation,** any unexpired lease or executory contract that has not been expressly rejected by the Debtor or treated in this Plan with the Bankruptcy Court's approval on or prior to the Confirmation Date shall, as of the Effective Date, be deemed to have been assumed by the Debtor unless there is pending before the Bankruptcy Court on the Effective Date a motion to reject such unexpired lease or executory contract (including, but not limited to any collective bargaining agreements) or such executory contract or unexpired lease is otherwise designated for rejection (including, but not limited to any collective bargaining agreements), <u>provided</u>**,** that~~:~~ (i) such lease or executory contract is ultimately rejected; (ii) the filing of the Confirmation Order shall be deemed to be a rejection of all then outstanding unexercised stock options, warrants and similar rights; and (iii) in accordance with Section 1123(a)(5)(G) of the Bankruptcy Code, on the Effective Date~~, or as soon as practicable thereafter~~ **or within ninety (90) days of the Effective Date, or such other time as may be agreed to by the Reorganized Debtor and the claimant**, Reorganized Debtor shall cure all defaults under any executory contract or unexpired lease assumed pursuant to this Section 8.1 by making a Cash payment in an amount agreed to between Reorganized Debtor and the claimant, or as otherwise fixed pursuant to a Final Order.

(b)     At least fifteen (15) days prior to the ~~deadline fixed for filing objections to confirmation of this Plan~~**Voting Deadline** (or such later date as the Bankruptcy Court may fix), the Debtor shall file ~~a schedule~~**schedules** setting forth each of its executory contracts and unexpired leases to be assumed and assigned under this Plan **and identifying those contracts and leases to be**

**rejected**, and the Person to which such executory contract or unexpired lease shall be assigned, together with the cure amount(s), if any, to be paid respecting such executory contracts and leases.  Any party who disputes the proposed cure amount must file an objection not later than the date fixed for filing objections to confirmation of this Plan and any dispute respecting such cure amounts will be determined by the Bankruptcy Court at the Confirmation Hearing or on such later date as the Bankruptcy Court may fix.  Notwithstanding the foregoing, the Debtor reserves the right, **until five (5) days** prior to the ~~Effective Date~~**Confirmation Hearing**, to seek to reject any executory contract or unexpired lease included on the ~~foregoing schedule, and the~~**schedule, to assume subject to the other contract party's right to (a) receive notice of the rejection, (b) object to the Debtor's rejection and (c) change its vote on the Debtor's Plan.  The** listing of a contract or lease on the foregoing schedule**s** shall not constitute an admission by the Debtor that such agreement is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

8.2    Claims Deadline for Filing Proofs of Claims Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Plan. Claims arising out of  the rejection of an executory contract or unexpired lease designated for rejection hereunder or pursuant to the Confirmation Order, must be filed with the Bankruptcy Court and served upon the Debtor or Reorganized Debtor by no later than 30 days after the notice of entry of an order approving such rejection or as otherwise may be provided in the Confirmation Order.  Any Claims not filed within such time will be forever barred from assertion against the Debtor, the Estate, Reorganized Debtor and its property, and the holders thereof shall not be entitled to any Distribution under this Plan or otherwise from the Debtor or Reorganized Debtor.  Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims under this Plan.

8.3    Insurance Policies.  Each of the Debtor's insurance policies (except for the proceeds of certain D&O Policies being assigned to the D&O Trust) and any agreements, documents or instruments relating thereto, including, without limitation, any retrospective premium rating plans relating to such policies, are treated as executory contracts under this Plan.  Notwithstanding the foregoing, distributions under this Plan to any holder of a Claim covered by any such insurance policies and related agreements, documents or instruments that are assumed hereunder, shall be in accordance with the treatment provided under Article 4 and Article 6 hereof.  Each of the D&O Policies being assigned to the D&O Trust and any agreements, documents or instruments relating thereto, including, without limitation, any retrospective premium rating plans relating to such policies, are treated as assumed under this Plan.  Nothing contained in this Section 8.3 shall constitute or be deemed a waiver of any Cause of Action that the

Debtor may hold against any Person, including, without limitation, the insurer under any of the Debtor's policies of insurance.

8.4     Indemnification Claims.  Indemnity claims not channeled to the D&O Trust shall be paid: (i) if Allowed on the Effective Date, in full in cash on the Effective Date; and (ii) if not then Allowed, such indemnity claim shall be assumed and paid in the ordinary course when such claim is Allowed.

8.5     Compensation and Benefit Programs.  Except as otherwise provided in this Plan or subsequent motion prior to the Effective Date, all employment plans, practices, programs and policies maintained by the Debtor as of the Effective Date shall remain in full force and effect following the Effective Date, subject to any and all rights of the Debtor under applicable non-bankruptcy law to amend or terminate such plans, practices, programs and policies.

8.6     Retiree Benefits.  Payment of any Retiree Benefits (as such benefits may have been modified during the Chapter 11 Case) shall be continued solely to the extent, and for the duration of the period, the Debtor is contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtor under applicable law (including, without limitation, the Debtor's right to amend or terminate such benefits prior to or after the Effective Date).

**The Debtor has established and maintained two (2) pension plans for its employees, known as the NorthWestern Energy Pension Plan and the NorthWestern Pension Plan (collectively, the "Pension Plans").  The Pension Plans are single employer defined benefit plans covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1301 *et seq*.  The Pension Plans will not be terminated during the Debtor's Chapter 11 Case and the Debtor will continue to sponsor the Pension Plans after emerging from Chapter 11, assuming the Plan is confirmed.**

**[The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government corporation which guarantees the payment of certain pension benefits upon termination of a pension plan, has asserted that the Pension Plans may be underfunded on a termination basis.  The PBGC has filed contingent claims against the Debtor for unfunded benefit liabilities under 29 U.S.C. §§ 1362 and 1368; for unpaid minimum funding contributions under 29 U.S.C. § 1082 and 26 U.S.C. § 412; and for unpaid premiums under 29 U.S.C. § 1307.  The PBGC has asserted that portions of these claims may be entitled to priority.  PBGC's claims are contingent upon termination of the Pension Plans during the Chapter 11 Case.]**

8.7     QF Agreements.  As of the Petition Date, the Debtor was party to approximately fourteen (14) power purchase agreements giving rise to the QF Claims as defined herein.  As of the filing of the Plan, the Debtor has elected not to file a motion to reject any of the QF agreements.  Unless the Debtor files a

motion to reject any of the QF agreements on or before the Confirmation Date, as of the Effective Date, such QF agreements shall be deemed assumed by the Reorganized Debtor.

## ARTICLE 9

## CORPORATE GOVERNANCE, MANAGEMENT AND STRUCTURE OF REORGANIZED DEBTOR

9.1    <u>Management of Reorganized Debtor</u>.  On the Effective Date, the management, control and operation of Reorganized Debtor shall become the general responsibility of the board of directors of Reorganized Debtor (the "<u>New Board</u>"), which shall, thereafter, have responsibility for the management, control and operation of Reorganized Debtor in accordance with applicable law.

9.2    <u>Directors and Officers of Reorganized Debtor</u>.

(a)    <u>Board of Directors of Reorganized Debtor</u>.  As of the Effective Date, the initial ~~members of the~~ New Board of Reorganized Debtor shall consist of seven (7) **members** of which six (6) shall be designated by the Committee and one (1) of which shall be the Chief Executive Officer of the Reorganized Debtor.  The designation of the board members for Reorganized Debtor shall be filed with the Bankruptcy Court on or prior to five (5) business days prior to the commencement date of the Confirmation Hearing, or such other date as the Bankruptcy Court may establish.  On the Effective Date, the authority, power and incumbency of the persons then acting as directors of the Debtor shall be terminated and such directors shall be deemed to have been removed by unanimous vote of stockholders, and the directors of Reorganized Debtor that are selected in accordance with this Section 9.2 shall be deemed to have been elected by unanimous vote of the stockholders and shall have responsibility for the management, control and operations of Reorganized Debtor.

(b)    <u>Officers of Reorganized Debtor</u>.  On the Effective Date, the officers of the Debtor immediately prior to the Effective Date shall serve as the officers of Reorganized Debtor.   After the Effective Date, the officers of Reorganized Debtor shall be determined by the New Board in accordance with Delaware law.

9.3    <u>Corporate Action</u>.  Pursuant to Section 303 of the Delaware General Corporation Law, all terms of this Plan may be put into effect and carried out without further action by the directors or stockholders of the Debtor or Reorganized Debtor, who shall be deemed to have unanimously approved this Plan and all agreements and transactions provided for or contemplated herein, including, without limitation:  (i) the adoption of the Reorganized Debtor Charter and by-laws; (ii) removal of existing directors and the initial selection of directors

and officers of Reorganized Debtor; and (iii) the distribution of Cash and the issuance and distribution of New Common Stock pursuant to this Plan; and (iv) implementation of the New Incentive Plan.

9.4     Reorganized Debtor Corporate Structure.     Reorganized Debtor's regulated energy and utility businesses and assets will be "ring fenced" in that such assets and businesses will be owned by Reorganized Debtor as the parent company.  All of the Debtor's and Reorganized Debtor's non-regulated energy related or other businesses will be held in wholly owned subsidiaries of Reorganized Debtor.  These wholly owned subsidiaries have, and are anticipated to have, no employees of their own, but will be served by Reorganized Debtor's utility employees whose costs will be charged to the non-regulated subsidiaries through intercompany transfer pricing, which pricing mechanisms ~~have heretofore been established with the approval of the SDPUC~~**will be subject to review by the regulatory commissions having jurisdiction over Reorganized Debtor's rates**.  Any debt incurred by the non-regulated subsidiaries' operations will be incurred at the subsidiary level and will be non-recourse to Reorganized Debtor.

**ARTICLE 10**

**EXCULPATION, INJUNCTIONS, AND DISCHARGE**

**10.1     Exculpation.  None of the Debtor, Reorganized Debtor, the DIP Lenders, the Creditors' Committee or any of their respective present or former Affiliates, Officers or Directors, or any of their respective present or former stockholders, members~~, officers (both former and current), directors (both former and current~~ (in their capacity as members only), employees, advisors, attorneys, financial advisors, agents or Professionals in their capacities as such (collectively, the "Exculpated Parties") shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the preparation or formulation of this Plan, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of this Plan or the property to be distributed under this Plan, except for willful misconduct or gross negligence, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan; provided, however, that nothing in this Plan shall, or shall be deemed to, release the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, their respective obligations or covenants arising pursuant to this Plan.**

**10.2     Release of General Released Parties.  As of the Effective Date, in consideration for, and as part of the treatment afforded to the**

holders of Claims and Equity Interests under this Plan, and for other valuable consideration, each of the Debtor, Reorganized Debtor, the DIP Lenders, the Creditors' Committee, and each of their respective Affiliates and their respective parents, subsidiaries, Affiliates, Officers or Directors, or any of their former or present stockholders, members, officers (both former and current), directors (both former and current (in their capacity as members only), employees, advisors, attorneys, financial advisors, accountants, auditors, agents or Professionals in their capacities as such (collectively, the "General Released Parties") shall be deemed forever released and discharged from any and all known and unknown Causes of Action of any nature that any Person (including, without limitation, any holder of Claims and Equity Interests under this Plan) may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the General Released Parties based on any act or omission relating to the Chapter 11 Case on or prior to the Effective Date, excluding gross negligence and willful misconduct; provided, however, that the foregoing release and discharge shall not apply to Causes of Action that arise from obligations or rights created under or in connection with this Plan or any agreement provided for or contemplated in this Plan.

10.3    **Mutual Releases by General Released Parties.** As of the Effective Date, each of the General Released Parties hereby unconditionally forever releases, waives and discharges all known and unknown Causes of Action of any nature that such General Released Party has asserted, may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the other General Released Parties based on any act or omission relating to the Debtor or the Debtor's business operations (including, without limitation, the organization or capitalization of the Debtor or extensions of credit and other financial services and accommodations made or not made to the Debtor) or the Chapter 11 Case on or prior to the Effective Date; provided, however, that the foregoing release, waiver and discharge shall not apply to Causes of Action that arise from obligations or rights created under or in connection with this Plan or any agreement provided for or contemplated in this Plan.

10.4    **Discharge.** Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or this Plan, the Distributions made pursuant to and in accordance with the applicable terms and conditions of this Plan are in full and final satisfaction, settlement, release and discharge as against the Debtor of any debt that arose before the Effective Date, and any debt of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims and Equity Interests of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of claim or proof of interest based on such Debt,

obligation or Equity Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim or Equity Interest is Allowed under Section 502 of the Bankruptcy Code or (iii) the holder of such Claim or Equity Interest has accepted this Plan.

10.5    **Injunctions.**

(a)    **Injunction Related to Discharge.**  As of the Effective Date and subject to its occurrence, all Persons that have held, currently hold or may have asserted, directly, indirectly, derivatively or otherwise, a Claim, a Cause of Action or an Equity Interest or other right of a holder of an Equity Interest that is discharged, released or terminated pursuant to this Plan, are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, creating, perfecting or enforcing any lien or encumbrance, asserting a set-off, or right or~~of~~ subrogation ~~or recoupment~~ of any kind against any Debt, liability or obligation due to any such releasing Person, and from commencing or continuing any action, in any manner or in any place where the foregoing does not comply with or is inconsistent with the provisions of this Plan, and the Confirmation Order shall provide for such injunctions.

(b)    **Injunction Relating to Exculpation and Release.**  As of the Effective Date, except as otherwise provided in this Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, derivatively or otherwise against any or all of the Exculpated Parties or General Released Parties, on account of or respecting any Claims, Debts, rights, Causes of Action or liabilities exculpated, released or discharged pursuant to this Plan, and the Confirmation Order shall provide for such injunctions.

(c)    **D&O Insurance Entity Injunction.**  The purpose and terms of the D&O Insurance Entity Injunction are set forth in detail in Section 6.9 of this Plan.

(d)    **D&O Trust Channeling Injunction.**  The sole recourse of the holder of a D&O Trust Claim in respect of such Claim shall be the D&O Trust pursuant to the provisions of the D&O Trust Channeling Injunction and the TDP, and such holder shall have no right whatsoever at any time to assert its D&O Trust Claim against the Debtor, Reorganized Debtor or any Released Party or any property or interest in property of the Debtor, Reorganized Debtor or any Released Party.  Without limiting the foregoing, from and after the Effective Date, the D&O Trust Channeling

**Injunction shall apply to all holders of D&O Trust Claims including, without limitation, holders of Indemnification Claims in connection with any D&O Proceeding, and all such holders shall be permanently and forever stayed, restrained and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any D&O Trust Claims, other than from the D&O Trust in accordance with the D&O Trust Channeling Injunction and pursuant to the D&O Trust Documents:**

    **(i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative or other proceeding) in any forum against or affecting the Debtor, Reorganized Debtor or any Released Party or any property or interests in property of the Debtor, Reorganized Debtor or any Released Party;**

    **(ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against the Debtor, Reorganized Debtor or any Released Party or any property or interests in property of the Debtor, Reorganized Debtor or any Released Party;**

    **(iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance or lien against the Debtor, Reorganized Debtor or any Released Party, or any property or interests in property of the Debtor, Reorganized Debtor or any Released Party;**

    **(iv) setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to the Debtor, Reorganized Debtor or any Released Party or any property or interest in property of the Debtor, Reorganized Debtor or any Released Party; and**

    **(v) proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the D&O Trust, except in conformity and compliance with the D&O Trust Agreement and the TDP.**

Except as otherwise expressly provided in this Plan or the D&O Trust Documents, nothing contained in this Plan shall constitute or be deemed a waiver of any Claim, right or cause of action that the Debtor, Reorganized Debtor or the D&O Trust may have against any Person in connection with or arising out of or related to a D&O Trust Claim.

10.6     <u>No Release, Discharge, Injunction as to Richard Hylland</u>. Notwithstanding any provision to the contrary set forth in this Plan, nothing herein shall be deemed to release, discharge or otherwise affect the Debtor's or Reorganized Debtor's rights to assert Claims or Causes of Action against Richard Hylland (excluding Claims for rights of **indemnification and** contribution with respect to the Class Action and D&O Proceedings), or defenses to any Claims which Richard Hylland has asserted or may assert against the Debtor.

10.7     <u>No Release as to</u> ~~SEC Inquiry. Nothing herein shall be deemed to release, discharge, or otherwise affect the right of the SEC to assert Claims or causes of action against the Debtor or Reorganized Debtor in connection with the SEC Inquiry.~~**<u>Pension Plans. Notwithstanding any language to the contrary in the Debtor's Plan, nothing in the Plan shall be construed as releasing, discharging, or otherwise relieving the Debtor or any other party who may be a fiduciary with respect to the Pension Plans of any potential liability for breaches of fiduciary duties owed to the Pension Plans under ERISA.</u>**

**<u>10.8     Limitations of Releases, Exculpation, Discharge and Injunction. Except as specifically provided for in this Plan, the releases, exculpation, discharge and injunctions with respect to non-Debtor third parties shall be effective only as to those holders of Claims and Interests which vote to accept the Plan and mark their respective ballots in the place provided consenting and agreeing to the release, exculpation, discharge and injunction provisions of the Plan.</u>**

## ARTICLE 11

## <u>EFFECTIVENESS OF THIS PLAN</u>

11.1     **Conditions to Confirmation**.  It is a condition to the entry of the Confirmation Order that the following conditions have been satisfied or waived pursuant to Section 11.3 of this Plan:

(a)     The Confirmation Order shall be in form and substance reasonably satisfactory to the Debtor **and the Committee**; and

(b)     The Bankruptcy Court shall have made findings and determinations, among others, substantially to the effect as follows:

(i)     The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are to be implemented in accordance with this Plan and the D&O Trust;

(ii)     As of the Petition Date, the Debtor has been named as a defendant in securities actions seeking damages to which the Debtor is entitled to reimbursement from the D&O Policies;

(iii)     The D&O Trust is to use its assets and income to pay D&O Trust Claims;

(iv)     The Debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the D&O Trust Claims, which are addressed by the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction;

(v)     The actual amounts, numbers, and timing of demands cannot be determined;

(vi)     Pursuit of demands outside the procedures prescribed by this Plan and the TDP is likely to threaten this Plan's purpose to deal equitably with D&O Trust Claims;

(vii)     The terms of the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in this Plan and described in the Disclosure Statement;

(viii)     Pursuant to court orders, the TDP or otherwise, the D&O Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of D&O Trust Claims or other comparable mechanisms, that provide reasonable assurance that the D&O Trust shall value, and be in a financial position to pay, D&O Trust Claims that involve similar D&O Trust Claims in substantially the same manner;

(ix)     The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are essential to this Plan and the Debtor's reorganization efforts;

(x)     An identity of interests exists among the Debtor and the Released Parties such that a Claim asserted against any of the Released Parties gives rise to a Claim against the Debtor by the operation of the law of indemnity and contribution;

(xi)     In light of the benefits provided, or to be provided, to the D&O Trust on behalf of each Released Party, the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are fair and equitable with

respect to the persons that might subsequently assert demands that would constitute D&O Trust Claims against any Released Party; and

(xii)    This Plan and its acceptance otherwise comply with Section 105 of the Bankruptcy Code;

(c)    The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction shall have been implemented in connection with the D&O Trust and this Plan; and

(d)    The D&O Trust shall have the sole and exclusive authority as of the Effective Date to defend all D&O Trust Claims.

11.2    <u>Conditions Precedent to Effectiveness</u>.  This Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 11.3 of this Plan:

(a)    the Confirmation Order, in form and substance reasonably acceptable to the Debtor and the Committee, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

(b)    the Bankruptcy Court shall have entered or affirmed an order or orders entering the D&O Trust Channeling Injunction and the D&O Entity Injunction;

(c)    each of the Plan Documents and the New Common Stock, in form and substance reasonably acceptable to the Debtor and the Committee, shall have been effected or executed and delivered~~, and shall be validly issued and outstanding~~;

(d)    the Debtor shall have ~~entered into modified collective bargaining agreements with its labor unions in form and substance acceptable to the Debtor to the extent such agreements need to be modified;~~**distributed on the Effective Date to each holder of an Allowed Bank One DIP Financing Claim the amount of such Allowed Claim pursuant to the DIP Financing Order and the DIP Loan Documents in full satisfaction, settlement, release, extinguishment and discharge of such Allowed Claim, unless the holder of the Allowed Bank One DIP Financing Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof;**

(e)    all outstanding fees and expenses of Professionals retained by the Debtor and the Committee that are due and payable and have been authorized to be paid as of the Effective Date pursuant to an order of the Bankruptcy Court shall have been paid, and a reserve, sufficient to pay the

reasonable estimated post-Effective Date fees and expenses of such Professionals shall have been established by the Debtor for the benefit of such Professionals;

(f)    all actions, other documents and agreements necessary to implement this Plan shall have been effected or executed and delivered;

(g)    the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction shall be **in** full force and effect;

(h)    the Debtor and all applicable Trustees shall have executed the D&O Trust Agreement;

(i)    the D&O Insurance Entities shall have executed and delivered counterparts of the Insurance Assignment Agreement and such agreement shall be in full force and effect;

(j)    all Trust Assets that are to be delivered to the D&O Trust on the Effective Date shall have been delivered to the D&O Trust in accordance with the requirements of all applicable Plan Documents;

(k)    the Reorganized Debtor Charter **and by-laws** shall be in full force and effect; and

(l)    the Debtor shall have obtained either: (i) a private letter ruling establishing that the D&O Trust is a "qualified settlement fund" pursuant to Section 468B of the Internal Revenue Code and the regulations issued pursuant thereto; or (ii) other decisions, opinions, or assurances regarding the tax consequences of this Plan satisfactory to the Debtor, the Official Creditors' Committee and the Claimants' Representative Committee.

11.3    <u>Waiver of Conditions</u>.    One or more of the conditions contained in Section 11.1 and Section 11.2 of this Plan may be waived with the prior execution of a written consent by or on behalf of the Debtor and the Committee, in their judgment reasonably exercised.

11.4    <u>Effect of Failure of Conditions</u>.    In the event that one or more of the conditions specified in Section 11.2 of this Plan have not occurred on or before 120 days after the Confirmation Date, upon notification submitted by the Debtor to the Bankruptcy Court, counsel for the Committee, counsel for the DIP Lenders, and counsel for the CSFB Lenders (a) the Confirmation Order shall be vacated, (b) no Distributions under this Plan shall be made, (c) the Debtor and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (d) the Debtor's obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained

herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other ~~p~~Person or to prejudice in any manner the rights of the Debtor or any ~~p~~Person in any further proceedings involving the Debtor.

## ARTICLE 12

## REGULATION

12.1    <u>Regulation</u>.   The Debtor ~~is~~<u>continues to be</u> subject to both federal and state regulation.   The Debtor shall continue to be regulated by: (i) FERC; (ii) the MPSC in accordance with the Montana Public Utilities Law, the MPSC's policies and practices, and any other laws and regulations applicable to investor-owned utilities in the State of Montana with respect to the Debtor's Montana assets and operations; (iii) the SDPUC in accordance with South Dakota Public Utilities Law, the SDPUC's policies and procedures, and any other laws ~~and~~, regulations <u>and orders</u> applicable to investor-owned utilities in the State of South Dakota with respect to the Debtor's South Dakota assets and operations; and (iv) the NPSC in accordance with the Nebraska S<u>t</u>ate Gas Regulation Act and the NPSC's rules and regulations applicable to jurisdictional utilities in the State of Nebraska with respect to the Debtor's Nebraska assets and operations.

12.2    <u>Rates and Tariffs</u>.    ~~No provision~~<u>Unless specifically provided for</u> in this Plan<u>, no provision herein</u> is intended to <u>impair,</u> alter, modify, increase or decrease any ~~rates, tariffs or agreements relating to rates and/or tariffs~~<u>prepetition or postpetition: (i) rate, tariff, regulatory order or regulatory proceeding of FERC, MPSC, SDPUC or NPSC; (ii) agreement relating to any such rate, tariff, order or proceeding; (iii) right of appeal, action or collateral challenge with respect to any of the foregoing; or (iv) the regulatory authority or jurisdiction of FERC, MPSC, SDPUC or NPSC</u>.

## ARTICLE 13

## RETENTION OF JURISDICTION

13.1    <u>Retention of Jurisdiction</u>.  Following the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and this Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims;

(b)    to hear and determine any and all applications by Professionals for compensation and reimbursement of reasonable fees and expenses;

(c)    to hear and determine any and all pending applications for the rejection and disaffirmance of executory contracts (including, without limitation, any collective bargaining agreements) and unexpired leases, and fix and allow any Claims resulting therefrom;

(d)    to liquidate any Disputed Claim;

(e)    to enforce the provisions of this Plan, including the injunction, exculpation and releases provided for in this Plan;

(f)    to enable the Debtor to prosecute any and all proceedings which have been or may be brought prior to the Effective Date, or subsequent to the Effective Date, to set aside liens or encumbrances and to recover any transfers, assets, properties, or damages to which the Debtor may be entitled under applicable provisions of the Bankruptcy Code or any federal state, or local laws;

(g)    to correct any defect, cure any omission, or reconcile any inconsistency in this Plan or in the Confirmation Order as may be necessary to carry out its purpose and the intent of this Plan;

(h)    to determine any Claim or liability to a governmental unit which may be asserted as a result of the transactions contemplated herein;

(i)    to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

(j)    to hear and determine any matters or disputes respecting the Debtor under Sections 1113 and 1114 of the Bankruptcy Code;

(k)    to hear and determine any matters relating to the D&O Trust; and

(l)    to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code.

# ARTICLE 14

## MISCELLANEOUS PROVISIONS

14.1    Effectuating Documents and Further Transactions.  Each of the Debtor or Reorganized Debtor, as the case may be, is authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms  and conditions of this Plan and any notes or securities issued pursuant to this Plan.

14.2    Exemption from Transfer Taxes.    In accordance with Section 1146(c) of the Bankruptcy Code: (a) the issuance, transfer or exchange of any security under this Plan including, without limitation the New Common Stock, or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by this Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan, or the revesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated by this Plan; (b) the making, delivery, creation, assignment, amendment or recording of any note or other obligation for the payment of money or any mortgage, deed of trust or other security interest under, in furtherance of, or in connection with this Plan, the issuance, renewal, modification or securing of indebtedness by such means; and (c) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

14.3    Amendment or Modification of this Plan.    Alterations, amendments or modifications of this Plan may be proposed in writing by the Debtor, with the prior consent of the Committee as to any material alterations, amendments or modifications (which consent shall not be unreasonably withheld), at any time prior to the Confirmation Date, provided that this Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with Section 1125 of the Bankruptcy Code.  This Plan may be altered, amended or modified at any time

before or after the Confirmation Date and before substantial consummation, provided that this Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms this Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code.  A holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.  The Debtor may, with notice to the Committee, the DIP Lenders and the CSFB Lenders, but without notice to holders of Claims or Equity Interests insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in this Plan and any exhibit hereto or in any Plan Document.

14.4    <u>Severability</u>.   In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in this Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void or unenforceable.  The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision hereof.

14.5    <u>Revocation or Withdrawal of this Plan</u>.   The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then this Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

14.6    <u>Plan Supplement</u>.  The Plan Supplement (containing drafts or final versions of the Plan Documents) shall be filed with the Bankruptcy Court and served upon the Office of the United States Trustee, and respective counsel to the Committee and the DIP Lenders and the CSFB Lenders as early as practicable (but in no event later than ~~five~~**fifteen** (~~5~~**15**) days) prior to the Confirmation Hearing, or on such other date as the Bankruptcy Court may establish.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to the Debtor in accordance with Section ~~13.8~~**14.8** hereof.  The Plan Supplement is incorporated into and a part of this Plan as if set forth in full herein.

14.7    <u>Binding Effect</u>.  This Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims and Equity Interests, and their

respective successors and assigns, including, without limitation, Reorganized Debtor.

14.8    Notices.  All notices, requests and demands to or upon the Debtor or the Committee, to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtor:

NorthWestern Corporation
125 South Dakota Avenue
Sioux Falls, SD 57104
Attn:    William M. Austin
             Eric R. Jacobsen, Esq.

and

Paul Hastings Janofsky & Walker, LLP
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Attn:    Jesse H. Austin, III, Esq.
             Karol K. Denniston, Esq.
Co-Counsel to the Debtor and Debtor-in-Possession

and

Greenberg Traurig, L.P.
The Brandywine Building, Suite 1540
1000 West Street
Wilmington, DE 19801
Attn:    Scott D. Cousins, Esq.
             Victoria Watson Counihan, Esq.
             William E. Chipman, Jr., Esq.
Co-Counsel to the Debtor and Debtor-in-Possession

If to the Committee:

Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:    Alan W. Kornberg, Esq.
             Ephraim Diamond, Esq.

and

The Bayard Firm
222 Delaware Avenue
Wilmington, DE 19801
Attn:    Neil B. Glassman, Esq.
          Charlene D. Davis, Esq.

14.9    Termination of Any Committees.  Except as otherwise provided in this Section ~~13.9,~~14.9, on the Effective Date, ~~any~~all Committees (other than the TAC **and the Plan Committee**) shall cease to exist and their respective members and employees or agents (including, without limitation, attorneys, investment bankers, financial advisors, accountants and other professionals) shall be released and discharged from any further authority, duties, responsibilities and obligations relating to, arising from or in connection with such Committee.  ~~The~~All Committee**s** shall continue to exist after such date (i) with respect to all the applications filed pursuant to Sections 330 and 503 of the Bankruptcy Code or Claims for fees and expenses by Professionals; (i) any post-confirmation modifications to this Plan or Confirmation Order; and (iii) any matters pending as of the Effective Date before the Bankruptcy Court to which ~~the~~such Committee is party, until such matters are resolved.

14.10    Governing Law.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent this Plan, provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

14.11    Withholding and Reporting Requirements.  In connection with the consummation of this Plan, the Debtor or Reorganized Debtor, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.

14.12    Allocation of Plan Distributions Between Principal and Interest.  To the extent that any Allowed Claim entitled to a Distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first, and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

14.13  <u>Headings</u>.  Headings are used in this Plan for convenience and reference only, and shall not constitute a part of this Plan for any other purpose.

14.14  <u>Inconsistency</u>.  In the event of any inconsistency between this Plan and the Disclosure Statement, any exhibit to this Plan or Disclosure Statement or any other instrument or document created or executed pursuant to this Plan, this Plan shall govern.

[Concluded on next page]

Date:  ~~March 11,~~May 14, 2004
Wilmington, Delaware

**NorthWestern Corporation**
Debtor and Debtor-in-Possession

By:  _____
       William M. Austin
       Chief Restructuring Officer


PAUL, HASTINGS, JANOFSKY & WALKER LLP


_____
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street
Suite 2400
Atlanta, GA 30309
Telephone:  (404) 815-2400

and

GREENBERG TRAURIG, LLP


_____
Scott D. Cousins (No. 3079)
Victoria Watson Counihan (No. 3488)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone:  (302) 661-7000

*Co-Counsel for the Debtor*
*and Debtor-in-Possession*

EXHIBIT A

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
NORTHWESTERN CORPORATION

NorthWestern Corporation (the "Corporation"), a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "GCL"), does hereby certify as follows:

1.    The present name of the Corporation is NorthWestern Corporation.  The name under which the Corporation was originally incorporated was Northwestern Public Service Company.

2.    The original Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on November 27, 1923.

3.    This Amended and Restated Certificate of Incorporation, which further amends and restates the certificate of incorporation of the Corporation as heretofore amended and restated, was duly adopted in accordance with Sections 242 and 245 of the GCL by virtue of Section 303 of the GCL.

4.    Provision for the making of this Amended and Restated Certificate of Incorporation of the Corporation is contained in that order of the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Corporation's case under Chapter 11 of title 11 of the United States Code, as amended from time to time, Jointly Administered Case No. 03-12872 (CGC), issued by such Court on September 14, 2003.

5.    The Certificate of Incorporation of the Corporation, as heretofore amended and restated, is hereby amended and restated so as to read in its entirety as follows:

ARTICLE 1
NAME

The name of the Corporation is NorthWestern Corporation (the "Corporation").

ARTICLE 2
ADDRESS AND AGENT

The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of its registered agent at that address is The Corporation Trust Company.

ARTICLE 3
PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the GCL.

ARTICLE 4
STOCK

4.1    Authorized Capital Stock.  The total number of shares of stock which the Corporation shall have authority to issue is 250,000,000 consisting of (i) 200,000,000 shares of common stock, par value of $.001 per share (the "Common Stock"), and (ii) 50,000,000 shares of preferred stock, par value of $.001 per share (the "Preferred Stock").

4.2    Common Stock.  The designations, powers (including voting powers), preferences and rights, and the qualifications, limitations and restrictions, of the Common Stock are as follows:

(a)    Dividends.  Subject to the terms of any outstanding series of Preferred Stock and any other provisions of this Amended and Restated Certificate of Incorporation, as it may be amended from time to time (the "Certificate of Incorporation"), holders of shares of Common Stock shall be entitled to receive such dividends and other distributions in cash, stock or property of the Corporation when, as and if declared thereon by the Board of Directors from time to time out of assets or funds of the Corporation legally available therefor.

(b)    Liquidation, Dissolution, Winding Up.  In the event of any liquidation, dissolution or winding up (either voluntary or involuntary) of the Corporation resulting in any distribution of its assets to its stockholders, subject to the terms of any outstanding series of Preferred Stock, the holders of the Common Stock shall be entitled to receive pro rata the assets of the Company legally available for distribution to its stockholders.

(c)    Voting.  Except as otherwise required by law and subject to the terms of any outstanding series of Preferred Stock, each outstanding share of Common Stock shall be entitled to one vote per share held of record by such holder on all matters presented to stockholders for a vote; provided, however, that holders of Common Stock shall not be entitled to vote on any amendment to this Certificate of Incorporation (including any Preferred Stock Designation (as defined below)) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together as a class with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation (including any Preferred Stock Designation) or the GCL.

4.3    Preferred Stock.  The Board of Directors is hereby expressly authorized, by resolution or resolutions thereof, to provide, out of the unissued

shares of Preferred Stock, for one or more series of Preferred Stock, and by filing a certificate pursuant to the applicable law of the State of Delaware (such certificate being hereinafter referred to as a "Preferred Stock Designation"), to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers (including voting powers, if any), preferences, and relative participating optional or other special rights of the shares of each such series and any qualifications, limitations or restrictions thereof. The powers, preferences and relative, participating optional or other special rights of each series of Preferred Stock, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding. All shares of any one series of Preferred Stock shall be identical in all respects with all other shares of such series, except that shares of any one series issued at different times may differ as to the date from which dividends thereon, if any, shall be cumulative. The number of shares of any series of Preferred Stock may be increased (but not above the total number of authorized shares of Preferred Stock) or decreased (but not below the number of shares then outstanding) by a certificate executed, acknowledged and filed in accordance with the GCL setting forth a statement that such increase or decrease was authorized and directed by resolution or resolutions of the Board of Directors of the Corporation. The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the Common Stock, without a vote of the holders of the Preferred Stock, or of any series thereof, unless a vote of any such holders is required pursuant to the terms of any Preferred Stock Designation. Nothing contained herein shall be deemed to limit any rights of the holders of any series of Preferred Stock as expressly granted or indicated pursuant to the terms of the applicable Preferred Stock Designation.

4.4    Nonvoting Stock.    Notwithstanding anything to the contrary in this Certificate of Incorporation, the Corporation shall not issue any nonvoting equity securities to the extent prohibited by Section 1123 or Section 365 of Title 11 of the United States Code (the "United States Bankruptcy Code") as in effect on the effective date of the Plan of Reorganization of the Corporation, duly confirmed by the Bankruptcy Court in Jointly Administered Case No. 03-12872 (CGC) (the "Effective Date"); provided, however, that this Section 4.4 of Article 4, (a) shall have no further force and effect beyond that required under Section 1123 of the United States Bankruptcy Code, (b) shall have such force and effect, if any, only for so long as such Section is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time in effect.

4.5    Action in Lieu of Meetings.    Subject to rights, if any, of any series of Preferred Stock then outstanding, any action required or permitted to be taken by the stockholders must be effected at an annual or special meeting of

stockholders and may not be effected by any consent in writing of such stockholders.

ARTICLE 5
DIRECTORS

5.1    Number and Election of Directors.  Subject to rights, if any, of any series of Preferred Stock then outstanding, the number of Directors which shall constitute the whole Board of Directors shall be fixed by, or in the manner provided in, the Bylaws of the Corporation.  Within the limits specified herein and in the Corporation's Bylaws, the election of Directors shall be determined by the stockholders of the Corporation by a plurality of the votes cast by the shares of capital stock present in person or represented by proxy at the meeting in which the election of Directors is considered and entitled to vote in the election of Directors.  The Directors need not be stockholders of the Corporation.

5.2    Classes and Terms of Office  The Board of Directors (other than the those directors, if any, elected by the holders of any series of Preferred Stock then outstanding) shall be and is divided into three classes, Class I, Class II and Class III, which shall be as equal in number of directors as possible. The term of office of the initial Class I Directors shall expire at the Corporation's first annual meeting of stockholders following the Effective Date, the term of office of the initial Class II Directors to expire at the Corporation's second annual meeting of stockholders following the Effective Date and the term of office of the Class III Directors to expire at the Corporation's third annual meeting of stockholders following the Effective Date.  At each successive annual meeting of stockholders, Directors elected to succeed those Directors whose terms expire shall be elected for a term of office to expire at the third succeeding annual meeting of stockholders after their election, with each Director to hold office until his or her successor shall have been duly elected and qualified or until such Director's death, resignation or removal.  Any Director who is also an executive officer of the Corporation shall, immediately upon ceasing to be an executive officer of the Corporation for any reason whatsoever, be disqualified from continuing to serve as a Director and such Director's term of office as a Director shall thereupon automatically expire.

5.3    Removal of Directors.  Except for such additional directors, if any, elected by a series of Preferred Stock then outstanding, any Director or the entire Board of Directors may be removed, but only for cause, and only by the affirmative vote of the holders of at least a majority of the voting power of all of the then outstanding shares of the capital stock of the Corporation then entitled to vote at an election of Directors, voting together as a single class.  Nothing in this Section 5.3 shall be deemed to affect any rights of the holders of any series of Preferred Stock to remove Directors pursuant to any applicable provisions of the Certificate of Incorporation.

5.4    Vacancies.  Subject to the rights, if any, of any series of Preferred Stock then outstanding, and except as otherwise provided in this Certificate of Incorporation, any vacancy, whether arising through death, resignation, retirement, removal or disqualification of a Director, and any newly-created directorship resulting from an increase in the number of Directors, shall be filled solely by a majority vote of the remaining Directors even though less than a quorum of the Board of Directors.  A Director so elected to fill a vacancy or newly-created directorship shall serve for the remainder of the then present term of office of the class to which such Director was elected.  No decrease in the number of directors shall shorten the term of any incumbent director.

5.5    Written Ballot.  Unless and except to the extent that the Bylaws of the Corporation shall so require, the election of directors of the Corporation need not be by written ballot.

<h2 style="text-align:center">ARTICLE 6<br>LIABILITY AND INDEMNITY</h2>

6.1    Limitation of Liability of Directors.  No Director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a Director, except to the extent that such elimination or limitation of liability is not permitted under the GCL, as the same exists or may hereafter be amended.

6.2    Right to Indemnification.  To the fullest extent permitted by law, the Corporation shall indemnify and hold harmless any person who was or is made or is threatened to be made a party or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding") by reason of the fact that such person, or the person for whom he is the legally representative, is or was a Director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans (any such person, a "Section 6.2 Indemnitee"), against all liabilities, losses, expenses (including attorney's fees), judgments, fines and amounts paid in settlement ("expenses") actually and reasonably incurred by such person in connection with such proceeding; *provided, however*, that except as otherwise provided in Section 6.4, the Corporation shall only be required to indemnify a person in connection with a proceeding (or part thereof) initiated by such person if the commencement of such proceeding (or part thereof) was authorized by the Board of Directors.

6.3    Prepayment of Expenses.  The Corporation shall pay the expenses incurred by a Section 6.2 Indemnitee in defending any proceeding in advance of its final disposition, provided that, to the extent required by law, the

payment of expenses in advance of the final disposition of the proceeding shall be made only upon receipt of an undertaking by such person to repay all amounts advanced if it should be ultimately determined that such person is not entitled to be indemnified under this Article or otherwise.  The Corporation may pay the expenses incurred by any other person in defending any proceeding in advance of its final disposition upon such terms and conditions as the Board of Directors deems appropriate.

6.4    Claims.  If a claim for indemnification or advancement of expenses under Section 6.2 or Section 6.3 is not paid in full within sixty (60) days after a written claim therefor by a Section 6.2 Indemnitee has been received by the Corporation, such Section 6.2 Indemnitee may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.  In any such action, the Corporation shall have the burden of proving that such Section 6.2 Indemnitee is not entitled to the requested indemnification or advancement of expenses under applicable law.

6.5    Repeal or Modification.    Any amendment, repeal or modification of the provisions of this Article or applicable law shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring before the time of such amendment, repeal or modification regardless of whether the proceeding is brought or threatened before or after the time of such amendment, repeal or modification.

6.6    Non-Exclusivity of Rights.  The right to indemnification and advancement of expenses conferred on any person by this Article shall not be exclusive of any other rights such person may have or acquire under any other provision hereof, the Bylaws or by law, agreement, vote of stockholders or disinterested Directors or otherwise.

6.7    Survival of Rights.    The right to indemnification and prepayment of expenses conferred on any person by this Article shall continue as to a person who has ceased to be a Director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

6.8    Insurance.  The Corporation may purchase and maintain insurance on behalf of any person who is or was a Director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against any liability or expenses incurred by such person in connection with a proceeding, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Article or by law.

6.9    Other Sources.    The Corporation's obligation, if any, to indemnify or advance expenses to any Section 6.2 Indemnitee who was or is serving at the Corporation's request as a director or officer of another corporation or a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, shall be reduced by any amount such Section 6.2 Indemnitee may collect as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or non-profit entity.

6.10    Other Indemnification and Advancement of Expenses.    This Article 6 shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Section 6.2 Indemnitees when and as authorized by appropriate corporate action.

ARTICLE 7
BYLAWS AND CERTIFICATE OF INCORPORATION

7.1    Creation, Amendment and Repeal of Bylaws.    In furtherance and not in limitation of the powers conferred upon it by the laws of the State of Delaware, the Board of Directors shall have the power to adopt, alter, amend or repeal the Bylaws of the Corporation, subject to the power of the stockholders of the Corporation to alter or repeal any Bylaws whether adopted by them or otherwise.

7.2    Amendment of Certificate of Incorporation.    The Corporation reserves the right at any time, and from time to time, to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by law; and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, Directors or any other persons whomsoever by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the rights reserved in this Section 7.2(b) of Article 7.

ARTICLE 8
INTERESTED STOCKHOLDER TRANSACTIONS

8.1    Purpose.    In addition to any affirmative vote required by law or by this Certificate of Incorporation, any Business Combination (as defined in Section 8.2 of this Article 8) respecting the Corporation shall require the approval of the stockholders of the Corporation pursuant to Section 8.5 of this Article 8 or the approval of the Directors of the Corporation pursuant to Section 8.4 of this Article 8.

8.2    Certain Definitions.  For the purposes of this Article 8:

(a)    "Act" shall mean the Securities Exchange Act of 1934, as amended.

(b)    "Affiliate," "affiliated" and "Associate" shall have the respective meanings ascribed to such terms in Rule 12b-2 of the General Rules and Regulations under the Act.

(c)    A person shall be a "beneficial owner" of, or "beneficially own," or have "beneficial ownership" of, any Voting Stock if such person has or shares, directly or indirectly, through any agreement, arrangement or understanding or otherwise:

(i)    voting power which includes the power to vote, or to direct the voting of, such Voting Shares (other than pursuant to a revocable proxy given to such person or any of its Affiliates or Associates in response to a public proxy solicitation made pursuant to, and in accordance with, all applicable requirements of the Act and the rules and regulations promulgated thereunder); and/or

(ii)    investment power which includes the right to acquire such Voting Stock (whether or not such right is immediately exercisable) pursuant to any agreement, arrangement or understanding or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise, or the power to direct the dispose or, or direct the disposition of, such Voting Stock.

(d)    "Business Combination" shall include:

(i)    any merger or consolidation of the Corporation or any Subsidiary with (A) an Interested Stockholder or (B) any other corporation (whether or not itself an Interested Stockholder) that is, or after such merger would be, an Affiliate of an Interested Stockholder;

(ii)    any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions) to or with an Interested Stockholder or aft Affiliate of an Interested Stockholder of any assets of the Corporation or any Subsidiary having an aggregate fair market value equal to 15% or more of either the aggregate market value of all of the assets of the Corporation determined on a consolidated basis or the aggregate market value of all of the outstanding stock of the Corporation;

(iii)    the issuance or transfer by the Corporation or any Subsidiary (in one transaction or a series of transactions) of any securities of the Corporation or any Subsidiary to an Interested Stockholder or any Affiliate of an Interested Stockholder in exchange for cash, securities or other property (or a combination thereof) having an aggregate fair market value equal to 15% or more

of either the aggregate market value of all of the assets of the Corporation determined on a consolidated basis or the aggregate market value of all of the outstanding stock of the Corporation;

(iv)     the adoption of any plan or proposal for the liquidation or dissolution of the Corporation proposed by or on behalf of an Interested Stockholder or any Affiliate of an Interested Stockholder; or

(v)     any reclassification of the Corporation's securities (including any reverse stock split), recapitalization of the Corporation, merger or consolidation of the Corporation with any Subsidiary or any other transaction (whether or not involving an Interested Stockholder) that has the effect, directly or indirectly, of increasing the proportionate beneficial ownership of an Interested Stockholder or any Affiliate of an Interested Stockholder in the outstanding shares of any class of equity or securities convertible into any class of equity securities of the Corporation or of any Subsidiary.

(e)     "Disinterested Director" shall mean any member of the Board of Directors of the Corporation who is not an Affiliate, Associate or representative of the Interested Stockholder and was a member of the Board of Directors prior to the time that such Interested Stockholder became an Interested Stockholder, and any successor of a Disinterested Director who is not an Affiliate, Associate or representative of the Interested Stockholder and is nominated for election as a Director or elected as a Director to succeed a Disinterested Director by a majority of the Disinterested Directors then on the Board of Directors.

(f)     "Interested Stockholder" shall mean any person (other than the Corporation or any Subsidiary) that:

(i)     is itself, or together with its Affiliates, the beneficial owne r, directly or indirectly, of 10% or more of the Voting Stock;

(ii)     is an Affiliate of the Corporation and at any time during the prior two years was the beneficial owner, itself, or together with its Affiliates, directly or indirectly, of 10% or more of the then outstanding Voting Stock; or

(iii)     is an assignee of or has otherwise succeeded to any shares of Voting Stock of which an Interested Stockholder was the beneficial owner at any time during the prior two years, unless such assignment or succession occurs in a transaction that is a public offering within the meaning of the Securities Act of 1933;

provided however, that in determining whether a person is an Interested Stockholder, the number of shares of Voting Stock deemed to be outstanding shall include shares of which the Interested Stockholder is deemed to have beneficial

ownership through application of Section 8.2(c) of this Article 8 but shall not include any other shares of Voting Stock that may be issuable pursuant to any agreement arrangement or understanding, or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise.

(g)     A "person" shall mean any individual, corporation, company, association, partnership, limited partnership, limited liability limited partnership, limited liability company, joint venture, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof, or any other form of entity.

(h)     "Subsidiary" means, with respect to a party, any corporation, company, association, partnership, joint venture, limited partnership, limited liability limited partnership, limited liability company or other business association or entity, whether incorporated or unincorporated, of which (i) such party or any other Subsidiary of such party is a general partner or a managing member (excluding partnerships, the general partnership interests of which are held by such party and/or one or more of its Subsidiaries do not have a majority of the voting interest in such partnership), (ii) such party and/or one or more of its Subsidiaries holds voting power to elect a majority of the board of directors or other governing body performing similar functions, (iii) such party and/or one or more of its Subsidiaries, directly or indirectly, owns or controls more than 50% of the equity, membership, partnership or similar interests or (iv) such party and/or one or more of its Subsidiaries has the right to receive 50% or more of the distribution of profits or 50% or more of the assets on liquidation or dissolution..

(i)     "Voting Stock" shall mean the outstanding shares of capital stock of the Corporation entitled to vote generally and shall not mean the shares of capital stock of any predecessor corporation.

8.3     Powers of the Board of Directors.  For purposes of this Article 8, a majority of the Disinterested Directors of the Corporation present at a meeting at which a quorum is present shall have the power and duty to determine in good faith, on the basis of information known to them after reasonable inquiry, all facts necessary to determine compliance with this Article 8, including, without limitation, (i) whether a person is an Interested Stockholder, (ii) the number of shares of Voting Stock of which a person is the beneficial owner, and (iii) whether a person is an Affiliate or Associate of another.

8.4     Approval by Board of Directors. A Business Combination that is approved by a majority of the Disinterested Directors shall not require the approval of the stockholders pursuant to Section 8.5 of this Article 8.

8.5     Approval by Stockholders.  Unless a proposed Business Combination is approved by the Directors of the Corporation pursuant to Section

8.4 of this Article 8, such Business Combination shall require, except as otherwise prohibited by applicable law, the affirmative vote of the holders of at least 66 2/3% of the Voting Stock, voting together as a single class, excluding shares of Voting Stock that are beneficially owned by the Interested Stockholder or any Affiliate of any Interested Stockholder. Such affirmative vote shall be required notwithstanding the fact that no vote or a lesser vote may be required by law, the Bylaws of the Corporation, by any agreement with any national securities exchange, or otherwise.

8.6    No Effect on Fiduciary Obligations of Interested Stockholders. Nothing contained in this Article 8 shall be construed to relieve an Interested Stockholder from any fiduciary obligation imposed by law.

8.7    Amendment, Repeal or Modification. Notwithstanding anything contained in this Certificate of Incorporation to the contrary, but in addition to any vote of the holders of any class or series of Stock of the Corporation required by law or this Certificate of Incorporation, the affirmative vote of the holders of at least sixty six and two-thirds percent (66 2/3%) of the Voting Stock, voting together as a single class, shall be required to amend or repeal, or to adopt any provision inconsistent with, this Article 8.

## ARTICLE 9
## SECTION 203 OF DELAWARE GENERAL CORPORATION LAW

The Corporation shall be governed by Section 203 of the General Corporation Law of the State of Delaware as it may be amended from time to time.

IN WITNESS WHEREOF, the Corporation has caused this Certificate of

Incorporation to be executed on its behalf this _____ day of _____, 2004.

NORTHWESTERN CORPORATION

By:_____
Name:

Title:

## AMENDED AND RESTATED BYLAWS

## OF

## NORTHWESTERN CORPORATION,

## A DELAWARE CORPORATION

### ARTICLE 1.
### OFFICES

**Section 1.1     Registered Office.**  The registered office of the NorthWestern Corporation (the "Corporation") shall be located in the City of Wilmington, County of New Castle, and State of Delaware.

**Section 1.2     Other Offices.**  The Corporation may also have offices at such other places both  within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

### ARTICLE 2.
### MEETINGS OF STOCKHOLDERS

**Section 2.1     Place of Meetings.**  All meetings of the stockholders for the election of Directors or for any other purpose shall be held at such place, within or without the State of Delaware, as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting, or if authorized by the Board of Directors may be held by means of remote communication in accordance with applicable law.

**Section 2.2     Annual Meeting.**  The annual meeting of stockholders for the election of Directors and for such other business as may properly be

conducted at such meeting shall be held at such time and date as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting. The Board of Directors shall have the authority to postpone to a later date and/or time the annual meeting of stockholders.

Section 2.3    Special Meetings.  Special meetings of stockholders of the Corporation may be called only by the Chairman of the Board or the Board of Directors acting pursuant to a resolution adopted by a majority of the Whole Board of Directors and may not be called by any other person or persons.  For purposes of these Bylaws, the term "Whole Board of Directors" shall mean the total number of authorized Directors whether or not there exist any vacancies in previously authorized directorships. Business transacted at special meetings shall be confined to the purpose or purposes stated in the notice of meeting.  Nothing in this Section 2.3 shall be deemed to affect any rights of the holders of any series of Preferred Stock to call special meetings pursuant to any applicable provisions of the Certificate of Incorporation.

Section 2.4    Notice of Meetings.  Unless otherwise required by law or the Amended and Restated Certificate of Incorporation of the Corporation as the seam may be amended from time to time (the "Certificate of Incorporation"), written notice of the date, time and place, if any, of the annual and of any special meeting of the stockholders shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.  Such written notice of any meeting of stockholders shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purposes of the meeting.

Section 2.5    Manner of Giving Notice.  Except as otherwise required by the Certificate of Incorporation or as otherwise provided herein, notices to Directors and stockholders shall be in writing and delivered personally or mailed to the Directors or stockholders at their address appearing on the books of the Corporation.  Notice to Directors may be given by telegram, telecopier, telephone, facsimile or any other means of electronic transmission.

Section 2.6    Waiver of Notice.  A written waiver of any notice, signed by a stockholder, Director, officer, employee or agent, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such stockholder, Director, officer, employee or agent.  Neither the business nor the purpose of any meeting need be specified in such a waiver.  Attendance at any meeting shall constitute waiver of notice except attendance for the sole purpose of objecting to the timeliness of notice at the beginning of the meeting.

Section 2.7    Chairman and Secretary.  The Chairman of the Board, or in the Chairman's absence the Chief Executive Officer, or in the Chief Executive Officer's absence the President, or in the President's absence the Chief Operating Officer, or in the Chief Operating Officer's absence a Vice President, or in the absence of a Vice President a chairman designated by the Board of Directors, shall preside over and act as chairman of the meeting of the stockholders.  The Corporate Secretary, or an Assistant Corporate Secretary, of the Corporation shall act as secretary at all meetings of the stockholders, but in their absence, a secretary designated by the chairman of the meeting shall act as secretary of the meeting of the stockholders.

Section 2.8    Record Date.  In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date, unless otherwise required by law, shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

Section 2.9    Persons Entitled to Vote.  A complete list of stockholders entitled to vote at any meeting of stockholders, arranged in alphabetical order and showing the address of each such stockholder and the number of shares of capital stock registered in his or her name, shall be prepared and made by the officer who has charge of the stock ledger of the Corporation, at least ten (10) days before every meeting of stockholders, and shall be open to the examination of any such stockholder in the manner provided by law.  The stockholder list shall also be kept at the place of the meeting during the whole time thereof and shall be open to the examination of any such stockholder who is present.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list required by this Section 2.9 or to vote in person or by proxy at any meeting of stockholders.

Section 2.10   Quorum.  Unless otherwise required by law or the Certificate of Incorporation, the holders of a majority in voting power of all of the then outstanding shares of the capital stock of the Corporation entitled to be voted at a meeting of the stockholders represented in person or by proxy, shall constitute a quorum for the transaction of business at such meeting.  In the absence of a

quorum, the stockholders so present may, by a majority in voting power thereof, adjourn the meeting from time to time in the manner provided by Section 2.11 of these Bylaws until a quorum shall attend.  The stockholders present at a duly called or held meeting of the stockholders at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum; provided that any action taken (other than adjournment) is approved by the vote required by Section 2.12 of these Bylaws.  In the absence of a quorum, no business other than adjournment may be transacted, except as described in this Section 2.10.

Section 2.11   Adjournment.  Any meeting of the stockholders may be adjourned from time to time either by the Chairman of the meeting or by a majority in voting power represented by the stockholders entitled to vote at the meeting, present in person or represented by proxy.  At any such adjourned meeting at which a quorum shall be present, any business may be transacted which might have been transacted by a quorum of the stockholders at the meeting as originally convened.  Notice need not be given of any adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment action is taken, unless the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, in which case a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 2.12   Voting and Proxies.  Unless otherwise required by law or the Certificate of Incorporation, each stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of the capital stock having voting power held by such stockholder.  Each stockholder of record entitled to vote at a meeting of stockholders may vote or express such consent or dissent in person or may authorize another person or persons to vote or act for him or her by proxy.  No such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.  A proxy shall be irrevocable if it states that it is irrevocable and if, and only so long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or by delivering a proxy in accordance with applicable law bearing a later date to the Corporate Secretary of the Corporation.  Voting at meetings of stockholders need not be by written ballot.  At all meetings of stockholders for the election of Directors, a plurality of the votes cast by the shares of capital stock present in person and represented by proxy at the meeting at which the election of Directors is considered and entitled to vote in the election of Directors shall be sufficient to elect.  All other elections and questions shall, unless otherwise required by law, the Certificate of Incorporation, or the rules or regulations of any stock exchange applicable to the Corporation, be decided by the affirmative vote of the holders of a majority in

voting power of the shares of stock of the Corporation which are present in person or by proxy and entitled to vote thereon.

Section 2.13   Action at Meetings.  The Corporation may, and to the extent required by law, shall, in advance of any meeting of stockholders, appoint one or more inspectors to act at the meeting and make a written report thereof.  The Corporation may designate one or more alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting of stockholders, the person presiding at the meeting may, and to the extent required by law, shall, appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  Every vote taken by ballots shall be counted by a duly appointed inspector or inspectors.

Section 2.14   Action in Lieu of Meetings.  Subject to rights, if any, of any series of Preferred Stock then outstanding, any action required or permitted to be taken by the stockholders must be effected at an annual or special meeting of stockholders and may not be effected by any consent in writing of such stockholders.

Section 2.15   Remote Communications.  If authorized by the Board of Directors, and subject to such guidelines and procedures as the Board of Directors may adopt, stockholders and proxyholders not physically present at a meeting of stockholders, by means of remote communications:

(a)       may participate in a meeting of stockholders; and

(b)       shall be deemed present in person and may vote at a meeting of stockholders;

provided that (i) reasonable procedures have been implemented to verify that each person deemed present and permitted to vote at the meeting by means of remote communications is a stockholder or proxyholder, (ii) reasonable procedures are implemented to provide stockholders and proxyholders participating in the meeting by means of remote communications with a reasonable opportunity to participate in the meeting and to vote on matters submitted to stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with the proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communications, a record of such vote or other action shall be maintained by the Corporation.

Section 2.16   Nominations and Proposals.

(a)    Nominations and Proposals at Annual Meetings. Nominations of persons for election to the Board of Directors and the proposal of business to be considered by the stockholders may be made at any annual meeting of stockholders only (i) pursuant to the Corporation's notice of meeting (or any supplement thereto), (ii) by or at the direction of the Board of Directors, or (iii) by any stockholder of the Corporation (A) who is a stockholder of record on the date the stockholder's notice provided for in this Section 2.16 is delivered to the Corporate Secretary and on the record date for the determination of stockholders entitled to vote at such annual meeting, and (B) who complies with the applicable notice procedures set forth in this Section 2.16.

(b)    Stockholder Notice for Annual Meetings.  For nominations or other business to be properly made by a stockholder at an annual meeting in accordance with this Section 2.16, such stockholder must have given timely notice thereof in proper written form to the Corporate Secretary and any such proposed business other than the nomination of persons for election to the Board of Directors must constitute a proper matter for stockholder action.  To be timely, a stockholder's notice must be delivered to the Corporate Secretary at the principal executive offices of the Corporation not later than ninety (90) days nor earlier than one hundred twenty (120) days prior to the first anniversary date of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is more than thirty (30) days before or more than seventy (70) days after such anniversary date, a stockholder's notice shall also be considered timely if it is so delivered not earlier than one hundred twenty (120) days prior to such annual meeting, nor later than the later of ninety (90) days prior to such annual meeting or ten (10) days after the day on which public announcement of the date of such meeting was first made; provided, further, that in the event that the number of Directors to be elected to the Board of Directors of the Corporation at an annual meeting is increased and there is no public announcement by the Corporation naming the nominees for the additional directorships at least one hundred (100) days prior to the first anniversary of the preceding year's annual meeting, a stockholder's notice shall also be considered timely, but only with respect to nominees for the additional directorships, if it is so delivered not later than ten (10) days after the day on which such public announcement is first made by the Corporation.  All notices shall be received by the Corporate Secretary by the close of business on the specified date to be deemed to have been delivered on that date. In no event shall the public announcement of an adjournment or postponement of an annual meeting commence a new time period or extend the foregoing time period.

(c)    Nominations and Proposals at Special Meetings. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting.  Nominations of persons for election to the Board of Directors may be

made at a special meeting of stockholders at which Directors are to be elected pursuant to the Corporation's notice of meeting (i) by or at the direction of the Board of Directors, or (ii) provided that the Board of Directors has determined that Directors shall be elected at such meeting, by any stockholder of the Corporation (A) who is a stockholder of record on the date the stockholders notice provided for in this Section 2.16 is delivered to the Corporate Secretary and on the record date for the determination of stockholders entitled to vote at such special meeting, and (B) who complies with the applicable notice procedures set forth in this Section 2.16.

(d)     Stockholder Notice for Special Meetings.  For nominations to be properly made by a stockholder at a special meeting of stockholders called by the Corporation for the purpose of electing one or more Directors to the Board of Directors, such stockholder must have given timely notice thereof in proper written form to the Corporate Secretary.  To be timely, a stockholder's notice must be delivered to the Corporate Secretary at the principal executive offices of the Corporation not earlier than one hundred twenty (120) days prior to such special meeting, nor later than the later of ninety (90) days prior to such special meeting or ten (10) days after the day on which public announcement of the date of such meeting and the proposed nominees to be elected at such meeting was first made.  All notices shall be received by the Corporate Secretary by the close of business on the specified date to be deemed to have been delivered on that date.  In no event shall the public announcement of an adjournment or postponement of a special meeting commence a new time period or extend the foregoing time period.

(e)     Form of Stockholders Notice.  To be in proper written form, a stockholder's notice for both annual and special meetings must set forth:

(i)     as to each person whom the stockholder proposes to nominate for election as a Director, (A) the name, age, business address and residence address of the person, (B) the principal occupation or employment of the person, (C) the class or series and number of shares of capital stock of the Corporation that are owned beneficially or of record by the person, (D) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of Directors pursuant to Section 14 of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder, and (E) such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a Director if elected;

(ii)     as to any other business that the stockholder proposes to bring before the meeting, (A) a brief description of the business desired to be brought before the meeting, (B) the text of the proposal or business (including

the text of any resolutions proposed for consideration, and, in the event that such business includes a proposal to amend the Bylaws of the Corporation, the language of the proposed amendment), (C) the reasons for conducting such business at the meeting, and (D) any material interest of such stockholder in the business being proposed and the beneficial owner, if any, on whose behalf the proposal is being made; and

(iii)     as to the stockholder giving this notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made, (A) the name and record address of such stockholder and any such beneficial owner, (B) the class or series and number of shares of capital stock of the Corporation that are owned beneficially or of record by such stockholder and beneficial owner, (C) a description of all arrangements or understandings between such stockholder and any such beneficial owner and each proposed nominee and any other persons (including their names) pursuant to which the nomination(s) are to be made by such stockholder, (D) a representation that such stockholder is a stockholder of record entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to nominate the persons and/or conduct the business being proposed as described in the notice, and (E) a representation of whether such stockholder or any such beneficial owner intends or is part of a group which intends (1) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal or elect the nominee, and/or (2) otherwise to solicit proxies from stockholders in support of such proposal or nomination.  The foregoing notice requirements shall be deemed satisfied by a stockholder with respect to an annual meeting if the stockholder has notified the Corporation of his or her intention to present a proposal at such annual meeting in compliance with Regulation 14A (or any successor thereof) promulgated under the Exchange Act and such stockholder's proposal has been included in a proxy statement that has been prepared by the Corporation to solicit proxies for such annual meeting.  The Corporation may require any proposed nominee to furnish such other information as it may reasonably require to determine the eligibility of such proposed nominee to serve as a Director of the Corporation.

(f)     General.  Only such persons who are nominated in accordance with the procedures set forth in this Section 2.16 shall be eligible to be elected at an annual or special meeting of stockholders of the Corporation to serve as Directors and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 2.16.  Except as otherwise provided by law, the chairman of the meeting shall have the power and duty (i) to determine whether a nomination or any business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in this Section 2.16 (including whether the stockholder or beneficial owner, if any, on whose behalf the

nomination or proposal is made solicited (or is part of a group which solicited) or did not so solicit, as the case may be, proxies in support of such stockholder's nominee or proposal in compliance with such stockholder's representation as required by Section 2.16(e)), and (b) if a proposed nomination or business was not made or proposed in compliance with this Section 2.16, to declare that such nomination shall be disregarded or that such proposed business shall not be transacted. Notwithstanding the foregoing provisions of this Section 2.16, if the stockholder (or a qualified representative of the stockholder) does not appear at the annual or special meeting of stockholders of the Corporation to present a nomination or business, such nomination shall be disregarded and such proposed business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation. Notwithstanding the foregoing provisions of this Section 2.16, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Section 2.16. Nothing in this Section 2.16 shall be deemed to affect any rights (i) of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Regulation 14A under the Exchange Act, or (ii) of the holders of any series of Preferred Stock to elect Directors pursuant to any applicable provisions of the Certificate of Incorporation.

## ARTICLE 3.
## BOARD OF DIRECTORS

Section 3.1    General Powers.  The business of the Corporation shall be managed by or under the direction of its Board of Directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law or by the Certificate of Incorporation or by these Bylaws directed or required to be exercised or done by the stockholders.

Section 3.2    Number of Directors.  Subject to the rights, if any, of any series of Preferred Stock then outstanding, the Board of Directors shall consist of not less than five (5) nor more than eleven (11) Directors, with such number to be established, from time to time, by resolution of the Board. The initial number of Directors on effective date of the Plan of Reorganization of the Corporation, duly confirmed by the Bankruptcy Court in Jointly Administered Case No. 03-12872 (CGC) (the "Effective Date") shall be seven (7).

Section 3.3    Classes and Terms of Office.  The Board of Directors (other than those directors, if any, elected by any series of Preferred Stock then outstanding) shall be and is divided into three classes, Class I, Class II and Class III, which shall be as equal in number of directors as possible.  Classes I and II shall initially consist of two (2) Directors and Class III shall initially consist of three (3) Directors. The term of office of the initial Class I Directors shall expire at the Corporation's first annual meeting of stockholders following the Effective Date, the

term of office of the initial Class II Directors to expire at the Corporation's second annual meeting of stockholders following the Effective Date and the term of office of the Class III Directors to expire at the Corporation's third annual meeting of stockholders following the Effective Date.  At each successive annual meeting of stockholders, Directors elected to succeed those Directors whose terms expire shall be elected for a term of office to expire at the third succeeding annual meeting of stockholders after their election, with each Director to hold office until his or her successor shall have been duly elected and qualified or until such Director's death, resignation or removal.  Any Director who is also an executive officer of the Corporation shall, immediately upon ceasing to be an executive officer of the Corporation for any reason whatsoever, be disqualified from continuing to serve as a Director and such Director's term of office as a Director shall thereupon automatically expire. In case of any increase or decrease in the number of Directors from time to time (other than those Directors, if any, elected by any series of Preferred Stock then outstanding), the number of Directors shall be apportioned as nearly as equally as possible.

       Section 3.4    Election.  Within the limits specified herein and in the Corporation's Certificate of Incorporation, the election of Directors shall be determined by the stockholders of the Corporation by a plurality of the votes cast by the shares of capital stock present in person or represented by proxy at the meeting in which the election of Directors is considered and entitled to vote in the election of Directors.  The Directors need not be stockholders of the Corporation.

       Section 3.5    Resignation.  Any Director may resign by delivering a written resignation to the Corporation at its principal office or to the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Corporate Secretary or the Board of Directors.  Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.  If the resignation specifies effectiveness at a future time, a successor may be elected pursuant to Section 3.7 of these Bylaws to take office on the date that the resignation becomes effective.

       Section 3.6    Removal.  Except for such additional directors, if any, elected by a series of Preferred Stock then outstanding, any Director or the entire Board of Directors may be removed, but only for cause, and only by the affirmative vote of the holders of at least a majority of the voting power of all of the then outstanding shares of the capital stock of the Corporation then entitled to vote at an election of Directors, voting together as a single class.  Nothing in this Section 3.6 shall be deemed to affect any rights of the holders of any series of Preferred Stock to remove Directors pursuant to any applicable provisions of the Certificate of Incorporation.

Section 3.7     Vacancies.  Subject to the rights, if any, of any series of Preferred Stock then outstanding, and except as otherwise provided in the Certificate of Incorporation, any vacancy, whether arising through death, resignation, retirement, removal or disqualification of a Director, and any newly-created directorship resulting from an increase in the number of Directors, shall be filled solely by a majority vote of the remaining Directors even though less than a quorum of the Board of Directors.  A Director so elected to fill a vacancy shall serve for the remainder of the then present term of office of the class to which such Director was elected.  No decrease in the number of Directors shall shorten the term of any incumbent director.

Section 3.8     Place of Meetings.  Any meetings of the Board of Directors may be held either within or without the State of Delaware.

Section 3.9     Regular Meetings.  Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the Board of Directors, provided that any Director who is absent when such determination is made shall be given notice of the determination.

Section 3.10    Special Meetings and Notice.  Special meetings of the Board of Directors may be called by the Chairman of the Board, the Chief Executive Officer, or any two Directors, and shall be held at such time and place as may be specified by the officer or Directors calling the meeting.  Unless otherwise required by law or the Certificate of Incorporation, notice stating the date, time and place of the meeting shall be given to each Director either by prepaid mail to such Director's address appearing on the books of the Corporation not less than forty-eight (48) hours before the date of the meeting, or personally or by telegram, facsimile, electronic transmission or similar means of communication not less than twenty-four (24) hours before the date of the special meeting.

Section 3.11    Meetings by Telephone Conference Call.  Unless otherwise required by law or the Certificate of Incorporation, members of the Board of Directors may participate in a meeting of the Board of Directors by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 3.12    Quorum and Adjournment.  Unless otherwise required by law or the Certificate of Incorporation, at all meetings of the Board of Directors, the presence of majority of the Whole Board of Directors shall constitute a quorum for the transaction of business (except for the filling of vacancies, which shall be governed by the provisions of Section 3.7).  Any meeting of the Board of Directors, or a committee thereof, whether or not a quorum is present, may be adjourned to another time and place by the affirmative vote of a majority of the Directors

present. If the meeting is adjourned for more than 24 hours, notice of such adjournment to another time or place shall be given prior to the time of the adjourned meeting to the Directors who were not present at the time of the adjournment.

Section 3.13   Action at Meetings.  Unless otherwise required by law or the Certificate of Incorporation, if a quorum is present at any meeting of the Board of Directors, the vote of a majority of the Directors present shall be sufficient to take any action.  A meeting at which a quorum is initially present may continue, and Directors may transact business, notwithstanding withdrawal of Directors, if any action taken is approved by at least a majority of the number of Directors constituting a quorum for such meeting.

Section 3.14   Action in Lieu of Meetings.  Unless otherwise required by law or the Certificate of Incorporation, any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting, if all Directors consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.15   Committees.  The Board of Directors may, by resolution passed by a majority of the Whole Board of Directors, designate one or more committees, each committee to consist of one or more of the Directors of the Corporation.  The Board of Directors may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of any such committee.  In the absence or disqualification of a member of a committee, and in the absence of a designation by the Board of Directors of an alternate member to replace the absent or disqualified member, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may (subject to the committee charter, if any) unanimously appoint another member of the Board of Directors to act at the meeting in the place of any absent or disqualified member.  Any committee, to the extent permitted by law and to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it.  Each committee shall keep regular minutes and report to the Board of Directors when required.

Section 3.16   Meetings and Action of Committees.  Meetings and action of committees shall be governed by and held and taken in accordance with the provisions of Sections 3.8 to 3.14, with such changes in the context thereof as are

necessary to substitute the committee and its members for the Board of Directors and its members.

Section 3.17    Compensation.  Unless otherwise required by law or the Certificate of Incorporation, Directors shall be entitled to receive such fees and expenses, if any, for attendance at meetings of the Board of Directors, and/or such fixed salaries for services as Directors, as may be fixed from time to time by resolution of the Board of Directors.  Nothing herein contained shall be construed to preclude any Director from serving the Corporation in any other capacity as an officer, committee member, agent or otherwise, and receiving compensation therefor.  Members of special or standing committees may be allowed like compensation for attending committee meetings.

Section 3.18    Chairman of the Board and Vice Chairman of the Board; Secretary.  The Board of Directors shall appoint a Chairman of the Board and may appoint a Vice Chairman of the Board, in its discretion, from among its members.  The Chairman of the Board shall preside at all meetings of stockholders and of the Board of Directors.  If the Board of Directors appoints a Vice Chairman of the Board, in the absence or disability of the Chairman of the Board, the Vice Chairman of the Board shall preside at all meetings of stockholders and of the Board of Directors.  The Corporate Secretary or an Assistant Corporate Secretary of the Corporation shall act as secretary at all meetings of the Board of Directors, but in their absence, a secretary designated by the Chairman of the meeting shall act as secretary of the meeting of the Board.

## ARTICLE 4.
## OFFICERS

Section 4.1    Designation, Term and Vacancies.  The officers of the Corporation shall be a Chief Executive Officer, a President, a Chief Operating Officer, one or more Vice Presidents, a Corporate Secretary and a Chief Financial Officer and/or Treasurer, all of whom shall be elected by the Board of Directors.  The Board of Directors may elect one or more Executive Vice Presidents, Senior Vice Presidents, or Assistant Vice Presidents, who shall have such authority and shall perform such duties as may from time to time be prescribed by the Board of Directors.  The Board of Directors may appoint one or more Assistant Corporate Secretaries and one or more Assistant Treasurers, and such other officers as may be deemed necessary, who shall have such authority and shall perform such duties as may from time to time be prescribed by the Board of Directors.  Vacancies occurring among the officers of the Corporation shall be filled by the Board of Directors. Subject to Section 4.2 of this Article 4, officers elected by the Board of Directors shall hold office until the next annual election of such officers by the Directors and until their successors are elected and qualified or until such officer's death, resignation or removal.  All other officers, agents and employees shall hold

office during the pleasure of the Board of Directors or the officer appointing them. Any two or more offices may be held by the same person, with the exception that the Chief Executive Officer and President shall not also hold the office of Corporate Secretary or the office of Chief Financial Officer and/or Treasurer.

Section 4.2     Resignation and Removal of Officers.  Any officer may resign at any time upon written notice to the Corporation, without prejudice to the rights, if any, of the Corporation under any contract to which such officer is a party. Such resignation shall be effective upon its receipt by the Chairman of the Board, the Chief Executive Officer, the President, the Corporate Secretary or the Board of Directors, unless a different time is specified in the notice for effectiveness of such resignation. The acceptance of any such resignation shall not be necessary to make it effective unless otherwise specified in such notice. Any officer may be removed from office at any time, with or without cause, but subject to the rights, if any, of such officer under any contract of employment, by the Board of Directors or by any committee to whom such power of removal has been duly delegated, or, with regard to any officer who has been appointed by the Chief Executive Officer pursuant to Section 4.3 below, by the Chief Executive Officer or any other officer upon whom such power of removal may be conferred by the Board of Directors. A vacancy occurring in any office for any cause may be filled by the Board of Directors, in the manner prescribed by this Article 4 of the Bylaws for initial appointment to such office.

Section 4.3     Chief Executive Officer.  The Chief Executive Officer shall be chosen from among the members of the Board of Directors and, subject to the control and direction of the Board of Directors, shall have general charge of the affairs and business of the Corporation and general charge and supervision of all the officers, agents, and employees of the Corporation.  He or she shall exercise all powers and perform all duties incident to the principal executive office of the Corporation, subject to the control and direction of the Board of Directors, and such other powers and duties as may from time to time be assigned to him by the Board of Directors or be prescribed by these Bylaws.  Also in the absence or inability of the Chairman to act, he or she shall preside at all meetings of stockholders.  He or she may sign and execute in the name of the Corporation all deeds, mortgages, bonds, contracts, powers of attorney, or other instruments authorized by the Board of Directors, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Corporation, and he or she may, without previous authority of the Board of Directors, make, in the name of the Corporation, such contracts, leases, and other agreements as the ordinary conduct of the Corporation's business requires.  He or she may sign and endorse notes, drafts, and checks.  He or she shall have power to select and appoint all necessary officers and servants, except those elected or appointed or required to be elected or appointed by the Board of Directors, and he or she shall also have power to remove

all such officers and servants and to make appointments to fill the vacancies.  He or she may delegate any of his powers to the President or the Chief Operating Officer of the Corporation.

Section 4.4     President.  The President shall perform all acts incident to the office of President, subject to the control and direction of the Board of Directors, and such other powers and duties as may from time to time be assigned to him by the Board of Directors or be prescribed by these Bylaws.  In the absence or inability of the Chief Executive Officer to act, he or she shall be the Chief Executive Officer of the Corporation.

Section 4.5     Chief Operating Officer.  The Chief Operating Officer of the Corporation shall have general and active management of and exercise general supervision over the business and property of the Corporation, subject to the control and direction of the Board of Directors, and such other powers and duties as may from time to time be assigned to him by the Board of Directors or be prescribed by these Bylaws.  He or she may delegate any of his powers to any Vice President of the Corporation.  In the absence or disability of the President, the Chief Operating Officer shall exercise the powers and perform the duties of the President.

Section 4.6     Vice Presidents.  Each Vice President shall exercise such powers and perform such duties as may from time to time be assigned to him by the Board of Directors, the Chief Executive Officer, the President or the Chief Operating Officer.

Section 4.7     Chief Financial Officer or Treasurer.  The Chief Financial Officer or Treasurer shall perform all acts incident to the office of Chief Financial Officer or Treasurer, subject to the control and direction of the Board of Directors, and such other powers and duties as may from time to time be assigned to him by the Board of Directors or be prescribed by these Bylaws.  He or she shall have custody of such funds and securities of the Corporation as may come to his hands or be committed to his care by the Board of Directors.  When necessary or proper, he or she shall endorse on behalf of the Corporation, for collection, checks, notes, or other obligations, and shall deposit the same to the credit of the Corporation, in such bank or banks or depositories as the Board of Directors, the Chief Executive Officer, the President, or the Chief Operating Officer may designate.  He or she may sign receipts or vouchers for payments made to the Corporation, and the Board of Directors may require that such receipts or vouchers shall also be signed by some other officer to be designated by them.  Whenever required by the Board of Directors, he or she shall render a statement of his cash accounts and such other statements respecting the affairs of the Corporation as may be requested.  He or she shall keep proper and accurate accounts of receipts and disbursements and other matters pertaining to his office.  In the discretion of the Board of Directors, he or she may be required to give a bond in such amount and

containing such conditions as the Board of Directors may approve, and such bond may be the undertaking of a surety company, and the premium therefor may be paid by the Corporation.

Section 4.8    Corporate Secretary.  The Corporate Secretary shall perform all acts incident to the office of Secretary, subject to the control and direction of the Board of Directors, and such other powers and duties as may from time to time be assigned to him by the Board of Directors or be prescribed by these Bylaws.  He or she shall record the votes and proceedings of the stockholders and of the Board of Directors in a book or books kept for that purpose, and shall attend all meetings of the Directors and stockholders.  He or she shall keep in safe custody the seal of the Corporation, and, when required by the Board of Directors, or when any instrument shall have been signed by the Chief Executive Officer, the President, the Chief Operating Officer, or any other officer duly authorized to sign the same, or when necessary to attest any proceedings of the stockholders or Directors, shall affix it to any instrument requiring the same, and shall attest the same with his signature.  Except as otherwise required by the Certificate of Incorporation or these Bylaws, he or she shall attend to the giving and serving of notices of meetings.  He or she shall have charge of such books and papers as properly belong to his office or as may be committed to his care by the Board of Directors.  Except as otherwise required by the Certificate of Incorporation or these Bylaws, in the absence of the Corporate Secretary, or an Assistant Corporate Secretary, from any meeting of the Board of Directors, the proceedings of such meeting shall be recorded by such other person as may be appointed at the meeting for that purpose.

Section 4.9    Assistant Vice President.  Each Assistant Vice President shall exercise such powers and perform such duties as may be assigned to him by the Board of Directors.

Section 4.10   Assistant Corporate Secretary.  Each Assistant Corporate Secretary shall be vested with the same powers and duties as the Corporate Secretary, and any act may be done or duty performed by an Assistant Corporate Secretary with like effect as though done or performed by the Corporate Secretary.  He or she shall have such other powers and perform such other duties as may be assigned to him by the Board of Directors.

Section 4.11   Other Officers.  Such other officers as the Board of Directors may appoint shall perform such duties and have such powers as may from time to time be assigned to them by the Board of Directors.  The Board of Directors may delegate to the Chief Executive Officer the power to choose such other officers and to prescribe their respective duties and powers.

ARTICLE 5.
INDEMNIFICATION

~~**Section 5.1 Right to Indemnification. To the fullest extent permitted by law, the Corporation shall indemnify and hold harmless any person who was or is made or is threatened to be made a party or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding") by reason of the fact that such person, or the person for whom he is the legally representative, is or was a Director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans (any such person, a "Section 5.1 Indemnitee"), against all liabilities, losses, expenses (including attorney's fees), judgments, fines and amounts paid in settlement ("expenses") actually and reasonably incurred by such person in connection with such proceeding; *provided, however*, that except as otherwise provided in Section 5.4, the Corporation shall only be required to indemnify a person in connection with a proceeding (or part thereof) initiated by such person if the commencement of such proceeding (or part thereof) was authorized by the Board of Directors.**~~

~~**Section 5.2 Prepayment of Expenses. The Corporation shall pay the expenses incurred by a Section 5.1 Indemnitee in defending any proceeding in advance of its final disposition, provided that, to the extent required by law, the payment of expenses in advance of the final disposition of the proceeding shall be made only upon receipt of an undertaking by such person to repay all amounts advanced if it should be ultimately determined that such person is not entitled to be indemnified under this Article or otherwise. The Corporation may pay the expenses incurred by any other person in defending any proceeding in advance of its final disposition upon such terms and conditions as the Board of Directors deems appropriate.**~~

~~**Section 5.3 Claims. If a claim for indemnification or advancement of expenses under Section 5.1 or Section 5.2 is not paid in full within sixty (60) days after a written claim therefor by a Section 5.1 Indemnitee has been received by the Corporation, such Section 5.1 Indemnitee may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action, the Corporation shall have the burden of proving that such Section 5.1 Indemnitee is not entitled to the requested indemnification or advancement of expenses under applicable law.**~~

~~**Section 5.4 Repeal or Modification. Any repeal or modification of the provisions of this Article or applicable law shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring before the time of such repeal or modification regardless of whether the proceeding is brought or threatened before or after the time of such repeal or modification.**~~

Section 5.5    Non-Exclusivity of Rights.  The right to indemnification and advancement of expenses conferred on any person by this Article shall not be exclusive of any other rights such person may have or acquire under any other provision hereof, the Bylaws or by law, agreement, vote of stockholders or disinterested Directors or otherwise.

Section 5.6    Survival of Rights.  The right to indemnification and prepayment of expenses conferred on any person by this Article shall continue as to a person who has ceased to be a Director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

Section 5.7    Insurance.  The Corporation may purchase and maintain insurance on behalf of any person who is or was a Director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against any liability or expenses incurred by such person in connection with a proceeding, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Article or by law.

Section 5.8    Other Sources.  The Corporation's obligation, if any, to indemnify or advance expenses to any Section 5.1 Indemnitee who was or is serving at the Corporation's request as a director or officer of another corporation or a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, shall be reduced by any amount such Section 5.1 Indemnitee may collect as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or non-profit entity.

Section 5.9    Other Indemnification and Advancement of Expenses. This Article 5 shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Section 5.1 Indemnitees when and as authorized by appropriate corporate action.

ARTICLE 6.
STOCK

Section 6.1    Stock Certificates.  Every holder of capital stock shall be entitled to have a certificate representing such stock in such form as shall be approved by the Board of Directors, signed by or in the name of the Corporation by (a) the President or a Vice President, and (b) the Corporate Secretary or an Assistant Corporate Secretary or Treasurer or Assistant Treasurer.  Any or all the signatures on the certificate may be a facsimile.  In case any officer, transfer agent,

transfer clerk or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, transfer clerk or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent, transfer clerk or registrar at the date of issue.

Section 6.2    Lost, Stolen or Destroyed Certificates.  The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed.  When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates or such person's legal representative to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of any such Certificate or the issuance of such new Certificate.

# ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Fiscal Year.  The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 7.2    Seal.  The corporate seal shall have the name of the Corporation inscribed thereon and shall be in such form as may be approved from time to time by the Board of Directors.

Section 7.3    Execution of Checks, etc.  The funds of the Corporation shall be deposited in such banks or trust companies as the Board of Directors from time to time shall designate and shall be withdrawn only on checks or drafts of the Corporation for the purposes of the Corporation.  All checks, drafts, notes, acceptances and endorsements of the Corporation shall be signed in such manner and by such officer or officers or such individual or individuals as the Board of Directors from time to time by resolution shall determine.  If and to the extent so authorized by the Board of Directors, such signature or signatures may be facsimile.  Only checks, drafts, notes, acceptances and endorsements signed in accordance with such resolution or resolutions shall be the valid checks, drafts, notes, acceptances or endorsements of the Corporation.

Section 7.4    Evidence of Authority.  A certificate by the Corporate Secretary or an Assistant Corporate Secretary as to any action taken by the stockholders, the Board of Directors, a committee or any officer or representative of

the Corporation shall as to all persons who rely on the certificate in good faith be conclusive evidence of such action.

Section 7.5     Severability.  Any determination that any provision of these Bylaws is for any reason inapplicable, illegal or ineffective shall not affect or invalidate any other provision of these Bylaws.

Section 7.6     Nonvoting Stock.  Notwithstanding anything to the contrary in this Certificate of Incorporation, the Corporation shall not issue any nonvoting equity securities to the extent prohibited by Section 1123 or Section 365 of Title 11 of the United States Code as in effect on Effective Date; provided, however, that this Section 7.6 of Article 7, (a) shall have no further force and effect beyond that required under Section 1123 of the United States Bankruptcy Code, (b) shall have such force and effect, if any, only for so long as such Section is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time in effect.

ARTICLE 8.
AMENDMENTS

Section 8.1     Creation, Amendment and Repeal of Bylaws.  In furtherance and not in limitation of the powers conferred upon it by the laws of the State of Delaware, the Board of Directors shall have the power to adopt, alter, amend or repeal the Bylaws of the Corporation, subject to the power of the stockholders of the Corporation to alter or repeal any Bylaws whether adopted by them or otherwise.

CERTIFICATE OF ADOPTION

KNOW ALL PERSONS BY THESE PRESENTS:

That the undersigned does hereby certify that the undersigned is the Corporate Secretary of NorthWestern Corporation, a corporation duly organized and existing under and by virtue of the laws of the State of Delaware, that the above and foregoing Bylaws of NorthWestern Corporation were duly and regularly adopted as such by the Board of Directors of NorthWestern Corporation on the date hereof, and that the above and foregoing Bylaws are now in full force and effect.

DATED this _____ day of _____, 2004.

_____
**Name:**
**Title:  Corporate Secretary**


## EXHIBIT B

## INSURANCE ASSIGNMENT AND FUNDING AGREEMENT

This **INSURANCE ASSIGNMENT AND FUNDING AGREEMENT** (this **"Agreement"**) is made as of _____, 2004 by and among the D&O Insurance Contributors and the D&O Trust.  Capitalized terms used herein without definition shall have the meanings given to such terms in the Plan of Reorganization of Northwestern Corporation (the **"Plan"**) (as may be amended, modified or supplemented from time to time in accordance with the terms thereof).

WHEREAS, on September 14, 2003, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, to protect themselves from certain risks resulting from their businesses, the D&O Insurance Contributors maintained directors and officers liability insurance programs;

WHEREAS, the Released Parties have been named as defendants in numerous actions involving D&O Trust Claims or have been identified as responsible persons or entities in claim letters;

WHEREAS, the Bankruptcy Court has entered a Confirmation Order in the matter of In re NorthWestern Corporation, No. 03-12872 (CGC), United States Bankruptcy Court for the District of Delaware, confirming the Plan;

WHEREAS, the Plan requires the D&O Insurance Contributors to assign certain insurance rights and fund certain amounts to the D&O Trust;

WHEREAS, the D&O Insurance Contributors wish to comply with the terms, conditions, and requirements of the Plan and the Confirmation Order;

WHEREAS, the D&O Insurance Contributors are receiving good and valuable consideration in exchange for the transfers, grants, assignments, and promises made in this Agreement, including the consideration described in the Plan;

NOW, THEREFORE, subject to and on the terms and conditions herein set forth, the D&O Insurance Contributors hereby agree as follows:

I.    ASSIGNMENT TO THE D&O TRUST

A.    Effective upon the Effective Date, the D&O Insurance Contributors hereby irrevocably transfer, grant and assign to the D&O Trust any and all of their D&O Insurance Rights to the D&O Policies identified in Exhibit A attached hereto.

B.    The D&O Insurance Assignment is made free and clear of all encumbrances, and other claims or causes of action.

C.    The D&O Insurance Assignment is made to the maximum extent possible under applicable law.

D.    The D&O Insurance Assignment is absolute and does not require any further action by the Debtor, the non-debtor subsidiaries, non-Debtor Affiliates, the Reorganized Debtor, the D&O Trust, the Bankruptcy Court, or any other Person.

E.    The D&O Insurance Assignment is not an assignment of any insurance policy itself.

F.    To the extent the D&O Insurance Assignment is determined to be invalid by a court of competent jurisdiction, upon request by the D&O Trust, a D&O Insurance Contributor or the Reorganized Debtor, as applicable, shall (i) pursue any of the D&O Insurance Rights for the benefit of and to the fullest extent required by the D&O Trust, and (ii) immediately transfer any amounts recovered under or on account of any of the D&O Insurance Rights to the D&O Trust; provided, however, that while any such amounts are held by or under the control of the D&O Insurance Contributor, such amounts shall be held in trust for the benefit of the D&O Trust.

II.    FUNDING

A.    On the Effective Date, the D&O Insurance Contributors shall irrevocably transfer $_____ to the D&O Trust (the "D&O Transfer").

B.    The D&O Transfer is made free and clear of all encumbrances, and other claims or causes of action.

III.    COOPERATION

The D&O Insurance Contributors shall cooperate in the pursuit by the D&O Trust of the D&O Insurance Rights as reasonably requested by the D&O Trust. Such cooperation shall include, but not be limited to, making their books, records, employees, agents, and professionals available to the D&O Trust.

IV.     WARRANTIES AND REPRESENTATIONS

The D&O Insurance Contributors warrant and represent that:

A.     All insurance policies that the D&O Insurance Contributors have reason to believe potentially provide insurance coverage for D&O Trust Claims are described accurately on Exhibit B to the Plan.

B.     The D&O Insurance Contributors have not heretofore transferred, granted, or assigned, in whole or in part, any sums in excess of $37 million provided to the Settlement Fund under any of the D&O Insurance Policies, other than sums provided to the Settlement Fund.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned, by their authorized representatives as indicated below, have caused this D&O Insurance Assignment Agreement to be duly executed on their own behalf and on behalf of their respective predecessors, successors, parents, present and former Subsidiaries, divisions, Affiliates, and merged or acquired companies and operations.

By: _____

Name: NorthWestern Corporation, Debtor
     and Debtor in Possession

Title:

Date:

TBD     on Releasing Parties to sign

D&O TRUST

By: _____

Name:

Title:

Date:

EXHIBIT C

D&O POLICIES

| Insurer | Policy Type | Policy Number | Policy Amount | Policy Period Begin Date | Policy Period End Date |
|---|---|---|---|---|---|
| NORTHWESTERN CORPORATION POLICIES | | | | | |
| Assoc. Electric & Gas Ins. Svcs. Ltd. (AEGIS) | D&O Liability Insurance Policy | D0626A1A00 | $35,000,000.00 | June 1, 2000 | June 1, 2003 |
| Energy Ins. Mutual (EIM) | Excess Liability Insurance Policy | 900588-00D0 | $25,000,000.00 | June 1, 2000 | June 1, 2003 |

| Insurer | Policy Type | Policy Number | Policy Amount | Policy Period Begin Date | Policy Period End Date |
|---|---|---|---|---|---|
| Assoc. Electric & Gas Ins. Svcs. Ltd. (AEGIS) | Excess Liability Insurance Policy | X0626A1A02 | $35,000,000.00 | June 1, 2002 | June 1, 2003 |
| **MONTANA POWER COMPANY POLICIES** | | | | | |
| Assoc. Electric & Gas Ins. Svcs. Ltd. (AEGIS) | D&O Liability Insurance Policy | D0030A1A99 | $35,000,000.00 | May 1, 1999 | February 15, 2008 |
| Twin City Fire Ins. Co. (Hartford) | Excess Liability Insurance Policy | NDA0155398-99 | $15,000,000.00 | February 15, 2002 | February 15, 2008 |
| Federal Ins. Co. (Chubb) | Excess Liability Insurance Policy | 8141-60-17B | $25,000,000.00 | May 1, 1999 | February 15, 2008 |
| Reliance Ins. Co. | Excess D&O Liability Insurance Policy | NDA0155298-99H | $15,000,000.00 | May 1, 1999 | February 15, 2002 |
| AIG/Nat'l Union Fire Ins. Co. of Pittsburgh, PA | Excess Liability Insurance Policy | 213-9797 | $25,000,000.00 | February 15, 2002 | February 15, 2008 |
| **CORNERSTONE PROPANE PARTNERS LP POLICIES** | | | | | |
| Assoc. Electric & Gas Ins. Svcs. Ltd. (AEGIS) | General Partner Liability Insurance Policy | P0738A1A02 | $5,000,000.00 | June 30, 2002 | June 30, 2003 |
| ELU/Greenwich Ins. Co. | Excess Liability Insurance Policy | EX 71 01 09 99 | $15,000,000 | June 30, 2002 | June 30, 2003 |

\*     The fact of inclusion of an insurance policy on this Exhibit C does not constitute a determination or an admission as to whether any particular policy provides coverage for any matter resolved by the Plan or for any other matter.

## EXHIBIT D

## D&O PROTECTED PARTIES SETTLEMENT AGREEMENT

This D&O PROTECTED PARTIES SETTLEMENT AGREEMENT (this "Agreement") is made as of _____, 2004, and is effective on the Effective Date, by and among the D&O Protected Parties and the D&O Trust (as defined in

the Plan).  Certain capitalized terms used herein are defined in Article I below, and capitalized terms used herein without definition shall have the meanings given to such terms in the Plan.

## RECITALS

WHEREAS, on September 14, 2003, the Debtor filed its voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code (the "Chapter 11 Case") in the Bankruptcy Court;

WHEREAS, the Debtor, the other D&O Protected Parties and the D&O Trust have agreed to a settlement of the outstanding disputes among them concerning various issues, as reflected in this Agreement, and it is a condition to the effectiveness of the Plan that the parties enter into this Agreement;

WHEREAS, as part of the settlement, the parties have agreed to, among other things, cause the D&O Trust to be established for the benefit of potential D&O Trust Claim claimants and settlement of potential D&O Trust Claims, payment of the defense cost of any D&O Protected Party and to provide certain protections to the D&O Protected Parties, in light of the benefits to be provided to such claimants by means of the D&O Trust, pursuant to this Agreement and the other Plan Documents;

WHEREAS, the D&O Protected Parties have concluded it is in their respective best interests and the D&O Trust has concluded it is in the best interests of its beneficiaries to enter into this Agreement and to effect the settlement reflected in this Agreement and the other Plan Documents.

NOW, THEREFORE, in consideration of the mutual covenants and understandings contained herein, and subject to and on the terms and conditions herein set forth, the parties hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1    Definitions.  The following capitalized terms used herein shall have the meanings set forth below:

"Damage" to any specified Person means (x) any cost, damage (including any consequential, exemplary, punitive or treble damage) or expense (including reasonable fees and actual disbursements by attorneys, consultants, experts or other representatives and costs of litigation) to, any fine of or penalty on or any liability (including loss of earnings or profits) of any other nature of that Person, or (y) any fine or penalty imposed by any Governmental Authority upon that Person.

"**Governmental Approval**" means at any time any authorization, consent, approval, permit, franchise, certificate, license, implementing order or exemption of any Governmental Authority.

"**Governmental Authority**" means any federal, state, county, municipal or other government, domestic or foreign, or any agency, board, bureau, commission, court, department or other instrumentality of any such government.

"**Non-Debtor Subsidiaries**" means any Subsidiary of Debtor that has not filed a Chapter 11 Case.

"**Released Claim**" means any and all past, present or future claims, demands, causes of action, liabilities, and obligations whatsoever (whether any such claims, demands, causes of action, liabilities or obligations are reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefore are known or unknown, and whether in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) arising out of, resulting from or relating to, directly or indirectly, the business or operations of the Debtor, the ownership or the business or operations of the Non-Debtor Subsidiaries or Any Affiliates, any contract, agreement, arrangement or understanding with the Debtor, Non-Debtor Subsidiaries, Affiliates or any of their past or present Subsidiaries and/or Affiliates in effect prior to the Effective Date, any affiliation or relationship with the Debtor, Non-Debtor Subsidiaries, Affiliates or any of their past or present Subsidiaries and/or Affiliates prior to the Effective Date, and/or any legal or equitable claims or causes of action of any kind by the Debtor, Non-Debtor Subsidiaries and/or Affiliates of Debtor, relating to any period prior to the Effective Date (including any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct, of any of the D&O Protected Parties or any conduct for which any of the D&O Protected Parties may be deemed to have strict liability under any applicable law).

"**Subsidiary**" means with regard to any specified Person at any time, any Person a majority of the capital stock of which the specified entity owns or controls at that time, directly or indirectly, through another Subsidiary of the specified Person.

1.2     **Other Definitional Provisions.**

(a)     This Agreement uses the words "herein," "hereof" and "hereunder" and words of similar import to refer to this Agreement as a whole and not to any provision of this Agreement, and the words "Article," "Section," "Recitals," "Schedule" and "Exhibit" refer to Articles and Sections of, the Recitals to, and Schedules and Exhibits to, this Agreement unless otherwise specified.

(b)   Whenever the context so requires, the singular number includes the plural and vice versa, and a reference to one gender includes the other gender and the neuter.

(c)   Except where the context otherwise requires, the word "including" (and, with correlative meaning, the word "include") means including, without limiting the generality of any description preceding that word, and the words "shall" and "will" are used interchangeably and have the same meaning.

(d)   The term "business day" means any day other than a Saturday, Sunday or U.S. federal holiday.

(e)   All references to "$" or "dollars" are to U.S. dollars.

(f)   The language this Agreement uses will be deemed to be the language the parties hereto have chosen to express their mutual intent, and no rule of strict construction will be applied against any party hereto.

1.3   Captions. This Agreement includes captions to Articles, Sections and subsections of, and Schedules and Exhibits to, this Agreement for convenience of reference only, and these captions do not constitute a part of this Agreement for any other purpose or in any way affect the meaning or construction of any provision of this Agreement.

## ARTICLE 2

## CONTRIBUTIONS TO THE D&O TRUST

In consideration of the provision of the D&O Channeling Injunction and the releases and indemnification protection to be provided pursuant to the Plan and this Agreement, on behalf of the D&O Protected Parties, subject to the satisfaction (or waiver by the appropriate party or parties) of the conditions set forth in Article IV and effective as of the Effective Date, the D&O Protected Parties will execute and deliver the Insurance Assignment Agreement to the D&O Trust.

## ARTICLE 3

## RELEASE AND INDEMNIFICATION

3.1   General Release.

(a)   Subject to the satisfaction (or waiver by the appropriate party or parties) of the conditions set forth in Article IV, (i) the Debtor, the Reorganized Debtor, the Debtor's estate, and the D&O Trust hereby release each of the D&O Protected Parties; and (ii) the D&O Trust hereby releases each of the D&O

Protected Parties, to the fullest extent permitted by applicable law, from any and all past, present or future claims, demands, causes of action, liabilities, and obligations whatsoever (whether any such claims, demands, causes of action, liabilities or obligations are reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefore are known or unknown, and whether in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) arising out of, resulting from or relating to, directly or indirectly, the business or operations of the Debtor, the ownership and business or operations of the Non-Debtor Subsidiaries, any contract, agreement, arrangement or understanding with the Debtor, Non-Debtor Subsidiaries, or any of their past or present Subsidiaries in effect prior to the Effective Date, any affiliation or relationship with the Debtor, Non-Debtor Subsidiaries, or any of their past or present Subsidiaries prior to the Effective Date, and/or any legal or equitable claims or causes of action of any kind by the Debtor, Non-Debtor Subsidiaries of Debtor, relating to any period prior to the Effective Date, (including any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct, of any of the D&O Protected Parties or any conduct for which any of the D&O Protected Parties may be deemed to have strict liability under any applicable law) (collectively, the "Released Claims"), including with:

(i)    any and all past, present or future claims, demands, causes of action, liabilities, or obligations of any kind whatsoever arising out of, resulting from or relating to, directly or indirectly, D&O Trust Claims made under the Securities Act of 1933, as amended, the Securities and Exchange Act of 1934, as amended, the Sarbanes-Oxley Act of 2002, any other state or federal laws, or service by any of the D&O Protected Parties as a Director or Officer of Debtor or any of the Non-Debtor Subsidiaries;

(ii)    any and all past, present or future claims, demands, causes of action, liabilities, or obligations of any kind whatsoever arising out of, resulting from, or relating to, directly or indirectly, any and all other intercompany dealings between Debtor and/or its past and present Non-Debtor Subsidiaries (other than the Debtor and its past or present Non-Debtor Subsidiaries) on the one hand, and the Debtor and any of its past or present Subsidiaries, on the other hand, prior to the Effective Date;

(iii)    any and all past, present or future claims, demands, causes of action, liabilities, or obligations of any kind whatsoever arising from or relating to insurance or the placement of insurance coverage under which the Debtor or any of its past or present Non-Debtor Subsidiaries is or was an insured or additional insured, including all claims for contribution, indemnity, retrospective premiums, insurance coverages owed and reinsurance coverages owed; and

(iv)    any and all past, present or future claims, demands, causes of action, liabilities, or obligations of any kind whatsoever which may be asserted against any of the D&O Protected Parties, including claims and causes of action arising under Sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or similar Claims arising under state or any other law, including claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, corporate governance or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor or the Non-Debtor Subsidiaries (or any of their respective predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

(b)    Notwithstanding the foregoing, the Released Claims shall not include the obligations of Debtor and the other D&O Protected Parties under this Agreement and the Plan, the D&O Insurance Assignment Agreement, and the other Plan Documents.

3.2    Indemnification.

(a)    From and after the Effective Date, the D&O Trust shall protect, indemnify and hold harmless, to the fullest extent permitted by applicable law, each of (i) the Debtor, (ii) the other D&O Protected Parties, and (iii) the respective past, present and future representatives of the Person described in the foregoing clauses (i) - (ii) of this Section 3.2(a), from and against any and all Claims or Damages arising out of, resulting from or relating to, directly or indirectly: (A) any of the Released Claims, to the extent they are channeled (or purported to be channeled) to the D&O Trust as contemplated by the Plan; (B) all Damages relating to Claims referred to in the D&O Trust Channeling Injunction, to the extent such Claims are brought in jurisdictions outside the United States of America or are not otherwise, for any reason, subject to the D&O Trust Channeling Injunction; (C) any and all Claims or Damages arising out of, resulting from or relating to, directly or indirectly, the assignment or transfer to the D&O Trust of the rights to the coverages under the D&O Policies  (D) any and all Claims that have been or hereafter may be made by any claimant, insurer or other Person other than the Debtor, D&O Insurance Contributor or D&O Protected Party or a Released Party under the D&O Policies and/or any settlement, coverage-in-place, insurance, reinsurance or other agreement relating to any of the D&O Policies; and (E) any and all Claims and Damages arising out of Released Claims to the extent such Claims and Damages are based upon Claims brought by, on behalf of or in the name of the D&O Trust on account of or derived from D&O Trust Assets. If there shall be pending any claim against the D&O Trust for indemnification under this Section 3.2(a), the D&O Trust shall maintain sufficient assets (as determined in good faith by the trustee of the D&O Trust) to fund any payments in respect of that claim for indemnification. Any Person seeking indemnification pursuant to this

Section 3.2(a) for any Claim described above shall use its good faith efforts to provide prompt notice after becoming aware of any such Claim. If a party indemnified under this Section grants a waiver of the protection and benefits offered to it under the D&O Trust Channeling Injunction pursuant to Article 6 of the Plan, the indemnification provided under this Section shall not be entitled to any costs and expenses that would not have been incurred if such waiver had not been granted.

(b)     Any claim for indemnification from the D&O Trust pursuant to Section 3.2(a) shall be satisfied from the D&O Trust Assets.

(c)     From and after the Effective Date, the Debtor and Reorganized Debtor shall, jointly and severally, protect, indemnify and hold harmless, to the fullest extent permitted by applicable law, each of the D&O Protected Parties from and against any and all Claims and any and all Claims or Damages whatsoever arising out of, resulting from or relating to, directly or indirectly any of the Released Claims, except as provided for in Section 5.1 of the Plan.

## ARTICLE 4

## CONDITIONS TO CONSUMMATION OF THE SETTLEMENT

**4.1    Conditions to the Obligations of Each Party and the Effectiveness of the Releases and Indemnities Herein.** The obligation of each party hereto to take the actions contemplated to be taken by that party and the delivery or effectiveness of the releases or indemnities contemplated to be delivered or given by that party under this Agreement are subject to the occurrence of the Effective Date.

**4.2    Conditions to the Obligations of the Debtor.** The obligations of the Debtor with respect to the actions contemplated to be taken by it under this Agreement are subject to the satisfaction on or before the Effective Date, or the written waiver of the Debtor, of (i) the condition set forth in Section 4.1, and (ii) all the representations and warranties of the D&O Trust in this Agreement shall be true and correct as of the Effective Date as though made as of the Effective Date.

**4.3    Conditions to the Obligations of the D&O Trust.** The obligation of the D&O Trust with respect to the actions contemplated to be taken by it under this Agreement is subject to the satisfaction on or before the Effective Date, or the written waiver by the D&O Trust under Section 6.2, of (i) the condition set forth in Section 4.1 and (ii) all the representations and warranties of the Debtor in this Agreement shall be true and correct as of the Effective Date as though made as of the Effective Date.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

**5.1    Representations and Warranties of the Debtor.** The Debtor represents and warrants to the other parties to this Agreement as follows:

(i)    Organization and Qualification It is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation.

(ii)    **Authority.** It has the requisite corporate power and authority to enter into this Agreement and, subject to the conditions set forth herein, to consummate the settlement contemplated hereby. The execution and delivery by it of this Agreement have been duly authorized by all necessary corporate action on its part.

(iii)    **Enforceability.** This Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms hereof, except as that

enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

5.2    Representations and Warranties of the D&O Trust. The D&O Trust represents and warrants to the other parties to this Agreement as follows:

(i)    Authority. It has all requisite power and authority to enter into this Agreement and, subject to the conditions set forth herein, to consummate the settlement contemplated hereby. The execution and delivery of this Agreement by it has been duly authorized by all necessary action on its part.

(ii)    Enforceability. This Agreement has been executed and delivered by it and constitutes its valid and binding obligation, enforceable against it in accordance with the terms hereof, except as that enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally.

ARTICLE 6

GENERAL PROVISIONS

6.1    Binding Effect; Assignment; Third Party Beneficiaries. The Plan shall provide that this Agreement is binding on the Reorganized Debtor and the D&O Trust. This Agreement and the rights of the parties hereunder may not be assigned (except by operation of law) and will be binding on and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that no transfer or assignment shall release any party of its obligations hereunder. This Agreement is not intended, and shall not be construed, deemed or interpreted, to confer on any Person not a party hereto any rights or remedies hereunder, except as otherwise provided expressly herein.

6.2    Entire Agreement; Amendment; Waivers. This Agreement and the other Plan Documents shall constitute the entire agreement and understanding among the parties to this Agreement with respect to the subject matter hereof and supersede dl prior agreements and understandings, oral or written, among the parties hereto relating to the subject matter of this Agreement. This Agreement may not be amended or modified, and no provision hereof may be waived, except by an agreement in writing signed by the party against whom enforcement of any such amendment, modification or waiver is sought. The waiver of any of the terms and conditions hereof shall not be construed or interpreted as, or deemed to be, a waiver of any other term or condition hereof.

6.3    Termination of This Agreement.

(a)     This Agreement may be terminated at any time prior to the Effective Date solely:

(i)     by the mutual written consent of the parties hereto; or

(ii)    by any party hereto if the Effective Date shall not have occurred by _____, 2004.

(b)     If this Agreement is terminated under Section 6.3(a), there shall be no liability or obligation under this Agreement on the part of any party hereto.

6.4     No Admissions.  This Agreement does not constitute, and shall not be construed, interpreted or otherwise read to constitute any admission by any of the Debtor, D&O Insurance Contributor or the D&O Protected Parties with respect to any alleged D&O Trust Claim.

6.5     Notices.     All notices required or permitted under this Agreement must be in (i) writing and is deemed given when (a) delivered personally to the recipient, (b) sent by facsimile before 5:00 p.m. prevailing eastern time on a Business Day with a copy of such facsimile sent on the same day to the recipient by reputable overnight courier service (charges prepaid), (c) seven (7) days after deposit in the U.S. mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (d) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); and (ii) addressed to the other Persons at the addresses identified in Exhibit A hereto, or at such other address as such Person now designates from time to time in writing in accordance with this Section 6.5.

6.6     Governing Law: Jurisdiction.

(a)     This Agreement and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(b)     With respect to claims under this Agreement, each party hereby irrevocably (i) submits to the exclusive jurisdiction of the Bankruptcy Court, provided that to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then each party hereby submits to the exclusive jurisdiction of the federal and state courts in Wilmington, Delaware and (ii) agrees that any and all claims in respect of such action, suit or proceeding may be heard and determined in any such court.

6.7    **Exercise of Rights and Remedies**. Except as this Agreement otherwise provides, no delay or omission in the exercise of any right, power or remedy accruing to any party hereto as a result of any breach or default hereunder by any other party hereto will impair any such right, power or remedy, nor will it be construed, deemed or interpreted as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor will any waiver of any single breach or default be construed, deemed or interpreted as a waiver of any other breach or default hereunder occurring before or after that waiver. No right, remedy or election any term of this Agreement gives will be deemed exclusive, but each will be cumulative with all other rights, remedies and elections available at law or in equity.

6.8    **Reformation and Severability**. If any provision of this Agreement is invalid, illegal or unenforceable, that provision will, to the extent possible, be modified in such manner as to be valid, legal and enforceable but so as to most nearly retain the intent of the parties hereto as expressed herein, and if such a modification is not possible, that provision will be severed from this Agreement, and in either case the validity, legality and enforceability of the remaining provisions of this Agreement will not in any way be affected or impaired thereby, it being intended by each party hereto that all the rights and privileges of all parties hereto will be enforceable to the fullest extent permitted by applicable law.

6.9    **Counterparts**. This Agreement may be executed in multiple counterparts, each of which will be an original, but all of which together will constitute one and the same agreement.

**[Signature page follows]**

IN WITNESS WHEREOF, the parties hereto have executed this D&O Protected Parties Settlement Agreement as of the date first above written:

TBD

## EXHIBIT E

## NORTHWESTERN D&O TRUST AGREEMENT

This NORTHWESTERN D&O TRUST AGREEMENT (this "D&O Trust Agreement"), effective as of the Effective Date, is among NorthWestern Corporation, a Delaware corporation and the debtor and debtor-in-possession in case number 03-12872 (CGC) in the United States Bankruptcy Court for the District of Delaware (the Bankruptcy Court"), as settlor (the "Debtor" or the "Settlor"), and the Trustee identified on the signature page hereof and appointed on the Confirmation Date pursuant to the Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code of NorthWestern Corporation, as the same may be amended, modified or supplemented from time to time (the "Plan"). All capitalized terms used herein but not otherwise defined shall have the respective meanings given to such terms in the Plan and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

### RECITALS

WHEREAS, at the time of the entry of the order for relief in the Chapter 11 Case, the Debtor was named as a defendant in the D&O Proceedings; and

WHEREAS, the Debtor has reorganized under the provisions of Chapter 11 of the Bankruptcy Code in a case pending in the Bankruptcy Court known as *In re NorthWestern Corporation,* Case No. 03-12872 (CGC), United States Bankruptcy Court for the District of Delaware; and

WHEREAS, the Plan, filed by the Debtor and supported by the Official Committee of Unsecured Creditors, has been confirmed by the Bankruptcy Court; and

WHEREAS, the Plan Documents provide, among other things, for the creation of the D&O Trust; and

WHEREAS, pursuant to the Plan, the D&O Trust is to use its assets and income to pay D&O Trust Claims as and to the extent provided for herein and in the TDP; and

WHEREAS, pursuant to the Plan, the D&O Trust is intended to qualify as a "qualified settlement fund" (a "QSF") within the meaning of Section 1.468B-1(c) of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended from time to time (the "IRC"); and

WHEREAS, it is the intent of the Settlor and the Trustee that the D&O Trust be administered, maintained, and operated at all times as a qualified settlement fund through mechanisms that provide reasonable assurance that the D&O Trust will value, and be in a financial position to pay all D&O Trust Claims in strict compliance with the terms of this D&O Trust Agreement and the TDP; and

WHEREAS, the Plan provides, among other things, for the complete treatment of all liabilities and obligations of the Debtor (among others) with respect to D&O Trust Claims; and

WHEREAS, the Bankruptcy Court has determined that the D&O Trust and the Plan satisfy all the prerequisites for the injunction pursuant to Section 105(a) of the Bankruptcy Code provided for in the Plan, and such injunction has been entered by the Court.

NOW, THEREFORE, in consideration of the mutual covenants and understandings contained herein, and subject to and on the terms and conditions herein set forth, the parties hereby agree as follows:

ARTICLE 1
AGREEMENT OF TRUST

1.1    Creation and Name.  The Settlor hereby creates a trust known as the "NorthWestern Company D&O Trust" or the "D&O Trust" as a Delaware statutory trust, which is the D&O Trust to be created on the Effective Date pursuant to the Plan. The Trustee of the D&O Trust may transact the business and affairs of the D&O Trust in the name "NOR D&O Trust" or "NorthWestern D&O Trust".  Contemporaneously with the execution of this D&O Trust Agreement, the Settlor will file a Certificate of Trust for the creation of a statutory trust with the Secretary of State of Delaware.

1.2    Purpose.  The purpose of the D&O Trust is to assume liability for any D&O Trust Claims that arise out of or relate to the D&O Proceedings and to use the D&O Trust Assets to pay such D&O Trust Claims and the Defense Costs in accordance with this D&O Trust Agreement and the TDP, and in such a way that all holders of D&O Trust Claims that arise out of or relate to the D&O Proceedings

are treated in substantially the same manner. All D&O Trust Claims shall be paid in accordance with this D&O Trust Agreement and the TDP.

1.3    Acceptance of Assets and Assumption of Liabilities.

(a)    In furtherance of the purposes of the D&O Trust, the Trustee, on behalf of the D&O Trust, hereby expressly accept the transfer, issuance and assignment, as applicable, to the D&O Trust of the D&O Trust Assets at the time and in the manner contemplated by the Plan Documents, in accordance with the terms of this D&O Trust Agreement.

(b)    In furtherance of the purposes of the D&O Trust, the Trustee, on behalf of the D&O Trust, hereby expressly assumes all liability for any D&O Trust Claims that may arise out of the D&O Proceedings.  The D&O Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding the D&O Proceedings that the Debtor or any successors of the Debtor has or would have had under applicable law or under any agreement related thereto.

(c)    Nothing in this D&O Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the injunctions issued in connection with the Plan or the D&O Trust's assumption of the D&O Trust Claims as and when provided herein.

ARTICLE 2
POWERS AND TRUST ADMINISTRATION

2.1    Powers.

(a)    The Trustee is and shall act as a fiduciary to the D&O Trust in accordance with the provisions of this D&O Trust Agreement, the Plan, and Delaware law. The Trustee shall, at all times, administer the D&O Trust and the D&O Trust Assets in accordance with the purposes set forth in Section 1.2 of this D&O Trust Agreement.  Subject to the limitations set forth in this D&O Trust Agreement and the TDP, the Trustee shall have the power to take any and all actions that, in the reasonable judgment of the Trustee, are necessary or proper to fulfill the purposes of the D&O Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any statutory trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as otherwise specified herein, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below, the Trustee shall have the power to:

(i)     receive and hold the D&O Trust Assets, in the accounts described below;

(ii)     invest the monies held from time to time by the D&O Trust;

(iii)     sell, transfer, or exchange any or all of the D&O Trust Assets at such prices and upon such terms as the Trustee considers proper, consistent with the other terms of this D&O Trust Agreement;

(iv)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the D&O Trust to operate;

(v)     pay liabilities and reasonable expenses of the D&O Trust, including, without limitation, Trust Expenses;

(vi)     establish such funds, reserves and accounts within the D&O Trust estate, as deemed by the Trustee to be useful in carrying out the purposes of the D&O Trust;

(vii)     sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding or legal action;

(viii)     adopt and amend the D&O Trust By-laws in accordance with the terms thereof;

(ix)     supervise and administer the D&O Trust in accordance with the TDP and the terms hereof;

(x)     administer, amend, supplement, or modify the TDP in accordance with the terms thereof;

(xi)     appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants or alternative dispute resolution panelists and agents as the business of the D&O Trust requires, and to delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of the D&O Trust;

(xii)    pay employees, legal, financial, accounting, investment, auditing and forecasting, and other consultants, advisors, and agents reasonable compensation, including without limitation, compensation at rates approved by the Trustee for services rendered prior to the execution hereof;

(xiii)    compensate the Trustee, the TAC and their respective Representatives and reimburse reasonable out of pocket costs and expenses incurred by such Entities in connection with the performance of their duties hereunder, including, without limitation, costs and expenses incurred prior to the execution hereof;

(xiv)    execute and deliver such instruments as the Trustee considers proper in administering the D&O Trust;

(xv)    enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the D&O Trust, provided that such arrangements do not conflict with any other provision of this D&O Trust Agreement or the TDP;

(xvi)    in accordance with Section 3.4, indemnify the entities to be indemnified under Section 2.4 to the fullest extent that a corporation or trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and/or insure its representatives and purchase insurance for the D&O Trust and those entities for whom the D&O Trust has an indemnification obligation hereunder;

(xvii)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the D&O Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Sections 4.4 and 5.9;

(xviii)    consult with Reorganized Debtor, the Debtor's non-debtor subsidiaries and affiliates or their successors at such times and with respect to such issues relating to the conduct of the D&O Trust as the Trustee considers desirable;

(xix)    make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the D&O Trust or the name of Reorganized Debtor or any successor in interest, any D&O Trust Claim that arise out of or relate to the D&O Proceedings;

(xx)    merge or contract with other claims resolution facilities that are not specifically created by this D&O Trust Agreement or the TDP; provided that such merger or contract shall not (a) subject Reorganized Debtor or

any successor in interest to any risk of having any D&O Trust Claims asserted against it or them, (b) result in the imposition of any federal, state or local tax or assessment on Reorganized Debtor, or (c) otherwise jeopardize the validity or enforceability of the D&O Trust Channeling Injunction, or (d) unreasonably increase the D&O Trust Expenses;

(xxi)    defend against the D&O Proceedings;

(xxii)    seek to modify the Plan to the extent provided in Article VI of the Plan.

(xxiii)    obtain a tax identification number for the D&O Trust, communicate with the Internal Revenue Service and state and local taxing authorities on behalf of the D&O Trust, make payment of taxes on behalf of the D&O Trust, and file all applicable tax returns for the D&O Trust; and

(xxiv)    execute and deliver the D&O Protected Parties Settlement Agreement.

(d)    The Trustee shall not have the power to guarantee any debt of other entities.

(e)    The Trustee shall give the Debtor and/or the Reorganized Debtor prompt notice of any act performed or taken pursuant to Section 2.1(c)(ii), (iii), (iv), (vi), (vii), (viii), (ix), (x), (xiii), (xv), (xviii), (xix), (xx), (xxi), (xxii), (xxiii) and Section 2.2(f).

2.2    General Administration

(a)    To the extent not inconsistent with the terms of this D&O Trust Agreement, the D&O Trust By-laws shall govern the affairs of the D&O Trust and the Trustee shall act in accordance with the D&O Trust By-laws.  In the event of an inconsistency between the D&O Trust By-laws and this D&O Trust Agreement, this D&O Trust Agreement shall govern.

(b)    Tax Returns and Reports.

(i)    The Trustee shall cause to be obtained, at the cost and expense of the D&O Trust, a Federal Employer Identification Number ("FEIN") for the D&O Trust and shall cause such income tax and other returns and statements as are required by the applicable provisions of the IRC and the Treasury Regulations and such other state or local laws and regulations as may be applicable to be timely filed on behalf of the D&O Trust on the basis of a December 31 year end.  The Trustee shall take all steps necessary to ensure that any tax obligations imposed upon the D&O Trust are paid and shall otherwise comply with Section 1.468B-2 of

the Treasury Regulations and all other reporting obligations of the D&O Trust. The Trustee shall comply with all applicable withholding obligations as required under the applicable provisions of the IRC and such other state and local laws as may be applicable, and the regulations promulgated thereunder.

(ii)    The Trustee shall cause the Trust to qualify and maintain, qualification as a "qualified settlement fund" within the meaning of section 1.468B-1(c) of the Treasury Regulations promulgated under section 468B of the IRC.

(iii)    Within seventy-five (75) days (or earlier if required by law) after the end of each calendar year, the D&O Trust shall cause to be prepared and mailed such information as required by law to enable payees to complete and file each of their respective federal, state and local income and other tax returns. The Trustee also shall provide a copy of any filed tax returns of the D&O Trust to NOR when such return is filed.

(c)    (i)    The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, but, in any event, no later than one hundred twenty (120) days following the end of each fiscal year, an annual report containing financial statements of the D&O Trust (including, without limitation, a balance sheet of the D&O Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustee and accompanied by an opinion of such firm that such financial statements present fairly in all material respects the financial condition of the D&O Trust as of such fiscal year end and the results of its operations as of the year then ended in conformity with accounting principles generally accepted in the United States. The Trustee shall provide a copy of such reports to the Reorganized Debtor or its successor when such reports are filed with the Bankruptcy Court.

(ii)    Simultaneously with delivery of each set of financial statements referred to in Section 2.2(c)(i), the Trustee shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of D&O Trust Claims (and the amount paid in respect of each such D&O Trust Claims) disposed of during the period covered by the financial statements. The Trustee shall provide a copy of such reports to the NOR when such report is filed.

(iii)    All materials required to be filed with the Bankruptcy Court by this Section 2.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be filed with the Bankruptcy Court.

(d)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year budget and cash flow projections covering such fiscal year and the succeeding four fiscal years.  The Trustee shall provide a copy of the budget and cash flow to the Debtor.

(e)    The Trustee shall consult with the Debtor and/or Reorganized Debtor (i) on the implementation and administration of the TDP and (ii) on the implementation and administration of the D&O Trust.  The Trustee may consult with the TAC with respect to any other matter affecting the D&O Trust.  The Trustee shall meet with the Debtor and/or Reorganized Debtor not fewer than two (2) times each calendar year during the first two (2) years following the Effective Date and then one (1) time each calendar year thereafter, which shall be at a regular or special meeting of the Trustee as mutually agreed to by the Trustee and the Debtor and/or Reorganized Debtor, to discuss general matters regarding the administration of the D&O Trust, the review, allowance, and payment of D&O Trust Claims, and the condition of the D&O Trust Assets.

(f)    In addition to the other provisions contained in this D&O Trust Agreement or in the TDP requiring the consent of the Bankruptcy Court, the Trustee shall be required to obtain the consent of the TAC to:

(i)    amend any provision of this D&O Trust Agreement;

(ii)    terminate the D&O Trust pursuant to Section 6.2 hereof;

(iii)    change the number of Trustees to serve hereunder and appoint successor Trustees;

(iv)    settle the liability of any insurer under any D&O Policy;

(v)    change the compensation of the Trustee;

(vi)    amend or modify the TDP; or

(vii)    take any action pursuant to Section 2.1(c)(iii), 2.1(c)(viii), 2.1(c)(xxi) or 2.1(c).

2.3    Claims Administration    On the Effective Date, the Trustee shall promptly implement the TDP.  The TDP provides mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of present D&O Trust Claims and future demands, and other comparable mechanisms, that provide reasonable assurance that the D&O Trust will value and be in a financial position to pay D&O Trust Claims that arise out of or relate to the D&O Proceedings.

2.4    Indemnification of Trustee and Additional Indemnitees.

(a)    The D&O Trust shall indemnify and defend the Trustee, the D&O Trust's directors and officers, the TAC and their employees to the fullest extent that a corporation or trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend its directors, Trustee, officers and employees against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder. Additionally, any of the Additional Indemnitees, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or omission of such Additional Indemnitees with respect to (i) the Chapter 11 Case, (ii) the administration of the D&O Trust and the implementation of the TDP, or (iii) any and all activities in connection with this D&O Trust Agreement shall be indemnified and defended by the D&O Trust to the fullest extent that a corporation or trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend its officers, directors, Trustee, and employees, against reasonable expenses, costs and fees (including reasonable attorneys' fees and costs), judgments, awards, amounts paid in settlement, and liabilities of all kinds incurred by each Additional Indemnitee in connection with or resulting from such action, suit, or proceeding, if he or she acted in good faith and in a manner such Additional Indemnitee reasonably believed to be in, or not opposed to, the best interests of the holders of D&O Trust Claims whom the applicable Additional Indemnitee represents. Notwithstanding the foregoing, neither the Trustee nor any officer or employee of the D&O Trust shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which they are ultimately liable under Sections 4.4 or 5.9, as applicable.

(b)    Reasonable expenses, costs and fees (including reasonable attorneys' fees and costs) incurred by or on behalf of the Trustee or any Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative or arbitrative from which he or she is indemnified by the D&O Trust pursuant to Section 2.4(a), shall be paid by the D&O Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Trustee or Additional Indemnitee, to repay such amount in the event that it shall be determined ultimately by Final Order that such Trustee or any Additional Indemnitee is not entitled to be indemnified by the D&O Trust.

(c)    The Trustee shall have the power, generally or in specific cases, to cause the D&O Trust to indemnify the agents, advisors, or consultants of the D&O Trust to the same extent as provided in this Section 2.4 with respect to the Trustee.

(d)    Any indemnification under Section 2.4(c) of this D&O Trust Agreement shall be made by the D&O Trust upon a determination by the Trustee that indemnification of such Person is proper under the circumstances.

(e)    The Trustee may purchase and maintain reasonable amounts and types of insurance on behalf of the D&O Trust that covers and pay any individual who is or was a Trustee, director, officer, employee, agent or representative of the D&O Trust or an Additional Indemnitee against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, member of the TAC, director, officer, employee, agent or other representative to the extent permitted by the laws of the State of Delaware.

2.5    Encumbrance.  The Trustee and the Additional Indemnitees shall have an encumbrance upon the D&O Trust Assets which shall be satisfied first by any insurance proceeds from insurance policies obtained by the D&O Trustee under subsection 2.4(e) and then only if unsatisfied prior to any other Encumbrance thereon, and the D&O Trust hereby grants a security interest in the D&O Trust Assets, all proceeds thereof and all accounts into which such proceeds or the D&O Trust Assets are deposited or maintained to each of the Trustee and the Additional Indemnitees, to secure the payment of any amounts payable to them pursuant to Section 2.4, 4.5 or 5.6.  The D&O Trust shall take such actions as may be necessary or reasonably requested by the Trustee or any of the other Additional Indemnitees to evidence such Encumbrance (including, without limitation, filing appropriate financing statements).

### ARTICLE 3
### ACCOUNTS, INVESTMENTS, AND PAYMENTS

3.1    Accounts.  The Trustee may, from time to time, establish and maintain such accounts and reserves within the D&O Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of Trust Expenses payable hereunder and D&O Trust Claims in accordance with the TDP, and may, with respect to any such account or reserve, restrict the use of monies therein. In addition, the Trustee shall establish, as soon as practicable after the Effective Date, an account to be designated the "D&O Trust Account".  All D&O Trust Assets received by the D&O Trust and all proceeds of and earnings on D&O Trust Assets shall be held solely in the D&O Trust Account and shall be used to pay D&O Trust Claims, NOR Defense Costs and Trust Expenses as and to the extent provided in the TDP.

3.2    Investments.  Investment of monies held in the D&O Trust shall be administered in the manner in which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs, subject to the following limitations and provisions:

(a)    The D&O Trust shall not acquire, directly or indirectly, equity in any Person or business enterprise if, immediately following such acquisition, the D&O Trust would hold more than 5% of the equity in such Person or business enterprise. The D&O Trust shall not hold, directly or indirectly, more than 10% of the equity in any Person or business enterprise.

(b)    The D&O Trust shall not acquire or hold any long-term debt securities unless (i) such securities have a maturity of not less than one (1) year from the date of purchase and are rated "A" or higher by Moody's Investors Services, Inc. ("Moody's") or by Standard & Poor's Corporation ("S&P"), or (ii) such securities have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof and have a maturity of not more than two (2) years from the date of purchase.

(c)    The D&O Trust shall not acquire or hold any United States direct obligation (e.g., Treasury bills, notes and bonds) unless the United States direct obligation has a maturity of not more than two (2) years from the date of purchase.

(d)    The D&O Trust shall not acquire or hold any commercial paper not: of a foreign or domestic corporation that has a maturity of not more than six (6) months unless such commercial paper is rated "A-I" or higher by Moody's or "A I" or higher by S&P.

(e)    The D&O Trust shall not acquire or hold any promissory note of a domestic or foreign corporation unless the note has a maturity of not more than two (2) years from the date of purchase and such note is rated "A" or higher by Moody's or S&P.

(f)    The D&O Trust shall not acquire or hold any foreign or domestic banker's acceptance, certificate of deposit, time deposit or note, unless that instrument has a maturity of not more than one (1) year from the date of purchase and is rated "A" or higher by Moody's or S&P.

(g)    The D&O Trust may acquire a short term or long term issue which is a direct or indirect obligation of any state, county, city or other qualifying Person. A short term issue may be rated no lower than "MIG 1" or "SP-1"; a long-term issue may be rated no lower than "A" by S&P or Moody's. Issuers must have a maturity or redemption option of not more than two (2) years from the date of purchase.

(h)    The D&O Trust may invest in a money market fund if the fund has minimum net assets of $550 million and an average portfolio maturity of not more than 180 days.

(i)    The D&O Trust shall not acquire or hold any common or preferred stock or convertible securities unless such stock or securities are rated "A" or higher by Moody's or "A" or higher by S&P's, and have a maturity of not less than one (1) year from the date of purchase.

(j)    The D&O Trust shall not acquire any securities or other instruments issued by any Person (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate fair market value as determined in good faith by the Trustee of all securities and instruments issued by such Person held by the D&O Trust would exceed 2% of the aggregate value of the D&O Trust estate. The D&O Trust shall not hold any securities or other instruments issued by any Person (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) to the extent that the aggregate fair market value as determined in good faith by the Trustee of all securities and instruments issued by such Person and held by the D&O Trust would exceed 5% of the aggregate value of the D&O Trust estate.

(k)    The D&O Trust shall not acquire or hold any certificates of deposit unless all publicly held, long term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b).

(l)    The D&O Trust shall not acquire or hold any options or derivatives.

(m)    The D&O Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustee, they are adequately collateralized.

3.3    Source of Payments.  All Trust Expenses and all liabilities with respect to the D&O Trust Claims and the NOR Defense Costs shall be payable solely by the D&O Trust out of the D&O Trust Account only to the extent of D&O Trust Assets.  Neither the Debtor, Reorganized Debtor, their respective Affiliates or subsidiaries, any successor in interest or the present or former stockholders, directors, officers, employees or agents of the Debtor, Reorganized Debtor, or their subsidiaries, nor the Trustee, or any of their officers, directors, agents, advisors, or employees shall be liable for the payment of any D&O Trust Claims, Trust Expense, NOR Defense Costs or any other liability of the D&O Trust.

3.4    Indemnification.

(a)    The D&O Trust shall indemnify the Debtor and the Released Parties in accordance with the D&O Protected Parties Settlement Agreement.

ATL/1005339.12    58

(b)    Any claim for indemnification from the D&O Trust and all costs and expenses associated therewith shall be satisfied solely from the D&O Trust Assets.

ARTICLE 4
TRUSTEE

4.1    Number.    The initial number of Trustees shall be one (1); provided, however, that the number of Trustees may be increased or decreased in accordance with Section 2.2(f)(iii) hereof.    The initial Trustee shall be appointed by the Bankruptcy Court pursuant to Section 6.2 of the Plan and named on the signature page hereof.

4.2    Term of Service.

(a)    The initial Trustee shall serve from the Effective Date and each successor Trustee named to fill a vacancy shall serve from the date of appointment until the earlier of (i) his or her death, (ii) the end of the calendar year in which he or she reaches age 70, (iii) his or her resignation pursuant to Section 4.2(b), (iv) his or her removal pursuant to Section 4.2(c), or (v) the termination of the D&O Trust pursuant to Section 6.2.

(b)    The Trustee may resign at any time by written notice to each member of the TAC. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given.

(c)    The Trustee may be removed in the event that such Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause.    Good cause shall be deemed to include, without limitation, any substantial failure to comply with Section 3.2, a consistent pattern of neglect and failure to perform or participate in performing the duties of a trustee hereunder, or repeated non-attendance at scheduled meetings.    Such removal shall be made upon effect at such time as the TAC shall determine.

4.3    Appointment of Successor Trustee.

(a)    In the event of a vacancy in the position of a Trustee, the vacancy shall be filled by the joint consent of the proposed successor Trustee and the TAC.  If such vacancy has not been filled within ninety (90) days of the event causing the vacancy, the Bankruptcy Court shall fill the vacancy on application of any members of the TAC.

(b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.

4.4     **Liability of Trustee, Officers and Employees.**  No Trustee, officer, or employee of the D&O Trust shall be liable to the D&O Trust, to any Person holding a D&O Trust Claim, or to any other Person except to the extent of such individual's (i) own breach of trust committed in bad faith or (ii) willful misappropriation.  Such protection may, in the discretion of the Trustee, be extended to the agents, advisors, or consultants of the D&O Trust.  No Trustee, officer, or employee of the D&O Trust shall be liable for any act or omission of any other officer, employee, agent or consultant of the D&O Trust, unless such Trustee, officer, employee or consultant of the D&O Trust, respectively, acted with bad faith in the selection or retention of such other officer, employee, agent, or consultant of the D&O Trust.

4.5     **Compensation and Expenses of Trustee.**

(a)     The Trustee shall receive compensation from the D&O Trust for his or her services as a Trustee in the amount of $_____[1] per annum plus a per diem allowance for meetings or other D&O Trust business attended in the amount of $_____[2]; provided, however, that if a meeting was less than a full day's duration, the Trustee shall receive only a proportional payment of the per diem amount.  The per annum compensation payable to each Trustee hereunder shall be reviewed every three (3) years and appropriately adjusted with the consent of the TAC.

(b)     The D&O Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his or her duties hereunder.

(c)     The D&O Trust will include a description of the amounts paid under this Section 4.5 in the report to be filed pursuant to Section 2.2(c)(i) of this D&O Trust Agreement.

4.6     **Trustee's Employment of Experts**.  The Trustee may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors and forecasters, and other Entities deemed by the Trustee to be qualified as experts on the matters submitted to them with the consent of the TAC, and the

---

[1]  To be determined prior to or on the Confirmation Date.

[2]  To be determined prior to or on the Confirmation Date.

opinion of any such Entities on any matters submitted to them by the Trustee shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of any such Person, in the absence of gross negligence.

4.7     Trustee' Independence.  No Trustee shall, during the term of his or her service, hold a financial interest in, act as attorney or agent or subsidiaries for, or serve as any other professional for Reorganized Debtor, any non-debtor affiliates of the Debtor, or any of their successors or any Person who holds a D&O Trust Claim.  No Trustee shall act as an attorney for any Person who holds a D&O Trust Claim.

4.8     Bond.  The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

ARTICLE 5
TRUST ADVISORY COMMITTEE

5.1     Formulation and Number.  The TAC shall be formed pursuant to the Plan as of the Effective Date. The TAC shall be composed of three (3) members to be appointed by the Debtor, the Official Committee and the D&O Trust Claimants.  The initial members of the TAC are identified on the signature page hereto.  The TAC shall have a chairperson who shall act as the TAC's liaison with the D&O Trust, coordinate and schedule meetings of the TAC, and handle all administrative matters that come before the TAC.

5.2     Duties.  The TAC and its members shall serve in a fiduciary capacity representing all holders of present D&O Trust Claims.  Where provided in this D&O Trust Agreement or the TDP, certain actions by the Trustee are subject to the consent of the TAC.

5.3     Term of Office.

(a)     Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b), (iii) his or her removal pursuant to Section 5.3(c) or (iv) the termination of the D&O Trust pursuant to Section 6.2.

(b)     Any member of the TAC may resign at any time by written notice to each of the remaining TAC members.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     Any member of the TAC may be removed in the event he or she becomes unable to discharge his or her duties hereunder due to accident,

physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include, without limitation, a consistent pattern of neglect and failure to perform or to participate in performing duties of such member hereunder and under the TDP, such as repeated non-attendance at scheduled meetings. Such removal shall be made by the majority vote of the Trustee and the other members of the TAC, and shall take effect at such time as the Trustee and the other members of the TAC jointly determine.

5.4    Appointment of Successors.  A vacancy in the TAC caused by resignation, death, or removal shall be filled by an individual appointed by either the Debtor and/or Reorganized Debtor, the Committee or the D&O Trust Claimants based on the initial appointment of the departed member.

5.5    The TAC's Employment of Professionals.  The TAC may retain and/or consult with counsel, accountants, appraisers, auditors, forecasters and other Entities deemed by the TAC to be qualified as experts on matters submitted to them, and the opinion of any such Entities on any matters submitted to them shall be full and complete authorization and protection in support of any action taken or not taken by the TAC hereunder in good faith and in accordance with the written opinion of any such Person, and in the absence of gross negligence. The TAC and its experts shall at all times have complete access to the D&O Trust's officers, employees and agents, and the accountants, appraisers, auditors, forecasters and other experts retained by the D&O Trust as well as all information generated by them or otherwise available to the D&O Trust or the Trustee.

5.6    Compensation for Attendance at Meetings and Expenses of the TAC.  The members of the TAC shall be compensated for attendance at meetings as follows: _____.[3]  The D&O Trust will promptly reimburse, or pay directly if so instructed, the TAC and each TAC member for all reasonable out-of-pocket costs and expenses, including reasonable fees and costs associated with employment of professionals pursuant to Section 5.5 and the procurement and maintenance of insurance incurred by the TAC in connection with the performance of its members' duties hereunder. Such reimbursement or direct payment shall be deemed a Trust Expense.

5.7    Procedure for Obtaining Consent of the TAC.

(a)    In the event the consent of the TAC is required pursuant to the terms of this D&O Trust Agreement, the Trustee shall promptly provide the TAC and its counsel with notice and with all information regarding the matter in question.

---

[3]  To be determined prior to or on the Confirmation Date.

(b)    The TAC must consider in good faith and in a timely fashion any request by the Trustee and may not withhold its consent unreasonably. If the TAC does not notify the Trustee of its objection to such request within 45 days or such other time as has been approved by the Bankruptcy Court after receiving notice and information regarding such request, then the TAC's consent shall be deemed to have been affirmatively granted.

(c)    Except where otherwise provided for in this D&O Trust Agreement, the TAC shall act in all cases by majority vote.

5.8    Lack of Consent of the TAC.

(a)    In the event the Trustee is unable to obtain the consent of the TAC on any action or decision for which consent of the TAC is required, after following the procedure set forth in Section 5.7 of this D&O Trust Agreement, or if the Trustee and the TAC are unable to reach agreement on any matter on which the TAC's consent is required, then the matter may be submitted promptly to alternative dispute resolution if mutually agreeable to the Trustee and the TAC.

(b)    If the disagreement is not resolved by alternative dispute resolution, or if the Trustee and the TAC do not agree to participate in any such alternative dispute resolution, the Trustee may apply to the Bankruptcy Court on an expedited basis for approval of such action or decision. If such approval is given by the Bankruptcy Court by entry of an appropriate order, the Trustee shall have the authority to implement such action or decision without any further consent of the TAC.

5.9    Liability of the TAC, Officers and Employees. No member of the TAC shall be liable to the D&O Trust, to any Person holding D&O Trust Claims, or to any other Person except to the extent of such individual's (i) own breach of trust committed in bad faith or (ii) willful misappropriation. Such protection may, in the discretion of the Trustee, be extended to the agents, advisors, or consultants of the TAC. No member of the TAC, nor any officer or employee of the TAC, shall be liable for any act or omission of any other officer, employee, agent or consultant of the TAC unless the TAC, or officer or employee of the TAC, acted with bad faith in the selection or retention of such other officer, employee, agent, or consultant of the D&O Trust.

ARTICLE 6
GENERAL PROVISIONS

6.1    Irrevocability. The D&O Trust is irrevocable.

6.2    Termination.

(a)     The D&O Trust shall automatically terminate on the date ninety (90) days after the first to occur of the following events (the "Termination Date"):

(i)     subject to Section 2.2(f), the Trustee in his or her discretion decide to terminate the D&O Trust because (A) D&O Trust Claims duly filed with the D&O Trust have been Allowed and paid to the extent provided in this D&O Trust Agreement and the TDP (and to the extent possible based upon the funds available through the Plan Documents), or disallowed by a final, non-appealable order, or (B) in the event that each of the D&O Proceedings is fully and finally discharged with no liability of the D&O Trust; or

(ii)     if the Trustee has procured and has in place irrevocable insurance policies and has established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the D&O Trust in a manner consistent with this D&O Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order.

(b)     On the Termination Date after payment of all the D&O Trust's liabilities, after all demands have been provided for and after liquidation of all properties and other non-cash D&O Trust Assets then held by the D&O Trust, all monies remaining in the D&O Trust estate shall be given to such organization(s) exempt from federal income tax under section 501(c)(3) of the IRC, which tax-exempt organizations shall be selected by the Trustee using their reasonable discretion; provided, however, that the tax-exempt organization(s) shall not bear any relationship to Reorganized Debtor within the meaning of Section 468B(d)(3) of the IRC. Notwithstanding any other provision of the Plan Documents, this Section 6.2(b) cannot be modified or amended.

6.3     Amendments.  The Trustee, after consultation with the TAC, and subject to the consent of the TAC to the extent provided elsewhere in this D&O Trust Agreement, may modify or amend this D&O Trust Agreement or any document annexed to it, including, without limitation, the D&O Trust By-laws or the TDP (provided that the provisions of the TDP, if any, regarding any such modification or amendment are also followed).  Any modification or amendment made pursuant to this Section 6.3 must be done in writing.  Notwithstanding anything contained in this D&O Trust Agreement to the contrary, neither this D&O Trust Agreement, the D&O Trust By-laws, the TDP nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify the efficacy or enforceability of the D&O Trust Channeling Injunction set out in the Plan, the D&O Trust's QSF status under section 468B of

the IRC or the rights of the Debtor or the Reorganized Debtor under the Plan Documents.

6.4    Meetings.  The Trustee or a TAC member shall be deemed to have attended a meeting in the event such person spends a substantial portion of the day conferring, by phone or in person, on D&O Trust matters with the Trustee or a TAC member, as applicable.  The Trustee shall have complete discretion to determine whether a meeting, as described herein, occurred for purposes of this D&O Trust Agreement.

6.5    Severability.  Should any provision in this D&O Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this D&O Trust Agreement.

6.6    Notices.  Notices to Entities asserting D&O Trust Claims shall be given at the address of such Person, or, where applicable, such Person's representative, in each case as provided on such person's claim form submitted to the D&O Trust with respect to his or her or its D&O Trust Claim or as otherwise provided to the D&O Trust.  Any notices or other report required or permitted by this D&O Trust Agreement must be in (i) writing and is deemed given when (a) delivered personally to the recipient, (b) sent by facsimile before 5:00 p.m. prevailing eastern time on a Business Day with a copy of such facsimile sent on the same day to the recipient by reputable overnight courier service (charges prepaid), (c) seven (7) days after deposit in the U.S. mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (d) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); and (ii) addressed to the other Persons at the addresses set forth below, or at such other address as such Person now designates from time to time in writing in accordance with this Section 6.6.

To the D&O Trust through the Trustee:

_____
_____
Attention: _____
Fax: _____

To the TAC:

_____
_____
_____
Attention: _____
Fax: _____

To Debtor, Settlor or Reorganized Debtor:

> NorthWestern Corporation
> 125 South Dakota Avenue
> Sioux Falls, SD 57104
> Attn:   William M. Austin
>            Eric R. Jacobsen, Esq.

With a copy to:

> Paul Hastings Janofsky & Walker, LLP
> 600 Peachtree Street
> Suite 2400
> Atlanta, GA 30308
> Attn:   Jesse H. Austin, III, Esq.
>            Karol K. Denniston, Esq.
> Co-Counsel to the Debtor and Debtor-in-Possession

Successors and Assigns.  The provisions of this D&O Trust Agreement shall be binding upon and inure to the benefit of the Debtor, Reorganized Debtor, the D&O Trust and the Trustee and their respective successors and assigns, except that neither the Debtor nor the D&O Trust nor the Trustee may assign or otherwise transfer any of its, or his or her rights or obligations under this D&O Trust Agreement, except, in the case of the D&O Trust and the Trustee.

Limitation on Claim Interests for Securities Laws Purposes.  D&O Trust Claims and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution and except that the foregoing shall not apply to any holder of a D&O Trust Claim that is subrogated to a D&O Trust Claim as a result of its satisfaction of such D&O Trust Claim, (b) shall not be evidenced by a certificate or other instrument, (c) shall not possess any voting rights, and (d) shall not be entitled to receive any dividends or interest.

Entire Agreement; No Waiver.  The entire agreement of the parties relating to the subject matter of this D&O Trust Agreement is contained herein and in the documents referred to herein, and this D&O Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege.  The rights and remedies herein

provided are cumulative and are not exclusive of rights under law or in equity, except as otherwise provided in the D&O Trust Channeling Injunction.

Headings. The headings used in this D&O Trust Agreement are inserted for convenience only and neither constitute a portion of this D&O Trust Agreement, nor in any manner affect the construction of the provisions of this D&O Trust Agreement.

Governing Law. This D&O Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to Delaware conflict of laws principles.

Dispute Resolution. Any disputes that arise under this D&O Trust Agreement or under the TDP or the D&O Trust By-laws shall be resolved by the Bankruptcy Court pursuant to the Plan, except as otherwise provided herein, or in the TDP or in the D&O Trust By-laws. Notwithstanding anything else herein contained, to the extent any provision of this D&O Trust Agreement is inconsistent with any provision of the Plan, the Plan shall control.

Enforcement and Administration. The provisions of this D&O Trust Agreement and the annexes hereto shall be enforced by the Bankruptcy Court pursuant to the Plan. The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustee.

Effectiveness. This D&O Trust Agreement shall not become effective until such time as it has been approved by the Bankruptcy Court and executed and delivered by all the parties hereto, and the Effective Date of the Plan has occurred.

Counterpart Signatures. This D&O Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

Notices Under Plan Documents. The Trustee shall deliver to the TAC a copy of all written notices that the D&O Trust or the Trustee gives or receives under any of the Plan Documents (other than the TDP) promptly after receipt of the same. Notices to the TAC under the TDP shall be governed by the provisions of the TDP.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties have executed this NorthWestern D&O Trust Agreement this day of _____, 2004.

SETTLOR:

By:    NORTHWESTERN CORPORATION, DEBTOR AND DEBTOR IN POSSESSION

Name:_____

Title:_____

TRUSTEE:

_____

Name:

TRUST ADVISORY COMMITTEE:

_____

Name:

_____

Name:

_____

Name:

EXHIBIT F

NORTHWESTERN CORPORATION
D&O TRUST DISTRIBUTION PROCEDURES

These NorthWestern Corporation D&O Trust Distribution Procedures ("**TDP**") provide for satisfying all future judgments awarded to the

plaintiffs in the D&O Proceedings ("D&O Proceedings Final Order"), as provided in and required by NorthWestern Corporation's Plan of Reorganization ("Plan") and the NorthWestern Corporation D&O Trust Agreement ("D&O Trust Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan or in the D&O Trust Agreement.

The Plan and the D&O Trust Agreement establish the D&O Trust. The Trustee shall implement and administer this TDP in accordance with the D &O Trust Agreement.

## ARTICLE 1

## INTRODUCTION

1.1    Purpose.  This TDP has been adopted pursuant to the D&O Trust Agreement.  It is designed to provide fair and equitable treatment for all D&O Proceedings Final Order in substantially the same manner.

1.2    Interpretation  Nothing in this TDP shall be deemed to create a substantive right for any claimant.

1.3    Definitions.  The following capitalized terms used herein shall have the meanings set forth below:

"Claimant's Jurisdiction" means the jurisdiction in which the claim was filed (if at all) against NOR prior to the Petition Date.

"Defense Costs" means legal fees and associated expenses (including expert fees) incurred in defending the D&O Trust Claims by (a) NOR, or (b) any Other Insureds (as such term is defined in the Defense Cost Motion).

"D&O Proceedings" means any proceeding, and/or claim against the Debtor or D&O Protected Party, currently existing or initiated prior to the Effective Date, which may be covered by the D&O Policies, including, but not limited to, the following:

(a)    In re Cornerstone Propane Partners LP Securities Litigation (Case No. 03-2522 MHP), a consolidated securities class action pending in the United States District Court for the Northern District of California before the Honorable Marilyn Hall Patel;

(b)    Mewhinney v. Cornerstone Propane, GP, Inc. (Case No. 032-01181(a), Cir. Ct of the City of St. Louis, MO), a securities class action in the city court of St. Louis, Missouri;

(c)    McGreevey, et al. v. The Montana Power Company, et al. (Case No. CV 03-01-BU-SEH), a securities class action pending in the United States District Court for the District of Montana before the Honorable Sam E. Haddon;

(d)    In re Touch America ERISA Litigation (Case No. CV-02-106-BU-SEH), an ERISA class action pending in the United States District Court for the District of Montana before the Honorable Sam E. Haddon; and

(e)    Securities and Exchange Commission ("SEC") Inquiry (D-02572-A) (the "SEC Inquiry"), a non-public SEC inquiry into various issues.

"D&O Proceedings Final Order" means the final nonappealable order of the relevant court providing for a Final Award in any D&O Proceedings or finally approving a settlement, or the final judgment of the SEC (in the case of the SEC Inquiry).

"**D&O Policies**" means the policies set forth on Exhibit C to the Plan.

"**D&O Trust**" means the NorthWestern Corporation D&O Trust established by the D&O Trust Agreement and related documents.

"**D&O Trust Claim**" means claims regarding the D&O Proceedings including rights of indemnification, contribution and similar rights as well as the amount of any D&O Proceedings Final Order apportioned to an individual plaintiff in any D&O Proceeding in accordance with any court order fully and finally awarding a judgment to the plaintiffs in any D&O Proceeding.

"**D&O Trust Agreement**" means the NorthWestern Corporation D&O Trust Agreement.

"**D&O Trust Claim Holder**" means the holder of a D&O Trust Claim.

"**Effective Date**" shall have the meaning set forth in the Plan.

"**FIFO**" means first-in-first-out.

"**NOR**" means NorthWestern Corporation.

"**Plan**" means NorthWestern Corporation's Plan of Reorganization.

"**TDP**" means these NorthWestern Corporation D&O Trust Distribution Procedures.

"**Trustee**" shall have the meaning set forth in the Plan.

**ARTICLE 2**

**OVERVIEW**

2.1     D&O Trust Goals.  The goal of the D&O Trust is to treat all D&O Trust Claim holders equitably.  This TDP furthers that goal by setting forth procedures for processing and paying D&O Trust Claims on an impartial, first-in-first-out ("FIFO") basis.  To this end, this TDP provides that the amount of all D&O Trust Claims will be distributed by the D&O Trust in accordance with the procedures established by any D&O Proceedings Final Order, on a FIFO basis, as more fully described in Section 4.1(b) hereof.

2.2     Payment of Defense Costs.  The D&O Policies, subject to their terms, conditions and exclusions, include coverage for NOR Defense Costs.  The TDP provides that, in addition to paying D&O Trust Claims, the D&O Trust will pay all NOR Defense Costs upon receipt and determination of validity, as more fully described in Section 4.2 hereof.

2.3     Reorganized Debtor's Contribution to NOR Defense Costs.  In the event the D&O Trust funds are exhausted and directors and officers of the Debtor as of the Petition Date have outstanding and unpaid Defense Costs claims, the Reorganized Debtor shall pay such claims up to and not to exceed $5.0 million when such claims are determined to be valid by the trustee under the D&O Trust.

ARTICLE 3

TDP ADMINISTRATION

3.1    Trust Advisory Committee.  Pursuant to the Plan and the D&O Trust Agreement, this TDP will be administered by the Trustee in consultation with the TAC.  The Trustee shall obtain the consent of the TAC on any amendments to this TDP pursuant to Section 5.1 below, and on such other matters as are otherwise required herein or in the D&O Trust Agreement.  The Trustee shall also consult with the TAC on such matters as are provided below and in Section 2.2(f) of the D&O Trust Agreement.  The initial members of the TAC are identified on the signature pages to the D&O Trust Agreement.

3.2    Consent and Consultation Procedures.  In those circumstances in which consultation or consent is required hereunder, the Trustee will provide written notice to the TAC of the specific amendment or other action that is proposed.  The Trustee will not implement such amendment nor take such action unless and until the parties have engaged in the consent process described in Section 5.7 of the D&O Trust Agreement.

## ARTICLE 4

## RESOLUTION OF D&O TRUST CLAIMS

4.1    Payment of D&O Trust Claims.

(a)    Establishing a D&O Trust Claim.  Upon the entry of a D&O Proceedings Final Order, holders of D&O Trust Clams or their counsel shall provide to the D&O Trust a certified copy of such D&O Proceedings Final Order out of such D&O Proceeding (together, the "Notice of D&O Trust Claim").  Upon

receipt of a Notice of D&O Trust Claim, the Trustee shall take all actions necessary to comply with the D&O Proceedings Final Order provided by such Notice of D&O Trust Claim, including without limitation the payment of all D&O Trust Claims created by such D&O Proceedings Final Order.

(b)    Order of Payment of Claims.  D&O Trust Claims shall be paid in FIFO order based on the date of entry of the D&O Proceedings Final Order providing for in the D&O Proceeding giving rise to such D&O Trust Claim.  Among D&O Trust Claims created by the same D&O Proceedings Final Order, D&O Trust Claims will be paid in accordance with the D&O Proceedings Final Order giving rise to such D&O Trust Claim.

4.2    Payment of Indemnification and Contribution Claims and Defense Costs.  On a monthly basis NOR and any other D&O Trust Claim Holder shall submit to the Trustee a notice setting forth the amount of Defense Costs incurred during the previous month (collectively, the "Defense Cost Notice") and provide copies of any Bankruptcy Court orders, to the extent required, regarding such Defense Costs.  After the Effective Date, no Bankruptcy Court order will be necessary for any Defense Cost Notice for Defense Costs incurred.  The Trustee shall reimburse NOR and any D&O Trust Claim Holder promptly upon submission of a Defense Cost Notice and the Trustee's determination that such Defense Costs are valid.  Such claims shall be processed as soon as received by the Trustee and paid on a FIFO Order.  In the event the Trustee has questions regarding the

reasonableness of any D&O Defense Cost Notice, the Trustee shall so advise the D&O Trust Claim Holder within ten (10) business days of receipt of the Defense Cost Notice.

## ARTICLE 5

## MISCELLANEOUS

5.1     **Amendments.**   Except as otherwise provided herein, the Trustee may not amend, modify, delete, or add to any provisions of this TDP.

5.2     **Severability.**   Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP. Should any provision contained in this TDP be determined to be inconsistent with or contrary to NOR's obligations to any insurance company providing insurance coverage to NOR in respect of any D&O Trust Claims, no payment shall be made by the D&O Trust in respect of any such claim from proceeds from said insurance coverage.

5.3     **GOVERNING LAW.   EXCEPT FOR PURPOSES OF DETERMINING THE LIQUIDATED VALUE OF ANY D&O TRUST CLAIM, ADMINISTRATION OF THIS TDP SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.** ARTICLE 1 DEFINITIONS AND CONSTRUCTION OF TERMS

ARTICLE 2     TREATMENT OF ALLOWED ADMINISTRATIVE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS ............ 22 26

ARTICLE 3     CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................................................................... 24 29

ARTICLE 4      TREATMENT OF CLAIMS AND EQUITY INTERESTS ......... ~~25~~29

ARTICLE 5      MEANS OF IMPLEMENTATION AND EFFECT OF
CONFIRMATION OF PLAN ....................................................... ~~32~~38

ARTICLE 6      IMPLEMENTATION OF THE D&O TRUST ............................ ~~37~~45

ARTICLE 7      VOTING AND DISTRIBUTIONS; AND TREATMENT OF
DISPUTED, CONTINGENT AND UNLIQUIDATED
CLAIMS AND EQUITY INTERESTS ....................................... ~~41~~49

ARTICLE 8      EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
INDEMNIFICATION CLAIMS; AND RETIREE BENEFITS .... ~~44~~53

ARTICLE 9      CORPORATE GOVERNANCE, MANAGEMENT AND
STRUCTURE OF REORGANIZED DEBTOR............................ ~~46~~55

ARTICLE 10      EXCULPATION, INJUNCTIONS, AND DISCHARGE ............. ~~47~~57

ARTICLE 11      EFFECTIVENESS OF THIS PLAN ........................................... ~~51~~60

ARTICLE 12      REGULATION................................................................................ ~~54~~64

ARTICLE 13      RETENTION OF JURISDICTION............................................... ~~54~~64

ARTICLE 14      MISCELLANEOUS PROVISIONS............................................ ~~55~~65

EXHIBITS

EXHIBIT A      CERTIFICATE OF INCORPORATION OF REORGANIZED
DEBTOR

EXHIBIT B      FORM OF INSURANCE ASSIGNMENT AGREEMENT

EXHIBIT C      D&O POLICIES

EXHIBIT D      D&O PROTECTED PARTIES SETTLEMENT
AGREEMENT

EXHIBIT E      NORTHWESTERN CORPORATION D&O TRUST
AGREEMENT

EXHIBIT F      NORTHWESTERN CORPORATION D&O TRUST
DISTRIBUTION PROCEDURES

Document comparison done by DeltaView on Friday, May 14, 2004 2:03:42 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://atlanta/1005339/12 |
| Document 2 | pcdocs://atlanta/1005339/20 |
| Rendering set | PHJW Standard |

| Legend: | |
|---|---|
| **Insertion** | |
| ~~Deletion~~ | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 272 |
| Deletions | 917 |
| Moved from | 11 |
| Moved to | 11 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 1211 |