**EXHIBIT "B"**

A. Clifford Edwards
Triel D. Culver
John Heenan
EDWARDS, FRICKLE,
ANNER-HUGHES & CULVER
1601 Lewis Avenue, Suite 206
P.O. Box 20039
Billings, MT 59104
(406) 256-8155

Attorneys for Plaintiffs

## MONTANA SECOND JUDICIAL DISTRICT COURT,
## BUTTE-SILVER BOW COUNTY

| | |
|---|---|
| Lester E. AMMONDSON, Catherine COUTURE (as surviving spouse of James W. Couture); Sherwood CHRISTENSEN, W. Stephen DEE; Charles GILDER; John A. LAHR; Edmond MAGONE; Elmer MELDAHL; John S. MILLER; Roger L. RAWLS; C. Daniel REGAN; Allen T. SMITH; George A. THORSON; John B. VAN GELDER; and Wilhelmus C. VERBAEL,<br><br>                                   Plaintiffs,<br><br>                v.<br><br>NORTHWESTERN CORPORATION; Gary G. DROOK, individually and as corporate officer of Northwestern Corp.; Michael J. HANSON, individually and as corporate officer of Northwestern Corp.; Roger P. SCHRUM, individually and as corporate officer of Northwestern Corp.; Keith KOVASH, individually and as corporate officer of Northwestern Corp.; Kendall G. KLIEWER, individually and as corporate officer of Northwestern Corp.; and PAUL, HASTINGS, JANOFSKY & WALKER, LLP, a California limited liability partnership,<br><br>                                   Defendants. | Cause No: DV-05-97<br><br>Judge John W. Whelan<br><br>**PLAINTIFFS' THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

COME NOW, Plaintiffs, and each of them, by and through their counsel of record, the Edwards Law Firm, and complain and allege against Defendants as follows:

## PARTIES

1.      Plaintiffs Lester E. Ammondson, Sherwood Christensen, W. Stephen Dee, Charles Gilder, John A. Lahr, Edmond Magone, Elmer Meldahl, John S. Miller, Roger L. Rawls, C. Daniel Regan, Allen T. Smith, George A. Thorson, John B. Van Gelder, and Wilhelmus C. Verbael are all longtime, retired employees of the former Montana Power Company, its subsidiaries or affiliates.

2.      Plaintiff Catherine Couture is the surviving spouse of James W. Couture, a longtime Montana Power Company employee. Plaintiff Couture, along with the individual Plaintiffs identified in Paragraph 1, are herein collectively referred to as "the Retirees."

3.      Defendant NorthWestern Corporation ("NorthWestern") is a Delaware corporation whose principal office is located in Sioux Falls, South Dakota and is a provider of electricity and natural gas to approximately 608,000 customers in Montana, South Dakota and Nebraska. NorthWestern does substantial business in the State of Montana, providing gas and electricity to consumers throughout Montana.

4.      Defendants Drook, Hanson, Schrum, Kovash and Kliewer were employees of NorthWestern Corporation at all times relevant hereto, and are named in this Complaint in both their individual capacities and as agents in their corporate

capacities. Defendants, upon information and belief, were residents of South Dakota and Montana at all times pertinent to this action.

5    Defendant Paul, Hastings, Janofsky & Walker, LLP (hereafter "Paul Hastings") is a California limited liability partnership which "serves Fortune 500 and Forbes International 500 clients" through its "global law practice" of nearly 1,000 attorneys. Paul Hastings generated over $600,000,000 in revenue last year, making it one of the largest grossing law firms in the world. Paul Hastings advertises to potential corporate clients, through its website, its ability to "eliminate resistance that can slow [its clients] down." Paul Hastings is named in this Complaint individually and as an agent of NorthWestern Corporation.

## JURISDICTION

6.    Jurisdiction in the State of Montana is proper because:

a.    Several of the Retirees are residents of the State of Montana;

b.    At least one of the Defendants is a resident of the State of Montana;

c.    This action concerns contracts which were entered into in the State of Montana, and explicitly provide for the application of Montana law;

d.    The United States Bankruptcy Court for the District of Delaware, pursuant to its May 4, 2005 Order, transferred the determination of the Retirees' claims to this Court;

e.     Paul Hastings, through its attorneys, including but not limited to Tom Knapp (now NorthWestern's general counsel), represented NorthWestern in the purchase and acquisition of the Montana Power Company, a Montana company, and specifically negotiated the Unit Purchase Agreement ("UPA") on behalf of NorthWestern that mandated that NorthWestern "shall maintain and shall be responsible for . . . all current and future obligations of MPC . . . under any supplemental pension benefit or benefit replacement or restoration plan, program or individual agreement maintained by MPC;"

f.     NorthWestern, by and through its individually named officers Drook, Hanson, Schrum, Kovash, and Kliewer, has contacts with the State of Montana that are all substantial, continuous and systematic as they do substantial business within the State of Montana, exercising near monopolistic control over distribution of electricity and gas to Montana consumers;

g.     Paul Hastings contacts with the State of Montana are substantial, continuous and systematic as it, through its attorneys and employees, has, without limitation:[1] (1) made at least twelve trips to the State of Montana in the past three years, (2) performed over $600,000 in legal services to Montana residents in the past three years, (3) made formal *pro hac vice* appearances in four Montana actions over the past

---

[1] The Retirees incorporate by reference all filings made in their responses to Paul Hastings' Motion to Dismiss for Lack of Personal Jurisdiction and in their Motion for Sanctions as to the fraudulent affidavit of Paul Hastings' "ethics chairman" Carl Anderson. *See* ¶ 40, *infra*.

ten years, (4) billed on, but failed to file *pro hac vice* appearances, in several other Montana actions unbeknownst to the Montana Courts and in violation of Montana law; (5) represented the interests of monied foreign corporations (such as NorthWestern) in Montana on environmental, contractual, and other legal matters; (6) actively worked on regulatory matters before the Montana Public Service Commission and Montana Consumer Counsel, having billed NorthWestern for over $300,000 in legal fees in one year for matters related to the Montana Public Service Commission alone, (7) purposefully sent thousands of written, email and telephonic correspondence into the State of Montana, and (8) consulted and advised NorthWestern in 2000 in its purchase of the Montana Power Company and, in particular, compiled the list of the Retirees' pension contracts that NorthWestern assumed and ratified in Schedule 2.16(a) of the UPA.

       h.    Plaintiffs' claims arise from the commission of acts on the part of the Defendants which have resulted in the accrual of numerous and serious torts in the State of Montana, including the breach of Montana contracts, the tortious interference with Montana contracts, and numerous abuses of the legal process in the State of Montana or elsewhere which have resulted in the accrual of Montana torts;

       7.    Venue is proper in this District as the United States Bankruptcy Court for the District of Delaware specifically transferred this action on May 4, 2005 to this jurisdiction; several of the contracts were entered into in Silver Bow County; the

contracts specifically require the application of Montana law; the Miller contract states that "venue for any lawsuit shall be in Butte-Silver Bow County, Butte Montana"; several of the Plaintiffs reside in Butte-Silver Bow County, Defendant Kovash, upon information and belief, is a resident of Butte-Silver Bow County; and NorthWestern's Montana headquarters are located in Butte-Silver Bow County.

## GENERAL FACTUAL ALLEGATIONS

8.      Each and every one of the Retirees (except for Plaintiff Couture) is a party to a supplemental pension benefit contract or supplemental retirement agreement (hereinafter "pension contracts") entered into with the Montana Power Company, its subsidiaries or affiliates, negotiated and executed by the individual Retirees and Montana Power Company, its subsidiaries or affiliates, prior to January 1, 2002.

9.      James Couture was a party to a pension contract negotiated and executed by Mr. Couture and Montana Power Company prior to January 1, 2002; and his surviving spouse, Catherine Couture, is an intended beneficiary and successor to Mr. Couture's interest in such agreement.

10.     Each and every one of the Retirees' pension contracts constituted and continues to constitute a pension plan or pension benefits agreement applicable to Montana Power Company, its successors or assigns.

11.     All obligations of Montana Power Company, its subsidiaries or affiliates under each and all of the Retirees' pension contracts were, at the recommendation of

NorthWestern counsel, Paul Hastings (including then Paul Hastings' acquisition team member Tom Knapp), expressly assumed by NorthWestern under the Unit Purchase Agreement ("UPA") dated September 29, 2000, and closed in or around February of 2002, by and among NorthWestern, Touch America Holdings, Inc., and Montana Power Company.

12.    Each and every one of the Retirees' pension contracts remained in effect and was declared by NorthWestern to be "legal, valid, and binding agreement[s]" enforceable against NorthWestern after closing on the UPA.

13.    The cost of the payment obligations on each and every one of the Retirees' pension contracts were entirely recovered by NorthWestern in utility rates approved by the Montana Public Service Commission prior to closing on the UPA. Consequently, there is no cost to NorthWestern for the pension contracts and NorthWestern is unjustly enriched at the expense of Montana consumers for the non-payment of the obligations owed to the Retirees under their pension contracts.

14.    The costs (including administrative costs) of NorthWestern's payment obligations under each and every one of the Retirees' pension contracts has been offset by revenues received from rate payers in Montana and will continue to be offset until the next filed rate case in Montana.

15.    The Retirees' pension contracts provide for the recovery of attorney's fees by the prevailing party in the event of breach.

16.    On September 14, 2003, NorthWestern filed in the Delaware Bankruptcy Court a petition for bankruptcy under Chapter 11 of the Bankruptcy Code.

17.    Having represented NorthWestern for years, on September 14, 2003, Paul Hastings assumed the role of lead bankruptcy counsel for NorthWestern. Over the course of NorthWestern's foray into bankruptcy, Paul Hastings billed NorthWestern for over $13.5 million ($13,500,000) in legal fees, including hundreds of thousands of dollars researching, promoting and executing the termination of NorthWestern pension contracts, including those pertaining to these Retirees.

18.    On May 14, 2004, NorthWestern, by and through its agent, Paul Hastings, filed its First Amended Disclosure Statement in the Delaware Bankruptcy Court, which statement contemplated terminating Retirees' Contracts. Despite this contemplation, the Retirees were provided no notice that their pension contracts were in jeopardy.

19.    On August 18, 2004, NorthWestern, by and through its agent, Paul Hastings, filed its Second Amended Disclosure Statement in the Delaware Bankruptcy Court, which statement omitted any reference to Retirees' pension contracts and therefore contemplated assuming the Retirees' pension contracts.

20.    Although, in its public filings, NorthWestern and Paul Hastings were now taking the position that the Retirees' Contracts would not be rejected, behind closed doors, the NorthWestern Defendants and Paul Hastings were reviewing hundreds of pension contracts and other contracts which NorthWestern had legally ratified and

assumed, including the Retirees' pension contracts, with an eye towards breaching these contracts through the bankruptcy system. In fact, from the time NorthWestern entered bankruptcy in late 2003 until January 31, 2005, internal correspondence between NorthWestern and Paul Hastings demonstrates that they were actively searching for a justification to terminating the Retirees' pension contracts, including the theory that it was the Retirees who had failed to perform under their pension contracts and therefore should not be paid

21.    At the same time NorthWestern and Paul Hastings were actively seeking out pension and other retirement contracts which they could terminate, they were developing a bonus program for current NorthWestern officers and insiders, including Mr. Drook, Mr. Hanson, Mr. Schrum, and Mr. Knapp, as a "reward" for leading NorthWestern into bankruptcy and eliminating debts and obligations such as the pension contracts.

22.    On October 19, 2004, NorthWestern's bankruptcy plan was confirmed by the Delaware Bankruptcy Court. The plan was consummated on December 30, 2004, and the deadline for filing claims was set for January 30, 2005.

23.    In December of 2004, upon the advice and urging of Paul Hastings, NorthWestern ceased making payments to the Retirees under their pension contracts. In fact, prior to December of 2004, NorthWestern, by and through Paul Hastings, had already begun secretly preparing a Motion to Terminate the Retirees' pension contracts,

despite giving the Retirees no notice that their pension contracts were in jeopardy  Also upon the advice and urging of Paul Hastings, the stoppage of monthly benefits payments to these fifteen Retirees was done with no advanced warning to them.

24.    After NorthWestern's own deadline for claims had passed, on January 31, 2005, NorthWestern, by and through Paul Hastings, filed a Motion to Terminate[2] the Retirees' pension contracts.  The Motion to Terminate was premised upon the grounds that the Retirees' pension contracts, which NorthWestern had expressly assumed and had been paying under for several years, were not "legal, valid or binding agreements." Although NorthWestern and Paul Hastings willfully signed off on this factual assertion in court filings, behind closed doors it was conceded by both NorthWestern and Paul Hastings that this position was not only "weak," but an outright lie which directly contradicted the legal advice that Paul Hastings had previously provided to NorthWestern that "[NorthWestern] assumed these contracts pursuant to the UPA and the UPA specifically states that these agreements are valid."

25.    In filing the Motion to Terminate in Delaware, despite knowing that the Motion to Terminate was both legally and factually false, NorthWestern and Paul Hastings hoped and expected that the Retirees would be unable to find and afford competent, non-conflicted counsel who could defend their interests in the far away

---

[2] "Debtor's Second Motion (I) Authorizing Debtor to Terminate Certain Supplemental Retirement Agreements Pursuant to 11 U.S.C. '' 105(a) and 363; (II) Seeking Allowance of Certain Claims; and (III) Objecting To And Seeking To Disallow And Expunge Claim Number 825 Pursuant To 11 U.S.C. ' 502(b)(1)" otherwise referred to as the "Motion to Terminate."

Delaware Bankruptcy Court. Both NorthWestern and Paul Hastings filed the Motion to Terminate for the ulterior and illegal purpose of rejecting valid and legal pension contracts controlled by Montana law in a forum which they knew to be improper in an effort to illegally terminate their pension contracts by default and/or force the Retirees to "defend" their pension contracts in an improper forum at great financial and personal expense.

26.    On February 1, 2005 NorthWestern and Paul Hastings caused Keith Kovash to commit perjury by filing a Declaration in the United States Bankruptcy Court for the District of Delaware in support of NorthWestern's Motion to Terminate the pension contracts by stating in ¶ 10 that "a number of these agreements were in fact not legal, valid or binding agreements" when he also declared, under penalty of perjury, in ¶ 11 that NorthWestern had ratified the pension contracts under Section 5.04(h) of the UPA and "became responsible for the MPC Agreements." The legal validity of these pension contracts had been previously acknowledged by Paul Hastings and NorthWestern on January 20, 2005 and January 31, 2005.

27.    In February of 2005, NorthWestern, by and through Paul Hastings, drafted letters to the Retirees, offering to settle their claims for "Class 9 shares," which NorthWestern and Paul Hastings knew to be worth substantially less than their stated value. NorthWestern and Paul Hastings knew that the Disputed Claims Reserve was under funded and the amount of Class 9 shares set aside was inadequate to make whole

the numerous creditors which NorthWestern had accrued before and during the bankruptcy proceedings, including the hundreds of retirees whose pension contracts were breached by NorthWestern in the bankruptcy proceedings. Despite having under funded the Disputed Claims Reserve, NorthWestern's senior management, with the assistance of Paul Hastings, pursued settlement of their own claims and received distributions from that reserve. Part of NorthWestern and/or Paul Hastings' strategy in the distribution of the February 2005 letters was to get those affected to settle their claims for less than they were truly worth. Moreover, the alleged allowed claim and distribution of stock was contingent on the Retirees favorable reception of NorthWestern's Motion to Terminate. NorthWestern threatened the Retirees in February 2005 prior to their response to the Motion to Terminate that if any of Retirees opposed NorthWestern's Motion to Terminate, they would not be entitled to anything.

28.    On March 31, 2005, in the Delaware Bankruptcy Court, the Retirees filed their Objection to NorthWestern's Motion to Terminate their pension contracts, as well as a counterclaim asserting that NorthWestern had breached their contracts and abused the legal process by the filing of the Motion to Terminate.

29.    On April 1, 2005, the Retirees filed this action in the Montana Second Judicial District Court ("the Montana action"), setting forth claims against NorthWestern for breach of contract and abuse of the legal process for its improper and fraudulent termination of their pension contracts. By letter dated March 31, 2005, the

Retirees specifically and explicitly informed NorthWestern that they were withholding service of process of the Montana action on the NorthWestern defendants until receiving approval from the Delaware Bankruptcy Court

30.    Between April 1 and April 8, 2005, NorthWestern and Paul Hastings continued to discuss a strategy for resolving the claims of parties, whose pension contracts had been illegally terminated, including these Retirees.    Because of the Retirees' unwillingness to accept less than what NorthWestern and/or Paul Hastings felt they deserved, NorthWestern and Paul Hastings set out a unified strategy to make the Retirees and their legal counsel understand that "they were going to have to fight in bankruptcy court in Delaware." At this point, Paul Hastings' partner Karol Denniston established a "core team" of herself, Paul Hastings' associates Lynda Noggle, Carolyn Chayadadhanangkur (aka "Keri") and Stephen Starr, and NorthWestern in-house counsel Wayne Harper, officed in Butte, Montana.    The "core team's" mission was to "shut out" the Retirees and their counsel and "lay the battle at their feet."

31.    On April 8, 2005, as part and parcel of their scorched-earth litigation strategy, NorthWestern, by and through Paul Hastings, sent the Retirees' counsel a demand letter threatening to take legal action against the Retirees if they continued to seek to assert a cause of action in Montana, including threatening the Retirees that they would be forced to pay NorthWestern's actual damages, including the attorney's fees of Paul Hastings, whose lawyers bill in excess of $500 per hour.

32.    On April 25, 2005, despite knowing that the Retirees would not serve NorthWestern until after the Delaware Bankruptcy Court had ruled on jurisdiction, NorthWestern, by and through Paul Hastings, filed a Verified Complaint against the Retirees in the Delaware Bankruptcy Court seeking actual damages, including attorney's fees, against these fifteen Retirees for daring to file a lawsuit against NorthWestern in Montana. The Verified Complaint was filed by NorthWestern, by and through Defendant Kliewer, and Paul Hastings for the ulterior purposes of forcing the Retirees to "defend" their pension contracts in an improper forum at great personal expense, coercing the Retirees to accept a settlement of their claims and pension contracts for less than they were worth, and/or forcing the dismissal of the Retirees' properly brought Montana action.

33.    On April 25, 2005, NorthWestern, by and through Paul Hastings, also filed a Motion For Order To Show Cause Pending Hearing And Preliminary Injunction Staying State Court Action requesting that sanctions be imposed against the Retirees for daring to file a lawsuit in Montana against NorthWestern. Along with the Motion for an Order to Show Cause, NorthWestern, by and through Paul Hastings, filed a Motion to shorten the time for Retirees to respond and requesting that they defend themselves in Wilmington, Delaware with just eight days advance notice. NorthWestern, by and through Paul Hastings, filed the motion for sanctions for the ulterior purposes of forcing the Retirees to "defend" their pension contracts in a distant, improper forum at

great personal expense, coercing the Retirees to accept a settlement of their claims and pension contracts for less than they were worth, and/or forcing the dismissal of the Retirees' properly brought Montana action which the Retirees specifically informed NorthWestern would not be served until jurisdictional issues were resolved.

34    On May 3, 2005, the Delaware Bankruptcy Court held a hearing in Wilmington, Delaware, regarding, among other things, NorthWestern's Motion to Terminate the Retirees' pension contracts, NorthWestern's Verified Complaint against the Retirees, and NorthWestern's motion for sanctions against the Retirees. At the hearing, NorthWestern, by and through Paul Hastings, admitted that the Retirees had never received notice that their pension contracts were in jeopardy.

35.    The following day, May 4, 2005, the Delaware Bankruptcy Court issued an order and memorandum opinion wherein the Court found that the Retirees' had not been afforded due process because they had never received notice that their pension contracts were in jeopardy and the pension contracts had passed through the reorganization process binding NorthWestern to the obligations. The Court found NorthWestern's arguments to be "specious." Accordingly, the Delaware Bankruptcy Court dismissed NorthWestern's Verfied Complaint, denied NorthWestern's Motion for Order to Show Cause Pending Hearing and Preliminary Injunction, and refused to terminate the Retirees' pension contracts and, instead, abstained resolution of the issues in favor of this Montana Court.

36    In May of 2005, after nearly six months of not paying the Retirees their monthly supplemental pension payments, NorthWestern began to reconsider its position and presented to its Board of Directors the possibility of resuming the Retirees' monthly payments under their now-breached pension contracts. Ultimately, however, NorthWestern, as directed by Paul Hastings, continued on their course of contact in not making the required payments to the Retirees

37.    On May 13, 2005, NorthWestern, by and through Paul Hastings, appealed the Delaware Bankruptcy Court's decision, which appeal is currently pending in the United States District Court for the District of Delaware. NorthWestern, by and through Paul Hastings, filed and maintained an appeal for the ulterior purposes of forcing the Retirees to "defend" their pension contracts in an improper forum at great personal expense, coercing the Retirees to accept a settlement of their claims and pension contracts for less than they were worth, defeating prompt resolution of this Montana action, and defeating the Retirees' malicious prosecution claim in Montana.

38.    On June 6, 2005, the NorthWestern Defendants filed a motion to dismiss the Retirees' claims against them in the Montana action. In its brief in support of this motion, the NorthWestern Defendants took the position that the Retirees' pension contracts could be terminated by NorthWestern at any time because "the continued funding or termination of funding of [the Retirees'] contracts was to be in the sole discretion of . . . NorthWestern." Although the NorthWestern Defendants, by and

through NorthWestern's general counsel, took the position that NorthWestern was free to terminate the Retirees' pension contracts at will, NorthWestern, by and through Paul Hastings, had previously assumed the pension contracts and acknowledged in internal documents during the bankruptcy proceeding that "the contracts cannot be rejected" Thus, the NorthWestern Defendants took positions in their filings in the Montana action which they knew to be false in violation of Rule 11, Montana Rules of Civil Procedure. The NorthWestern Defendants, by and through NorthWestern's counsel, filed the motion to dismiss and supporting briefs for the ulterior purposes of attempting to cause valid and binding contracts to be terminated and attempting to defeat prompt resolution of this Montana action on its merits.

39.    On November 29, 2005, almost a year after NorthWestern had ceased making required pension benefit payments to the Retirees under the terms of their pension contracts, NorthWestern, by and through Defendant Kovash, sent correspondence directly to the Retirees (circumventing their legal counsel) informing them that NorthWestern had now taken the position that it would be making monthly payments to them "in accordance with the terms of [their] agreements." NorthWestern's "resumption" of payments under contracts which it had previously materially breached was done in an effort to undercut the Retirees' Montana action and was, in effect, an admission of guilt and fault.

40.    On December 2, 2005, the Montana Court granted the Retirees leave to name Paul Hastings as a party defendant in this matter. Paul Hastings was served with process on December 19, 2005.

41.    On January 17, 2006, Paul Hastings made its appearance in the Montana action by moving to dismiss the Retirees' claims against it on the basis that the bankruptcy court had exclusive jurisdiction and the Montana Court "lacked" jurisdiction over it. Paul Hastings' motion was based on the affidavit of Carl Anderson, a partner and chair of Paul Hastings' "ethics committee." In his affidavit, Mr. Anderson set forth several factual allegations which were untruthful and misleading in violation of Montana's Rules of Civil Procedure and Professional Ethics. Mr. Anderson's affidavit was a continuation of Paul Hastings' previously devised strategy of "shutting out" the Retirees and "laying the battle at their feet," and for the ulterior and improper purposes of escaping resolution, on the merits, of the Retirees' claims against them in this Montana forum and in an effort to force the Retirees to "defend" their pension contracts in some other forum at great financial and personal expense.

42.    This matter is ongoing. The Retirees reserve the right to conform the pleadings to the evidence which is developed between now and the trial date, and any and all further manipulations and/or abuses of the legal process shall be considered further evidence of Defendants' tortious conduct, and therefore admissible at trial in this matter.

### COUNT I - BREACH OF CONTRACT

43    The Retirees repeat and reallege Paragraphs 1 through 42.

44.    NorthWestern, as a party to and administrator of the Retirees' pension contracts, had a special relationship with each and every one of the Retirees as defined in *Story v. Bozeman*, 242 Mont. 436, 791 P.2d 767 (1990), and NorthWestern therefore owed a special duty to each and all of the Retirees.

45.    NorthWestern was required under the Unit Purchase Agreement to assume, and make monthly installment payments under, each and all of the Retirees' respective pension contracts.

46.    NorthWestern, by and through its agents, has materially breached each and all of the Retirees' pension contracts by its failure and refusal to make required monthly installment payments under each and all of the Retirees' respective pension contracts from December of 2004 until November of 2005.

47.    Each and all of the Retirees has been injured and suffered damages as the result of NorthWestern's material breach of their pension contracts, and are entitled to recover for all damages allowable by law, including, without limitation, acceleration of payments, attorneys' fees and costs, and any and all damages allowed under *Story v. Bozeman.*

### COUNT II - BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

48.    The Retirees repeat and reallege Paragraphs 1 through 47.

49.    NorthWestern, as a party to and administrator of the Retirees' pension contracts, had a special relationship with each and every one of the Retirees as defined in *Story v. Bozeman*, 242 Mont. 436, 791 P.2d 767 (1990), and NorthWestern therefore owed a special duty to each and all of the Retirees.

50.    Each and every one of the Retirees' pension contracts contained an implied obligation of good faith and fair dealing requiring NorthWestern to exercise honesty in fact and observe reasonable commercial standards of fair dealing by law.

51.    NorthWestern, by and through its agents, breached the Retirees' pension contracts by failing to exercise honesty in fact and observe reasonable commercial standards of fair dealing by law, in that it:

a.    Failed to give the Retirees any notice or opportunity to participate in the reorganization proceedings before the Debtor's plan was confirmed or became effective;

b.    Caused the issuance of huge, unjustified stock bonuses and/or other perquisites to NorthWestern executive insiders following plan confirmation, which adversely affected NorthWestern's cash position, thereby leading to the executives' attempts to wrongfully terminate the Retirees' pension contracts which were wholly recovered in rates and thus, the executives misappropriated the Retirees' money for the own uses;

c.    Caused unjustified, intentional stoppage of required monthly installment payments under the Retirees' pension contracts;

d.    Misrepresented to the Retirees, the Courts, and the public the nature, bases, terms and provisions of the Retirees' pension contracts, misrepresented the effects of the proposed terminations on NorthWestern's rate structure, and on the estate and creditors, and utterly disregarded the rights of the Retirees under their pension contracts; and

e.    Exerted, and continues to exert, pressure on the Retirees under implied and explicit threats of further unjustified legal actions against them to coerce acceptance by the Retirees of grossly inadequate non-cash remittances proposed to be made for termination of the Retirees' pension contracts.

52.    As a direct result of NorthWestern's actions, by and through its agents, NorthWestern has caused the Retirees severe financial and emotional hardship and duress, and despite possessing such knowledge, NorthWestern and its agents have persisted in callous disregard of the rights of the Retirees, and, in fact, have attempted to seize on the hardship which it has caused the Retirees for its own improper purposes.

53.    As a result of NorthWestern and its agents' conduct as described herein, the Retirees have been damaged and are entitled to all damages proximately caused by the breach of the implied covenant of good faith and fair dealing, including, but certainly not limited to, exemplary and punitive damages in amounts sufficient to punish NorthWestern and its agents' conduct.

### COUNT III - TORTIOUS INTERFERENCE WITH CONTRACT

54      The Retirees repeat and reallege Paragraphs 1 through 53.

55.     Each and every one of the Retirees entered into pension contracts which NorthWestern explicitly assumed under its Unit Purchase Agreement with the Montana Power Company.

56.     In December of 2004, NorthWestern, by and through its agents, refused to perform under each and every one of the Retirees' pension contracts by ceasing to make required monthly installment payments.

57.     NorthWestern's refusal to perform was induced by the unlawful and malicious acts of its agents, including Defendant Drook, Defendant Hanson, Defendant Schrum, Defendant Kovash, Defendant Kliewer, and Defendant Paul Hastings.

58.     The unlawful and malicious acts of Defendant Drook, Defendant Hanson, Defendant Schrum, Defendant Kovash, Defendant Kliewer, and Defendant Paul Hastings, in causing the Retirees' pension contracts to be materially breached by NorthWestern, have resulted in serious and severe damages to the Retirees in an amount to be determined at trial.

### COUNT IV - ABUSE OF PROCESS

59.     The Retirees repeat and reallege Paragraphs 1 through 58.

60.     NorthWestern, by and through its agents Defendant Drook, Defendant Hanson, Defendant Schrum, Defendant Kovash, Defendant Kliewer, and Defendant

Paul Hastings, have manipulated and abused the legal process in, but not limited to, the following manners:

    a.    Filing a motion to terminate the Retirees' pension contracts in the Delaware Bankruptcy Court;

    b.    Filing a Verified Complaint against the Retirees in the Delaware Bankruptcy Court;

    c.    Filing false declarations in the Delaware Bankruptcy Court;

    d.    Filing a motion to show cause in the Delaware Bankruptcy Court requesting that sanctions be imposed against the Retirees;

    e.    Filing an appeal of the Delaware Bankruptcy Court's order transferring the adversary proceedings to the State of Montana;

    f.    Filing a motion to dismiss in the Montana action;

    g.    (As to Paul Hastings only) Filing a false and misleading affidavit by Paul Hastings' "ethics chairman" in support of a motion to dismiss for lack of personal jurisdiction.

    61.    NorthWestern, by and through its agents Defendant Drook, Defendant Hanson, Defendant Schrum, Defendant Kovash, Defendant Kliewer, and Defendant Paul Hastings, filed the various baseless and untenable legal documents for the ulterior purposes of, without limitation, forcing the Retirees to "defend" their pension contracts in an improper forum at great personal expense, coercing the Retirees to accept a

settlement of their claims and pension contracts for less than they were worth, and/or forcing the dismissal of the Retirees' properly brought Montana action, all of which constitute uses of the legal process which are illegal and/or unintended.

62.    The Retirees have suffered serious and severe damages as a result of Defendants conduct in an amount to be determined at trial.

### COUNT V - MALICIOUS AND FRAUDULENT CONDUCT

63.    The Retirees repeat and reallege Paragraphs 1 through 62.

64.    In addition to all compensatory damages (e.g. emotional distress and the value of pension contracts) available under Montana law to these Retirees for the claims pled herein; these Retirees are entitled to an award of substantial punitive damages against Defendants, and each of them, under Mont. Code Ann. § 27-1-221. The Retirees allege that the beginning measure of that damage should be whatever the true monetary amount the executives have set aside for themselves; such amount of millions of dollars should be taken from them, individually or from the corporate treasury, or both, and be awarded to these Plaintiffs; as well as a fair portion of the over $13.5 million which Defendant Paul Hastings firm charged for its attorneys' fees in the far away Delaware Bankruptcy Court.

65.    The Retirees further allege that the jury should decide whether simply that amount is proper; or, whether a multiple of that amount from Defendants, and each of them, might be more fair, appropriate, and just under these circumstances, and

to fulfill the purposes and office of Punitive Damage, which is to punish and make example and deter others in similar circumstances as these Defendants, from such misconduct.

66.    All statutory "limitations" that Defendants may attempt to assert, including those set forth in § 27-1-220(3), MCA, which purports to limit each of the Retirees' maximum recovery to $10 million dollars, are unconstitutional as to these Retirees and are, therefore, void and unenforceable. The grounds include, but are not limited to: 1) granting special privileges and immunities in violation of Art. II, Sec. 31; 2) creating special legislation in violation of Art. V, Sec. 12 (by specially protecting inanimate legal entities); violating the Right to Trial as guaranteed by Art. II, Sec. 26; and 4) violating Substantive Due Process under Art. II, Sec. 17.

67.    The Retirees further allege that they are entitled, under these circumstances, to an award of interest on monies they have wrongfully been deprived, together with all costs and attorney fees incurred by these Retirees due to Defendants' wrongful and malicious acts that have caused them emotional and financial distress. In particular, the Retirees are entitled to attorneys' fees and costs incurred as a result of having to defend themselves against NorthWestern's wrongful and malicious acts in Bankruptcy Court on the eastern shores of the Delaware River in Wilmington, Delaware, all as orchestrated and directed by Northwestern, its officers, and its counsel, Paul Hastings.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs make demand against Defendants, and each of them, for all compensatory and other damages available under Montana law together with interest on money wrongfully deprived from them, and an award of substantial punitive damages, together with attorney fees, all of which the Court and the jury might find appropriate and fair under these sad circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury of all issues so triable.

DATED this 31st day of March, 2006.

EDWARDS, FRICKLE,
ANNER-HUGHES & CULVER

By:_____
A. Clifford Edwards
Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that on the $\underline{13th}$ day of April, 2006 a copy of the foregoing was duly deposited within the U.S. Mail, postage prepaid, to the following counsel of record:

Keith Strong
Dorsey & Whitney
P.O. Box 1566
Great Falls, MT 59403

E. Wayne Harper
40 East Broadway Street
Butte, MT 59701